**MARKMAN LAW**
DAVID MARKMAN (Nevada Bar. No. 12440)
David@Markmanlawfirm.com
4484 S. Pecos Rd. Suite #130
Las Vegas NV 89121
Telephone: 702-843-5899
Facsimile: 702-843-6010

**GUTRIDE SAFIER LLP**
SETH A. SAFIER (*pro hac vice*)
seth@gutridesafier.com
MARIE A. MCCRARY (*pro hac vice*)
marie@gutridesafier.com
HAYLEY REYNOLDS (*pro hac vice*)
hayley@gutridesafier.com
KALI BACKER (*pro hac vice*)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT FOR NEVADA

| | |
|---|---|
| EVERETT BLOOM, JACK GRAHAM, AND DAVE LINDHOLM on behalf of themselves, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ZUFFA, LLC; ENDEAVOR STREAMING, LLC and ENDEAVOR GROUP HOLDINGS, INC.<br><br>Defendants. | CASE NO. 2:22-cv-00412-RFB-BNW<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Everett Bloom, Jack Graham, and Dave Lindholm (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Zuffa, LLC, Endeavour Streaming, LLC and Endeavour Group Holdings, Inc. (collectively, "Defendants"). Plaintiffs' allegations against Defendants are based upon information and belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## INTRODUCTION

1. This is a class action suit brought against Defendants Zuffa, LLC ("Zuffa"), Endeavour Streaming, LLC ("Endeavor Streaming") and Endeavour Group Holdings, Inc. ("Endeavour Group") for knowingly disclosing UFC Fight Pass users' personally identifiable information to Facebook without obtaining user consent. Unbeknownst to UFC Fight Pass users, each time they use the UFC Fight Pass to watch a video, Defendants knowingly disclose their personally identifiable information—including the user's Facebook ID and a record of every video viewed by the user—to an unrelated third party. In addition to demonstrating a disregard for users' privacy rights protected by the California Constitution, Defendants' actions violate the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), which prohibits companies from disclosing their customers' video viewing records to third parties without express written consent and the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*

2. Endeavor Group owns the wildly popular Ultimate Fighting Championship ("UFC") mixed martial arts enterprise. Fans of the UFC can watch UFC video content by subscribing to the online streaming platform that Endeavor Holdings runs through its subsidiary, Zuffa, called UFC Fight Pass. The UFC Fight Pass makes video content available through a mobile application and the Fight Pass Website (ufcfightpass.com). Zuffa operates the UFC Fight Pass, and its sister company, Endeavor Streaming, writes the code that shows the videos on the Fight Pass Website. Defendants do not disclose to consumers that they share users' personally identifiable information, including their Facebook IDs and information about videos requested or obtained, with Facebook, nor do Defendants obtain users' informed, written consent to do so.

3. Facebook created software code, which it offered to its customers such as Defendants, which is designed to track consumers' behavior on the customer websites. When the Facebook code was integrated into the Fight Pass Website, the code causes certain information about the consumers' interactions with the Fight Pass Website to be sent to Facebook. The information is valuable to Facebook because Facebook uses the information to profile consumers and target advertisements to them. Facebook's customers, like Defendants, can also use the information (and the tools provided by Facebook that incorporate the user information) to track consumers' behavior and send them targeted ads.

4. Facebook sets defaults on the categories of information the software code sends to Facebook, including the URLs of the websites a consumer views and the consumer's unique Facebook ID that Facebook assigns to him or her.[1] Third parties can use Facebook IDs to identify particular consumers' names and to obtain other sensitive information, without consumers' knowledge or consent. Facebook further states that Facebook IDs "[a]llow someone with the ID to see your profile."

5. Unbeknownst to consumers, Defendants designed the webpages on the Fight Pass Website to include Facebook's software code that causes the user's browser to communicate with Facebook when the user loads one of the webpages. Although consumers watching videos using the UFC Fight Pass intend to and reasonably expect that they are communicating with Zuffa, this code enables Facebook's computer network to collect and track information about the consumer's behavior on the site. Thus, when a consumer logs into the UFC Fight Pass and clicks on a video, Defendants disclose to Facebook, through the code, the consumer's Facebook ID, the URL of the website hosting the video, which includes the name of the video the consumer requests or obtains, and the fact that the website viewed contains video content simultaneously.

6. Defendants do not inform consumers that they share consumers' sensitive information with Facebook, let alone obtain their consent.

---

[1] https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last accessed 2/9/22).

7. In doing so, Defendants violate the VPPA in a number of ways. First, they fail to obtain consumers' informed, written consent prior to disclosing their personally identifiable information to Facebook. The VPPA requires that informed consent must be obtained in a form distinct and separate from any form setting forth other legal or financial obligations of the consumers. Defendants fail to do this. Second, because Defendants do not get consumers' informed, written consent, Defendants also do not allow consumers to elect between giving consent at the time of the disclosure or in advance of a set period of time, not to exceed two years or until consent is withdrawn in violation of the VPPA. Finally, Defendants do not provide consumers with an opportunity, in a clear and conspicuous manner, to withdraw consent on a case-by-case basis or to withdraw from any disclosures, at the consumers' election.

## **PARTIES**

8. Plaintiff Everett Bloom is, and at all times alleged in this First Amended Class Action Complaint was, an individual and domiciled in Mission Viejo, California.

9. Plaintiff Jack Graham is, and at all times alleged in this First Amended Class Action Complaint was, an individual and domiciled in Oak Ridge, Florida.

10. Plaintiff Dave Lindhom is, and at all times alleged in this First Amended Class Action Complaint was, an individual and domiciled in Centennial, Colorado.

11. Defendant Zuffa, LLC ("Zuffa") is a limited liability corporation existing under the laws of Nevada, with its principal place of business in Las Vegas, Nevada. Zuffa is wholly owned by Endeavor Group Holdings, Inc. Zuffa, LLC directs the marketing and advertising activities that utilize the Facebook pixel, and manages the events that trigger the Facebook pixel.

12. Defendant Endeavor Streaming, LLC ("Endeavor Streaming") is a limited liability corporation existing under the laws of Delaware, with its principal place of business in New York. Endeavor Streaming writes the code that shows videos on the Fight Pass Website. It is wholly owned by Endeavor Group, and it powers the Fight Pass platform.[2]

---

[2] *See* Prospectus dated April 28, 2021, *available at* https://www.sec.gov/Archives/edgar/data/1766363/000119312521144936/d156166d424b4.htm

13. Defendant Endeavor Group Holdings, Inc. ("Endeavor Group") is a corporation existing under the laws of Delaware, with its principal place of business in Beverly Hills, California. Endeavor Group is an umbrella organization that operates its business through its wholly owned subsidiaries, which include Zuffa and Endeavor Streaming. Endeavor Group touts itself as "one of the largest independent global distributors of sports video programming and data."[3] It further states that it "provide[s] streaming video solutions… via Endeavor Streaming." *Id*. It states that it "built and acquired streaming service capabilities via Endeavor Streaming to provide critical infrastructure to support" its entertainment platforms like Fight Pass. *Id*.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2)(A) because: (i) there are 100 or more class members, and (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs.

15. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over the federal claim under the Video Privacy Protection Act.

16. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

17. The Court has personal jurisdiction over Zuffa because Zuffa's principal place of business is in Las Vegas, Nevada and it conducts substantial business within the state of Nevada.

18. The Court has personal jurisdiction over Endeavor Streaming because it conducts substantial business within the state of Nevada, including with Zuffa, which has its principal place of business in Nevada. Specifically, Endeavor Streaming solicited business in Nevada when it entered into its contract with Zuffa to provide the technology that powers the Fight Pass platform. Further, Zuffa worked with Endeavor Streaming to build the Fight Pass Website. In particular, Endeavor Streaming writes the code for the Fight Pass Website and addresses technological problems that arise on the Fight Pass Website. In the course of providing these

[3] *See* Prospectus dated April 28, 2021, *available at* https://www.sec.gov/Archives/edgar/data/1766363/000119312521144936/d156166d424b4.htm

services, Endeavor Streaming regularly communicates and works alongside Zuffa employees located in Nevada. Endeavor Streaming attends conferences in Las Vegas, including the 2023 NAB, to court new customers for its streaming services.

19. The Court has personal jurisdiction over Endeavor Group because it conducts substantial business within the state of Nevada. Specifically, it is registered as a foreign corporation that does business in the state of Nevada, according to the Nevada Secretary of State's website. Endeavor Group has multiple subsidiaries that are incorporated in Nevada, including Zuffa.[4] Upon information and belief, Endeavor Group solicited business with Zuffa in Nevada in connection with its acquisition of the company in 2016 and to subsequently assist the development the Fight Pass platform. As explained above, the majority of Zuffa's employees are located in Nevada, and Endeavor Group regularly communicates with Zuffa employees located in Nevada in connection with its efforts to manage and monetize the Fight Pass platform. Indeed, much of the content featured on the Fight Pass platform was filmed in Nevada, including The Ultimate Fighter and other on-demand videos of live fights that occurred in Nevada.

20. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of Nevada. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products provided to persons and corporations in the State of Nevada. Defendants engage, and continue to engage, in substantial and continuous business practices in the State of Nevada, as explained above.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of Nevada, including within this District.

22. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

---

[4] These include: Zuffa Australia, LLC, Zuffa Brazil, LLC, Zuffa Canada, LLC, Zuffa Fitness, LLC, Zuffa International, LLC, Zuffa Ireland, LLC, Zuffa Landco, LLC, Zuffa Marketing, LLC, Zuffa Music, LLC, Zuffa Zen, LLC, Ultimate Fighting Productions, LLC, Ultimate Fighting Productions International, LLC, Forza, LLC, and Zuffa, LLC.

## SUBSTANTIVE ALLEGATIONS

23. Each of the Defendants is engaged in the business of the rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials. Endeavor Group provides video content streaming services to subscribers through Zuffa, which owns and operates the website, ufcfightpass.com ("Fight Pass Website). Endeavour Group oversees and operates the Fight Pass enterprise where marketing and technology functions are shared by both Zuffa and Endeavour Streaming, both of which are wholly-owned subsidiaries of Endeavour Group.

24. Endeavour Group directs Zuffa to handle marketing efforts related to Fight Pass while Endeavour Streaming provides the technology for the Fight Pass Website. Zuffa is, thus, the marketing and customer communications arm of the enterprise, and Endeavour Streaming actually writes the code for the Fight Pass Website. While Zuffa signs up customers, designs web site disclosures and print, and controls advertising decisions (including retargeting of ads to Fight Pass subscribers using subscriber data from the Facebook code), Endeavour Streaming provides the technology supporting the Fight Pass Website, including writing the code that enables subscribers to stream on-demand video content and making technical decisions about how that code interacts with Facebook pixels. These technology support services necessarily would have included configuring the URLs to include video titles.

25. As the parent company, Endeavour Group coordinates interactions between Zuffa and Endeavour Streaming, and both companies serve as agents of Endeavor Group. Upon information and belief, Endeavor Group directed Endeavour Streaming and Zuffa to enter into an agreement for Endeavour Streaming to provide technology support services, including writing the code for the Fight Pass Website.

26. The General Manager for the Fight Pass platform is a Zuffa employee, Crowley Sullivan. He stated with regard to Fight Pass that "Endeavor Streaming's platform is what we rely on to reach our fans throughout the world. They provide us with end-to-end tooling that not only enables us to monetize our content, but also identifies new fans, reduces churn, and helps us

understand our fans globally."[5] Endeavor Group similarly tells investors that that it "deliver[s] live streaming video and data feeds for more than 45,000 sports events annually, as well as for on-demand virtual sports products including our own UFC".[6]

27. Defendants Endeavor Group, Zuffa and Endeavor Streaming together engaged in systematic nationwide practice of invading subscribers' privacy by disclosing their personally identifiable information to Facebook. Defendants are equally liable for damages to Plaintiffs and subscribers nationwide since, among other things, they jointly operated the Fight Pass Website.

28. Through the Fight Pass Website, Defendants offer consumers a subscription to certain video content called the UFC Fight Pass. The UFC Fight Pass gives consumers access to videos of preliminary fights for pay-per-view events, on-demand video content, past fights, original series and shows, and other UFC video content.

29. Consumers who wish to sign up for a subscription to the UFC Fight Pass can do so by visiting the Fight Pass Website. To sign up for a UFC Fight Pass subscription, Zuffa presents consumers with a webpage that requires the consumer to select his or her desired UFC Fight Pass Plan on the Fight Pass Website in the following form:

[5] *See* https://www.endeavorstreaming.com/services/ (last accessed April 5, 2023).

[6] *See* Prospectus dated April 28, 2021, *available at* https://www.sec.gov/Archives/edgar/data/1766363/000119312521144936/d156166d424b4.htm




30. Consumers have two subscription options for the UFC Fight Pass: one is a monthly plan of $9.99 a month and the other is an annual plan of $95.99 per year. Once consumers select their desired subscription plan, the Fight Pass Website prompts consumers to provide their payment information as follows:



31. After the consumer completes the subscription sign-up process, the user can then access the UFC Fight Pass video content when they log in.

32. At no point in time – during the subscription process or thereafter – do Defendants inform consumers that they disclose to Facebook their personal information, including their unique Facebook ID and URLs with the titles of the videos they request or obtain, every time the consumer watches a video through the Fight Pass Website.

33. At no point in time – during the subscription process or thereafter – do Defendants obtain consumers' informed, written consent to the disclosure of their personally identifiable information to Facebook in a form distinct and separate from other forms setting forth other legal or financial obligations of the consumer, such as its privacy policy or terms of use.

34. At no point in time – during the subscription process or thereafter – do Defendants give consumers the right to elect between giving consent at the time of the disclosure or in advance of a set period of time, not to exceed two years or until consent is withdrawn. Nor do Defendants give consumers an opportunity, in a clear and conspicuous manner, for the consumer to withdraw from disclosures to Facebook on a case-by-case basis or to withdraw from ongoing Facebook disclosures at the consumer's election. As such, Defendants do not comply with their statutory obligations.

**Zuffa's Disclosure of Users' Video Watching History**

35. Unbeknownst to consumers, Zuffa with Endeavor Streaming and Endeavor Group designed the Fight Pass Website to include Facebook JavaScript software code through Google Tag Manager that causes the user's browser to communicate with Facebook when the user loads one of the UFC Fight Pass webpages. Although consumers watching videos on the UFC Fight Pass intend to and reasonably expect that they are communicating with the entities operating the Fight Pass Website (i.e., Defendants), this code enables Facebook's computer network to collect and track information about the consumer's behavior on the site. Thus, when a consumer logs into UFC Fight Pass and clicks on a video, Defendants disclose simultaneously to Facebook, among other things: (1) the consumer's identity (through a Facebook ID); (2) the complete URL that the

user visited, which includes the names of videos obtained or requested; and (3) the fact that UFC Fight Pass and the particular webpage viewed by the consumer hosts video content. Through the JavaScript code, Defendants knowingly disclose to Facebook the videos that each consumer with a Facebook account obtains or requests on the UFC Fight Pass.

36. The Fight Pass Website is run on an Akamai platform. Only employees from Zuffa and Endeavor Streaming have access to the Akamai platform and have the ability to make changes to the code on the Fight Pass Website. As explained above, during the class period, the URLs for the webpages on the Fight Pass Website contained the video title, and Defendants shared personally identifiable information with Facebook, in part, by causing the transmission of these URLs to Facebook along with the fact that webpage hosted video content. Endeavor Streaming wrote the code on the Fight Pass Website, which included designing the URLs to include the titles of the videos on the Fight Pass Website and the fact that the webpage contained video content. Without that work, video title information would not have been sent to Facebook.

37. Moreover, a Facebook ID is a unique identifier that Facebook assigns to every person who signs up for a Facebook account. With it, third parties can identify particular consumers and to obtain other sensitive information on their Facebook profiles, without consumers' knowledge or consent. A Facebook profile can also show other detailed information about a person, such as photos of the person, his or her city and state of residence, employer, job title, email address, birth date, gender, relationship status, family members, education history, and job history.

38. When a consumer’s information is sent to Facebook via the JavaScript code, Facebook utilizes the Facebook ID to obtain the identity of the consumer, and stores the information pertaining to his or her use of the Fight Pass Website on Facebook’s servers associated with the Facebook ID. Facebook then uses that information to enable advertisers to target ads to the consumer. Facebook summarizes how it receives information about consumers’ activity off Facebook as follows:




(https://www.facebook.com/off_facebook_activity (last accessed 2/8/22).)

39. Facebook provides comprehensive documentation to its advertising customers describing how to integrate the JavaScript code into their websites. Advertisers obtain the code by telling Facebook which website events they want to track (i.e., purchases, additions to cart, and/or product views) and Facebook returns corresponding Facebook code for the advertiser to incorporate into its website.

40. Generally, when a consumer with a Facebook account obtains or requests videos from the Fight Pass Website, the webpage containing the video loads and the Facebook JavaScript code on that page causes the user's browser to send to Facebook: (1) the URL of the webpage hosting the video, including the name of the video; (2) information disclosing that the URL hosts video content; and (3) the user's Facebook ID. This is done through a "GET Request," which is a message sent from the user's web browser to Facebook's server.

41. By way of example, when a consumer uses the Fight Pass Website to browse to a video of the fight between Silvana Gomez Juarez and Vanessa Demopoulos, the Facebook JavaScript code executes a GET request to Facebook's tracking URL "https://www.facebook.com/tr", and sends to it various querystring parameters and cookie values simultaneously, including the following:

| **Querystring Parameter / Cookie Value** | **Description** | **Example from the Juarez-Demopoulos Video** |
|---|---|---|
| c_user | the unique Facebook ID of the user | <<*varies depending on who views the video*>> |
| dl | the URL that the user | https://ufcfightpass.com/video/286731/silvana- |

| | | |
|---|---|---|
| | has visited | gomez-juarez-vs-vanessa-demopoulos-ufc-270?playlistId=9119 |
| ts | the Unix timestamp corresponding to the exact time the user viewed the video | *<<varies depending on when the user views the video>>* |
| cd[Meta] | metadata corresponding to the type of content that the user has viewed | {"title":"Video - UFC Fight Pass"} |

**<u>Both Facebook and Defendants benefit from the sharing of data</u>**

42. Defendants and Facebook both profit from the data derived from the Fight Pass Website's use of the Facebook JavaScript code. The code allows Facebook to amass an incredible amount of data on users by tracking, among other things, the webpages that they visit, including the webpages that host video content, and how long a user views each webpage. The more Facebook learns about user, the more it can develop a picture about who the user is, and the more it can target ads to the user.

43. The data is also valuable to Defendants. Facebook explains that the JavaScript code and Facebook's advertising system "allow you to show targeted ads to people who have already visited your site" and "[y]ou can choose to get really granular here."[7]

44. Targeted advertising plays an important role in generating profits for Defendants. There are a variety of ways in which Defendants can use the data. For example, because the UFC Fight Pass does not include pay-per-view main event fights, people who have the UFC Fight Pass have to pay additional fees to watch those fights. With the information obtained with the Facebook JavaScript code, Defendants can send targeted Facebook ads to UFC Fight Pass subscribers in an effort to convince them to buy pay-per-view events related to prior events they have viewed.

45. In fact, Endeavor Group explains in SEC filings that "[r]egulation of cookies and similar technologies, and any decline of cookies or similar online tracking technologies as a

---

[7] https://www.facebook.com/business/m/one-sheeters/facebook-pixel-events#:~:text=Autologged%20Events,measurement%2C%20optimization%2C%20and%20insights.

means to identify and potentially target users, may lead to broader restrictions and impairments on our marketing and personalization activities and may negatively impact our efforts to better understand users."

46. Endeavor Streaming has also observed the importance of tracking subscribers. It posted to its Twitter account on August 22, 2018, "Tracking data for #OTT platforms is more important than ever, says @Forbes"[8] and linked an article that explained: "The benefits of having that data are multifold: brands are able to run multiscreen addressable ad campaigns that are bought programmatically and networks have better data on who their users are and what shows they're watching, which allows them to make better programming decisions."

47. In another Twitter post from August 7, 2018, Endeavor Streaming wrote, "How will data make a splash in #OTT advertising?/bit.ly/2MaYond #SSAI #TargetedAdvertising." The post linked to an Adweek article that explained: "Achieving OTT addressability requires having true precision targeting at the household level and then down to the viewer level. This is done by collecting viewer data and analysis of viewer data into audience segments, such as auto intenders or travel enthusiasts. Those segments are then applied to advertiser campaigns. With the use of real-time dynamic ad insertion and ad decisioning, the ad is then delivered to the person depending on the audience group that they fall into."

48. The same day, Endeavor Streaming posted again on Twitter, saying "To pull past the competition in the thriving #OTT industry, you need to effectively market your service and know who your viewers are – and we're not just talking about their names."

49. Facebook further tells its advertising customers that when its JavaScript code is integrated into the website, it "will log when someone takes an action on your website. Examples of actions include adding an item to their shopping cart or making a purchase." The code "receives these actions, or events" which the customer can view on its Events Manager page. On that page, Facebook's customers can "see the actions that your customers take" and can "reach

[8] "OTT" refers to over-the-top streaming services like Netflix and Fight Pass.

those customers again through future Facebook ads."[9]

50. Facebook designs the Facebook JavaScript code such that the webpages that a user views are sent to Facebook. It explains: "page views on your website are automatically logged and collected for Facebook Analytics unless you disable automatic event logging."[10] The event is helpful to Facebook for "targeting, measurement, optimization, and insights."

51. Thus, Defendants could have stopped sending Facebook information about the webpages that hosted videos that users view on the UFC Fight Pass by disabling the automatic logging of the page views. But they chose not to. Instead, they knowingly sent Facebook information about videos users request or obtain because it is profitable for it to do so.

## PLANTIFFS' EXPERIENCES

### A. Everett Bloom

52. Plaintiff Everett Bloom has paid for a monthly subscription to the UFC Fight Pass since at least December 2021.

53. After Plaintiff Bloom subscribed to the UFC Fight Pass, he watched multiple videos of fights and other content offered through the UFC Fight Pass on his laptop computer and other devices, including through Chrome. Plaintiff Bloom had a Facebook account before he subscribed to the UFC Fight Pass. Consequently, Plaintiff Bloom's personally identifiable video information, including his Facebook ID and the URLs with the name of video content he watched and/or obtained were disclosed to Facebook as described above.

54. Although Plaintiff Bloom was not aware of it at the time, after he logged into his UFC Fight Pass, the web pages on the UFC Fight Pass contained Facebook JavaScript code, which caused his browser to load and execute the code. Although it was not disclosed to Plaintiff Bloom, when he clicked on a link to a page that hosted video content with the UFC Fight Pass, the Facebook JavaScript code: (i) caused his browser to establish a connection with Facebook's

---

[9] https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed 2/9/22).

[10] https://www.facebook.com/business/m/one-sheeters/facebook-pixel-events#:~:text=Autologged%20Events,measurement%2C%20optimization%2C%20and%20insights. (last accessed 2/9/22).

computer network; and (ii) sent to Facebook Plaintiff Bloom's Facebook ID and the URL of the webpage hosting the video content, which included the name of the video he obtained or received. Thus, when Plaintiff requested or obtained videos within the UFC Fight Pass, his private information was sent to Facebook's computer network, where it was stored, analyzed, and/or processed.

55. Plaintiff Bloom logged into his Facebook account and looked at his "Off-Facebook Activity" before filing suit. It revealed that "ufcfightpass.com" is sharing his information with Facebook.

56. Plaintiff Bloom did not provide consent to Defendants to share his personally identifiable video information with Facebook. Plaintiff Bloom also did not provide consent to Defendants to share with Facebook his Facebook ID and URLs with the name of the videos he received or obtained through the UFC Fight Pass. When Plaintiff Bloom clicked on links to video content within the UFC Fight Pass, he did not know that Defendants would share with Facebook information sufficient to show what videos he personally received or obtained on the UFC Fight Pass.

57. At no time during the checkout process did Defendants obtain Plaintiff Bloom's informed, written consent in a form that was separate and distinct from other forms setting forth Plaintiff Bloom's other legal and financial obligations to Defendants, such as the privacy policy and terms of use. Defendants also never disclosed to Plaintiff Bloom during the checkout process that they would share with Facebook information sufficient to show what videos he personally received or obtained on the UFC Fight Pass.

58. Had Plaintiff Bloom known that Defendants would share his personally identifiable information along with the UFC Fight Pass videos he received or obtained with Facebook, Plaintiff Bloom would not have subscribed to the UFC Fight Pass or, at a minimum, paid less for the UFC Fight Pass.

59. As a result of Defendants' misrepresentations and omissions, the UFC Fight Pass has no value, or, at a minimum, a much lower value to Plaintiff Bloom.

**B. Jack Graham**

60. Plaintiff Jack Graham has paid for a monthly subscription to the UFC Fight Pass since at least March 2021.

61. After Plaintiff Graham subscribed to the UFC Fight Pass, he watched multiple videos of fights and other content offered through the UFC Fight Pass on his laptop computer and other devices, including through Chrome. Plaintiff Graham had a Facebook account before he subscribed to the UFC Fight Pass. Consequently, Plaintiff Graham's personally identifiable video information, including his Facebook ID and the URLs with the name of video content he watched and/or obtained were disclosed to Facebook as described above.

62. Although Plaintiff Graham was not aware of it at the time, after he logged into his UFC Fight Pass, the web pages on the UFC Fight Pass contained Facebook JavaScript code, which caused his browser to load and execute the code. Although it was not disclosed to Plaintiff Graham, when he clicked on a link to a page that hosted video content with the UFC Fight Pass, the Facebook JavaScript code: (i) caused his browser to establish a connection with Facebook's computer network; and (ii) sent to Facebook Plaintiff Graham's Facebook ID and the URL of the webpage hosting the video content, which included the name of the video he obtained or received. Thus, when Plaintiff Graham requested or obtained videos within the UFC Fight Pass, his private information was sent to Facebook's computer network, where it was stored, analyzed, and/or processed.

63. Plaintiff Graham did not provide consent to Defendants to share his personally identifiable video information with Facebook. Plaintiff Graham also did not provide consent to Defendants to share with Facebook his Facebook ID and URLs with the name of the videos he received or obtained through the UFC Fight Pass. When Plaintiff Graham clicked on links to video content within the UFC Fight Pass, he did not know that Defendants would share with Facebook information sufficient to show what videos he personally received or obtained on the UFC Fight Pass.

64. At no time during the checkout process did Defendants obtain Plaintiff Graham's informed, written consent in a form that was separate and distinct from other forms setting forth Plaintiff Graham's other legal and financial obligations to Defendants, such as the privacy policy

and terms of use. Defendants also never disclosed to Plaintiff Graham during the checkout process that they would share with Facebook information sufficient to show what videos he personally received or obtained on the UFC Fight Pass.

65. Had Plaintiff Graham known that Defendants would share his personally identifiable information along with the UFC Fight Pass videos he received or obtained with Facebook, Plaintiff Graham would not have subscribed to the UFC Fight Pass or, at a minimum, paid less for the UFC Fight Pass.

66. As a result of Defendants' misrepresentations and omissions, the UFC Fight Pass has no value, or, at a minimum, a much lower value to Plaintiff Graham.

**C. Dave Lindholm**

67. Plaintiff Dave Lindholm has paid for a monthly subscription to the UFC Fight Pass since January 2022.

68. After Plaintiff Lindholm subscribed to the UFC Fight Pass, he watched multiple videos of fights and other content offered through the UFC Fight Pass on his laptop computer and other devices, including through Chrome. Plaintiff Lindholm had a Facebook account before he subscribed to the UFC Fight Pass. Consequently, Plaintiff Lindholm's personally identifiable video information, including his Facebook ID and the URLs with the name of video content he watched and/or obtained were disclosed to Facebook as described above.

69. Although Plaintiff Lindholm was not aware of it at the time, after he logged into his UFC Fight Pass, the web pages on the UFC Fight Pass contained Facebook JavaScript code, which caused his browser to load and execute the code. Although it was not disclosed to Plaintiff Lindholm, when he clicked on a link to a page that hosted video content with the UFC Fight Pass, the Facebook JavaScript code: (i) caused his browser to establish a connection with Facebook's computer network; and (ii) sent to Facebook Plaintiff Lindholm's Facebook ID and the URL of the webpage hosting the video content, which included the name of the video he obtained or received. Thus, when Plaintiff Lindholm requested or obtained videos within the UFC Fight Pass, his private information was sent to Facebook's computer network, where it was stored, analyzed, and/or processed.

70. Plaintiff Lindholm did not provide consent to Defendants to share his personally identifiable video information with Facebook. Plaintiff Lindholm also did not provide consent to Defendants to share with Facebook his Facebook ID and URLs with the name of the videos he received or obtained through the UFC Fight Pass. When Plaintiff Lindholm clicked on links to video content within the UFC Fight Pass, he did not know that Defendants would share with Facebook information sufficient to show what videos he personally received or obtained on the UFC Fight Pass.

71. At no time during the checkout process did Defendants obtain Plaintiff Lindholm's informed, written consent in a form that was separate and distinct from other forms setting forth Plaintiff Lindholm's other legal and financial obligations to Defendants, such as the privacy policy and terms of use. Defendants also never disclosed to Plaintiff Lindholm during the checkout process that they would share with Facebook information sufficient to show what videos he personally received or obtained on the UFC Fight Pass

72. Had Plaintiff Lindholm known that Defendants would share his personally identifiable information along with the UFC Fight Pass videos he received or obtained with Facebook, Plaintiff Lindholm would not have subscribed to the UFC Fight Pass or, at a minimum, paid less for the UFC Fight Pass.

73. As a result of Defendants' misrepresentations and omissions, the UFC Fight Pass has no value, or, at a minimum, a much lower value to Plaintiff Lindholm.

74. A person can identify Plaintiffs with their Facebook IDs by simply typing into a web browser www.facebook.com/[id-number], replacing "[id-number] with Plaintiffs' Facebook ID numbers. Doing so reveals their Facebook profile page and name.

75. Indeed, Zuffa's privacy policy does not mention the Facebook JavaScript code or the fact that Zuffa discloses to Facebook the UFC Fight Pass users' identities and every video the users request or obtain on the Fight Pass Website. While Zuffa's privacy policy states that it provides certain users' information to third parties including "social media companies (such as Facebook)," it does not state that it shares with Facebook every video a user requests or obtains. In fact, Zuffa tells users that "we do not provide them with your name, financial information, or

any sensitive information” but instead “use online identifiers such as email, cookie addresses, and device identifiers.” Zuffa does not disclose that it shares the Facebook ID, which is not an email, cookie address or device identifier and can be directly correlated with the user’s name and other identifying information. Zuffa’s use of the Facebook JavaScript code as alleged herein also violates Zuffa’s privacy policy by disclosing consumers’ sensitive information, including consumers’ Facebook IDs, and information about the videos consumers request or obtain.

76. Defendants also do not allow users to opt out of the disclosure to Facebook of their video watching history. Zuffa’s privacy policy tells users that they may “opt out of targeted advertising” by using four different links. However, none of those links applies to the Facebook JavaScript code. Thus, even if a user clicks on the links and follows the instructions to purportedly opt out, the user will not opt out of Zuffa’s use of the Facebook code. The Facebook code will remain active and continue to share users’ Facebook ID and the videos they obtain or request with Facebook.

77. Finally, the privacy policy identifies a number of “categories of personal information collected” which include “online identifiers” and “browsing history.” However, the privacy policy does not disclose that Zuffa, along with the other Defendants, share such information with Facebook or specifically that they share users’ Facebook IDs and the names of videos users watch on UFC Fight Pass.

78. Plaintiffs and members of the Class have been economically damaged by their purchase of UFC Fight Pass because their personally identifiable information is being disclosed without their consent; therefore, the UFC Fight Pass is worth less than what Plaintiffs and members of the Class paid for it.

## **CLASS ALLEGATIONS**

79. Plaintiffs bring this class action lawsuit on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

The Nationwide Class:

All natural persons in the United States who subscribed to the UFC Fight Pass for personal use and had their Facebook ID and URL(s) of video content they received or obtained through the UFC Fight Pass sent to Facebook between March 4, 2020 and the present.

80. Plaintiff Bloom also seeks to represent the following group of similarly situated persons, defined as follows:

The California Subclass:

All natural persons in California who subscribed to the UFC Fight Pass for personal use and had their Facebook ID and URL(s) of video content they received or obtained through the UFC Fight Pass sent to Facebook between March 4, 2018 and the present.

81. This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable. Class members can be easily identified through Defendants' records.

82. Numerosity: Plaintiffs do not know the exact size the two Classes, but they estimate that they are each composed of more than 100 persons. The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

83. Common Questions Predominate: This action involves common questions of law and fact to the potential Classes because each Class member's claims derive from the same unlawful practices of Defendants. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Classes to recover. The questions of law and fact common to the Nationwide Class include:

a. Whether the Fight Pass Website is embedded with Facebook JavaScript code;
b. What information was disclosed to Facebook concerning Nationwide Class members' video viewing history;
c. Whether information disclosed to Facebook concerning Nationwide Class members and their video viewing history constitutes personally identifiable

information under the VPPA;

d. Whether the disclosure of Nationwide Class members' personally identifiable information to Facebook was knowing under the VPPA;

e. Whether Nationwide Class members consented to the disclosure of their personally identifiable information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B);

f. Whether the Nationwide Class is entitled to damages as a result of Defendants' conduct;

g. Whether Nationwide Class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

h. Whether Nationwide Class members are entitled to payment of actual and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

84. Similarly, questions of law and fact common to the California Subclass include:

a. Whether the Fight Pass Website is embedded with Facebook JavaScript code;

b. What information was disclosed to Facebook concerning California Subclass members' video viewing history;

c. Whether "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by" Defendants was disclosed to "any person other than the individual who is the subject of the record" as provided under Cal. Civ. Code § 1799.3, *et seq*;

d. Whether California Subclass members consented in writing to Defendants' disclosure as provided under Cal. Civ. Code § 1799.3, *et seq*;

e. Whether Defendants invaded California Subclass members' privacy interests;

f. Whether Defendants violated the federal and California laws alleged herein;

g. Whether Defendants' conduct was unlawful as provided in Cal. Bus. & Prof. Code § 17200, *et seq;*

h. Whether Defendants' conduct was unfair as provided in Cal. Bus. & Prof. Code § 17200, *et seq;*

i. Whether Defendants' conduct was fraudulent as provided in Cal. Bus. & Prof. Code § 17200, *et seq;*

j. Whether California Subclass members are entitled to damages as a result of Defendants' conduct;

k. Whether California Subclass members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

l. Whether California Subclass members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

85. Typicality: Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendants in violation of law as complained of herein. Further, the damages of each member of the Classes were caused directly by Defendants' wrongful conduct in violation of the law as alleged herein.

86. Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of the Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interest that is in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the Classes. By prevailing on his own claims, Plaintiffs will establish Defendants' liability to all Class members. Plaintiffs and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

87. Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the class will tend to establish inconsistent standards of conduct for Defendants and result in the

impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

88. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## PLAINTIFFS' FIRST CAUSE OF ACTION

### Violation of the Video Privacy Protection Act (the "VPPA"), 18 U.S.C. § 2710
### (On Behalf of Plaintiffs and the Nationwide Class)

89. Plaintiffs reallege and incorporate the paragraphs of this Class Action Complaint as if set forth herein.

90. The VPPA prohibits a "video tape service provider" from knowingly disclosing to any person "personally identifiable information concerning any consumer" without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710. Defendants violated the VPPA by knowingly disclosing such "personally identifiable information" to Facebook.

91. Defendants are each a "video tape service provider" as defined in 18 U.S.C. §2710(a)(4) because they are "engaged in the business, in or affecting interstate or foreign commerce," of selling and delivering audiovisual materials including, UFC fights and other on-demand content, through its UFC Fight Pass, to Plaintiffs and the Nationwide Class members.

92. Plaintiffs and Nationwide Class members are "consumers" as defined in 18 U.S.C. §2710(a)(1) because they subscribed to the UFC Fight Pass. Plaintiffs subscribed to the UFC Fight Pass and watched video content Defendants provided through the UFC Fight Pass.

93. Defendants knowingly disclosed personally identifiable information concerning

Plaintiffs and Nationwide Class members to Facebook, including their Facebook ID's and the name of the videos requested and/or obtained, each time Plaintiffs and the Nationwide Class members requested or obtained video content from the UFC Fight Pass.

94. This information constitutes personally identifiable information under 18 U.S.C. §2710(a)(3) because it identified each Plaintiff and Nationwide Class member to Facebook as an individual who requested or obtained the named video content from Defendants. Further, an ordinary person could identify another person with their Facebook ID.

95. Defendants' transmissions of Plaintiffs' personally identifiable information to Facebook constitutes "knowing[] disclosures" of Plaintiffs' "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).

96. Defendants knew that these disclosures identified Plaintiffs and Nationwide Class members to Facebook as individuals having requested or obtained specific videos from Defendants because, inter alia, they chose, programmed, and intended for Facebook to receive in simultaneous communications (1) users' Facebook IDs, (2) the URLs of the websites that users visited which included the names of videos requested and/or obtained, and (3) the fact that the website viewed contained video content. Defendants understood that Facebook could then, to advance their business purposes and otherwise, serve targeted ads to individuals based on the videos they requested and/or obtained, which necessarily required Facebook to know which customers requested and/or obtained which videos. Defendants knew their disclosures to Facebook identified Plaintiffs and Nationwide Class members to Facebook as individuals having requested or obtained specific video materials from Defendants.

97. Plaintiffs and Nationwide Class members did not provide to Defendants and Defendants did not otherwise obtain their informed written consent, in a form distinct and separate from any form setting forth their other legal or financial obligations, to disclose the video content Plaintiffs and Nationwide Class member received or obtained through the UFC Fight Pass.

## PLAINTIFF'S SECOND CAUSE OF ACTION
**Violation of Cal. Civ. Code § 1799.3**
**(On Behalf of Plaintiff Bloom and the California Subclass)**

98. Plaintiff Bloom realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

99. Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales or rental services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person other than the individual who is the subject of the record, without the written consent of that individual."

100. Defendants are each a "person providing video recording sales or rental services" under Cal. Civ. Code § 1799.3(a) because they are engaged in the business of providing video rental services.

101. Defendants voluntarily subjected themselves to California law by enrolling consumers who they knew had billing addresses in California into the UFC Fight Pass subscription, providing California consumers content, and disclosing California consumers' data to Facebook. Further, Defendant Endeavor Group is based in California.

102. Defendants willfully disclosed information that identified Plaintiff Bloom and the California Subclass members to Facebook as individuals having requested or obtained video materials from the Fight Pass Website, including their Facebook IDs and the names of the videos they obtained. The information that Defendants shared with Facebook constitutes: (1) personal information of Plaintiff Bloom and the California Subclass, and/or (2) the contents of a record concerning Plaintiff Bloom and the California Subclass that Defendants maintained.

103. Plaintiff Bloom and the California Subclass did not consent, in writing or otherwise, to Defendants' disclosure of their personally identifiable information and video history to Facebook. Defendants' disclosure of this information to Facebook violated Cal. Civ. Code § 1799.3(a).

## PLAINTIFF'S THIRD CAUSE OF ACTION
**Invasion of Privacy Under California's Constitution**
**(On Behalf of Plaintiff Bloom and the California Subclass)**

104. Plaintiff Bloom realleges and incorporates by reference the paragraphs of this

Class Action Complaint as if set forth herein.

105. California's constitution in Article 1, section 1 creates a right to privacy, and further creates a right of action against private entities such as Defendants that violate those privacy rights.

106. The principal purpose of this constitutional right is to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Defendants.

107. To plead a California constitutional privacy claim, a plaintiff must show an invasion of (i) a legally protected privacy interest; (ii) where the plaintiff had a reasonable expectation of privacy in the circumstances; and (iii) conduct by the defendant constituting a serious invasion of privacy.

108. Defendants have intruded upon the following legally protected privacy interests of Plaintiff Bloom and the California Subclass members: (i) the VPPA as alleged above; (ii) Cal. Civ. Code § 1799.3 as alleged above; and (ii) the California Constitution, which guarantees Californians the right to privacy.

109. Plaintiff Bloom and California Subclass members had a reasonable expectation of privacy. They directed their electronic devices to access the Fight Pass Website. When they watched videos on the Fight Pass Website, they did not reasonably expect that Defendants would disclose their personally identifiable information and video history to a third-party (i.e., Facebook) without their prior informed consent.

110. Defendants' actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the California Constitution (i.e., one's personal communications) and violated laws protecting against the wrongful disclosure of such information. These acts constitute an egregious breach of social norms that is highly offensive.

111. Defendants' intentional intrusion into Plaintiff Bloom's and the California Subclass members' privacy was also highly offensive to a reasonable person in that Defendants violated civil laws designed to protect individual privacy and disclosed Plaintiff Bloom's and the California Subclass members' personally identifiable information.

112. Plaintiff Bloom and the California Subclass members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation and injunctive relief.

**PLAINTIFF'S FOURTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiff Bloom and the California Subclass)**

113. Plaintiff Bloom realleges and incorporates by reference all paragraphs alleged herein.

114. Defendants are each a "person" under Cal. Bus. & Prof. Code § 17201.

115. Defendants created and implemented a scheme to disclose Plaintiff Bloom's and California Subclass members' personally identifiable information and video history through a pervasive pattern of false and misleading omissions. Defendants concealed and failed to disclose to the California Subclass members the following facts: (i) that the UFC Fight Pass website contains Facebook JavaScript code that enables Facebook and Defendants to track California Subclass members' behavior; (ii) that Defendants would share the California Subclass members' personally identifiable information as defined under the VPPA with Facebook through the Facebook JavaScript code; (iii) that the California Subclass members had a statutory right to opt out from ongoing disclosures or on a case-by-case basis; and (iv) that both Defendants and Facebook would use the information shared with Facebook target ads to the California Subclass Members.

116. These omissions were misleading and deceptive.

117. Defendants' conduct was unfair and unconscionable, particularly because Defendants disclosed information that Plaintiff Bloom and the California Subclass members reasonably believed to be private. Unbeknownst to Plaintiff Bloom and the California Subclass members and without their consent, Defendants shared their personally identifiable information and video history with Facebook without their informed written consent. Upon information and belief, Facebook, in turn, shares Plaintiff Bloom's and the California Subclass members' data with other third parties.

118. Defendants' conduct was fraudulent and deceptive because the omissions at issue

were likely to, and in fact did, deceive reasonable consumers, including Plaintiff Bloom and the California Subclass members. Reasonable consumers, including the California Subclass members, would have found it material to their purchasing decisions that Defendants would disclose their private information without their consent. Knowledge of these facts would have been a substantial factor in the California Subclass members' decisions to engage in the financial transactions described herein.

119. Defendants owed the California Subclass members a duty to disclose these facts because they were exclusively known and/or accessible to Defendant, who had superior knowledge of its activities with respect to the private information of Plaintiff Bloom and California Subclass members; because Defendants had a statutory obligation to disclose such facts; because Defendants concealed the facts; and because Defendants intended for consumers to rely on the omissions in question.

120. As set forth above, in engaging in financial transactions by purchasing the UFC Fight Pass, Plaintiff Bloom and the California Subclass members relied on Defendants' omissions. Reasonable consumers would have expected Defendants to comply with its statutory obligations and disclose the fact that they share personally identifiable information and video history in a form separate from its other forms, as is required under the VPPA. Plaintiff Bloom and the California Subclass members relied on the omissions because Defendants failed to make statutorily required disclosures and obtain their informed written consent.

121. Further, a reasonable consumer would deem Defendants' disclosure of the Facebook IDs and information disclosing videos requested and/or obtained to Facebook important in determining whether to purchase the UFC Fight Pass because it infringes upon his or her personal privacy and contravenes his or her reasonable expectation that Defendants would not disclose such information without permission. A reasonable consumer also would value the UFC Fight Pass less if he or she knew that Defendants would disclose his or her personally identifiable information and video history to Facebook.

122. Defendants has engaged, and continues to engage, in unlawful practices as described herein, in violation of the Unfair Competition Law, California Business & Professions

Code §§ 17200 et seq. (the "UCL"), by, without limitation, violating the following statutes: VPPA, 18 U.S.C. § 2710; and Cal. Civ. Code § 1799.3. Defendants' conduct was also unlawful because it intruded upon Plaintiff Bloom's and the California Subclass members' seclusion and violated the California Constitution by invading Class members' privacy, as described above, and because Zuffa violated its own privacy policy, as described above.

123. Defendants engaged in conduct that is unfair and unconscionable because its activities with respect to Plaintiff Bloom and Subclass members' private information offends public policy, is immoral unethical, oppressive, outrageous, unscrupulous, and substantially injurious, and has caused substantial harm that greatly outweighs any possible utility from the conduct.

124. Defendants' conduct actually and proximately caused Plaintiff Bloom and the California Subclass members to lose money or property. Had Plaintiff Bloom and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the UFC Fight Pass, or (ii) paying less for the UFC Fight Pass.

125. Plaintiff Bloom seeks, on behalf of himself and those similarly situated, equitable relief, including restitution for the premium and/or the full price that he and others paid as result of Defendants' conduct. Plaintiff and the California Subclass members lack an adequate remedy at law to obtain such relief with respect to their "unfairness" claims in this UCL cause of action, because there is no cause of action at law for "unfair" conduct.

126. Plaintiff Bloom also seeks equitable relief, including restitution, with respect to his UCL unlawfulness claims for violations of the VPPA and his UCL "fraudulent" claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff Bloom makes the following allegations in this paragraph as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiff Bloom and the California Subclass members may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law. For example, Plaintiff Bloom and the California Subclass members may be unable to obtain such relief under other causes of action and

will lack an adequate remedy at law, if Plaintiff Bloom is unable to demonstrate the requisite mens rea, because the UCL imposes no such mens rea requirement and liability exists even if Defendants acted in good faith.

127. Plaintiff Bloom seeks, on behalf of himself and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

128. Plaintiff Bloom seeks, on behalf of himself and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they were not entitled. Plaintiff Bloom, those similarly situated and/or other California consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgement against Defendants as follows:

A. Certification of the proposed Nationwide Class and California Subclass, including appointment of Plaintiffs' counsel as class counsel;

B. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C. An award of compensatory damages in an amount to be determined at trial, except for those causes of action where compensatory damages are not legally available;

D. An award of statutory damages in an amount to be determined at trial, except for those causes of action where statutory damages are not legally available;

E. An award of punitive damages in an amount to be determined at trial, except for

those causes of action where punitive damages are not legally available;

F. An award of treble damages, except for those causes of action where treble damages are not legally available;

G. An award of restitution in an amount to be determined at trial;

H. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I. For reasonable attorneys' fees and the costs of suit incurred; and

J. For such further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: May 29, 2023


**GUTRIDE SAFIER LLP**

/s/ *Anthony J. Patek/s/*

Seth A. Safier (*pro hac vice*)
seth@gutridesafier.com
Marie A. McCrary (*pro hac vice*)
marie@gutridesafier.com
Kali Backer (*pro hac vice*)
kali@gutridesafier.com
Anthony J. Patek (pro hac vice)
anthony@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469

**MARKMAN LAW**

David Markman (Nevada Bar No. 12440)
David@Markmanlawfirm.com
4484 S. Pecos Rd. Suite #130
Las Vegas NV 89121
Telephone: 702-843-5899
Facsimile: 702-843-6010

Attorneys for Plaintiffs