**MARKMAN LAW**
DAVID MARKMAN (Nevada Bar No. 12440)
David@Markmanlawfirm.com
4484 S. Pecos Rd. Suite #130
Las Vegas, NV 89121
Telephone: 702-843-5899
Facsimile: 702-843-6010

**GUTRIDE SAFIER LLP**
SETH A. SAFIER (*pro hac vice*)
seth@gutridesafier.com
MARIE A. MCCRARY (*pro hac vice*)
marie@gutridesafier.com
HAYLEY REYNOLDS (*pro hac vice*)
hayley@gutridesafier.com
ANTHONY PATEK (*pro hac vice*)
anthony@gutridesafier.com
KALI BACKER (*pro hac vice*)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| EVERETT BLOOM, JACK GRAHAM, and DAVE LNIDHOLM, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ZUFFA, LLC; ENDEAVOR STREAMING, LLC and ENDEAVOR GROUP HOLDINGS, INC.,<br><br>Defendants. | Case No. 2:22-cv-00412-RFB-BNW<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS ENDEAVOR STREAMING, LLC AND ENDEAVOR GROUP HOLDINGS, INC.'S MOTION TO DISMISS** |

TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

A. Endeavor Holdings is Registered to Do Business in Nevada and Has a Registered Agent in Nevada for All Legal Process. .......... 2

B. Endeavor Holdings Operates UFC Fight Pass Through Its Subsidiaries. .......... 3

C. The Endeavor Defendants Designed and Operated the Fight Pass Website to Gather and Transmit Subscribers' Personally Identifiable Information to Facebook. .......... 4

III. LEGAL STANDARDS .......... 5

IV. ARGUMENT .......... 5

A. This Court Has Personal Jurisdiction Over the Endeavor Defendants. .......... 5

1. Endeavor Holdings is subject to general jurisdiction in Nevada under *Mallory*. .......... 5

2. The Court has specific personal jurisdiction over Endeavor Holdings and Endeavor Streaming. .......... 8

a. The Endeavor Defendants purposefully availed themselves to Nevada. .......... 9

b. The Endeavor Defendants' Fight Pass Website purposefully directed activities at Nevada. .......... 10

c. The claim arises out of and relates to forum contacts. .......... 12

3. Plaintiffs request jurisdictional discovery. .......... 12

B. Plaintiffs Have Stated a Claim Under the VPPA. .......... 13

1. The Endeavor Defendants are video tape service providers .......... 13

2. Plaintiffs are "consumers" of the Endeavor Defendants. .......... 15

3. The Endeavor Defendants disclosed Plaintiffs' personally identifiable information. .......... 17

C. Plaintiff Bloom Adequately Pleads Violations of California Law. .......... 19

1. Plaintiff's Section 1799.3 Claim. .......... 19

2. Invasion of privacy under the California constitution. .......... 20

3. UCL. .......... 21

a. Unlawful prong claim. .......... 21

b. Fraud prong claim. .......... 22

c. Unfair prong claim. .......... 23

D. In the Alternative, Plaintiffs Request Leave to Amend. .......... 24

V. CONCLUSION .......... 24

## TABLE OF AUTHORITIES

***Cases***

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....... 6

*Austin-Spearman v. AMC Network Ent. LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 2015) ....... 22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....... 6

*Calix Networks, Inc. v. Wi-Lan, Inc.*,
No. C-09-06038-CRB DMR, 2010 WL 3515759 (N.D. Cal. Sept. 8, 2010) ....... 16

*Carpenters Health & Welfare Tr. Funds v. Robertson*,
53 F.3d 1064 (9th Cir. 1995) ....... 22

*Carter v. Scripps Networks, LLC*,
No. 22-cv-2031 (PKC), 2023 U.S. Dist. LEXIS 71150 (S.D.N.Y. Apr. 24, 2023) ....... 21

*Collins v. eMachines, Inc.*,
202 Cal. App. 4th 249 (2011) ....... 28, 29

*Daimler AG v. Bauman*,
571 U.S. 117, 134 S. Ct. 746 (2014) ....... 9

*Daugherty v. Am. Honda Motor Co.*,
144 Cal. App. 4th 824 (2006) ....... 28

*Davis v. Cranfield Aero. Sols., Ltd.*,
2023 U.S. App. LEXIS 15794 (9th Cir. June 23, 2023) ....... 11, 12

*Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.)*,
2023 U.S. App. LEXIS 15794 (9th Cir. June 23, 2023) ....... 26, 27

*Doe v. Successfulmatch.com*,
70 F. Supp.3d 1066 (N.D. Cal. 2014) ....... 29

*Doe v. Unocal Corp.*,
248 F.3d 915 (9th Cir. 2001) ....... 3

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ....... 23, 26

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) ....... 21

*Epic Games, Inc. v. Apple, Inc.*, 2023 U.S. App. LEXIS 9775 (9th Cir. Apr. 24, 2023) ..... 30

*Focht v. Sol Melia S.A.*, No. 10-cv-0906-EMC, 2010 WL 3155826 (N.D. Cal. Aug. 9, 2010) ..... 16

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021) ..... 11

*Freeman v. Second Jud. Dist. Ct. ex rel. Cnty. of Washoe*, 116 Nev. 550 (2000) ..... 10

*Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101 (9th Cir. 2020) ..... 12

*Gold Issue Mining & Mill. Co. v. Pa. Fire Ins. Co.*, 267 Mo. 524 (1916) ..... 6, 8

*Herbal Brands, Inc. v. Photoplaza, Inc.*, No. 21-17001, 2023 U.S. App. LEXIS 16904 (9th Cir. July 5, 2023) ..... 14

*Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272 (2009) ..... 27

*Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1 (1994) ..... 26

*Hunt v. Auto-Owners Ins. Co.*, No. 2:15-cv-00520-JCM-NJK, 2015 U.S. Dist. LEXIS 75099 (D. Nev. June 10, 2015) ..... 9

*In re Adobe Sys. Privacy Litig.*, 66 F. Supp. 3d 1197 (N.D. Cal. 2014) ..... 29

*In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797 (N.D. Cal. 2020) ..... 31

*In re iPhone Application Litig.*, 844 F. Supp. 2d 1040 (N.D. Cal. 2012) ..... 31

*In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284 (S.D. Cal. 2020) ..... 29

*In re Vizio, Inc.*, 238 F. Supp. 3d 1204 (C.D. Cal. 2017) ..... 17, 18, 19

*International Shoe Co. v. Washington*, 326 U. S. 310 (1945) ..... 8, 9, 10

*Jefferson v. Healthline Media, Inc.*, No. 3:22-cv-05059-JD, 2023 U.S. Dist. LEXIS 91174 (N.D. Cal. May 24, 2023) ..... 21

*Joal, LLC v. Trailboss Enters., Inc.*, No. 2:19-CV-1523 JCM (BNW), 2020 U.S. Dist. LEXIS 249257 (D. Nev. Mar. 23, 2020).....9

*Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95 (2006).....26

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009).....30

*Klein v. Chevron U.S.A., Inc.*, 137 Cal. Rptr. 3d 293 (2012).....28

*Mallory v. Norfolk Southern Ry.*, 2023 U.S. LEXIS 2786 (June 27, 2023).....passim

*Martin v. Meredith Corp.*, No. 22cv4776 (DLC), 2023 WL 2118074 (S.D.N.Y. Feb. 17, 2023).....25

*Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218 (9th Cir. 2011).....14, 15

*McCoy v. Alphabet, Inc.*, No. 20-cv-05427-SVK, 2021 U.S. Dist. LEXIS 24180 (N.D. Cal. Feb. 2, 2021).....31

*McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227 (2006).....31

*Mollett v. Netflix, Inc.*, 795 F.3d 1062 (9th Cir. 2015).....2, 22

*Myers v. Bennett Law Offices*, 238 F.3d 1068 (9th Cir. 2001).....16

*Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Mining & Milling Co.*, 243 U.S. 93 (1917).....7, 8, 9, 10

*Perry v. CNN, Inc.*, 854 F.3d 1336 (11th Cir. 2017).....21

*Plaintiffs v. MGM Resorts Int'l*, No. 2:20-cv-00376-GMN-EJY, 2022 U.S. Dist. LEXIS 199399 (D. Nev. Nov. 2, 2022).....29

*Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th Cir. 2015).....6

*Rovai v. Select Portfolio Serv., LLC*, No. 14-cv-1738-BAS-WVG, 2018 U.S. Dist. LEXIS 107764 (S.D. Cal. June 27, 2018).....31

*Rubio v. Capital One Bank*, 613 F.3d 1195 (9th Cir. 2010).....27

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004) .......... 6, 11

*Stark v. Patreon, Inc.*, No. 22-cv-03131-JCS, 2022 U.S. Dist. LEXIS 187602 (N.D. Cal. Oct. 13, 2022) .......... 17, 23

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal.4th 553 (1998) .......... 28

*United States ex rel. Insoon Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048 (9th Cir. 2001) .......... 32

*Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987) .......... 6

*Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406 (9th Cir. 1977) .......... 16


***Statutes***


18 U.S.C. § 2710 .......... 1

18 U.S.C. § 2710(a)(1) .......... 19

18 U.S.C. § 2710(a)(4) .......... 17, 22

18 U.S.C. § 2710(b)(1) .......... 21

18 U.S.C. § 2710(b)(2)(B) .......... 5

28 U.S.C. § 2710(a)(4) .......... 2

Cal. Civ. Code § 1799 .......... 26

Cal. Civ. Code § 1799.3 .......... 24, 25, 27

Cal. Civ. Code § 1799.3(a) .......... 24

Nev. Rev. Stat. § 14.020 .......... 8

Nev. Rev. Stat. § 14.065 .......... 5, 9

Nev. Rev. Stat. § 680A.250 .......... 9

Nev. Rev. Stat. Ann. § 80.060 .......... 3

1889 Nev. Stats. p. 47 .......... 10


**Rules**


Fed. R. Civ. P. 12(b)(6) .......... 5

Fed. R. Civ. P. 8 .......... 18

Fed. R. Civ. P. 9(b) .......... 23

## I. INTRODUCTION

The Ultimate Fighting Championship ("UFC") is a huge sensation in Las Vegas, Nevada. Its fights—predominantly held in Las Vegas—draw thousands of viewers, both in-person in Las Vegas and across the world on pay-per-view. Defendant Endeavor Group Holdings, Inc. ("Endeavor Holdings") owns the UFC. It capitalizes on the fights it holds in Las Vegas by recording them and offering fans access to those recordings through a paid streaming service for UFC video content called UFC Fight Pass. Endeavor Holdings runs UFC Fight Pass with Defendants Zuffa, LLC ("Zuffa") and Endeavor Streaming, LLC ("Endeavor Streaming"). *See* First Amended Complaint (Dkt. 47) ("FAC") ¶¶ 2, 23, 28. When a subscriber watches a video on UFC Fight Pass, they reasonably expect that the information about the videos they watch will remain private and will not be shared with others. Indeed, federal law ensures this privacy through the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). The VPPA vests consumers with a right to control who can access their video watching history by mandating video tape service providers like Defendants adhere to strict consent requirements prior to disclosing such information to third-parties. Defendants chose to defy the law and to embed UFC Fight Pass with software code that discloses subscribers' personally identifiable information to Facebook when they access video content.

Defendants Endeavor Holdings and Endeavor Streaming (the "Endeavor Defendants") now move to dismiss, contending that Nevada does not have personal jurisdiction over them because they are not located within Nevada and took no actions in Nevada related to the claims in this case. In making this argument, Endeavor Holdings egregiously suggests that a recent Supreme Court decision supports its argument, when that ruling plainly refutes it. Under *Mallory v. Norfolk Southern Ry.*, where a state such as Nevada requires a company to appoint a registered agent for service of all legal process, the company will be subject to suit in that state for all purposes. 2023 U.S. LEXIS 2786, at *12 (June 27, 2023) (identifying Nevada law as an example of an "all-purpose-jurisdiction rule" that requires out-of-state corporations "to agree to defend themselves there against any manner of suit."). As required by Nevada law, Endeavor Holdings has a registered agent in Nevada. Therefore, under *Mallory*, Endeavor Holdings has consented to jurisdiction here.

Rather than apply *Mallory*, the Endeavor Defendants apply standards that are applicable to unregistered companies to both Endeavor Holdings and Endeavor Streaming. Even under that rubric, as described above, this Court has jurisdiction because of the continuous and systematic contacts that the Endeavor Defendants maintain with Nevada.

On the merits, the Endeavor Defendants advance an overly narrow reading of the VPPA to argue that they are not video tape service providers, that Plaintiffs are not consumers, and that they do not disclose Plaintiffs' personally identifiable information . But "[c]onsistent with Congress's purpose, the statute's language is broad." *Mollett v. Netflix, Inc*., 795 F.3d 1062, 1066 (9th Cir. 2015). To accept the Endeavor Defendants' interpretation of the VPPA would render parts of the statute superfluous since it is designed to impose liability on all entities "engaged in the business" of the delivery of video content. 28 U.S.C. § 2710(a)(4). This language necessarily contemplates that *multiple* entities can provide the same video delivery service, making Plaintiffs consumers of both Zuffa and the Endeavor Defendants' services, and each can be held accountable for the disclosures of Plaintiffs' information that violate the statute.

Finally, the Endeavor Defendants argue that the California causes of action brought by Plaintiff Bloom should be dismissed based on the same distorted interpretation of the FAC. Courts applying California law to nearly identical facts, however, have found allegations such as those made by Plaintiff Bloom to be sufficient to survive a motion to dismiss. The Endeavor Defendants make no effort to distinguish these cases—because they cannot.

Accordingly, the Endeavor Defendants' motion should be denied.

## II. BACKGROUND

### A. Endeavor Holdings is Registered to Do Business in Nevada and Has a Registered Agent in Nevada for All Legal Process.

Endeavor Holdings Group, Inc. is a Delaware company registered to do business in Nevada. Decl. of A. Petek ("Patek Decl.") Ex. 1.[1] Pursuant to Nev. Rev. Stat. Ann. § 80.060, Endeavor Holdings has designated Paul Mathews at the Corporation Service Company at 112 North Curry Street, Carson City, Nevada as its registered agent in Nevada.

[1] Courts may consider evidence presented in affidavits and declarations in determining personal jurisdiction. *Doe v. Unocal Corp*., 248 F.3d 915, 922 (9th Cir. 2001).

### B. Endeavor Holdings Operates UFC Fight Pass Through Its Subsidiaries.

This case involves the actions by a corporate parent company—Defendant Endeavor Holdings—and its wholly owned subsidiaries—Defendants Endeavor Streaming and Zuffa. Endeavor Holdings is "one of the largest independent global distributors of sports video programming and data" and "a full-service content production and distribution platform." FAC ¶ 13 (quoting April 28, 2021 Prospectus of Endeavor Holdings Group, Inc. ("EHG Prospectus"), at 105, 145).[2] Among other assets, Endeavor Holdings owns the popular UFC mixed martial arts enterprise. *Id*. ¶ 2. In addition to live UFC events, consumers may purchase a subscription to Endeavor Holdings' UFC video content through UFC Fight Pass, an online streaming platform offering UFC content via ufcfightpass.com ("Fight Pass Website") as well as a mobile application. *Id.*

Endeavor Holdings owns and operates UFC Fight Pass and the Fight Pass Website through its subsidiaries, Zuffa and Endeavor Streaming. *Id*. ¶¶ 2, 13, 28; EHG Prospectus, at 4–5. Endeavor Holdings uses Zuffa to operate the public-facing aspects of UFC Fight Pass and the Fight Pass Website, such as marketing, advertising, and creating the content and text displayed to subscribers. FAC ¶¶ 2, 11. Endeavor Holdings uses Endeavor Streaming to provide the technology that enables the streaming of videos on UFC Fight Pass. *Id*. ¶ 13; EHG Prospectus, at 3, 145, 147, F-7. This involves creating, updating, and maintaining the computer code of the Fight Pass Website that delivers consumers the content to which they have subscribed. FAC ¶¶ 2, 12; *see also* EHG Prospectus, at 145 (stating that Endeavor Holdings distributes "steaming and video solutions . . . via Endeavor Streaming"). Endeavor Holdings, meanwhile, coordinates and manages interactions between Zuffa and Endeavor Streaming, which each in turn act as agents of Endeavor Holdings. *Id*. ¶ 25.

Endeavor Streaming and Zuffa, therefore, jointly operate UFC Fight Pass and the Fight Pass Website at the direction and management of Endeavor Holdings. All three Defendants are in constant communication with one another to this effect. *Id*. ¶¶ 23, 27. Indeed, UFC Fight Pass and

[2] The Endeavor Holdings Prospectus is available at: https://www.sec.gov/Archives/edgar/data/1766363/000119312521144936/d156166d424b4.htm. The Endeavor Defendants ask the Court to take judicial notice of the Endeavor Holdings Prospectus. Endeavor Defs.' Mot. to Dismiss ("Defs.' Mot."), Dkt. 60, at 2. Plaintiffs do not oppose that request.

the Fight Pass Website would not be able to obtain subscribers or deliver content to consumers without the continual joint efforts of these entities.

Because it wholly owns its subsidiaries, Endeavor Holdings reports Zuffa's and Endeavor Streaming's assets and income as its own. It likewise touts the commercial successes of Zuffa and Endeavor Streaming as its own success when soliciting additional investment. *See, e.g.*, EGH Prospectus, at 104 ("The value of *our* content is demonstrated by *our* licensing arrangements . . . and *our* increasing consumer engagement is reflected by the growth of FIGHT PASS subscribers and overall follower growth and engagement across *our* social channels." (emphasis added)). Endeavor Holdings similarly tells investors that it "deliver[s] live streaming video and data feeds for more than 45,000 sports events annually, as well as for on-demand virtual sports products including *our own* UFC." FAC ¶ 26 (emphasis added).

### C. The Endeavor Defendants Designed and Operated the Fight Pass Website to Gather and Transmit Subscribers' Personally Identifiable Information to Facebook.

In order to better monetize their consumers' information, Defendants together engaged in a systematic, nationwide practice of invading consumers' privacy. *Id.* ¶ 27. Defendants programed the Fight Pass Website to include software code, created by Facebook, that causes a UFC Fight Pass consumer's browser to send information about that consumer's interactions with the Fight Pass Website to Meta Platforms Inc. (more commonly known as Facebook)—a third party—without informing the consumer or asking for the consumer's consent. *Id.* ¶¶ 3–5. When consumers access video content on the Fight Pass Website, the Meta code sends to Meta: (1) the consumer's Facebook ID and (2) the URL of the webpage visited, which includes the video title and the fact that the webpage contains video content. *Id.* ¶ 5. Because this information personally identifies the consumer as having requested or obtained particular videos on the UFC Fight Pass Website, disclosing it to Facebook—without first obtaining consent in accordance with 18 U.S.C. § 2710(b)(2)(B)—violates the VPPA.

Endeavor Holdings and its subsidiaries understood the value in the data they wrongfully shared with Facebook. One of the most effective ways to drive additional sales through an Over The Top ("OTT") streaming service—such as UFC Fight Pass—is to track subscribers' behavior

and target them with specific advertising. According to Endeavor Streaming, "[t]racking data for #OTT platforms is more important than ever . . ." *Id*. ¶ 46. Endeavor Streaming also believes that "[a]chieving OTT addressability requires having true precision targeting at the household level and then *down to the viewer level* . . . ." *Id*. ¶ 47 (emphasis added). And "[t]o pull past the competition in the thriving #OTT industry, you need to effectively market your service and know who your viewers are—*and we're not just talking about their names*." *Id*. ¶ 48 (emphasis added).

## III. LEGAL STANDARDS

Nevada's long-arm statute authorizes courts to exercise personal jurisdiction "on any basis not inconsistent with . . . the Constitution of the United States." Nev. Rev. Stat. § 14.065. "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand" it. *Ranza v. Nike, Inc*., 793 F.3d 1059, 1068 (9th Cir. 2015) (citation omitted). The Court must accept Plaintiffs' uncontroverted allegations as true, and resolve factual disputes in the plaintiffs' favor. *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 800 (9th Cir. 2004).

To survive a Rule 12(b)(6) motion, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). This is not akin to a "probability requirement." *Id*.

## IV. ARGUMENT

### A. This Court Has Personal Jurisdiction Over the Endeavor Defendants.

#### 1. Endeavor Holdings is subject to general jurisdiction in Nevada under *Mallory*.

This court has general jurisdiction over Endeavor Holdings by virtue of its registration as a foreign corporation doing business in the state of Nevada and appointment of an agent for service of process in the state. FAC ¶ 19; *see also* Patek Decl. Ex. 1. Long ago, the Supreme Court held that consent to accept service of process through a state official was a sufficient basis for jurisdiction,

the same as if the corporation had appointed an agent to receive service in a state. *Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 95 (1917). Last month, in *Mallory*, the Supreme Court reaffirmed its holding from *Pennsylvania Fire* that "due process allows a corporation to be sued on any claim in a State where it has appointed an agent to receive whatever suits may come." 2023 U.S. LEXIS 2786 at *15. Accordingly, under both *Pennsylvania Fire* and *Mallory*, where a state requires a corporation to have a registered agent to accept service of all legal process in the state, the corporation is subject to suit there.

In *Pennsylvania Fire*, a company challenged a Missouri court's exercise of jurisdiction where the plaintiff's home state was Arizona, the defendant's home state was Pennsylvania, and the underlying contractual dispute occurred in Colorado. Defendant was registered to do business in Missouri, which required the company to appoint an agent for service of process. *Pennsylvania Fire*, 243 U.S. at 94. The Court found "there was 'no doubt' Pennsylvania Fire could be sued in Missouri by an out-of-state plaintiff on an out-of-state contract because it had agreed to accept service of process in Missouri on any suit as a condition of doing business there." *Mallory*, 2023 U.S. LEXIS 2786, at *15 (citing *Pennsylvania Fire*, 243 U.S. at 95); *see also Gold Issue Mining & Mill. Co. v. Pa. Fire Ins. Co*., 267 Mo. 524, 543–44 (1916) (opinion that was appealed that includes the full text of the Missouri statute).

The Court further clarified that the traditional basis for transitory actions (or "tag" jurisdiction) recognized in *Pennsylvania Fire* and *Mallory* sits "side by side" with its holding in *International Shoe Co. v. Washington*, 326 U. S. 310 (1945). *Mallory*, 2023 U.S. LEXIS 2786, at *19. *International Shoe* did not limit the traditional basis for jurisdiction over out-of-state corporations that *had* consented to in-state suits by designating agents to receive service of process; rather, *International Shoe* provided an additional road to jurisdiction over out-of-state corporations that had *not* consented to suit in the forum or were not present in that way. *Id.* at *22–23.

Here, Nevada's foreign corporation law provides that "[e]very foreign corporation owning property or doing business in [Nevada] shall appoint and keep in [Nevada] a registered agent as provided in NRS 14.020." NRS 80.060. NRS 14.020 requires a foreign corporation, such as Endeavor Holdings, to "appoint and keep . . . a registered agent who resides or is located in this

state, upon whom ***all legal process*** and any demand or notice authorized by law to be served upon it may be served . . . ." Endeavor Holdings is registered to do business in Nevada and has designated a registered agent in the state. Patek Decl. 1. Designating an agent for service of process of suits in a state is a sufficient basis for personal jurisdiction under *Mallory* and *Pennsylvania Fire*, and, pursuant to NRS 14.065, Nevada exercises jurisdiction over parties "on any basis not inconsistent with . . . the Constitution of the United States." Thus, this Court has jurisdiction over Endeavor Holdings.

Recognizing that the Supreme Court and plain text of the Nevada statute are not on their side, the Endeavor Defendants attempt to create their own rule from whole cloth—that "unless a statute *expressly* states that being licensed to do business is a state constitutes consent to jurisdiction . . . , a company is not subject to general jurisdiction by doing so." Defs.' Mot. at 6 (emphasis in original). None of the cases cited by the Endeavor Defendants, however, support any such rule. Instead, all but one of these cases discuss whether a defendant is subject to general personal jurisdiction under *International Shoe*. *See Joal, LLC v. Trailboss Enters., Inc.*, 2020 U.S. Dist. LEXIS 249257, at *6 (D. Nev. Mar. 23, 2020) (analyzing whether defendant is subject to general jurisdiction under *International Shoe*); *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.20, 134 S. Ct. 746 (2014) (same); *Hunt v. Auto-Owners Ins. Co.*, 2015 U.S. Dist. LEXIS 75099, at *1 (D. Nev. June 10, 2015) (same); *Freeman v. Second Jud. Dist. Ct. ex rel. Cnty. of Washoe*, 116 Nev. 550, 558 (2000) (analyzing whether NRS 680A.250, which applies only to insurance companies, subjects a non-resident insurance company to personal jurisdiction in Nevada under *International Shoe*). As explained in *Mallory*, however, the *International Shoe* analysis applies only where a defendant has *not* appointed an agent for process or otherwise consented to personal jurisdiction in order to do business in a state.[3]

It is true that the state statute at issue in *Mallory* explicitly stated that establishing a registered agent permitted state courts to "exercise general personal jurisdiction" over registered, foreign corporations. 42 Pa. Cons. Stat. § 5301(a)(2)(i). And while the *Mallory* Court did state that

---

[3] Accordingly, to the extent *Freeman* is inconsistent with *Mallory*, ithas been effectively overruled.

it "need not speculate whether any other statutory scheme and set of facts would suffice to establish consent to suit," it did not limit its holding to statutes with explicit jurisdictional language. *Mallory*, 2023 U.S. LEXIS 2786, *18. To the contrary, the Court reaffirmed *Pennsylvania Fire*, where there was no such statutory language. *See id.*; *see also Gold Issue Mining & Mill. Co. v. Pa. Fire Ins. Co.*, 267 Mo. at 543–44 (full text of Missouri statute). Moreover, the Court specifically identified Nevada law (among others) as an example of an "all-purpose-jurisdiction rule" that requires out-of-state corporations "to agree to defend themselves there against any manner of suit." *Mallory*, 2023 U.S. LEXIS 2786, at *12 (citing 1889 Nev. Stats. p. 47).

Therefore, because Endeavor Holdings has a registered agent for service of all legal process in Nevada, it is subject to suit here and the Court has jurisdiction.

**2. The Court has specific personal jurisdiction over Endeavor Holdings and Endeavor Streaming.**

Even if the Court does not have general jurisdiction over Endeavor Holdings, it still has specific jurisdiction over both Endeavor Holdings and Endeavor Streaming. Whether a court's exercise of jurisdiction satisfies due process turns on "the nature and extent of the defendant's relationship to the forum State." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). To assert specific jurisdiction, the defendant must have "take[n] some act by which it purposefully avails itself of the privilege of conducting activities within the forum State." *Id.* The Ninth Circuit uses a three-part test to determine whether specific jurisdiction exists:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;[4] (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.[5]

*Fred Martin Motor Co.*, 374 F.3d at 802. Plaintiffs' claims arise out of and relate to UFC Fight Pass. The Endeavor Defendants' forum-related activities with respect to UFC Fight Pass and the content hosted on UFC Fight Pass subject them to personal jurisdiction in Nevada.

---

[4] The Ninth Circuit recently confirmed that "the first prong 'may be satisfied by purposeful availment,' 'by purposeful direction,' or 'by some combination thereof'" regardless of whether the claims sound in tort or contract. *Davis v. Cranfield Aero. Sols., Ltd.*, 2023 U.S. App. LEXIS 15794, at *12 (9th Cir. June 23, 2023).

[5] The Endeavor Defendants do not contest the third factor. *See generally* Defs.' Mot. at 5–8.

***a. The Endeavor Defendants purposefully availed themselves to Nevada.***

Purposeful availment looks to a defendant's "entire course of dealing" with the forum state—"not solely the particular contract or tortious conduct giving rise to [a plaintiff's] claim." *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1108 (9th Cir. 2020). It exists when a defendant "deliberately reached out beyond [its] home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." *Davis*, 2023 U.S. App. LEXIS 15794, at *14–15. It "can be established by a contract's negotiations, its terms, its contemplated future consequences, and the parties' actual course of dealing." *Id*. Both Endeavor Defendants purposefully availed themselves of the right to do business in Nevada by entering into contracts centered on performance there and exploiting the Nevada market.

Endeavor Streaming has had a long-standing business relationship with Zuffa—a Nevada company—to manage the code on the Fight Pass Website. FAC ¶ 18. While Zuffa signs up customers for UFC Fight Pass, "Endeavor Streaming collects revenue paid by the end-user for these products and then remits payment to the [Zuffa]" in Nevada. Patek Decl. Ex. 2, Endeavor Group Holdings, Inc. Form 8-K, dated June 16, 2023 ("Form 8-K"), at 15. From Nevada, Zuffa "pays Endeavor Streaming fees for revenue generated using Endeavor Streaming's platform, as well as for work performed in updating and maintaining the video platform." *Id*.

Endeavor Streaming committed additional acts which, together with the Fight Pass Website, exploited the Nevada market.[6] First, Endeavor Streaming initially programmed the Fight Pass Website, in coordination with Nevada-based Zuffa, to collect and transmit subscribers' personally identifiable information to Facebook. This act was "expressly aimed at the forum state" in that it was aimed to assist Nevada-based Zuffa in operating the Fight Pass Website.

Moreover, Endeavor Streaming conducts substantial business within the state of Nevada, including with Zuffa, which has its principal place of business in Nevada. FAC ¶ 18. Zuffa worked

---

[6] This analysis does not separate the Endeavor Defendants' collection, use and disclosure of Nevada residents' data from Endeavor Holdings' and Endeavor Streaming's physical contacts with Nevada. The Ninth Circuit in *Mavrix Photo, Inc. v. Brand Techs, Inc.* made clear that *all* of these contacts are to be examined *collectively* as factors in determining whether a defendant has done "something more" than simply operate a passive website. 647 F.3d 1218, 1229 (9th Cir. 2011).

with Endeavor Streaming to build the Fight Pass Website and continues to coordinate with Endeavor Streaming to maintain and operate the Fight Pass Website. *Id.* In the course of providing these services, Endeavor Streaming regularly communicates and works alongside Zuffa employees located in Nevada. *Id*.

Endeavor Holdings, meanwhile, provides significant management and back office services related to the operation of the UFC Fight Pass to Zuffa in Nevada. Endeavor Holdings charges Zuffa an annual management fee of $25.0 million for services related to "representation, executive leadership, back-office and corporate functions, and other services." Form 8-K at 15. Zuffa enters into various other transactions with entities affiliated with Endeavor Holdings "throughout the normal course of business." Form 8-K, at 15.

Endeavor Holdings further exploited the Nevada market by directing Endeavor Streaming and Nevada-based Zuffa to create the Fight Pass Website—including directing Endeavor Streaming and Zuffa to enter into an agreement whereby Endeavor Streaming would "power" the Fight Pass Website. These actions were "expressly aimed at the forum state" because they assisted Nevada-based Zuffa in operating the Fight Pass Website. Further, Endeavor Holdings solicited business with Zuffa in Nevada in connection with its acquisition of the company in 2016 and subsequently worked closely with Zuffa to develop the UFC Fight Pass platform. *Id*. The majority of Zuffa's employees are located in Nevada, and Endeavor Holdings regularly communicates with Zuffa employees located in Nevada in connection with its management and monetization of the UFC Fight Pass platform. *Id*. Indeed, much of content of Endeavor Holdings "own" UFC featured on the UFC Fight Pass platform was filmed in Nevada, including The Ultimate Fighter and other on-demand videos of live fights that occurred in Nevada. *Id*.

***b. The Endeavor Defendants' Fight Pass Website purposefully directed activities at Nevada.***

In operating the Fight Pass Website with Zuffa, the Endeavor Defendants "engage[] in [the] systematic nationwide practice of invading subscribers' privacy," including those from Nevada, by

disclosing subscribers' sensitive data to Facebook without their consent.[7] FAC ¶ 27. In the context of a nationally accessible website, the "maintenance of a passive website alone cannot satisfy the express aiming prong," but "operating even a passive website in conjunction with 'something more'—conduct directly targeting the forum—is sufficient." *Mavrix Photo, Inc*., 647 F. 3d at 1229. Courts look to "the interactivity of the website," whether "a website 'with national viewership and scope appeals to, and profits from, an audience in a particular state,'" and whether "the site had a forum-specific focus." *Herbal Brands, Inc. v. Photoplaza, Inc.*, 2023 U.S. App. LEXIS 16904, at *13 (9th Cir. July 5, 2023).

In *Mavrix Photo*, the defendant exploited the California market because it made "money by selling advertising space on its website to third-party advertisers." *Id*. at 1225–26. To the Ninth Circuit, it was "immaterial" whether the third-party advertisers or the defendant specifically targeted California residents. *Id*. at 1230. Instead, the court concluded that the defendant exploited the California market because it had actual or constructive knowledge about its California user base and profited from California "by selling space on its website for advertisements." *Id*.

The Fight Pass Website is interactive (i.e., a website in which "visitors can exchange information with the host computer by inputting data directly") because subscribers input their personal information when they sign up. *Id*.; *see also* FAC ¶¶ 29–30. UFC Fight Pass operates on a national scale, and a significant portion of its subscribers are from Nevada. Defendants' forum-related activities also include, unbeknownst to subscribers, sharing Nevada subscribers' browsing data and the videos they requested or obtained. FAC ¶ 20. Indeed, Defendants shared this information with Facebook specifically to *target* subscribers across the United States and in Nevada for the purpose of sending them targeted advertisements and promotions. FAC ¶¶ 3, 96.

Beyond their use of Nevada consumers' data, the Endeavor Defendants also exploited the Nevada market through their operation of the Fight Pass Website. Defendants created a significant portion of their Fight Pass content in Las Vegas—a deciding factor in *Mavrix* (*see* 647 F.3d at 1230). FAC ¶ 19. Further, UFC hosts major fights that primarily take place in Las Vegas that Fight Pass

---

[7] *Carroll v. J.M. Smucker Co.*, No. C 22-08952 WHA, 2023 U.S. Dist. LEXIS 104522, at *6 (N.D. Cal. June 15, 2023) ("Defendant's use of the Facebook Pixel on its website is therefore the requisite intentional act committed.").

subscribers can watch on demand. Endeavor Holdings also owns UFC Apex, a "state-of-the-art, 130,000 square-foot production facility in Las Vegas" that gives Defendants "the flexibility to try new things and push the envelope on producing and distributing combat sports all over the world." *See* Patek Decl. Ex. 3, printout of UFC website, available at <u>*https://www.ufc.com/news/ufc-apex-officially-opens-las-vegas*</u> (last visited July 26, 2023).[8] Advertisements for these events are targeted towards UFC Fight Pass subscribers using data sent to Facebook. FAC ¶ 44. Finally, Endeavor Streaming collects revenue paid by subscribers to UFC Fight Pass remits payment to the Zuffa in Nevada. Form 8-K, at 15.

***c. The claim arises out of and relates to forum contacts.***

To demonstrate that its claims "arise out" of forum-related activities, a "Plaintiff[] must show that [it] would not have suffered an injury 'but for' [the Defendant's] forum related conduct." *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1075 (9th Cir. 2001). Here, Plaintiffs' injuries arise from the Endeavor Defendants' interactions with Nevada-based Zuffa and content that was frequently created in, and likely distributed from, Nevada. *See* FAC ¶¶ 11, 13, 18–20, 25, 27. As such, Plaintiffs' claims are directly tied to Defendants' contact with Nevada.

**3. Plaintiffs request jurisdictional discovery.**

If the Court finds that Plaintiffs have not sufficiently pleaded facts to establish personal jurisdiction, it should nevertheless exercise its discretion to grant Plaintiffs jurisdictional discovery. *See Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977) (holding that the decision whether to grant jurisdictional discovery is within the discretion of the district court). "[A] plaintiff need not make out a prima facie case of personal jurisdiction before it can obtain jurisdictional discovery." *Calix Networks, Inc. v. Wi-Lan, Inc.*, No. C-09-06038-CRB DMR, 2010 WL 3515759, at *4 (N.D. Cal. Sept. 8, 2010) (collecting cases). "Rather, a plaintiff must present a 'colorable basis' for jurisdiction, or 'some evidence' constituting a lesser showing than a prima facie case." *Id*. (citation omitted); *Focht v. Sol Melia S.A.*, No. 10-cv-0906-EMC, 2010 WL 3155826, at *2 (N.D. Cal. Aug. 9, 2010).

[8] Endeavor Holdings claims to own the UFC Apex venue. EHG Prospectus, at 8 (referring to Endeavor Holdings' "owned Apex venue in Las Vegas").

At this early stage, Plaintiffs are not aware of the full extent of the Endeavor Defendants' Fight Pass-related contacts with Nevada.[9] At a minimum, jurisdictional discovery will reveal the agreements between the Endeavor Defendants and Zuffa defining their business relationship. Plaintiffs have already served discovery requests seeking this, and other, information that will provide evidence to support the exercise of personal jurisdiction. *See* Patek Decl. Exs. 4–7. To date, Defendants have not responded to these requests.

**B. Plaintiffs Have Stated a Claim Under the VPPA.**

**1. The Endeavor Defendants are video tape service providers.**

The VPPA defines a "video tape service provider" to mean "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials . . . . 18 U.S.C. § 2710(a)(4). "'[A] defendant can be 'engaged in the business' of delivering video content even if other actors *also* take part in the delivery of the same video content.'" *Stark v. Patreon, Inc.*, No. 22-cv-03131-JCS, 2022 U.S. Dist. LEXIS 187602, at *20–21 (N.D. Cal. Oct. 13, 2022) (quoting *In re Vizio, Inc.*, 238 F. Supp. 3d 1204, 1221–22 (C.D. Cal. 2017) (holding that a provider of "Smart TVs" that were "designed to enable consumers to seamlessly access Netflix, Hulu, YouTube, and Amazon Instant Video content in their home" was sufficiently alleged to be a "video tape service provider" within the meaning of the VPPA). Rather, so long as the product at issue is "substantially involved in the conveyance of video content to consumers" and "significantly tailored to serve that purpose," a defendant is in the business of delivering video content. *In re Vizio*, 238 F. Supp. 3d at 1221.

Plaintiffs allege that Endeavor Holdings 'deliver[s]" "on-demand virtual sports products" including its "own" UFC through UFC Fight Pass, and unquestionably "provide[s] streaming video solutions" to consumers. FAC ¶¶ 13, 26; EHG Prospectus, at 145. These allegations are more than sufficient to plead that Endeavor Holdings "engages in" the delivery of prerecorded video cassette tapes or similar audio visual materials. Plaintiffs have likewise adequately alleged that Endeavor Streaming is a video tape service provider. Endeavor Streaming's entire business model is built on

[9] Nor should Plaintiffs be penalized at this stage for not possessing a full knowledge of the interworking between Endeavor Holdings and its complex web of subsidiaries.

providing video streaming services. *See* FAC ¶¶ 2, 12, 13, 26. This activity is not "peripherally or passively involved in video content delivery" but rather is specifically tailored to the purpose of delivering video content. *See In re Vizio*, 238 F. Supp. 3d at 1221–22. Endeavor Streaming, therefore, falls squarely into the definition of video tape service provider.

The Endeavor Defendants argue that Plaintiffs have not adequately pleaded that Endeavor Holdings is a video tape service provider because (1) Plaintiffs allegations are conclusory; and (2) that Endeavor Holdings is a mere umbrella organization and that only Defendant Zuffa operates the Fight Pass Website.

First, Plaintiffs' allegations are hardly conclusory. Rather, they mirror Endeavor Holdings' own statements describing its business and operations. *See*, *e.g.*, FAC ¶¶ 13, 26 (citing EHG Prospectus). And the Endeavor Defendants' motion outright ignores several allegations in the FAC which describe in detail how Endeavor Holdings' business and operations fall within the definition of video tape service provider. *See id*. ¶¶ 2, 12–13, 26, 28. The FAC alleges that Endeavor Holdings is "engaged in the business . . . of rental, sale, or *delivery* of" video content because it tells its *own investors* "that it '*deliver[s]* live streaming video and data feeds for more than 45,000 sports events annually, as well as for on-demand virtual sports products including our own UFC.'" FAC ¶ 26 (emphasis added). It "touts itself as 'one of the largest independent global distributors of sports video programming and data,'" (FAC ¶ 13) and describes itself in SEC filings as "a full-service content production and distribution platform" (EHG Prospectus, at 145). As Endeavor Holdings itself concedes, *distribution* necessarily encompasses the *delivery* of video content.[10]

Second, Endeavor Holdings owns, operates, and manages several subsidiaries within its corporate umbrella. *See* FAC ¶¶ 13, 19, 23; *see also* EHG Prospectus, at 12. At its core, the Endeavor Defendants' argument is that only one entity (i.e., Zuffa) can qualify as a "video tape service provider" under the VPPA. "But such a limitation is found nowhere in the text of the statute." *In re Vizio*, 238 F. Supp. 3d at 1222. Indeed, "Congress's use of a disjunctive list (*i.e.,* 'engaged in

---

[10] *Compare Deliver*, Oxford English Dictionary (Online ed.) ("The action of conveying and handing over something, esp. the delivering of letters, parcels, or goods.") *with Distribution*, Oxford English Dictionary (Online ed.) ("The action of dividing and dealing out or bestowing in portions among a number of recipients; apportionment, allotment.").

the business . . . of . . . rental, sale, *or* delivery') unmistakably indicates that Congress intended to cover more than just the local video rental store" including entities like Zuffa and the Endeavor Defendants that sell directly to consumers. *Id*. at 1221.

The Endeavor Defendants' attempt to minimize Endeavor Streaming's involvement by characterizing Endeavor Streaming's actions as "merely" "writ[ing] the code for the Fight Pass Website" and "address[ing] technological problems." Defs.' Mot. at 7. This argument again ignores the allegations in the FAC, and Endeavor Holdings own statements, which show that Endeavor Streaming's actions were critical to the creation and operation of the Fight Pass Website. FAC ¶¶ 13, 23–24, 27; EHG Prospectus, at 3, 145, 147, F-7.

**2. Plaintiffs are "consumers" of the Endeavor Defendants.**

Under the VPPA, "consumers" are "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1). Plaintiffs are clearly "consumers" of Endeavor Holdings and Endeavor Streaming, which are, as described above, video tape service providers. First, Plaintiffs are consumers of Endeavor Holdings because they pay for and subscribe to Endeavor Holdings' content. Indeed, Endeavor Holdings considers subscribers to UFC Fight Pass its "*own*" subscribers. EHG Prospectus, at 104 ("The value of *our* content is demonstrated by *our* licensing arrangements . . . and *our* increasing consumer engagement is reflected by the growth of FIGHT PASS subscribers and overall follower growth and engagement across *our* social channels.") (emphasis added).

Second, Plaintiffs are consumers of Endeavor Streaming. They pay for and subscribe to the streaming services that Endeavor Streaming provides for UFC Fight Pass even if they do not know it. Indeed, subscribers could not watch *any* videos on UFC Fight Pass without the technology Endeavor Streaming provides to enable video streaming on the platform. And, because Endeavor Streaming "powers" the UFC Fight Pass platform, subscribers' payments are remitted through Endeavor Streaming. *See* Form 8-K, at 15 ("Endeavor Streaming collects revenue paid by the end-user for [UFC Fight Pass].").

The Endeavor Defendants, again, advance a narrow view of the VPPA to contend that Fight Pass purchasers qualify as "consumers" for only one entity—Zuffa—because a consumer only

"subscribes" to services of entities with whom they contract. Endeavor Defendants contend that "Plaintiffs here have not alleged any 'ongoing commitment or relationship'[11] with the Endeavor Defendants, nor do they allege that the Endeavor Defendants own or operate the UFC Fight Pass website" (Defs.' Mot. at 12). This argument ignores the pleadings (*e.g.* FAC ¶¶ 2 ("Endeavor Group the wildly popular Ultimate Fighting Championship ("UFC") mixed martial arts enterprise"), 45–48 (Endeavor Streaming discussing the need to understand who Fight Pass users are "and we're not just talking about their names."), 52–78 (discussing Plaintiffs experiences with Defendants, including the Endeavor Defendants (i.e. their "ongoing commitment or relationship" )), and Endeavor Holdings' statements to investors (*e.g.* EHG Prospectus, at 104 ("The value of our . . . increasing consumer engagement is reflected by the growth of FIGHT PASS subscribers"), 148 ("reaching a global audience . . . through . . . our owned FIGHT PASS streaming platform. In 2020, FIGHT PASS subscriptions were up over 40% . . . .").

The cases cited by the Endeavor Defendants are inapposite. Each of those cases cites to a complaint where plaintiffs did not allege that they had subscribed to *any* service, not where plaintiffs alleged they were consumers of multiple entities where those entities jointly operated a streaming platform. *See Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1257 (11th Cir. 2015) (rejecting "the broad proposition that persons do not have to log in or register to be considered subscribers"); *Perry v. CNN, Inc.*, 854 F.3d 1336, 1344 (11th Cir. 2017) (holding that simply downloading an app is not enough to consider someone a subscriber); *Jefferson v. Healthline Media, Inc.*, No. 3:22-cv-05059-JD, 2023 U.S. Dist. LEXIS 91174, at *8 (N.D. Cal. May 24, 2023) (dismissing, with leave to amend, complaint where plaintiff alleged she signed up for an email list but did not allege that she received any type of publication or service); *Carter v. Scripps Networks, LLC*, No. 22-cv-2031 (PKC), 2023 U.S. Dist. LEXIS 71150, at *16 (S.D.N.Y. Apr. 24, 2023) (dismissing complaint where plaintiffs were a subscribers of an hgtv.com newsletter but not the hgtv.com video services that collected and transmitted plaintiffs' information); *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015) (dismissing complaint where

[11] The Endeavor Defendants lift the "ongoing commitment or relationship" language from Eleventh Circuit precedent. Defs.' Mot. at 12 (citing *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1257 (11th Cir. 2015)). The Ninth Circuit has yet to evaluate the definition of "consumer."

plaintiff alleged infrequent, irregular visits to AMC's website, did not create a profile, and did not sign up for any service).

The argument also turns the plain language of the statute on its head. When engaging in statutory interpretation, the Ninth Circuit instructs that courts must "derive meaning from context, and this requires reading the relevant statutory provisions as a whole." *Carpenters Health & Welfare Tr. Funds v. Robertson*, 53 F.3d 1064, 1067 (9th Cir. 1995). The VPPA imposes liability on video tape service providers "who knowingly disclose[], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). To read "consumer" to mean only persons who contract with a video tape service provider would inherently limit liability under the VPPA to only video tape service providers in privity with a consumer. If it were true the statute only applied to consumer in direct privity with a video tape service provider, there would be no need for the VPPA to sweep all persons "engaged in the business" of the delivery of video content into its reach. By adopting a broad definition of "video tape service provider," the VPPA necessarily contemplates *multiple* entities can provide the same service, even those that are not in a contractual relationship with the consumer. 18 U.S.C. § 2710(a)(4). In accordance with the VPPA's overarching goal to vest consumers with the power "to maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers," the statute's broad definition of "video tape service provider" ensures that *every* entity engaged in the business of providing video content abides by this responsibility and secures consumer consent prior to disclosure, regardless of privity. *Mollett*, 795 F.3d at 1065. The Endeavor Defendants' interpretation runs counter to the statute's goal and renders the "engaged in the business" language in the definition of "video tape service provider" superfluous.

**3. The Endeavor Defendants disclosed Plaintiffs' personally identifiable information.**

The VPPA defines "personally identifiable information" to "include[] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017). In the Ninth Circuit, information is personally identifiable information if it would "readily permit an ordinary person to identify a specific individual's video-watching behavior." *Id.* at 985. Plaintiffs allege

Defendants disclosed to Meta (a.k.a. Facebook) "a Facebook ID is a unique identifier that Facebook assigns to every person who signs up for a Facebook account. With it, third parties can identify particular consumers and to obtain other sensitive information on their Facebook profiles, without consumers' knowledge or consent." FAC ¶ 37. Courts have held this is sufficient. *See*, *e.g.*, *Stark*, 2022 U.S. Dist. LEXIS 187602, at *24–25. (finding "sufficient" "alleg[ations] that '[a]nyone who possesses an FID may use this number to quickly and easily locate, access, and view the corresponding Facebook profile,' which in turn can reveal a user's name or other personal information").

The Endeavor Defendants do not argue that the information transmitted to Facebook was not personally identifiable information. Rather, they continue to lay all the blame at the feet of Zuffa.[12] But the FAC alleges that Endeavor Holdings, Zuffa, and Endeavor Streaming "*together* engaged in [a] systematic nationwide practice of invading subscribers' privacy by disclosing their personally identifiable information to Facebook" and "*jointly* operated the Fight Pass Website." FAC ¶ 27 (emphasis added). Endeavor Streaming, in particular, was responsible for "mak[ing] technical decisions about how [the] code interacts with Facebook pixels" which included "configuring the URLs to include video titles." *Id*. ¶ 24. The Facebook code embedded into the Fight Pass Website transmitted these URLs to Facebook when users accessed video content on Fight Pass, and, as a result, disclosed "the name of the video the consumer requests or obtains, and the fact that the website viewed contains video content." *Id*. ¶ 5. These disclosures form the basis of the VPPA claim.[13]

---

[12] The Endeavor Defendants also argue that the FAC does not satisfy Rule 8 because it at times "refer[s] collectively to "Defendants"" instead of each Defendant individually. Defs.' Mot. at 13–14. But, "[g]roup pleading is not fatal to a complaint if the complaint still gives defendants fair notice of the claims against them." *Tivoli LLC v. Targetti Sankey S.P.A.*, 2015 U.S. Dist. LEXIS 189660, at *9 (C.D. Cal. Feb. 3, 2015). And, where, as here, defendants share a parent-subsidiary relationship, frustration of notice is unlikely. *See Munning v. Gap, Inc.*, 2016 U.S. Dist. LEXIS 149886, at *9 (N.D. Cal. Oct. 28, 2016) ("because the Defendants all share a parent-subsidiary relationship . . . and because all the Defendants are represented by the same counsel, frustration of notice of the claims to each defendant is unlikely"). Here, the FAC alleges that Defendants acted collectively to unlawfully transmit Plaintiffs' information to a third party. Thus, Defendants on notice of exactly which claims are asserted against each entity—all of them.

[13] The Endeavor Defendants also include a throwaway argument that Facebook, not Endeavor Streaming, designed the code at issue and therefore Endeavor Streaming did not disclose consumers' personally identifiable information to a third party. This ignores the FAC's allegations that Defendants used a pre-packaged tool from Facebook and programmed it into the Fight Pass

### C. Plaintiff Bloom Adequately Pleads Violations of California Law.

In addition to Plaintiffs' VPPA Claims, Plaintiff Bloom brings three causes of action under California law. The Endeavor Defendants' arguments for dismissal of these claims largely mirror their arguments for dismissing Plaintiffs' VPPA claims.

#### 1. Plaintiff's Section 1799.3 Claim.

California Civil Code § 1799.3 provides that "[n]o person providing video recording sales or rental services shall disclose any personal information or the contents of any record, including sales or rental information . . . to any person, other than the individual who is the subject of the record, without the written consent of that individual." Cal. Civ. Code § 1799.3(a). The Endeavor Defendants offer two arguments for why Plaintiff Bloom has failed to plead a violation of § 1799.3—both fail.

First, the Endeavor Defendants argue that Plaintiff Bloom's claim under California Civil Code § 1799.3 fails for the same reasons as Plaintiffs' VPPA claim, i.e. that there must be privity. In fact, the Endeavor Defendants argue that § 1799.3 is narrower than the VPPA[14] because the term "sales or rental services" indicates that the statute applies only to entities providing video materials to customers "in exchange for money," (Defs' Mot. at 15 (citing *Martin v. Meredith Corp.*, No. 22cv4776 (DLC), 2023 WL 2118074, at *4 (S.D.N.Y. Feb. 17, 2023)), and that Plaintiff Bloom does not allege that he exchanged money with either of the Endeavor Defendants for his UFC Fight Pass subscription. *Id*. Once again, Defendant puts forth its own interpretation that ignores the law and the allegations in the FAC. *See supra* § IV.B.

The Endeavor Defendants' assertion that § 1799.3 is "narrower" than the VPPA relies on a New York court's interpretation of California's statute. Defs.' Mot. at 15. *Martin* is not binding. And in any event, the court's finding that § 1799.3 applies to entities providing video services "in exchange for money" was meant to distinguish between paid subscriptions and free subscriptions (the subscription in *Martin* was free). Here, however, UFC Fight Pass *is* a paid subscription, and

---

Website—thereby causing consumers' personally identifiable information to be transmitted to Facebook. FAC ¶¶ 3–5.

[14] The Endeavor Defendants ignore that proving a claim under Cal. Civ. Code § 1799.3 is in fact easier than the VPPA since § 1799.3 does not have a "knowing" requirement.

therefore Endeavor Holdings and Endeavor Streaming did provide services "in exchange for money." FAC ¶¶ 29–30.

**2. Invasion of privacy under the California constitution.**

To state a claim for invasion of privacy under the California Constitution, plaintiffs must show that (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is "so serious . . . as to constitute an egregious breach of the social norms" such that the breach is "highly offensive." *Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.)*, 956 F.3d 589, 601 (9th Cir. 2020) (citation omitted).

In a familiar refrain, the Endeavor Defendants argue that Plaintiff's "legally protected privacy interest" premised on violations of the VPPA and § 1799.3 fail because the underlying violations are not adequately pleaded. As discussed above, this could not be farther from the truth.[15]

Likewise, the California Constitutional provides Plaintiff Bloom a legally protected interest in his "informational privacy." Indeed, "informational privacy" is the core of the relevant article of the California Constitution that underlies this cause of action. *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35 (1994). The Endeavor Defendants challenge whether the personally identifiable information they sent to Facebook was "sensitive and confidential information" for purposes of an information privacy claim. But the type of information Endeavor Defendants secretly transmitted to Facebook—information that identified individual subscribers, their video history, and video habits—is wholly within the ambit of "sensitive and confidential information." *See In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d at 604 ("the allegations that Facebook allegedly compiled highly personalized profiles from sensitive browsing histories and habits prevent us from concluding that the Plaintiffs have no reasonable expectation of privacy"); *Eichenberger*, 876 F.3d at 983 (finding that the VPPA "codifies a context-specific extension of the *substantive* right to privacy"); *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 125 (2006) (the California Legislature "repeatedly has enacted new legislation" including Cal. Civ. Code § 1799 "in an effort

---

[15] Likewise, to the extent the Endeavor Defendants argue that the FAC fails to allege specific conduct by the Endeavor Defendants related to the invasion of privacy claims, these arguments have been addressed, and refuted, above.

to increase the protection of California consumers' privacy in the face of a perceived escalation in the impingement upon privacy interests caused by various business practices").

Therefore, Plaintiff has adequately pleaded the first two elements of a claim for invasion of privacy—(1) that he possessed a legally protected privacy interest, and (2) that he maintained a reasonable expectation of privacy. The third element, whether the intrusion is "so serious . . . as to constitute an egregious breach of the social norms" such that the breach is "highly offensive," is a factual inquiry that is typically left to a jury. *See Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 285–97 (2009). Regardless, the Ninth Circuit has held allegations nearly identical to those at issue here (surreptitious transmission of data to Facebook of an individuals' off-Facebook activity) sufficient to survive a motion to dismiss. *See In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d at 606 ("The ultimate question of whether Facebook's tracking and collection practices could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage. Plaintiffs have identified sufficient facts to survive a motion to dismiss. Plaintiffs' allegations of surreptitious data collection when individuals were not using Facebook are sufficient to survive a dismissal motion on the issue."). As such, Plaintiff Bloom has adequately pled his California Constitutional privacy claim.

**3. UCL.**

The UCL has three separate prongs—the unlawful prong, the unfair prong, and the fraud prong—and each "captures a 'separate and distinct theory of liability.'" *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010). Plaintiff brings claims under *all three prongs*. None are subject to dismissal.

**a. Unlawful prong claim.**

Section 17200's "unlawful" prong "borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL." *Klein v. Chevron U.S.A., Inc.*, 137 Cal. Rptr. 3d 293, 326–27 (2012) (internal quotations omitted). "[V]irtually any law or regulation—federal or state, statutory or common law—can serve as [a] predicate for a . . . [section] 17200 'unlawful' violation." *Id*. (internal quotations omitted). This includes statutes that do not have their own private right of action. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal.4th 553, 561–62 (1998)

(rejecting argument that plaintiff should not be permitted to bring a claim under the UCL for a violation of a statute that did not have a private right of action). Plaintiff's claim under the "unlawful" prong of the UCL is based on Defendant's violation of the VPPA, California Civil Code § 1799.3, and California Constitution. FAC ¶ 122. Defendants' arguments for dismissal of Plaintiff's UCL claim under the "unlawful" prong fail for the same reasons as discussed for the predicate causes of action.

**b. Fraud prong claim.**

Omissions are actionable under the UCL when the omission is "contrary to a representation actually made by the defendant, or an omission of a fact that defendant was obliged to disclose." *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 835 (2006). A duty to disclose arises "when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff" and "when the defendant actively conceals a material fact from the plaintiff." *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255 (2011) (emphasis added).[16]

The Endeavor Defendants had a duty to disclose their disclosure of Plaintiff's private information to Facebook. These facts are material because a "reasonable [consumer] would deem it important in determining how to act in the transaction at issue." *Collins*, 202 Cal. App. 4th at 255; *see also In re Adobe Sys. Privacy Litig.*, 66 F. Supp. 3d 1197, 1231 (N.D. Cal. 2014) (finding Adobe had a duty to disclose "that its security practices were not up to industry standards"). The FAC further alleges that this information was "material to [Plaintiff's] purchasing decisions that Defendants would disclose [his] private information without [his] consent." FAC ¶ 118. And, Plaintiff would have, at the least, valued UFC Fight Pass less had he known the truth. FAC ¶ 121. These allegations are sufficient to establish materiality. *See Doe v. Successfulmatch.com*, 70 F.

[16] The Endeavor Defendants spend multiple pages of their brief in a rabbit hole argument based on a theory that a product defect must exist for Defendants to have a duty to disclose. *See* Defs.' Mot. at 19–21. But this is not the law. Rather, a duty to disclose arises "(1) when the defendant is the plaintiff's fiduciary; (2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; [or] (4) when the defendant makes partial representations that are misleading because some other material fact has not been disclosed." *Collins*, 202 Cal. App. 4th at 255. For that reason, courts routinely find the existence of a duty to disclose privacy violations. *See e.g.*, *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1302–03 (S.D. Cal. 2020); *Plaintiffs v. MGM Resorts Int'l*, No. 2:20-cv-00376-GMN-EJY, 2022 U.S. Dist. LEXIS 199399, at *45–47 (D. Nev. Nov. 2, 2022).

Supp. 3d 1066, 1080–81 (N.D. Cal. 2014) (finding that "information was material to Plaintiffs' purchases of Defendant's services since they would not have purchased memberships if they had 'known that their information was to be available on all of the websites . . . affiliated with PositiveSingles.com at any given time.'").

The FAC alleges that Defendants had exclusive knowledge of these material facts that were not known or reasonably accessible to Plaintiff and that Defendants actively concealed these material facts. FAC ¶ 119. Plaintiff did not know about Defendants' transmission of Plaintiff's personally identifiable information to Facebook. *Id*. Nor could he because each Defendant took steps to actively conceal the disclosure by omitting it from the Fight Pass privacy policy or in disclosures on the Fight Pass Website. FAC ¶¶ 33, 57, 64, 71, 75–77. These facts are more than sufficient to withstand a motion to dismiss.

The Endeavor Defendants argue that Plaintiff Bloom has not met the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, which requires that "a party must state with particularity the circumstances constituting fraud." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125–26 (9th Cir. 2009); Fed. R. Civ. P. 9(b). Plaintiff, however, has done so. *See* FAC ¶¶ 52–59 (describing Plaintiff's experiences with the Fight Pass Website). Each time Plaintiff Bloom visited the Fight Pass Website, Defendants concealed that Plaintiff's activity would be collected and transmitted to Facebook so that Plaintiff could be individually targeted with advertisements.

**c. Unfair prong claim.**

Under the UCL, a "a business practice may be unfair, and therefore illegal under the UCL, even if not specifically proscribed by some other law." *Epic Games, Inc. v. Apple, Inc.*, 2023 U.S. App. LEXIS 9775, at *94 (9th Cir. Apr. 24, 2023) (quotations omitted). The test "to support a finding of unfairness to *consumers*" is "the balancing test, which 'weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" *Id*. at *95. The FAC alleges the Endeavor Defendants engaged in unfair practices by sharing Plaintiff's sensitive information with a third party without Plaintiffs knowledge or consent. FAC ¶¶ 1–2, 4, 6–7, 33–34, 56, 118. This injury is particularly egregious and unavoidable because consumers have no ability

to opt out of their tracking. *Id.* ¶ 76. Moreover, the harm is not outweighed by any countervailing utility. The Endeavor Defendants use Plaintiff's data for their own monetary gain. *See id*. ¶¶ 42–45. This is no excuse for the surreptitious transmission of consumers' personally identifiable information. Indeed, multiple courts have recognized that there is *no* corresponding benefit under the balancing test when a defendant violates consumers' right to privacy. *See, e.g.*, *McCoy v. Alphabet, Inc.*, No. 20-cv-05427-SVK, 2021 U.S. Dist. LEXIS 24180, at *29–30 (N.D. Cal. Feb. 2, 2021) (court cannot say that the "benefit of collecting information outweighs harm to privacy rights"); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1073 (N.D. Cal. 2012) ("However, at this juncture the Court cannot say that Apple's practices are not injurious to consumers, or that any benefit to consumers outweighs the harm."); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 844 (N.D. Cal. 2020) ("The Court cannot say, as a matter of law, that the utility of the Google Assistant necessarily outweighs the harm from false accepts.").

Even so, dismissal of the UCL claim would be improper since whether a practice is unfair "is one of fact which requires a review of the evidence" and "thus cannot usually be" determined on the pleadings. *McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227, 240 (2006); *see also Rovai v. Select Portfolio Serv., LLC*, No. 14-cv-1738-BAS-WVG, 2018 U.S. Dist. LEXIS 107764, at *47 (S.D. Cal. June 27, 2018) ("The balancing test should not be a particularly difficult test to satisfy at the motion to dismiss stage.").

**D. In the Alternative, Plaintiffs Request Leave to Amend.**

In the event the Court grants the Endeavor Defendants' motion in any respect, Plaintiffs respectfully request that the Court grant leave to amend to correct any defects the Court identifies. *See United States ex rel. Insoon Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1050 (9th Cir. 2001) ("Leave to amend should be granted unless the district court determines that the pleading could not possibly be cured by the allegation of other facts.").

## V. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court deny the Endeavor Defendants' motion to dismiss.

Dated: July 26, 2023

**GUTRIDE SAFIER LLP**

*s/ Anthony J. Patek*
SETH A. SAFIER (*pro hac vice*)
seth@gutridesafier.com
MARIE A. MCCRARY (*pro hac vice*)
marie@gutridesafier.com
HAYLEY A. REYNOLDS (*pro hac vice*)
hayley@gutridesafier.com
ANTHONY J. PATEK (*pro hac vice*)
anthony@gutridesafier.com
KALI R. BACKER (*pro hac vice*)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111

*Attorneys for Plaintiffs*