1    **CAMPBELL & WILLIAMS**
     J. COLBY WILLIAMS (Nev. Bar No. 5549)
2    jcw@cwlawlv.com
     710 South 7th Street
3    Las Vegas, Nevada 89101
     Telephone: (702) 382-5222
4    Facsimile: (702) 382-0540

5    **PAUL HASTINGS LLP**
     SUSAN LEADER (*admitted pro hac vice*)
6    susanleader@paulhastings.com
     ALI R. RABBANI (*admitted pro hac vice*)
7    alirabbani@paulhastings.com
     STEPHANIE BALITZER (*admitted pro hac vice*)
8    stephaniebalitzer@paulhastings.com
     1999 Avenue of the Stars
9    Los Angeles, California  90067
     Telephone:  (310) 620-5700
10   Facsimile:  (310) 620-5899

11   Attorneys for Defendants

12

13

14                     UNITED STATES DISTRICT COURT

15                        DISTRICT OF NEVADA

16

17   EVERETT BLOOM; JACK GRAHAM;        | CASE NO. 2:22-cv-00412-RFB-BNW
     and DAVE LINDHOLM, on behalf of    |
18   themselves, and those similarly situated, | **DEFENDANT ZUFFA LLC'S**
                                         | **OPPOSITION TO PLAINTIFFS'**
19                Plaintiffs,            | **MOTION FOR CLASS**
                                         | **CERTIFICATION**
20          v.                           |

21   ZUFFA, LLC; ENDEAVOR
     STREAMING, LLC; and ENDEAVOR
22   GROUP HOLDINGS, INC.,

23                Defendants.

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page

3

I.      Introduction ............................................................................................................. 1

4

II.     Background ............................................................................................................. 4

5

        A.     Zuffa and the UFC Fight Pass Website................................................... 4

        B.     The Meta Pixel ....................................................................................... 4

6

        C.     Plaintiffs' Disclosure Theories................................................................ 4

7

        D.     Meta's Records........................................................................................ 5

        E.     The Named Plaintiffs .............................................................................. 6

8

        F.     Plaintiffs' Experts .................................................................................... 7

9

III.    Legal Standard ...................................................................................................... 8

IV.     Plaintiffs' Proposed Classes Are Not Sufficiently Defined................................... 8

10

V.      Plaintiffs Have Failed To Prove Numerosity ....................................................... 9

11

VI.     Plaintiffs Have Failed To Meet Their Burden Of Showing  Common Questions
        Predominate Over Individualized Issues.............................................................. 10

12

        A.     Whether Facebook IDs Were Disclosed to Meta Requires Individualized Proof.. 11

13

        B.     The "FBP" Cookie is not Common Proof that Zuffa Disclosed Facebook IDs..... 17

14

VII.    Plaintiffs Have Failed To Meet Their Burden Of Showing That Class Treatment Is The
        Superior Method Of Adjudication ........................................................................ 18

15

VIII.   The Proposed California Class Should Not Be Certified For Additional Independent
        Reasons ................................................................................................................. 21

16

        A.     Plaintiff Bloom Cannot Satisfy the Typicality and Adequacy Requirements........ 21

        B.     Common Questions Do Not Predominate Over Individualized Issues................. 21

17

        C.     Plaintiff Bloom Fails to Provide Any Damages Methodology For His California
               Invasion of Privacy and UCL Claims. ................................................................ 22

18

IX.     Plaintiffs Lack Standing To Certify A Rule 23(B)(2) Class ............................................. 23

19

X.      Plaintiffs Should Be Prohibited From Using Meta's Records For The First Time On
        Reply ................................................................................................................................ 23

20

XI.     Plaintiffs Have Waived Class Certification Against The Endeavor Defendants ............... 24

21

XII.    Conclusion ....................................................................................................................... 24

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

*Page(s)*

3

**Cases**

4

*In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*,

5
   2017 WL 2559615 (C.D. Cal. June 7, 2017) ........................................................ 24

6

*Amchem Prods., Inc. v. Windsor*,

7
   521 U.S. 591 (1997) .............................................................................................. 12

8

*Antoninetti v. Chipotle Mexican Grill, Inv.*,
   2012 WL 3762440 (S.D. Cal. Aug. 28, 2012) ...................................................... 12

9

*Bowerman v. Field Asset Servs.*,

10
   Inc., 60 F.4th 459, 469 (9th Cir. 2023) ................................................................ 12

11

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ........................................................................ 22, 23

12

13

*Carmen Pena v. Taylor Farms Pac., Inc.*,
   2015 WL 12550898 (E.D. Cal. Mar. 30, 2015) .................................................... 27

14

*Comcast Corp. v. Behrend*,

15
   569 U.S. 27 (2013) ........................................................................................ *passim*

16

*Daniel F. v. Blue Shield of California*,
   305 F.R.D. 115 (N.D. Cal. 2014) .......................................................................... 25

17

18

*Davis v. Homecomings Fin.*,
   2007 WL 1600809 (W.D. Wash. June 1, 2007) .................................................... 26

19

*Eichenberger v. ESPN, Inc.*,

20
   876 F.3d 979 (9th Cir. 2017) ................................................................................ 19

21

*In re: Facebook Privacy Litig.*,
   2016 WL 4585817 (N.D. Cal. Sept. 2, 2016) ....................................................... 18

22

*Gen. Tel. Co. of Sw. v. Falcon*,

23
   457 U.S. 147 (1982) ................................................................................................ 9

24

*In re Graphics Processing Units Antitrust Litig.*,

25
   253 F.R.D. 478 (N.D. Cal. 2008) ................................................................ 2, 12, 27

26

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ........................................................................................... 9, 19

27

*Hart v. TWC Prod. & Tech. LLC*,

28
   2023 WL 3568078 (N.D. Cal. Mar. 30, 2023) ................................................ 23, 24

*Hernandez v. City of San Jose*,
  2019 WL 4450930 (N.D. Cal. Sept. 17, 2019) ......................................................... 26

*In re Hulu Privacy Litig.*,
  2014 WL 2758598 (N.D. Cal. June 17, 2014) ................................................... *passim*

*Kim v. Benihana, Inc.*,
  2022 WL 1601393 (C.D. Cal. Mar. 25, 2022) .......................................................... 25

*Larsen v. Vizio, Inc.*,
  2017 WL 11633132 (C.D. Cal. Apr. 27, 2017) ................................................... 3, 26

*Mazza v. Am. Honda Motor Co.*, ................................................................................ 10
  666 F.3d 581, 596 (9th Cir. 2012)

*Mays v. Wal-Mart Stores, Inc.*,
  804 F. App'x 641 (9th Cir. 2020) (unpublished) ..................................................... 11

*McCarty v. SMG Holdings, I, LLC*,
  2022 WL 913092 (N.D. Cal. Mar. 29, 2022).......................................................... 11

*Miller v. RP On-Site, LLC*,
  2020 WL 6940936 (N.D. Cal. Nov. 25, 2020)........................................................ 11

*In re Nickelodeon Consumer Privacy Litig.*,
  827 F.3d 262 (3rd Cir. 2016) ................................................................................... 20

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2020) ................................................................................ 9, 10

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm.
  Co. Ltd.*,
  2023 WL 4191651 (C.D. Cal. May 24, 2023) ......................................................... 25

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015) ............................................................................ 23

*Risinger v. SOC LLC*,
  2019 WL 3400645 (D. Nev. July 26, 2019)............................................................ 25

*In re Taco Bell Wage & Hour Actions*,
  2011 WL 4479730 (E.D. Cal. Sept. 26, 2011)........................................................ 27

*Townsend v. Monster Beverage Corp.*,
  303 F. Supp. 3d 1010 (C.D. Cal. 2018) .................................................................. 24

*Wakefield v. ViSalus, Inc.*
  51 F.4th 1109 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1756 (2023)..................... 22

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................................................... 12

*Walker v. Life Ins. Co. of the Sw.*,
    953 F.3d 624 (9th Cir. 2020) ....................................................................................... 22, 23

*Wetzel v. CertainTeed Corp.*,
    2019 WL 3976204 (W.D. Wash. Mar. 25, 2019) .................................................................. 21

*Zinser v. Accufix Rsch. Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ...................................................................................... 20, 21

**Other Authorities**

Fed. R. Civ. P.
    23(b)(3) ..................................................................................................................... 12, 20
    23(b)(3)(D) ................................................................................................................... 3, 20
    23(c)(1)(B) .................................................................................................................... 2, 9

1    **I.**    <u>**INTRODUCTION**</u>

2        Plaintiffs' Motion for Class Certification should be denied because the core issue underlying

3    their claims—whether Zuffa allegedly disclosed Facebook IDs to Meta by installing the Meta Pixel

4    on the UFC Fight Pass website—cannot be determined on a class-wide basis without evaluating

5    each and every proposed class member's Facebook and web browser settings and practices.

6    Specifically, Plaintiffs seek to certify a class of all Fight Pass subscribers "with respect to whom

7    Meta received their [Facebook] ID and the URL of the webpage hosting video content."  Not. of

8    Mot. at 2.  According to Plaintiffs, this includes only Fight Pass subscribers whose Facebook IDs

9    were "actually sent" to Meta.  Mot. at 14.  But there is simply no way to determine whether *any*

10   proposed class member's Facebook ID was actually sent to Meta without highly individualized

11   inquiries because, as Plaintiffs and their expert acknowledge, this information is embedded in third-

12   party cookies (i.e., Facebook's "c_user" and "m_page_voice" cookies) that can be blocked by a

13   variety of common settings and practices—including using web browsers like Safari that block

14   third-party cookies by default, installing cookie blocker extensions like AdBlock, or manually

15   clearing cookies.  In fact, by Plaintiffs' own estimate, "perhaps 30% of total tracking was lost due

16   to cookie blockers."  Mot. at 15.  This alone is fatal to Plaintiffs' Motion.  *See In re Hulu Privacy*

17   *Litig.*, 2014 WL 2758598, at *22 (N.D. Cal. June 17, 2014) (denying class certification premised

18   on the disclosure of Facebook's c_user cookie because "the substantial issues about remaining

19   logged into Facebook and clearing and blocking cookies mean that the court cannot conclude on

20   this record that the common issues predominate over the individual ones").

21       Rather than address these individualized issues head on, Plaintiffs assert, for the first time,

22   a new and half-baked disclosure theory, claiming that the Pixel also transmits a first-party cookie

23   (i.e., the "fbp" cookie) to Meta "to defeat cookie blocker settings."  Mot. at 2-4, 14-15.  But unlike

24   the third-party cookies discussed above, the fbp cookie does ***not*** include a Facebook ID or any other

25   personally identifiable information ("PII").  Plaintiffs fail to explain—let alone prove by a

26   preponderance of the evidence—how the fbp cookie could, therefore, serve as common proof that

27   Zuffa allegedly disclosed Facebook IDs to Meta.  That is because it cannot.

28

1    Recognizing these inherent defects in their Motion, Plaintiffs blindly point to the records

2    produced by Meta in this litigation as common proof that Zuffa allegedly disclosed Facebook IDs.

3    Mot. at 14 ("Meta has records of the data transfers, which Plaintiffs have subpoenaed; this will

4    allow confirmation of whose data was transferred."). ████████████████████████

5    ████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████

7    ███████████████████████████████████████████████████. Plaintiffs fail to explain

8    (because they cannot) how the information in Meta's records supports their Motion, and Plaintiffs'

9    expert has never analyzed Meta's records let alone formed any opinions based on them. Thus,

10   beyond the fact that ██████████████████████ Plaintiffs have waived any

11   argument based on the contents of such records and cannot do so for the first time on reply. *In re*

12   *Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 501 (N.D. Cal. 2008) ("[s]lipping []

13   new arguments into a rebuttal report was a clear-cut form of sandbagging and was simply unfair.").

14        Plaintiffs' inability to establish predominance should end the certification inquiry. But even

15   setting this fundamental flaw aside, Plaintiffs' Motion should also be denied for additional reasons:

16        **First**, as a threshold issue, Plaintiffs' proposed nationwide and California classes are not

17   sufficiently defined to warrant class certification. *See* Fed. R. Civ. P. 23(c)(1)(B) ("[a]n order that

18   certifies a class action must define the class and the class claims, issues, or defenses"). Rather,

19   both proposed classes are defined to include only Fight Pass subscribers whose data was "actually

20   sent" to Meta. Mot. at 14. But, as noted above, there is no way to determine whether any putative

21   class member's Facebook ID was "actually sent" to Meta because of the highly individualized

22   inquiries required to know whether any such disclosure *could* have occurred. ████████████

23   ████████████████████████████████████████████████████████████████████

24   ██████████████████████████████████████████

25        **Second**, Plaintiffs have failed to meet their burden of proving numerosity. Rather, Plaintiffs

26   merely assert that █████████████████████████████ have accessed video content

27   on the Fight Pass website. Mot. at 7. But that does nothing to show the number of Fight Pass

28   subscribers who fall within Plaintiffs' proposed class definitions, which are limited to those

1   subscribers "with respect to whom Meta received their [Facebook ID] and the URL of the webpage

2   hosting video content." Not. of Mot. at 2. Plaintiffs have, therefore, failed to "prove that there are

3   *in fact* sufficiently numerous parties." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

4       **Third**, Plaintiffs cannot establish that a class action is the superior method for adjudicating

5   their claims because the proposed classes would be unmanageable. Fed. R. Civ. P. 23(b)(3)(D).

6   Indeed, the numerous evidentiary issues discussed above would each require full-blown mini-trials,

7   making identifying and verifying the claims of each putative class member extremely difficult if

8   not impossible. Based on similar circumstances, courts have held that "class treatment is not

9   superior." *See, e.g.*, *In re Hulu Privacy Litig.*, 2014 WL 2758598, at *22-23.

10      **Fourth**, Plaintiff Bloom (who seeks to represent the proposed California class) is not an

11  adequate or typical class representative because he lacks standing. ████████████████████████

12  ████████████████████████████████████████████████████████████████████████████████████████

13  ████████████████████. Consequently, Bloom cannot claim that he has suffered any injury in fact.

14      **Fifth**, Plaintiffs' state law claims also raise a host of additional individualized issues.

15  Plaintiffs' Invasion of Privacy claim will require individualized proof regarding whether each

16  putative class member actually maintained a reasonable expectation of privacy in Fight Pass video

17  titles. Plaintiffs' UCL claim will also require them to establish that the materiality of Zuffa's

18  alleged omissions about the Pixel is subject to common proof. And lastly, Plaintiffs' failure to

19  provide *any* methodology for calculating class-wide damages for these California claims is fatal.

20      **Sixth**, Plaintiffs' request for certification for injunctive relief under Rule 23(b)(2) should

21  also be denied. Plaintiffs do not have standing to seek injunctive relief because they are not current

22  Fight Pass subscribers and have not demonstrated that they intend to purchase Fight Pass

23  subscriptions in the future. *See Larsen v. Vizio, Inc.*, 2017 WL 11633132, at *6 (C.D. Cal. Apr. 27,

24  2017) (Plaintiffs failed to make the requisite showing of future harm for purposes of establishing

25  Article III standing to seek injunctive relief under Rule 23(b)(2)).

26      **Finally**, Plaintiffs have waived class certification against the Endeavor Defendants because

27  Plaintiffs' Motion solely seeks to certify a class against Zuffa. Indeed, Plaintiffs' Motion makes

28  no reference to Endeavor Group Holdings and only makes a passing reference to Endeavor

Streaming (Mot. at 4).  Accordingly, Plaintiffs have failed to meet their burden with respect to the Endeavor Defendants and have waived their right to seek certification against the Endeavor Defendants in the future by failing to timely file a motion for class certification against them.

## II.    BACKGROUND

### A.    Zuffa and the UFC Fight Pass Website

Zuffa owns and operates UFC Fight Pass, a subscription-based video streaming platform that gives UFC fans access to live events and other video content, including prelims for pay-per-view events, past UFC fights, original series and shows, and other UFC-related videos.  *See* Ex. S at 23:2-13.    Fight Pass subscribers can stream video from the Fight Pass website (www.ufcfightpass.com) or through one of the Fight Pass apps for mobile devices, Smart TVs, and media-streaming devices.  *See* Ex. T at 91:22-92:5; Ex. S at 127:17-128:4.

Zuffa advertises UFC Fight Pass through Facebook.  Ex. S at 27:5-22.  To understand the performance of its Facebook ads, Zuffa uses a complimentary and commonly used digital marketing tool called the Meta Pixel on the Fight Pass website.  Ex. S at 73:16-74:6; Ex. T at 22:20-23:6.  Zuffa uses the Pixel to understand "conversions" from Facebook ads, such as the number of times Fight Pass subscriptions are purchased through Facebook ads.  Ex. S at 65:14-17.

### B.    The Meta Pixel

The Meta Pixel (or the "Pixel") is a snippet of JavaScript code that can be added directly to a website's code.  Here, Zuffa copied the base Pixel code into a user-friendly coding interface called Google Tag Manager ("GTM").  Ex. T at 31:17-32:1, 35:4-7.  When installing the Pixel through GTM, Facebook instructs that the Pixel "base code" should be configured to fire on all pages of a website.  Ex. T at 69:18-71:18; *see also* Ex. HH.  Once installed, the Pixel can be used to track certain website visitor actions, which Facebook calls "events."  The base Pixel code—which must be used to install the Pixel on a website—includes a default "PageView" event (i.e., the Pixel event at issue in this case).  Ex. T at 82:4-12; 90:20-91:8; *see also* Ex. KK.

### C.    Plaintiffs' Disclosure Theories

From the outset of this case, Plaintiffs' theory of liability has been that Zuffa's use of the Pixel code on the Fight Pass website caused the disclosure of two pieces of information to Meta

Platforms, Inc. ("Meta" or "Facebook"), which Plaintiffs claim constitute PII: (1) Facebook IDs (via the third-party "c_user" and "m_page_voice" cookies), and (2) video titles embedded in Fight Pass URLs.  ECF No. 47 ¶¶ 2, 4-5, 32, 35.  Plaintiffs' Motion doubles-down on this disclosure theory by defining the proposed classes as limited to Fight Pass subscribers "with respect to whom Meta received their [Facebook] ID and the URL of the webpage hosting video content."  Not. of Mot. at 2; *see also* Mot. at 1, 3-5, 14, 17, 19.

However, anticipating that "Zuffa [would] argue that individualized questions exist as to whether [PII] was disclosed due to discrepancies in subscribers' browsers, devices, privacy settings, and the possible use of cookie-blocking add-on software," Plaintiffs raise, for the first time, a new and half-baked disclosure theory that an "updated Pixel and CAPI" also transmits a first-party cookie (the "fbp" cookie) to Meta.  *Id.*  Even setting aside the factual inaccuracies underlying this theory (*see* Expert Report of Ron Schnell ("Schnell Rep.") ¶¶ 46-71, attached as Ex. A), it does not salvage Plaintiffs' Motion because the fbp cookie does not contain a Facebook ID or any other PII. *Id.* ¶ 49.  Rather, it is comprised of two elements that are the same for all users and two elements that differ each time the cookie is created (the time the cookie was created and a random number). Schnell Rep. ¶¶ 47-48.  At her deposition, Plaintiffs' expert admitted that she did not know how (if at all) Meta purportedly uses the fbp cookie to identify an individual.  Ex. U at 234:12-18.

**D.    Meta's Records**

On August 21, 2023, Meta produced data in response to a subpoena served by Plaintiffs. Ex. W. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  In fact, although Meta produced these records over three months

1   ago, Plaintiffs have made no attempt to supplement their Motion, Plaintiffs' expert has not analyzed

2   or formulated any opinions based on Meta's production (Ex. U at 130:10-25), and Plaintiffs have

3   not deposed anyone from Meta.  As discussed below, Plaintiffs should be prohibited from making

4   any argument based on the contents of Meta's records for the first time on reply.

5       **E.**    **The Named Plaintiffs**

6       Discovery from Plaintiffs has shown that this case is ill-suited for class treatment.

7       *Everett Bloom.* ████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████████████

15      *Jack Graham.* ████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ███████████████████████████████████████████████

22      *Dave Lindholm.* ████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28  ██████████████████████████████████

1

### F.    Plaintiffs' Experts

2    ***Rebecca Herold.*** Plaintiffs submitted a "preliminary" expert report from Rebecca Herold

3    that is riddled with inaccuracies. ████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████████

5    ██████████████████████. Ex. U at 109:19-110:21, 152:6-152:24. █████████████████

6    ████████████████████████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████████████████████████. Ex. U

8    at 147:1-149:14; 193:23-194:12 █████████████████████████████████████████ *id.*

9    at 185:1-8 ███████████████████████████████████████████████████████████ *id.*

10    at 212:19-22.  Consequently, Herold did not test whether any data was *actually sent* to Meta.

11    Nor did Herold test the effects of common Facebook and web browser settings and practices

12    on the cookies at issue, █████████████████████████████████████████████████████

13    ████████████████████████████████████████████████████████████████████████████

14    ██████. Exs. NN, OO; Ex. U at 170:9-14; 176:11-194:4; 199:22-203:13; 205:3-210:11; 238:2-

15    239:5.  In particular, ████████████████████████████████████████████████████████

16    ████████████████████████████████████████████████████████████████████████████

17    ████████████████████████████████ Ex. U at 187:13-188:10, 189:5-22.

18    ██████████████████████████████████████████████████████████████████████████

19    ██████████████████████. Ex. U at 234:9-237:25, 196:17-197:11.  Perhaps tellingly, during

20    the time she was drafting her report, she posted a message on LinkedIn asking for help

21    understanding how the Pixel functions.  Ex. V; Ex. U at 135:5-138:20.

22    Finally, Herold stated that ██████████████████████████████████████████████

23    ████████████████████████████████████████████████████████████████████████████

24    ████████████████████████████████████████████████████████████████████████████

25    ████████████████████████████████████████████████████████████████████████████

26    ██████████████████████████████████

27    ***Bruce McFarlane.*** Plaintiffs also submitted a report from Bruce McFarlane on damages

28    which simply multiplies the statutory damages by the number of Fight Pass subscribers.  McFarlane

Rep. at 4-7.  The report does not provide any methodology regarding Plaintiffs' state law claims.

## III.  <u>LEGAL STANDARD</u>

Before it can certify a class, a district court must be "satisfied, after a rigorous analysis, that the prerequisites" of both Rule 23(a) and 23(b)(3) have been satisfied.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).  "[P]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)," and must carry their burden of proof "before class certification."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275-76 (2014).  Plaintiffs must do so by "a preponderance of the evidence."  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2020).  As discussed below, Plaintiffs have failed to meet their burden.[1]

## IV.  <u>PLAINTIFFS' PROPOSED CLASSES ARE NOT SUFFICIENTLY DEFINED</u>

A threshold requirement for class certification is that Plaintiffs must establish a definite class.  Fed. R. Civ. P. 23(c)(1)(B) ("[a]n order that certifies a class action must define the class and the class claims, issues, or defenses").  Here, however, Plaintiffs' proposed nationwide and California classes are not sufficiently defined to warrant class certification.

Specifically, Plaintiffs' proposed classes are defined to include all UFC Fight Pass subscribers in the United States and California, respectively, who "requested or obtained on-demand video content on the UFC Fight Pass Website" and "with respect to whom Meta received their [Facebook] ID and the URL of the webpage hosting video content."  Not. of Mot. at 2.  According to Plaintiffs, "the Classes are limited to subscribers whose data was ***actually sent*** to Meta."  Mot. at 14 (emphasis added).  But, as discussed in Sections VI and VII below, there is no way to determine on a class-wide basis whether any putative class member's Facebook ID was "actually sent" to Meta through the Pixel on the Fight Pass Website.

Recognizing this defect in their proposed class definitions, Plaintiffs suggest that "Meta has

---

[1] Plaintiffs' Motion is also filled with baseless allegations regarding the merits that are not at issue on class certification.  *See, e.g.*, Mot. at 16-18 (alleging that Zuffa "knowingly" disclosed Facebook IDs).  These allegations are demonstrably false and Zuffa vigorously disputes any contention that it has violated the VPPA or California law.  But that is a matter for another day.

1    records of the data transfers [that] will allow confirmation of whose data was transferred."  Mot. at

2    14. ███████████████████████████████████████████████████████████

3    █████████████████████████████████████████████████████████████████

4    █████████████████████████████████████████████████████████████████

5    ███████████████████████████████████████.  And aside from blindly pointing

6    to Meta's records, Plaintiffs have provided no other evidence to demonstrate how they can possibly

7    confirm whose Facebook IDs were "actually sent" to Meta.  Plaintiffs' inability to answer this

8    fundamental question—whose Facebook IDs (if any) were disclosed to Meta—renders futile any

9    effort to define a class that warrants certification.  It also signals the existence of other inherent

10   flaws in Plaintiffs' Motion, such as the existence of individualized issues and an unmanageable

11   class, that are discussed in greater detail below.[2]

12       Nor can Plaintiffs resolve this defect by expanding their proposed class definitions to

13   include putative class members who could not have possibly been harmed, such as UFC Fight Pass

14   subscribers who do not have Facebook accounts (and, therefore, do not have Facebook IDs to begin

15   with), or UFC Fight Pass subscribers with respect to whom Meta received other types of data (such

16   as the fbp cookie) that could not possibly be considered PII.  Such proposed class definitions would

17   also be improper because they are fatally overbroad.  *See, e.g.*, *Mazza v. Am. Honda Motor Co.*,

18   666 F.3d 581, 596 (9th Cir. 2012) (holding that class definition was overbroad).

19       Accordingly, Plaintiffs' Motion should be denied because Plaintiffs have not (and cannot)

20   satisfy the threshold requirement that their proposed classes must be definite.[3]

21   **V.    PLAINTIFFS HAVE FAILED TO PROVE NUMEROSITY**

22       Plaintiffs have also failed to prove that "there are *in fact* sufficiently numerous parties" in

23   

24   _____

[2] Plaintiffs' proposed class definitions are also improper because they create a "fail safe" class that
is defined to include only those individuals who were purportedly injured by the allegedly unlawful
25   conduct.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669
n.14 (9th Cir. 2022).  "Such a class definition is improper because a class member either wins or,
26   by virtue of losing, is defined out of the class and is therefore not bound by the judgment."  *Id.*

[3] Even setting these issues aside, Plaintiffs' proposed California class is not sufficiently defined
27   because it fails to account for the different statute of limitations for each California claim.  Not. of
Mot. at 2.  As Plaintiffs acknowledge (Mot. at 4), all of their claims, other than the UCL claim, are
28   subject to a two-year statute of limitations.  At a minimum, the proposed California class should be
limited to the same time period as the proposed Nationwide class for all but the UCL claim.

each of their proposed classes. *Comcast*, 569 U.S. at 33; *McCarty v. SMG Holdings, I, LLC*, 2022 WL 913092, at *2 (N.D. Cal. Mar. 29, 2022) (denying class certification where plaintiffs "have no idea" how many people are in their proposed classes). Plaintiffs' only attempt is their claim that the proposed classes ███████████████████████████████████████ Mot. at 7. That is not nearly enough. Plaintiffs' proposed classes include multiple additional requirements for membership, including that each putative class member's Facebook ID was "actually sent" to Meta. Mot. at 14; Not. of Mot. at 2. Plaintiffs offer no estimate as to the actual size of any class, and their only offer of proof is that "Meta has records of the data transfers, which . . . will allow confirmation of whose data was transferred." Mot. at 14. ███████████████████████████████

███████████████████████████████████████████ Moreover, Plaintiffs have only subpoenaed records from Meta for the three named Plaintiffs, and ██████████████ ███████████████████████████████████████████████. *See infra* Section VII.A; *see also* Schnell Rep. ¶ 83. Plaintiffs' bare reliance on nothing more than these records and the general number of Fight Pass subscribers "leav[es] the court with little concrete basis for assessing numerosity." *Mays v. Wal-Mart Stores, Inc.*, 804 F. App'x 641, 642 (9th Cir. 2020) (unpublished); *see also Miller v. RP On-Site, LLC*, 2020 WL 6940936, at *4 (N.D. Cal. Nov. 25, 2020) ("mere conclusory allegations as to the estimated class size are insufficient").

## VI.    PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF SHOWING COMMON QUESTIONS PREDOMINATE OVER INDIVIDUALIZED ISSUES

Under Rule 23(b)(3), a class action is only maintainable if "the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members . . . ." Fed. R. Civ. P. 23(b)(3). Although similar to the commonality requirement of Rule 23(a)(2),[4] the predominance inquiry is "far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). Common issues "predominate" only where "there is a clear justification for handling the dispute on a representative basis . . . ." *Antoninetti v. Chipotle Mexican Grill, Inv.*, 2012 WL 3762440, at *5-6 (S.D. Cal. Aug. 28, 2012). The question is not whether common issues

---

[4] To satisfy Rule 23(a)(2), Plaintiffs must identify "common" questions that, if tried, would result in "common answers" that would "drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Here, however, the question of whether Zuffa allegedly disclosed PII to Meta will not generate "common answers" due to the individualized issues discussed below.

1    exist, but whether issues "subject to generalized proof . . . predominate over those issues that are

2    subject only to individualized proof." *In re Graphics Processing*, 253 F.R.D. at 501 (N.D. Cal.

3    2008); *see also Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 469 (9th Cir. 2023) ("class

4    certification is inappropriate when individualized questions . . . will overwhelm common ones")

5    (internal quotations and citation omitted).  The Court must take a "close look" at the evidence to

6    make these determinations.  *Comcast*, 569 U.S. at 34.

7        Here, Plaintiffs' Motion should be denied because the core issue underlying all of Plaintiffs'

8    claims—whether Zuffa disclosed Facebook IDs to Meta—raises a host of individualized issues that

9    cannot be resolved on a class-wide basis.

10       **A.    Whether Facebook IDs Were Disclosed to Meta Requires Individualized Proof.**

11       Plaintiffs claim that "every time" a putative class member accessed an on-demand video on

12   the Fight Pass website during the proposed class periods, "they triggered a 'Page View' event that

13   transmitted to Meta the subscriber's Facebook ID—which identifies the person—and the URL of

14   [the] webpage accessed, which disclosed the title of the video."  Mot. at 14.  According to Plaintiffs,

15   this occurred because the Pixel on the Fight Pass website caused each putative class member's web

16   browser to transmit third-party cookies (called the c_user and m_page_voice cookies) that included

17   Facebook IDs to Meta.  *Id.*  But not only is this wrong (*see* Schnell Rep. ¶¶ 45-69), Plaintiffs admit

18   that "perhaps 30% of total tracking was lost" due to a variety of highly individualized issues that

19   would have prevented the c_user and m_page_voice cookies from ever being transmitted to Meta.

20   *Id.* at 15.  In fact, as discussed below, the percentage is likely significantly higher.

21       These individualized issues include a laundry list of common Facebook and web browser

22   settings and practices, including whether each putative class member used a web browser (like

23   Safari) that blocks third-party cookies by default, changed their web browser settings, installed an

24   ad blocker extension, manually cleared cookies, used Incognito mode, used multiple web browsers

25   or devices, shared their web browsers or devices, logged out of Facebook before watching a video

26   on the Fight Pass website, or changed certain Facebook settings.  Therefore, even if Plaintiffs'

27   claims had merit, it would be impossible to determine whether Zuffa's use of the Pixel caused the

28

ZUFFA'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

disclosure of Facebook IDs without evidence of each and every proposed class member's Facebook and web browser settings and practices. Each of these variables must be known to determine whether the c_user and m_page_voice cookies *could* have been transmitted to Meta.

**Type of Web Browser.** Each putative class member will need to present evidence regarding the type of web browser(s) they used to watch videos on the Fight Pass website. That is because many web browsers—including Safari, Firefox, and Brave—block third-party cookies by default. Exs. X, Y, Z. Therefore, even if a potential class member logged in to Facebook and then watched videos on the Fight Pass website using one of these web browsers, the browser would have blocked the transmission of third-party cookies—including the c_user and m_page_voice cookies—through the Pixel. *See* Schnell Rep. ¶ 45(e); Mot. at 15 (acknowledging that "certain browsers . . . may block third-party cookies"). Tellingly, Plaintiffs' expert chose not to conduct any testing using one of these web browsers, even though they are widely used (and, in fact, were used by the Plaintiffs here). Herold Decl. at ¶¶ 62-86. According to a recent survey, Safari was the most popular mobile browser in the U.S. during the proposed class periods, making up over 50% of the market share. And Safari and Firefox together comprised approximately 20-30% of the U.S. desktop browser market during the same period.[5] This fact alone demonstrates that Facebook IDs would not have been transmitted to Meta through the Pixel for a significant percentage of the proposed classes.

Illustrating this point, two of the three Plaintiffs used web browsers that would have blocked the transmission of Facebook IDs to Meta by default. Plaintiff Bloom used ████████ to access the Fight Pass website ████████. Ex. B at 4-5. Likewise, Plaintiff Graham used ████████ to access the Fight Pass website ████████. Ex. K at 5.

**Browser Settings and Extensions.** Each putative class member will also need to present evidence regarding their web browser settings and extensions. Even web browsers that do not block third-party cookies by default (such as Chrome) still give users the option to change their settings to automatically block third-party cookies. Ex. PP. Likewise, these web browsers allow users to

---

[5] https://www.statista.com/statistics/272664/market-share-held-by-mobile-browsers-in-the-us/; https://gs.statcounter.com/browser-market-share/desktop/united-states-of-america.

install extensions that automatically block third-party cookies, such as AdBlock, AdBlock Plus, and AdGuard. Exs. VV, QQ, RR. There is no dispute that changing these web browser settings or installing these extensions would have blocked the transmission of Facebook IDs via the c_user and m_page_voice cookies to Meta. *See* Schnell Rep. ¶ 45(e); *see also* Mot. at 15 (acknowledging that "certain . . . add-on software may block third-party cookies"). In fact, by Plaintiffs' own estimate, these types of web browser settings and extensions could have blocked "30% of total tracking" in this case. Mot. at 15. However, according to a recent survey by Pew Research Center, the percentage is likely significantly higher, as nearly 70% of social media users said they have turned off cookies or website tracking to manage their privacy online. Ex. AA.[6]

Here, one out of three Plaintiffs used web browser extensions that automatically block third-party cookies. Specifically, ██████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████. Ex. K at 8. That is in addition to using the ██████████ web browsers, which, as noted above, block third-party cookies by default.

***Cookie Clearing.*** Each putative class member will likewise need to present evidence regarding whether they cleared cookies from their web browser after logging in to Facebook but before watching videos on the Fight Pass website on the same web browser. If so, the c_user and m_page_voice cookies would have been deleted from their web browser and would not have been transmitted through the Pixel. *See* Schnell Rep. ¶¶ 45(i)-(k). This is a common practice to fix certain problems with a web browser, such as loading or formatting issues on websites. Ex. WW; *see also* Ex. BB (36% of U.S. respondents surveyed regularly deleted cookies).

Indeed, two of the three Plaintiffs ███████████████ testified that they regularly cleared cookies . Ex. E at 155:16-156:19 ████████████████████████████████ Ex. G at 169:8-14, 168:8-169:4 ████████████████████████████████████ ████████████████████████████████████████ The third Plaintiff ████████

---

[6] According to the Chrome Web Store, AdBlock has 69 million users; AdBlock Plus has 47 million users; AdGuard has 13 million users. Exs. VV, QQ, RR. These are just a small sample of the many web browser extensions that automatically block third-party cookies.

could not specifically recall whether he had ever cleared cookies but admitted that it was possible. Ex. C at 170:14-171:8.

**Incognito Mode.**  Each putative class member will also need to present evidence that they did not watch videos on the Fight Pass website using a private browsing feature, such as "Incognito" mode.  For example, Google Chrome blocks third-party cookies by default within each Incognito session and deletes cookies every time an Incognito window is closed.  Ex. CC.  Therefore, using Incognito mode (or a similar private browsing feature) could have prevented the transmission of Facebook IDs via the c_user and m_page_voice cookies.  *See* Schnell Rep. ¶ 45(g).

This feature is commonly used.  For example, ████████████████████████████
████████████████████ Ex. H; Ex. C at 191:4-12, 191:18-24, 192:9-18. ████████
████████████████████████████████. Ex. C at 169:11-170:2. ████████
████████████████████████████████. Ex. G at 167:13-21.

**Facebook Log Ins.**  Each putative class member will additionally need to present evidence that they watched a video on the Fight Pass website while logged in to their Facebook account on the same web browser.  That is because Facebook only temporarily places the c_user and m_page_voice cookies on a user's web browser when they are logged in to the Facebook website.  *See* Schnell Rep. ¶¶ 45(a), (d).  If the user logs out of their Facebook account, these cookies are cleared from the web browser and cannot be transmitted to Meta through the Pixel on another website.  *See id.*; *see also In re Hulu Priv. Litig.*, 2014 WL 2758598, at *14 (noting that whether the c_user cookie is transmitted to Facebook turns on a number of variables, "including whether the user remained logged into Facebook").

Here, records of Plaintiffs' log ins and log outs from Facebook demonstrate the difficulties of determining whether any given putative class member had the c_user and m_page_voice cookies on their web browsers at any given time.  For example, ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████ Ex. SS. ████████████████████████████
████████████████████████████████████████. Exs. TT, UU.

***Multiple Web Browsers and Devices.*** For the same reason above, if a user logs in to their Facebook account on one web browser (for example, Google Chrome) and visits a website with the Pixel on another web browser (for example, Microsoft Edge), the c_user and m_page_voice cookies could not be transmitted to Meta because they are restricted to the browser on which they were placed (i.e., Google Chrome in this example). *See* Schnell Rep. ¶ 45(a). The same is true if a user logs in to their Facebook account on one device (for example, a laptop) and visits a website with the Pixel on another device (for example, an iPhone) because the cookies are specific to the web browser on the device on which they were placed (i.e., the laptop in this example). *Id.*

***Shared Devices.*** Whether a user's Facebook ID could have been disclosed depends on whether more than one person used the device. That is because the c_user and m_page_voice cookies are tied to the Facebook account that was last logged in to on that web browser. In other words, if a putative class member shares their laptop with a roommate, and the roommate was the last to log in to Facebook on the web browser on that device, then any c_user and m_page_voice cookies on that device will be tied to the roommates Facebook account. *See* Schnell Rep. ¶ 45(c).

Illustrating the points above, each of the ███████████████████████████████████ ███████████████████████████████████. *See, e.g.*, Ex. B at 4-5; Ex. J at 5; Ex. K at 5; Ex. G at 71:6-16; Ex. E at 66:8-16. Likewise, ███████████████████████. Ex. C at 91:14-22; Ex. E at 46:18-51:10, 55:5-59:24; Ex. G at 76:2-16. ████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████. Ex. C at 98:9-16, 100:13-17 ██████████████████████████████████████████ ███████████████ *id.* at 207:20-208:3 ████████████████████ ███████████████████ Each of these variables makes it possible (if not likely) that Plaintiffs were not logged in to Facebook on the same web browser that they each used to access Fight Pass.

***Facebook Settings.*** Finally, each putative class member will need to present evidence that they did not disable the "Off-Facebook Activity" and "activity information" settings at the time they watched a video on the Fight Pass website. Through these settings, Facebook users can

disconnect the information Meta receives and uses about their activity on other websites, such as through the Pixel.  Exs. DD, EE.  Facebook gives its users the option to disable Off-Facebook Activity entirely or just for specific websites.  *Id.*  In addition, Facebook gives its users the option to choose whether Facebook can use "activity information" from "businesses, organizations or people who share information with Meta through [its] marketing and advertising business tools" such as the Pixel.  Ex. FF.  These settings also could have prevented Facebook IDs from being transmitted to Meta through the Pixel on the Fight Pass website.  *See* Schnell Rep. ¶ 45(h).[7]

\* \* \*

Given all of the things that must happen (or not) for the c_user and m_page_voice cookies to be transmitted to Meta, there is simply no way to determine whether any disclosure could have occurred.  The Court would have to assess (1) when a putative class member had logged into Facebook, (2) whether it was before they had watched an on-demand video on the Fight Pass website, (3) whether it was using the same web browser on the same device, (4) whether that web browser blocked cookies by default, by optional settings, and/or by extensions, (5) whether cookies had been manually cleared in the meantime, (6) whether the web browser was in Incognito mode, (7) whether the device was shared with anyone else using Facebook, and (8) whether the putative class member's "Off-Facebook Activity" and "activity information" settings were enabled.  Simply put, there is no way to determine whether Zuffa disclosed Facebook IDs to Meta without highly individualized inquiries regarding each of these variables for every alleged disclosure.

Based on similar facts, courts have ruled that these types of individualized issues preclude class certification.  *See, e.g.*, *In re Hulu Privacy Litig.*, 2014 WL 2758598, at *22 (denying class certification where "substantial issues about remaining logged into Facebook and clearing and blocking cookies means that the court cannot conclude on this record that the common issues predominate over the individualized ones"); *see also In re: Facebook Privacy Litig.*, 2016 WL

---

[7] In addition, there are issues outside of the control of putative class members that could have impacted the functionality of the Pixel.  As Ms. Herold's report shows, sometimes the Pixel simply does not work at all.  Herold Decl. ¶ 82 ("Warnings: We detected event code but the pixel has not activated for this event, so no information was sent to Meta. This could be due to an error in the code, but could also occur if the pixel fires on a dynamic event such as a button click.").

ZUFFA'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

4585817, at *7-10 (N.D. Cal. Sept. 2, 2016) (denying class certification because the question of whether Facebook disclosed PII to advertisers through referrer headers could not be resolved by common proof).[8]  The same outcome should follow here.

**B.**    **The "fbp" Cookie Is Not Common Proof That Zuffa Disclosed Facebook IDs.**

Recognizing that their disclosure theory—that the Pixel disclosed Facebook IDs via the c_user and m_page_voice cookies—is riddled with individualized issues, Plaintiffs argue for the first time in their Motion that the Pixel also transmits a first-party cookie (the "fbp" cookie) to Meta "to defeat cookie blocker settings."  Mot. at 4, 14-15.  This argument fails for several reasons.

First and most significantly, unlike the c_user and m_page_voice cookies, the fbp cookie does ***not*** include a Facebook ID.  Schnell Rep. ¶ 49.  Rather, the fbp cookie is comprised of a "random number" and the time of day.  *Id.* ¶ 48; Ex. GG.  Therefore, the mere existence of the fbp cookie does not provide any evidence—let alone common proof—that Zuffa disclosed Facebook IDs to Meta.  Nor do Plaintiffs offer any explanation of how the fbp cookie could otherwise be used to prove that Zuffa disclosed Facebook IDs to Meta.  As such, Plaintiffs have failed to meet their burden.  *See Halliburton*, 573 U.S. 258, 275-76 (2014) ("[P]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3).").

Second, to the extent Plaintiffs contend that the fbp cookie "uniquely identifies the user" (Mot. at 4), they are wrong.  *See* Schnell Rep. ¶¶ 49-63.As noted above, the fbp cookie does not contain ***any*** personally identifying information; it only contains a random number and the time of day.  *Id.*  Moreover, to the extent Plaintiffs are asserting that Facebook has the ability to somehow link the fbp cookie to a Facebook user, that is nothing more than speculation.  Indeed, Plaintiffs' expert admitted in her deposition that she did not know how Meta *might* use the fbp cookie to identify an individual.  Herold Dep. at 234:12-18; *see also* Schnell Rep. ¶¶ 55, 60-63. And even if Plaintiffs were correct, the Ninth Circuit's decision in *Eichenberger v. ESPN, Inc.* precludes any

---

[8] Plaintiffs' assertion that "VPPA claims, in particular, are suitable for class certification" is misleading.  Mot. at 6.  Indeed, all of the cases Plaintiffs cite for this contention were certified for settlement purposes only, and none involved the Meta Pixel.  *See id.* (citing inapposite authority); *see also* Mot. 8-9 (same).

1    argument that the fbp cookie is "personally identifiable information." 876 F.3d 979 (9th Cir. 2017).

2    In *Eichenberger*, the court held that "personally identifiable information" under the VPPA

3    "means only that information that would 'readily permit *an ordinary person* to identify a specific

4    individual's video-watching behavior.'" *Id.* at 985 (citation omitted; emphasis added). Applying

5    this "ordinary person" standard, the court found the plaintiff's allegations insufficient to state a

6    claim under the VPPA because the information that ESPN disclosed "*cannot* identify an individual

7    unless it is combined with other data in [a third-party's] possession—data that ESPN never

8    disclosed and apparently never even possessed." *Id.* at 986. The court reasoned that the VPPA

9    "looks to what information a video service provider discloses, not to what the recipient of that

10   information decides to do with it," and consequently "'personally identifiable information' must

11   have the same meaning without regard to its recipient's capabilities." *Id.* at 985; *see also In re*

12   *Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 267 (3rd Cir. 2016) (finding that a "browser

13   fingerprint," IP address, and unique device identifier did not constitute PII under the VPPA). Thus,

14   Plaintiffs cannot contend that the fbp cookie is common proof that Zuffa disclosed PII to Meta.

15   Third, the fbp cookie also raises its own individualized issues. As Plaintiffs' expert

16   admitted, first-party cookies (like the fbp cookie) can be blocked just like the third-party cookies

17   discussed above. Ex. U at 238:2-22; *see also* Schnell Rep. ¶ 97 ("it is quote easy to block first

18   party cookies from any modern browser"). Therefore, each putative class member will still have

19   to present evidence regarding their web browsers settings and practices. Moreover, to the extent

20   Plaintiffs suggest that Meta somehow associates the fbp cookie with Facebook users by linking it

21   to other information in Meta's database, then each putative class member must also present

22   evidence regarding whether and how Meta associated the fbp cookie with their Facebook account.

23   While this depends on a confluence of factors that are not knowable to anyone other than Meta, ■

24   ████████████████████████████████████████████████████████████████████

25   **VII.    PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF SHOWING THAT
         CLASS TREATMENT IS THE SUPERIOR METHOD OF ADJUDICATION**

26   Plaintiffs' Motion also fails to satisfy Rule 23(b)(3)'s superiority requirement because the

27   proposed classes are unmanageable. To satisfy Rule 23(b)(3), Plaintiffs must demonstrate that "a

28   class action is superior to other available methods for fairly and efficiently adjudicating the

1    controversy." Fed. R. Civ. P. 23(b)(3).  In assessing superiority, courts consider, among other

2    factors, "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D).  "When

3    the complexities of class action treatment outweigh the benefits of considering common issues in

4    one trial, class action treatment is not the 'superior' method of adjudication." *Zinser v. Accufix*

5    *Rsch. Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001) (citations omitted).

6          Here, as discussed above, determining whether any putative class member's Facebook ID

7    was "actually sent" to Meta will be extremely difficult (if not impossible) due to the wide variety

8    of individualized issues.  As a result, the evidentiary showing that would be necessary to establish

9    liability for each and every putative class member would overwhelm the benefits of class

10   adjudication.  This is particularly true where, as here, there are no records, master lists, or other

11   data that can be used to confirm whether, for example, a putative class member logged in to

12   Facebook before watching a video on the Fight Pass website on the same browser, or what cookie-

13   blocking settings or extensions they may have used on their computer years ago.  As discussed

14   above, ███████████████████████████████████████████████████████.  And,

15   contrary to Plaintiffs' suggestion (Mot. at 15), Zuffa has no records that could be used to determine

16   whether Facebook IDs were transmitted to Meta. ████████████████████████

17   ██████████████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████████

19   ███████████████████████████████████ Mot. at 15.

20         Under similar circumstances, courts have held that "class treatment is not superior." *See In*

21   *re Hulu Privacy Litig.*, 2014 WL 2758598, at *22-23; *see also Zinser*, 253 F.3d at 1192 ("If each

22   class member has to litigate numerous and substantial separate issues to establish his or her right

23   to recover individually, a class action is not 'superior.'"); *Wetzel v. CertainTeed Corp.*, 2019 WL

24   3976204, at *19 (W.D. Wash. Mar. 25, 2019) (denying class certification where "the predominance

25   of individualized questions influence[d] the court's assessment of the manageability of th[e] case

26   as a class action").  As the *Hulu* court explained, such claims are "not amenable to ready

27   verification" because "the court cannot tell how potential class members reliably could establish by

28   affidavit the answers to the potential questions: do you log into Facebook and Hulu from the same

browser; do you log out of Facebook; do you set browser settings to clear cookies; and do you use software to block cookies?" *Id.* at *15-16. This reasoning applies equally here. In fact, Plaintiffs have admitted that they have ████████ of changing any privacy settings on their devices, web browsers, or Facebook accounts. Ex. B at 7, 9, 12; Ex. J at 8-9, 12; Ex. K at 7-9, 12. But, as Plaintiffs' counsel acknowledged, that does not "preclude the possibility that someone [else] had changed [Plaintiffs' settings] in the past without [their] knowledge." Ex. II. These facts underscore that it would be difficult, if not impossible, to verify each putative class member's claims.

Even if some putative class members could remember all of the relevant details for purposes of establishing their claims, due process requires some way for Zuffa to verify or contest the claims of potentially tens of thousands of purported class members seeking at least $2,500 in damages. This large sum (equivalent to two hundred months of a Fight Pass subscription) creates incentives for potential class members to make out a claim. Thus, reliability and verifiability are even more critical here, and due process is lost if Zuffa is not permitted to weed out inaccurate claims.[9]

Finally, while Plaintiffs are correct that the Ninth Circuit in *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) rejected the requirement that plaintiffs provide an administratively feasible way to identify all class members (Mot. at 15), it did not hold that manageability is irrelevant to class certification. To the contrary, the Ninth Circuit noted that there is no need for a separate administrative feasibility requirement because the other Rule 23 factors, including the superiority analysis of Rule 23(b)(3), adequately account for that concern. *See Briseno*, 844 F.3d at 1124 n.4 ("[W]e have addressed the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues . . . through analysis of Rule 23's enumerated requirements."). More recently, the Ninth Circuit noted that courts have taken various approaches to addressing member-identification concerns and approved the Sixth Circuit's conclusion that "a district court's class-certification analysis would have been equally sufficient, regardless of whether the member-

---

[9] Under *Wakefield v. ViSalus, Inc.*, courts must also consider whether extreme aggregated damages transgress defendants' due process protections. 51 F.4th 1109, 1121 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1756 (2023) (aggregated statutory damages awards are, in certain extreme circumstances, subject to constitutional due process limitations, particularly "in the mass communications class action context," where "vast cumulative damages can be easily incurred, because modern technology permits hundreds of thousands of automated calls and triggers minimum statutory damages with the push of a button.").

identification concern was properly articulated as part of ascertainability, Rule 23(b)(3)

predominance, or Rule 23(b)(3) superiority." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 632

(9th Cir. 2020) (quoting *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d

460, 466 (6th Cir. 2017)) (internal quotations and alterations omitted).  Therefore, both *Briseno* and

*Walker* confirm that a court may consider class verification issues as part of its Rule 23 analysis.

## VIII.    THE PROPOSED CALIFORNIA CLASS SHOULD NOT BE CERTIFIED FOR ADDITIONAL INDEPENDENT REASONS

### A.    Plaintiff Bloom Cannot Satisfy the Typicality and Adequacy Requirements.

Plaintiff Bloom (who is the sole Plaintiff seeking to represent the proposed California class)

is not an adequate or typical class representative because ███████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████    Schnell Rep. ¶ 83.  In other words, Bloom

cannot demonstrate that he suffered any harm because ███████████████████████████████

██████████████████████.  The law is clear that if a plaintiff lacks standing, he or she cannot seek

remedies on behalf of the putative class members. *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336,

346 (C.D. Cal. 2015).  For that reason, Bloom is not an adequate or typical class representative and

cannot bring any claims on behalf of either of the putative classes.

### B.    Common Questions Do Not Predominate Over Individualized Issues.

First, Plaintiff Bloom's Invasion of Privacy claim under the California Constitution turns

on individualized factual questions of whether each putative class member maintained a reasonable

expectation of privacy in UFC Fight Pass video titles.  For example, two of the three named

Plaintiffs admitted that they did not have an expectation of privacy in the specific videos that they

watched on the Fight Pass website.  █████████████████████████████████████████████

█████████████████████████████████████████████████████    Graham Dep. at

85:9-14.  And ████████████████████████████████████████████████████████████████

██████████████████████    Lindholm Dep. at 87:7-13.  Therefore, resolution of the Invasion of

Privacy claim here will likely "turn[] on individualized factual questions of whether each user

actually maintained their reasonable expectation of privacy." *Hart v. TWC Prod. & Tech. LLC*,

1    2023 WL 3568078, at *9 (N.D. Cal. Mar. 30, 2023) (denying class certification where determining

2    a reasonable expectation of privacy required "an individualized factual inquiry" into the

3    understanding of each individual user of an app that collected location data).

4         All three Plaintiffs also testified that ███████████████████████

5    ███████████████—even after filing this lawsuit—further demonstrating no reasonable

6    expectation of privacy. Ex. E at 126:6-8, 126:25-127:4; Ex. C at 130:7-18; Ex. G. at 123:24-124:25.

7    In fact, putative class members are likely well aware of the Off-Facebook Activity setting given

8    the numerous posts Facebook has made online explaining this feature and the widespread press it

9    has garnered. *See, e.g.*, Exs. DD, EE, XX, YY. This too demonstrates that class certification is not

10    warranted. *Hart*, 2023 WL 3568078, at *10-11.

11         Second, Plaintiff Bloom's UCL claim will also require him to establish that Zuffa's alleged

12    omissions about the Pixel were material to putative class members, which is not subject to common

13    proof. For example, ████████████████████████████████████████████

14    ████████████████████████████████████████████████. Ex. C at

15    65:5-23; Lindholm Depo. Tr. 62:6-63:24. This alone demonstrates that there would be no cohesion

16    among the class members and that common questions regarding materiality would not predominate.

17    *See, e.g.*, *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1045 (C.D. Cal. 2018)

18    (denying class certification because the plaintiffs failed to present adequate evidence that alleged

19    misstatement was material); *In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, 2017 WL 2559615,

20    at *8 (C.D. Cal. June 7, 2017) (denying class certification because "[a]bsent a consumer survey or

21    other market research to indicate how consumers reacted to the [challenged] statements, and how

22    they valued these statements compared to other attributes of the product and the [relevant] market

23    generally, Plaintiffs ha[d] not offered sufficient evidence of materiality across the class.").

24    **C.    Plaintiff Bloom Fails to Provide Any Damages Methodology For His California Invasion of Privacy and UCL Claims.**

25         Despite referencing proposed "damages and restitution models" (Mot. at 2), Plaintiff Bloom

26    has failed to provide ***any*** methodology—reliable or otherwise—for calculating damages for his

27    California Invasion of Privacy and UCL claims. In fact, elsewhere in the Motion, it states that "the

28    only remedy sought for the UCL claim is injunctive relief." Mot. at 24 n.9. Therefore, Bloom has

1    provided no information on which the Court could conduct an analysis (let alone a rigorous one)

2    regarding the common methodology and model showing that "damages could feasibly and

3    efficiently be calculated once the common liability questions are adjudicated." *Kim v. Benihana,*

4    *Inc.*, 2022 WL 1601393, at *12 (C.D. Cal. Mar. 25, 2022) (denying class certification where the

5    plaintiff did not present a damages model); *Painters & Allied Trades Dist. Council 82 Health Care*

6    *Fund v. Takeda Pharm. Co. Ltd.*, 2023 WL 4191651, at *25 (C.D. Cal. May 24, 2023) ("Until a

7    model is constructed, or an analysis is performed, Plaintiffs receive a grade of 'incomplete' with

8    respect to damages and the predominance inquiry under Rule 23(b)(3).").

9    **IX.    PLAINTIFFS LACK STANDING TO CERTIFY A RULE 23(b)(2) CLASS**

10   Plaintiffs also lack standing to certify a Rule 23(b)(2) class because they are not currently

11   Fight Pass subscribers and have not shown that they will suffer future harm.  To certify a class

12   under Rule 23(b)(2), Plaintiffs must show that they have "suffered or [are] threatened with a

13   concrete and particularized legal harm . . . coupled with a sufficient likelihood that [they] will again

14   be wronged in a similar way." *Larsen*, 2017 WL 11633132 at *6.

15   Here, as noted, Plaintiffs do not currently have Fight Pass subscriptions and have submitted

16   no evidence demonstrating that they intend to purchase one in the future.  *See* Bloom, Graham, and

17   Lindholm Decls.  Plaintiffs also acknowledge that the Pixel has been removed from video pages on

18   the Fight Pass website.  Mot. at 24 (noting that Zuffa already took "steps to prevent violations of

19   VPPA and related laws raised in this case (e.g., adding 'exceptions' to Meta Pixel PAGE VIEW

20   event trigger)").  Without any proof of an ongoing relationship with Zuffa or potential for future

21   harm, Plaintiffs therefore "lack[] standing to obtain an injunction against its future conduct." *Davis*

22   *v. Homecomings Fin.,* 2007 WL 1600809, at *2 (W.D. Wash. June 1, 2007).

23   **X.    PLAINTIFFS SHOULD BE PROHIBITED FROM USING META'S RECORDS
       FOR THE FIRST TIME ON REPLY**

24   Meta produced records in response to Plaintiffs' subpoena nearly three months ago.  Yet,

25   even though Plaintiffs' Motion purports to rely on these records (Mot. at 14), Plaintiffs have made

26   no effort to explain how the information within Meta's records supports their Motion.  Plaintiffs

27   have not supplemented their Motion to discuss Meta's records, and Plaintiffs' expert has not

28   expressed any opinions based on their contents.  Ex. U at 130:10-25.  Consequently, Plaintiffs have

waived any argument based on the contents of Meta's records and should be prohibited from attempting to do so for the first time on reply. *See In re Graphics*, 253 F.R.D. at 501 (holding that "[s]lipping [] new arguments into a rebuttal report was a clear-cut form of sandbagging and was simply unfair."); *In re Taco Bell Wage & Hour Actions*, 2011 WL 4479730, at *7 (E.D. Cal. Sept. 26, 2011) ("New evidence or analysis presented for the first time in a reply will not be considered.").

## XI.    PLAINTIFFS HAVE WAIVED CLASS CERTIFICATION AGAINST THE ENDEAVOR DEFENDANTS

Defendants Endeavor Group Holdings and Endeavor Streaming's motion to dismiss is currently pending before the Court.  ECF No. 60.  However, despite naming the Endeavor Defendants as parties prior to filing the instant Motion, Plaintiffs bring their Motion solely against Zuffa and make no showing that a class should be certified against the Endeavor Defendants. Plaintiffs' Motion does not so much as mention Endeavor Group Holdings and only makes a passing reference to Endeavor Streaming (Mot. at 4).  Likewise, Plaintiffs' expert submitted no opinions regarding the Endeavor Defendants.  Herold Decl. ¶ 46.  While the Endeavor Defendants continue to preserve their challenges to jurisdiction and Plaintiffs' claims against them, Plaintiffs have waived their right to certify a class against the Endeavor Defendants by failing to timely file a motion for class certification against them.  *See Carmen Pena v. Taylor Farms Pac., Inc.*, 2015 WL 12550898 (E.D. Cal. Mar. 30, 2015) (class was not certified against newly-added defendant because plaintiffs' motion "did not specifically address certification of any class action against" it).

## XII.    CONCLUSION

For the foregoing reasons, Zuffa respectfully asks the Court to deny Plaintiffs' Motion for Class Certification with prejudice.

DATED:  November 17, 2023                **PAUL HASTINGS LLP**

By: /s/ Susan Leader
Susan Leader
Ali R. Rabbani
Stephanie Balitzer

Attorneys for Defendants

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on November 17, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

/s/ ***Susan Leader***

SUSAN LEADER

***Bloom, et al. v. Zuffa, LLC, et al.***
USDC of Nevada | Case No. 2:22-cv-00412-RFB-BNW

Index

| Tab | Document | Exhibit | Page | Sealed |
|-----|----------|---------|------|--------|
| 1 | Declaration of Ali Rabbani in Support of Defendant Zuffa, LLC's Opposition to Class Certification | **Exhibit A** – Expert Report of Ron Schnell | 1 | Filed Under Seal |
| | | **Exhibit B** – Plaintiff Everett Bloom's Second Suppl. Responses and Objections to Defendant's First Set of Interrogatories | 60 | |
| | | **Exhibit C** – Everett Bloom Deposition Transcript Excerpt, dated November 1, 2023 | 76 | Filed Under Seal |
| | | **Exhibit D** – Everett Bloom Dep. Tr. Def.'s Ex. No. 98 | 128 | Filed Under Seal |
| | | **Exhibit E** – Dave Lindholm's Deposition Transcript Excerpt, dated October 20, 2023 | 132 | Filed Under Seal |
| | | **Exhibit F** – Dave Lindholm's Dep. Tr. Def.'s Ex. No. 16 at PLAINTIFF_0037 | 173 | Filed Under Seal |
| | | **Exhibit G** – Jack Graham Deposition Transcript Excerpt, dated October 30, 2023 | 175 | Filed Under Seal |
| | | **Exhibit H** – Everett Bloom Dep. Tr. Def.'s Ex. No. 96 | 209 | Filed Under Seal |
| | | **Exhibit I** – Everett Bloom Dep. Tr. Def.'s Ex. No. 93 at PLAINTIFF_0053 | 211 | Filed Under Seal |
| | | **Exhibit J** – Plaintiff Dave Lindholm's Suppl. Resp. and Objs. To Defendant's First Set of Interrogatories | 213 | |
| | | **Exhibit K** – Plaintiff Jack Graham's Suppl. Resp. and Objs. To Defendant's First Set of Interrogatories | 230 | |
| | | **Exhibit L** – Everett Bloom Dep. Tr. Def.'s Ex. No. 91 at PLAINTIFF_0051 | 247 | Filed Under Seal |
| | | **Exhibit M** – Everett Bloom Dep. Tr. Def.'s Ex. No. 71 at PLAINTIFF_0636 | 249 | Filed Under Seal |

| | | | | |
|---|---|---|---|---|
| | | **Exhibit N** – Dave Lindholm's Dep. Tr. Def.'s Ex. No. 9 at PLAINTIFF_0619 | 251 | Filed Under Seal |
| | | **Exhibit O** – Dave Lindholm's Dep. Tr. Def.'s Ex. No. 17 at PLAINTIFF_0629 | 253 | Filed Under Seal |
| | | **Exhibit P** – Dave Lindholm's Dep. Tr. Def.'s Ex. No. 25 | 255 | Filed Under Seal |
| | | **Exhibit Q** – Dave Lindholm's Dep. Tr. Def.'s Ex. No. 43 | 257 | Filed Under Seal |
| | | **Exhibit R** – UFC's Terms of Use | 259 | |
| | | **Exhibit S** – Kristen Banks' Deposition Transcript Excerpt, dated May 31, 2023 | 275 | |
| | | **Exhibit T** – Travis Santypal Deposition Transcript Excerpt, dated March 15, 2023 | 282 | |
| | | **Exhibit U** – Rebecca Herold Deposition Transcript Excerpt, dated November 7, 2023 | 296 | Filed Under Seal |
| | | **Exhibit V** – Rebecca Herold Dep. Tr. Def.'s Ex. No. 107 | 360 | Filed Under Seal |
| | | **Exhibit W** – L. Edelstein Correspondence re Meta's Production of Documents in Response to Amended Subpoena, dated August 21, 2023 | 363 | Filed Under Seal |
| | | **Exhibit X** – WebKit, Full Third Party Cooking Blocking and More, dated March 24, 2020 | 366 | |
| | | **Exhibit Y** – Firefox, Today's Firefox Blocks Third Party Tracking Cookies and Cryptomining by Default, dated September 3, 2019 | 374 | |
| | | **Exhibit Z** – OK Google, don't delay real browser privacy until 2022, dated February 6, 2020 | 384 | |
| | | **Exhibit AA** – Pew Research Center, How American's View Data Privacy, dated October 18, 2023 | 394 | |
| | | **Exhibit BB** – Is Patience With the Cookie Crumbling?, dated January 27, 2022 | 411 | |
| | | **Exhibit CC** – Google, More intuitive privacy and security controls in Chrome, dated May 9, 2020 | 416 | |
| | | **Exhibit DD** – Facebook, Now You Can See and Control the Data That Apps and Websites Share With Facebook, dated August 20, 2019 | 425 | |
| | | **Exhibit EE** – Facebook Help Center, How do I manage my future activity off Meta technologies | 435 | |

| | | | | |
|---|---|---|---|---|
| | | **Exhibit FF** – Facebook Help Center, Ad partners on Facebook | 440 | |
| | | **Exhibit GG** – fbp and fbc Parameters | 444 | |
| | | **Exhibit HH** – Meta Business Help Center, Learn how to add the Facebook pixel in Google Tag Manager | 448 | |
| | | **Exhibit II** – A. Patek Correspondence re Discovery, dated March 9, 2023 | 455 | |
| | | **Exhibit JJ** – A. Patek Email re Herold Deposition, dated November 6, 2023 | 460 | |
| | | **Exhibit KK** – Meta Business Help Center, Specifications for Meta Pixel Standard Events | 462 | |
| | | **Exhibit LL** – Meta's Production of Documents in Response to Amended Subpoena, dated August 21, 2023 | 469 | Filed Under Seal |
| | | **Exhibit MM** – Everett Bloom Dep. Tr. Def.'s Ex. No. 81 at PLAINTIFF_0052 | 507 | Filed Under Seal |
| | | **Exhibit NN** – Rebecca Herold Dep. Tr. Def.'s Ex. No. 108 | 509 | |
| | | **Exhibit OO** – Rebecca Herold Dep. Tr. Def.'s Ex. No. 109 | 514 | |
| | | **Exhibit PP** – Clear, allow and manage cookies in Chrome | 534 | |
| | | **Exhibit QQ** – Adblock Plus – Free Ad Blocker | 537 | |
| | | **Exhibit RR** – AdGuard AdBlocker | 541 | |
| | | **Exhibit SS** – Plaintiff Lindholm's Facebook Activity Log at PLAINTIFF_0597 | 545 | Filed Under Seal |
| | | **Exhibit TT** – Jack Graham Dep. Tr. Def.'s Ex. No. 37 at PLAINTIFF_0662 | 551 | Filed Under Seal |
| | | **Exhibit UU** – Everett Bloom Dep. Tr. Def.'s Ex. No. 79 at PLAINTIFF_0630 | 555 | Filed Under Seal |
| | | **Exhibit VV** – AdBlock – best ad blocker | 558 | |
| | | **Exhibit WW** – Google Account Help, Clear Cache & Cookies | 562 | |
| | | **Exhibit XX** – The Washington Post, Faebook Will Now Show You Exactly How it Stalks You – Even When You are Not Using Facebook | 564 | |
| | | **Exhibit YY** – Vox, How to Delete What Facebook Knows About Your Life Outside of Facebook | 570 | |