—2:22-cv-00412-RFB-BNW—

1        UNITED STATES DISTRICT COURT

2            DISTRICT OF NEVADA

3

4   EVERETT BLOOM, JACK GRAHAM,        )
    and DAVE LINDHOLM, on              )  Case No. 2:22-cv-00412-RFB-BNW
5   behalf of themselves, and         )
    those similarly situated,         )  Las Vegas, Nevada
6                                      )  Tuesday, November 19, 2024
               Plaintiffs,            )  1:45 p.m.
7                                      )
        vs.                           )  MOTION HEARING
8                                      )
    ZUFFA, LLC; ENDEAVOR              )  *C E R T I F I E D   C O P Y*
9   STREAMING, LLC; and               )
    ENDEAVOR GROUP HOLDINGS,          )
10  INC.,                             )

11              Defendants.

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15        THE HONORABLE RICHARD F. BOULWARE, II,
               UNITED STATES DISTRICT JUDGE

16

17

18

19  APPEARANCES:       See next page

20

21

22  COURT REPORTER:    Patricia L. Ganci, RMR, CRR
                       United States District Court
23                     333 Las Vegas Boulevard South, Room 1334
                       Las Vegas, Nevada  89101
24

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

2:22-cv-00412-RFB-BNW

1  APPEARANCES:

2  For the Plaintiffs:

3          **ANTHONY J. PATEK, ESQ.**
           **SETH A. SAFIER, ESQ.**
4          GUTRIDE SAFIER, LLP
           100 Pine Street, Suite 1250
5          San Francisco, California 94111
           (415) 505-6226

6
   For the Defendants:
7
           **ARIANA REED, ESQ.**
8          CAMPBELL & WILLIAMS
           710 South 7th Street, Suite A
9          Las Vegas, Nevada 89101
           (702) 382-5222
10
           **SUSAN K. LEADER, ESQ.**
11         **ALI REZA RABBANI, ESQ.**
           PAUL HASTINGS, LLP
12         1999 Avenue of the Stars, 27th Floor
           Los Angeles, California 90067
13         (310) 620-5700

14

15

16

17

18

19

20

21

22

23

24

25

```
                        2:22-cv-00412-RFB-BNW
```

1          LAS VEGAS, NEVADA; TUESDAY, NOVEMBER 19, 2024; 1:45 P.M.

2                                --oOo--

3                       P R O C E E D I N G S

4          THE COURT:  Please be seated.

5          COURTROOM ADMINISTRATOR:  The matter now before the

6  Court is Bloom versus Zuffa, LLC, Case Number

7  2:22-cv-412-RFB-BNW.  Counsel, please make your appearances,

8  beginning with the plaintiff.

9          MR. PATEK:  Good afternoon, Your Honor.  This is

10  Anthony Patek of Gutride Safier appearing for the plaintiffs,

11  and with me is my colleague, Seth Safier.

12          THE COURT:  Okay.  Good afternoon.

13          MS. LEADER:  Hi.  Good afternoon, Your Honor.  Susan

14  Leader with the law firm of Paul Hastings.  I'm here with my

15  colleague, Ali Rabbani, and also joined with us is local

16  counsel, Ariana Reed.

17          THE COURT:  Good afternoon.

18          So we are here on a few different motions, but I really

19  want to cut to the chase on this class certification motion and

20  ask you all a few questions.  So, Mr. Patek, are you going to be

21  arguing this?

22          MR. PATEK:  Yes.

23          THE COURT:  Why don't you come up to the podium,

24  please.

25          So let me ask you this very basic question.  Do we or

—2:22-cv-00412-RFB-BNW—

1   do we not know whether or not this information was sent to

2   Facebook?

3            MR. PATEK:  I think we do, Your Honor.  I would say

4   that we could prove it --

5            THE COURT:  Well, I'm saying that because there's

6   disagreement between the parties about whether or not or what

7   can be demonstrated.  I know there's a default setting.  What

8   I'm saying is, is there actually some sort of other evidence

9   that either you have or could have that would demonstrate

10  whether or not an individual had this information sent via the

11  pixel once they viewed a video?

12           MR. PATEK:  The best evidence is the pixel data itself,

13  which shows the URL that was transmitted which confirms that the

14  transmission occurred via a third-party cookie and which has

15  been associated with the user's identity.

16           THE COURT:  Okay.  Do you have that for individual

17  users?

18           MR. PATEK:  Well, we have it for the three plaintiff --

19  we have it for the three plaintiffs, although for one of them

20  most of their viewing history was prior to the Facebook data.

21  So, for him, we have circumstantial evidence.

22           THE COURT:  Okay.  So I'm saying for potential class

23  members, is it ascertainable --

24           MR. PATEK:  Yes, we --

25           THE COURT:  -- whether or not they actually had this

2:22-cv-00412-RFB-BNW

1  information sent or not?  And I say that because obviously

2  defense keeps saying --

3        MR. PATEK:  Right.

4        THE COURT:  -- and this technology is new to me so

5  forgive me -- that there's a zero -- and I quote, zero evidence,

6  right, that this was actually sent.  You've read that same thing

7  that I read.

8        MR. PATEK:  There -- there is certainly not zero

9  evidence that these things were sent.  I think the -- the

10 difference between the parties is, it's sort of like getting

11 evidence on a murder where the defense wants somebody there who

12 was a witness and videotaped it so that they can prove every

13 single thing beyond a shadow of a doubt; whereas, you might in

14 fact be able to show that somebody committed a murder using

15 circumstantial evidence, such as the presence of DNA at the

16 scene, so on, and so forth.

17        So we have the pixel data.  There is a ton of

18 circumstantial evidence in there that these -- I mean, we know

19 that the data was transmitted.  That is direct evidence.  It's

20 right there.  It's reflected in the URLs.  It's reflected in the

21 field entries that show that there were third-party cookies

22 transmitted.

23        THE COURT:  So wait.  Is the question whether or not it

24 was blocked, then?

25        MR. PATEK:  No, by the time it's a pixel -- but if it's

─────2:22-cv-00412-RFB-BNW─────

1  in the pixel data, there is no question that it was blocked.

2  And that is actually a big part of the reason why we think that

3  the concerns that the defense has expressed are overblown

4  because they made all sorts of hay about how all of the

5  plaintiffs had -- were doing all of these things that were

6  supposed to block the third-party cookie transmissions for all

7  of them.  And what turned out to be the case when we actually

8  got the pixel data is that all of their concerns turned out to

9  be for naught.

10         So for Graham we had 325 different actual transmissions

11  of URL data which appear to have happened via -- I mean, based

12  on the data happened via a third-party cookie.  We know that the

13  c_user was a third-party cookie that was present on the computer

14  because he was a Facebook user.  And so it is reasonable to

15  infer that as part of the third-party data that was transmitted

16  his Facebook ID was included because that would have been how

17  Facebook associated the URL data with his identity when we went

18  to go and get that data.

19         THE COURT:  So Facebook has or Meta, whatever, has all

20  of this data?

21         MR. PATEK:  Yes.

22         THE COURT:  For all of the potential class members?

23         MR. PATEK:  We believe -- yeah, that's our

24  understanding is that they're tracking this constantly for all

25  the people who have Facebook IDs or Meta IDs depending on which

—2:22-cv-00412-RFB-BNW—

1  one you want to use.

2         THE COURT:  So I thought that you had received some

3  confirmation about that.  I'm trying to find out the -- was it a

4  deposition or declaration?

5         MR. PATEK:  Yeah, so we had a deposition.  We got in --

6  it was -- I believe David Woodridge was the person at Facebook

7  that was deposed.  And he was basically the one who explained

8  what all of the fields in the pixel data referred to and who

9  confirmed that there was in fact, you know, URL data for the

10 website.

11        THE COURT:  And I assume this data's all being

12 preserved now given this lawsuit.

13        MR. PATEK:  That is our understanding.  We subpoenaed

14 it.  We gave -- we gave -- we served on Meta a notice to

15 sequester and preserve the data.  Of course, you know, I'm not

16 Meta.  I don't represent them.  So I can't be, you know, 100

17 percent certain that they did what I asked them to, but we

18 certainly took all of the steps that we could to preserve that

19 data.

20        THE COURT:  Okay.

21        Because it seems to me, again, I'm not trying to reduce

22 this to one issue, but that seems to me to be the --

23        MR. PATEK:  Yes.

24        THE COURT:  -- crux of the dispute between the parties

25 is --

———2:22-cv-00412-RFB-BNW———

1          MR. PATEK:  And I agree --

2          THE COURT:  -- because it seems to me, and I'll let

3   defense respond to this, if they were sending the data and it

4   was regularly sending it, it doesn't really seem to be an issue

5   about an alleged violation, but there's arguments about them not

6   sending it and them not being technically a video producer or

7   whatever the term would be.  So there's some other arguments.

8          But as I look at this issue regard class certification,

9   the issue seems to revolve around this one particular question

10  about demonstrating whether or not the data was actually sent to

11  the degree that a class could be certified.

12         Would you agree with that?

13         MR. PATEK:  Yes, I would agree that is the main issue.

14         THE COURT:  So I will tell you all, and I'll let you

15  argue this today, but one of the things I've done in the past as

16  relates to this is have an evidentiary hearing, have the two

17  experts come up and have the Meta person come up and tell me,

18  and then I can resolve it.  Because I have two different

19  versions of whether or not and how this data is being

20  transmitted.  I think both of them potentially could be

21  persuasive.  And in prior cases involving class certification,

22  and as you know in this Circuit, the Circuit directs us now as

23  District Court judges to actually resolve disputes between

24  experts or technical issues.  This is a technical issue that I

25  would want to be able to clarify as it relates to the experts.

1        And so is there any reason why I couldn't do that?  I

2   know you think I don't need to do that, but I do feel like

3   again --

4        MR. PATEK:  I certainly don't think there's any reason

5   why you couldn't do that, Your Honor.  I do think that in cases

6   like *Lytle* the Ninth Circuit has set out that you don't actually

7   have to prove the merits and, thus, you don't have to figure out

8   whether or not expert testimony is going to be admissible.  But

9   I certainly understand that sometimes judges want that kind of

10  hearing, and we I don't think would have any objection to doing

11  that.  I think -- but part of the question for us would just be

12  what the scope of the evidence that you would want to see is.

13  So --

14       THE COURT:  Well, part of it is I would want to

15  understand a few things.  First, you have -- I have these expert

16  reports which are slightly contradictory as relates to not just

17  the setting, but what can be blocked and not blocked and what

18  people can see.  I don't know that I fully understand because I

19  haven't been -- I can't ask them questions about --

20       MR. PATEK:  Sure.

21       THE COURT:  -- for example, your suggestion, well, if

22  we want to limit the class, could we just do this and is that an

23  identifiable class, right.  You've offered some ways to address

24  the defendant's questions and I appreciate that, but you're not

25  an expert.  I'd like to hear from the experts, and then I'd like

—2:22-cv-00412-RFB-BNW—

1   to hear from someone at Meta who could tell me what data is

2   available, right, so that we don't have an issue.  Let them come

3   up here and tell me, "Yes, if you order us to provide it, we can

4   provide it."

5          That resolves another question because the defense

6   suggests, from my standpoint, two issues.  One is it's not clear

7   that the data's readily accessible even to the extent that

8   information may have been sent, but also we're not clear that it

9   was sent in the first place.  That seems to be something that I

10  could --

11         MR. PATEK:  Sure.

12         THE COURT:  -- resolve by asking them:  "Do you have

13  this?  What does it look like?  Is it in a form that could be

14  produced?"  And so the hearing would really be on this very

15  specific question.

16         Now, obviously we'd have to have a little bit of

17  background.  I'd let them do this in terms of their background.

18  But in this situation where from my standpoint I need a little

19  more information I feel like from the experts because you all

20  have done a very good job of representing your positions to the

21  extent that I'm still wanting to resolve this issue about how I

22  can confirm the, let's just say, adequacy or sufficiency of what

23  you call circumstantial evidence of the transmission of the

24  information.

25         Because, as far as I know, we don't have some sort of

1   log that says, John Smith, yes; Jane Doe, no.  But what we have

2   is a default setting.  We have a pixel that sort of activates it

3   a certain way that potentially can be blocked, but you're

4   essentially saying, "Look, for all intents and purposes it's for

5   the most part in this circumstance it's not blocked for lots of

6   different reasons or, to the extent it's blocked, it's

7   de minimus in terms of class certification."  And they're saying

8   the opposite.

9           MR. PATEK:  Right.

10          THE COURT:  And they're saying, "Look, you know, you'd

11   have to have these individualized, sort of, determinations,"

12   which is --

13          MR. PATEK:  Sure.

14          THE COURT:  -- a fairly regular argument, but a

15   legitimate one --

16          MR. PATEK:  Yeah.

17          THE COURT:  -- if there's an issue --

18          MR. PATEK:  So I think --

19          THE COURT:  -- so, again, I'm going -- I'm just

20   explaining to you what my concerns are so you have an idea of

21   what the scope would be of the hearing because I actually think

22   you all have laid it out fairly --

23          MR. PATEK:  Yeah.

24          THE COURT:  -- clearly in your briefing because you've

25   gone and back and forth on basically the same issue.

—2:22-cv-00412-RFB-BNW—

1      MR. PATEK:  So I think the one thing that I would put

2  out there is, while I very much understand your concerns, I

3  think in terms of from an efficiency perspective it might make

4  more sense to certify the class, allow the parties to go forward

5  with more discovery, and prepare their motions for summary

6  judgment which are going to overlap vastly with the evidentiary

7  concerns that you're expressing.  And then we can deal with that

8  issue then or, you know, also there will be an opportunity if it

9  looks like based on what came out during further discovery and

10  the motions for summary judgment that there's a problem or for

11  that matter if it goes to trial and it turns out there's a

12  problem, there can always be a motion to decertify the class.  I

13  mean, there are a lot of procedural safeguards that are put in

14  place to protect the due process concerns that defendants have

15  raised.

16      THE COURT:  Right, but one of them is not certifying

17  the class in the first place, right.  I mean, I appreciate that,

18  again, but my concern really is I feel based upon, again, the

19  law in this Circuit and its evolution to Courts being more

20  rigorous, Courts trying to resolve disputes at the certification

21  stage, this is something that the Court can do.

22      MR. PATEK:  Okay.

23      THE COURT:  Right.

24      MR. PATEK:  I mean, again, I would just caution, right,

25  the Ninth Circuit was very clear in *Lytle*.  I mean, they're

—2:22-cv-00412-RFB-BNW—

1  still reaffirming --

2          THE COURT:  In fact, I just had to deal with this

3  with --

4          MR. PATEK:  Okay.

5          THE COURT:  -- actually this same particular defendant.

6  You may not realize this.  On the fighters' class certification

7  we went through this same issue, right.  And only in this

8  district the Circuit very clear that if you don't resolve these

9  things, District Court, they're going to send it back.  And

10 they've sent them back here, to my district in fact, not my

11 case, but in other cases.

12         And so you're right.  It can be a judgment call, but

13 particularly in the context of experts presenting dueling or

14 potentially conflicting information, I actually think the law's

15 fairly clear that I have to resolve it.  Now, you're right.  I

16 could potentially resolve that in the context of the papers, but

17 I don't think that that's appropriate in this case because I

18 have questions.

19         But that's all right.  You don't have to agree with me

20 because that's not necessary.

21         MR. PATEK:  No, I understand that, Your Honor.

22         THE COURT:  But I just tell you that my review of the

23 law and in handling these cases I think it's important.  I also

24 think that the defendants have a right to know this at the

25 certification stage.  I don't think it's appropriate to

—2:22-cv-00412-RFB-BNW—

1    essentially certify it if I have these questions that I think

2    need to be resolved.

3          And, again, going back and forth with looking at the

4    reports and my notes from the two experts, and I know I'm going

5    to -- I don't want to butcher their names.  It's Herold and

6    Schnell, I think that's who the experts are.  I think the only

7    issue that would complicate this slightly is we would have to

8    identify someone from Meta who would need to come in, whoever

9    you all would identify, to come in and say, "This is the data

10   that's available," right.  And the only thing that we might -- I

11   might consider doing in the context of discovery is requiring

12   them to produce some version of that even before we have this

13   evidentiary hearing.

14         Like, in other words, right now as I understand it that

15   pixel data has been provided just for the named plaintiff.

16         MR. PATEK:  Just for the three named representatives

17   plaintiffs.

18         THE COURT:  It might make sense for us to be provided a

19   sample, for example, of the potential class members and that

20   would help me in terms of understanding this issue.

21         MR. PATEK:  Sure.  Okay.  And I just want to make

22   clear, I mean, if we do as Your Honor proposes, because I will

23   just note, like, Meta eventually turns stuff over and eventually

24   produced a witness, but it took a while, right, 18 months

25   between the time we first served the subpoena.  So I just want

—2:22-cv-00412-RFB-BNW—

1    to make sure that we would get --

2              THE COURT:  Well, you and I asking is slightly

3    different, right.

4              MR. PATEK:  Yes.  No, that's what I'm -- that's what

5    I'm saying -- getting at, Your Honor, is that I assume that this

6    would have your backing.

7              THE COURT:  No, I would order them to produce a

8    witness, right.

9              MR. PATEK:  Okay.

10             THE COURT:  And so, you know, we could have -- they

11   could have a back and forth, and we could talk about what would

12   be sealed or not sealed.  But, I mean, I don't see how they

13   could avoid this, but, again, they're a large corporation trying

14   to protect their interests.  I could see where they would want

15   to have some protection as relates to the confidentiality of

16   information, which it seems to me would be their main concern,

17   actually.  And we can address that.

18             I mean, I think that at some point they're going to

19   have to realize that this is going to become public.

20             Bless you, if you sneezed.

21             But we're not at that stage yet.  But I do think

22   providing some of the pixel data ahead of time would be

23   appropriate potentially.  I mean, I don't know that I actually

24   necessarily need it.  More directly, I simply need a witness

25   who's going to tell me what the data looks like, you know.  A

—2:22-cv-00412-RFB-BNW—

1  sample would be helpful, but the reality of it is you already

2  have a small sample, and we can talk about whether or not the

3  data for the other class members would look any different,

4  right.

5        It's enough there for me to be able to ask the

6  questions that I need to ask to resolve the issue, I mean,

7  because I don't think it's a particularly complicated issue, but

8  I just want to resolve the dispute between the parties.

9        So is there anything else that you had on that on this

10  particular issue?

11        MR. PATEK:  I don't think so, Your Honor.

12        THE COURT:  Because I do believe, also, this resolves a

13  lot of the questions that relate to the issues of certification:

14  commonality, common evidence, common damages.

15        MR. PATEK:  Yeah, absolutely, Your Honor.

16        THE COURT:  I think --

17        MR. PATEK:  We certainly agree with you that -- that

18  this is the core dispute, right, is what will the data actually

19  prove.

20        THE COURT:  Right.  Okay.  Well, let me hear from

21  defense counsel, and then I may come back to you.

22        MR. PATEK:  Okay.

23        MS. LEADER:  Thank you, Your Honor.

24        Is it possible if I could just pass out -- excuse me --

25  just -- we made a few visuals just from the evidentiary record

—2:22-cv-00412-RFB-BNW—

1  because I think it's just easier because we actually agree with

2  plaintiffs' counsel that the best evidence is the pixel data

3  that was produced by Meta in response to plaintiffs' subpoena,

4  which basically asks for, "hey, give us all of the information

5  for these three plaintiffs."  They provided Meta with the

6  Facebook ID, and Meta produced lots of data.  It was

7  overinclusive in nature, actually, but I think we were going to

8  do it as slides that we could bring up --

9       THE COURT:  I don't need that.  I have a very specific

10  question which I want you to address.  I don't need the handout.

11       MS. LEADER:  Okay.

12       THE COURT:  I mean, I want you first to address the

13  proposal the Court has because, again, this dispute between the

14  parties seems to be at the heart of what's happening here.  I

15  think again, as I've said to Mr. Patek, I believe the law is

16  pretty clear from *Olean* and other cases in the Circuit that if

17  there's a dispute between experts that I think is -- goes to the

18  core certification that I need to resolve that, and I have the

19  authority to have them come in and appear and testify before me.

20       MS. LEADER:  But I don't think there is a dispute

21  amongst the experts here, and the reason why I say that is the

22  whole theory of this case is not about just the transmittal of

23  the URLs.  That's obviously a piece of it, but, again, under the

24  VPPA it's very clear.  It doesn't matter if you transmit the

25  URLs unless it's associated with some personally-identifiable

—2:22-cv-00412-RFB-BNW—

1  information, right.  So if you go back to *Bork*, right, you
2  have --
3          THE COURT:  Right, but they say --
4          MS. LEADER:  -- main address and movie titles --
5          THE COURT:  Counsel, they say that you can figure it
6  out.  Like, it's not like that you all dispute that, too, right?
7          MS. LEADER:  No, that is certainly what is in dispute,
8  and if -- if -- that is what I was hoping to actually just do
9  some visuals from actually their expert's report because I think
10 it illustrates how we got to where we are, is when they filed
11 this case, what they represented to the Court and what's been
12 litigated for more than two years now, is that in this Meta
13 pixel what was being transmitted to Meta was not just the
14 URLs --
15         THE COURT:  Right.
16         MS. LEADER:  -- but they mention these cookies, the
17 c_user cookie and another cookie I'm less familiar with called
18 the m_page cookie.  And if Your Honor looks at Ms. Herold's
19 report, that's their expert, she actually has an illustration of
20 what those cookies look like.  And you have, like, the name of
21 the cookie --
22         THE COURT:  Yes, I --
23         MS. LEADER:  -- in one column, right, and the value.
24 For the m_page cookie and the c_user cookie, it's a nine-digit
25 code.  And if you or I -- if the Court was to do this, if I were

—2:22-cv-00412-RFB-BNW—

1  to do this, you go on someone's Facebook and you open it up, and

2  you just copy and paste that nine-digit number, you're able to

3  pull up that user's account, right.  We tried this out with my

4  colleague's dog's Facebook account, but you put the nine-digit

5  number in there and you could see all of this PII.

6          So their whole theory was, look, these third-party

7  cookies which have the Facebook ID in it have been sent --

8  transmitted through the Meta pixel to Meta along with URLs.

9          THE COURT:  Right.

10         MS. LEADER:  Meta was subpoenaed.  The production came

11  after they filed their moving papers, the Meta pixel production.

12  So they did not have that information when they wrote the --

13  when they filed their motion for class certification.

14         Not a single c_user cookie in there.  Not a single

15  m_page cookie.  Why does this matter?  Because I -- Your Honor

16  can look in the column, but there is a column that's labeled --

17  this is basically all of the hits -- here's everything we got

18  off that Meta pixel.  And when you look down that column, what

19  you mostly see is something called an fbp --

20         THE COURT:  Right.

21         MS. LEADER:  -- first-party cookie.  The only thing the

22  Court needs to know about the first-party cookie, the fbp, and

23  this is not in dispute, is it does not have a Facebook ID in it.

24  It is a piece of random code.  And so under *Eichenberger*, the

25  reason why they were very focussed on c_user cookies and m_page

```
2:22-cv-00412-RFB-BNW
```

1  cookies is you have to see something, even if it's not a name

2  and address like we had back in the Block Buster days, right,

3  you still need to see something that an ordinary person could

4  look at and tie it to an actual person, an actual identity.

5          With the Facebook ID you could do that.  So if that

6  field from Meta had been populated with c_user cookies, with

7  m_page cookies, they would have an argument.  I will obviously

8  represent --

9          THE COURT:  So you're saying the information that was

10 transmitted to Meta could not be used to figure out who these

11 people were?

12         MS. LEADER:  That's what I'm saying, is under

13 *Eichenberger* --

14         THE COURT:  I'm asking a specific question.

15         MS. LEADER:  Yes.  An ordinary person, which is the

16 *Eichenberger* test -- and that's what I was going to show Your

17 Honor, is what these look like.  It's -- an fbp is --

18         THE COURT:  That's another issue which I -- which we

19 should -- we can talk about, which is I don't think it's just an

20 ordinary person in the context of somehow some of this

21 information is being transmitted.  I do think, right, I mean,

22 we're in an evolving era of technology.  I don't know, right,

23 and I don't believe that *Eichenberger* or other precedent

24 suggests that somehow, right, you know, that we should remain

25 ignorant of how technology can be used to decipher individual's

————2:22-cv-00412-RFB-BNW————

1  identity.

2          And so my question to you is, are you saying that Meta

3  could not figure out from the information that was sent to it

4  who these people were?

5          MS. LEADER:  That is not what I'm saying, but what I am

6  saying, Your Honor, is I do think respectfully that the law says

7  just that; that when *Eichenberger* looked at the split in

8  circuits between the First Circuit and the Third Circuit, the

9  Ninth Circuit decided we're going to go with the Third Circuit,

10 which is the *Nickelodeon* case which actually --

11         THE COURT:  Wait.  So you're saying to me that even if

12 Meta could literally click a button, a macro, that would

13 translate this information to an identity, that's still one step

14 too far under *Eichenberger* and so, therefore, on that basis

15 alone that the Court would reject the plaintiffs' position?

16         MS. LEADER:  Well, I can say two things.  Going back to

17 the first-party cookie, which is the fbp --

18         THE COURT:  Yes, but that's actually not my question.

19 My question to you is, under the very precedent you're

20 presenting, are you saying that if it was as easy as using some

21 sort of macro or a one or two second, sort of, click, if Meta

22 could do that, are you saying under *Eichenberger* the fact that

23 they have to take an additional step that the normal person

24 wouldn't have the step means that they can't be held -- your

25 client can't be held responsible for that?

2:22-cv-00412-RFB-BNW

1        MS. LEADER:  Yes, my -- what I'm saying is under

2   *Eichenberger* is you look at not what the user could potentially

3   do or if it could reverse engineer that information, but you

4   look at whether an ordinary person could look at it and actually

5   link it with a user.  So could the Court take whatever that code

6   is -- and, I mean, obviously a Facebook ID, you still have to do

7   something, right.  I mean, a nine-digit code, if you or I are

8   looking at it, doesn't mean very much.  But if you understood

9   that, okay, I could open a web page, plug this in here, I could

10  reach the user, that's something that an ordinary person could

11  do.  You don't need vast resources to be able to do that.

12        But, I mean, and this is -- my colleague's helping me,

13  but the words from *Eichenberger* really says:  The statute views

14  disclosure from the perspective of the disclosing party.  It

15  looks at what information is actually handed over.

16        THE COURT:  Well, if they know that they can translate

17  it, it doesn't seem to me to make a difference.  You're right,

18  if they -- if they understand that.  But here's what I'm going

19  to tell you, you're not going to convince me.  I appreciate

20  that.  You're not going to convince me today.  I'm going to

21  still order the evidentiary hearing because your discussion

22  today actually has convinced me even more, right, that it needs

23  to happen because I do want to hear from these experts who talk

24  about exactly what you're talking about.  Because from what I

25  understood, at least from the plaintiffs' briefing, was that

─2:22-cv-00412-RFB-BNW─

1  this was a fairly easy process of figuring this out.  And that

2  these different settings and these cookies did not prevent this

3  inform -- this identifying information from being transmitted.

4  You're saying something different.  I appreciate that.

5         I'm just telling you, you can save some of your energy

6  because you're not going to convince me today, but what I would

7  like you to do is talk to me about what you think in terms of

8  this evidentiary hearing that we're going to have.

9         Because right now I'm thinking of three witnesses:  the

10 two experts, each expert, and Mr. Woodridge.  That's -- I just

11 have very specific questions.  I'll let you all ask these very

12 specific questions.

13        MS. LEADER:  Well, I think the questions that were

14 answered because when the Meta -- when Mr. Woolbridge --

15 Woodridge was deposed, the Meta witness, he was not involved in

16 preparing the responses to the subpoena, but I think he already

17 answered the question about -- with the fbp, the first-party

18 cookie, he said there is no Facebook ID.  And whether or not

19 Meta has the ability to reverse engineer that, we would argue is

20 not -- is not the test under *Eichenberger* --

21        THE COURT:  But that's not my position, right.  And he

22 could be here to talk about that, right, or someone else they

23 designate who would be most knowledgeable about that particular

24 issue.

25        So three witnesses that I see so far.  Any other

1    witnesses you think that we would need to have?

2        MS. LEADER:  I mean, I'd like to speak with my

3    colleague.  Potentially we'd want someone from Zuffa.

4        THE COURT:  And why would that matter for this

5    particular issue?  And I say that because, I mean, there are

6    other sort of factual issues, but it does seem to me, again,

7    this very unique and very specific question about what's

8    happening with this transmission and what is and isn't being

9    transmitted is crucial.

10        Now, if you think that Zuffa has information related to

11    that, I'm certainly happy to hear that.  I'm just not sure given

12    the way you all have phrased -- have framed -- excuse me -- this

13    dispute whether they're adding anything in particular.  If you

14    think that they are, certainly I would allow you to present a

15    witness.  But to me really the Court's focus and, again, the

16    focus as relates to class certification is when you have experts

17    who are presenting dueling or potentially conflicting or

18    inconsistent information, the Court has to resolve that.  And in

19    my judgment the best way to resolve that is for me to be able to

20    ask questions because I need to figure it out.

21        I know you all have been sitting with this for two

22    years, but I've only been sitting with it as it relates to

23    trying to figure this out for the past few weeks here as it

24    relates to sorting through the technology.  But I still have a

25    list of questions given the fact that you all don't seem to

———2:22-cv-00412-RFB-BNW———

1   quite fully agree about this pixel data and what it

2   demonstrates.

3           So --

4           MS. LEADER:  Perhaps -- oh, sorry.

5           THE COURT:  What I'm saying is if you think that a

6   Zuffa witness would be helpful, I'll let you offer one.

7           MS. LEADER:  I think it really depends on what

8   questions the Court has.  I mean, from -- if the central

9   question really is what information Meta produced, I mean, we

10  have that for the three plaintiffs and I think we have the

11  testimony from the Meta witness as to what that is and what that

12  contains or doesn't contain.

13          THE COURT:  I really just want to be able -- I believe

14  that I understand what your positions are.  I really just want

15  to be able to have not even -- maybe it's a full day, but really

16  just a half day with the experts to try to ask very specific

17  questions that I have about this -- both this technology, your

18  question about, well, what does it mean, right, when they get

19  the data back, what are they actually transmitting.  Because

20  there's some disagreement between the parties about what that --

21  what that transmission is.  Also, this issue about these, sort

22  of, ad blockers and third-party blockers and whether you're

23  using a particular browser, I have a list of questions that

24  relate to those disputes that were not resolved for me by

25  reading your dueling briefs.

2:22-cv-00412-RFB-BNW

1           And so I think you all are aware of these issues
2  because you all go back and forth on them basically throughout
3  the briefs, but it's a very specific narrow issue, which I also
4  think is fairly controlling in the context of this
5  certification.  Because if it is as you suggest, I don't know
6  the class could be certified.  But if it is as the plaintiffs
7  suggest, possibly, but there may still need to be some issues of
8  limitations, what's ascertainable, what's not.  Because that's a
9  separate issue, which is, you know, even if some of this
10 information is being transmitted, what does that class look
11 like?  How would you identify it?  How would you identify
12 damages as relates to that in terms of whether or not there are
13 individualized issues that we'd have to address?
14          So I need answers to some of my questions.  And as much
15 as I appreciate your briefing, you all are not the experts that
16 I need to help me figure this out.
17          So here's what I'm thinking.  I have to talk with my
18 scheduler here, but I don't really want this to take that long.
19 So I'm trying to find in the beginning part of next year,
20 January or February, just one day, you all bring your experts
21 in.  We subpoena the Meta person.  Hopefully that won't create
22 any issues, but we'll address that as it comes.  And then we
23 have the experts come in and talk to me about this issue.  So we
24 can look at a date, but I'm looking at -- we have that one week
25 in February.  What week is that?

```
                    2:22-cv-00412-RFB-BNW
```

 1              (Court conferring with courtroom administrator.)

 2              THE COURT:  I'm sorry, counsel.  You can take your

 3   seat.

 4              MS. LEADER:  Okay.

 5              THE COURT:  I don't want you to stand up here while

 6   we're trying to figure out our dates.

 7              MS. LEADER:  Understood.

 8              (Court conferring with courtroom administrator.)

 9              THE COURT:  So how about February 18th?

10              MR. PATEK:  Yes, Your Honor, that works for plaintiffs.

11   The one caveat, we'd obviously need to double-check the experts'

12   schedules.

13              THE COURT:  Right.

14              MR. PATEK:  But --

15              MS. LEADER:  Is it possible to do it one day later in

16   that week?

17              THE COURT:  We could do the 19th -- well, let's see.

18              (Court conferring with courtroom administrator.)

19              THE COURT:  Yes.  How about the 20th, Thursday, the

20   20th?

21              MR. PATEK:  Yes, Your Honor.

22              MS. LEADER:  That would be great, Your Honor.

23              THE COURT:  So check with your experts, right, and then

24   we should check with Mr. Woodridge or whoever that person would

25   be.  And I will tell you, again, what I really want to

—2:22-cv-00412-RFB-BNW—

1   understand is someone who could talk me through some of the

2   information in terms of Meta's pixels.  So whoever that would

3   be, if it's Mr. Woodridge, if it's someone else, I don't really

4   care.  I'm going to rely upon you.  You said Mr. Woodridge.

5   That's fine with me.

6          And who can tell me about what data exists.  So, for

7   example, if the pixel data that we have for the named plaintiffs

8   is essentially the same data we would have for the class

9   members, someone who can tell me that, right.  And then right

10  now those would be the three witnesses.  And I don't even think

11  that -- again, we'll block the whole day out because technical

12  experts sometimes tend to take a little bit of time to get

13  through what they need to get through.

14         And so the way that it will work, just so you

15  understand, is I will let you all each present your experts in

16  terms of going through their findings.  I will then ask some

17  questions.  I will let opposing counsel ask some questions, but

18  you'll present your witnesses.  Okay.

19         We'll have some time limits on those.  So, again, you

20  know, probably 30 minutes or 40 minutes to present, right, the

21  expert and their report and findings.  Then I'll have some

22  questions which may take 35, 40 minutes or more.  And then we'll

23  have opposing counsel ask questions.  It will be something along

24  those lines.  So, you know, it will probably take a good portion

25  of the day.

1          And for now, after hearing you speak, I'm not sure that
2     we would need any sort of sample data from Meta and also because
3     it just may take too much time to figure out what the sample
4     would be.  I think based upon the discussion I've heard today
5     and thinking about the material that you all have submitted to
6     me, having the experts talk and having the one representative
7     from Meta talk about the issues and the existing pixel data
8     should be enough.  I mean, all they would have to do is confirm
9     to me, the Meta person, that this is essentially the type of
10    data that we have for individuals like the named plaintiffs, and
11    that would be enough.

12          MR. PATEK:  Your Honor, so, I mean, if we can get a
13    sample of data, I do think that would be helpful.  I mean, can
14    we go ahead and subpoena it and we at least see what the
15    response is from Meta?

16          THE COURT:  So while we're here, let's figure out what
17    the sample is because what I don't want to have happen is then
18    we have a back-and-forth about the appropriate sample, not the
19    appropriate sample.  Let's discuss what the sample is that you
20    would request, see if there are any objections that I can
21    resolve, and let's just go through it right now.

22          If you want to take a moment to confer, you can.  And
23    if you want to take a moment to meet and confer, you can.  I
24    mean, I think it may make sense to be able to have it, as I said
25    before, as a way to sort of illustrate some of the issues that

—2:22-cv-00412-RFB-BNW—

1  we're talking about.

2       So I will let you request it.  We have enough time for

3  that to be able to be produced.

4       MR. PATEK:  Okay.  Thank you, Your Honor.

5       THE COURT:  Take a moment, sure.

6       (Counsel conferring.)

7       MR. PATEK:  So, Your Honor?

8       THE COURT:  Oh, okay.  Yes.

9       MR. PATEK:  Sorry.  So I don't know if we need to meet

10  and confer --

11       THE COURT:  Why don't you take a moment just to talk

12  about what you're asking for.  They may not agree, but at least

13  they know what it is, right, so they can respond.  So if you all

14  want to take a moment.  If you want to, we have a little

15  attorney room right back there if you guys want to go and talk

16  about it.

17       (Recess taken at 2:20 p.m.)

18       (Resumed at 2:25 p.m.)

19       THE COURT:  All right, counsel.  We're back on the

20  record.

21       MR. PATEK:  So, Your Honor, there isn't really

22  agreement between the parties, but our proposal would be, since

23  we've already served a subpoena on Meta that theoretically asked

24  them to sequester and preserve the data, we would go and serve

25  another one or an amended subpoena and try to get a sample of a

—2:22-cv-00412-RFB-BNW—

1  couple of days that were within the proposed class period for

2  the pixel data that had been transmitted from the Meta pixel

3  that was registered to Zuffa or, rather, it's actually four Meta

4  pixels I believe that were registered to Zuffa.  And, you know,

5  see what's in there and see if there was more useful

6  information, you know.

7          And part of the reason for that is, you know, we're

8  thinking if the idea is that we want to use the Meta data to

9  assemble a class list for notice purposes or whatever, then it

10  makes sense to check and see what we're actually going to get

11  when we go in and we're requesting stuff without having all of

12  the class members identified ahead of time.

13          MS. LEADER:  And, Your Honor, it seems like the central

14  question here is how does it work, not what the data says.  And

15  we have three very different plaintiffs.  We have Mr. Bloom

16  who's in California, Mr. Graham who's in Florida, we've got

17  Lindholm who's in Colorado, different time periods, different

18  practices in terms of how the -- which browsers they used,

19  whether or not they blocked cookies.

20          So as it is, it appears representative, and we got

21  thousands of rows of data that has already been analyzed by both

22  of the experts and that Meta's already testified to.  And so we

23  feel like the data set is certainly robust enough for there to

24  be testimony, and there has and there will be testimony --

25          THE COURT:  So are you going to be arguing to me that,

1   for example, for one particular named plaintiff this may have

2   happened, but we don't know that for other potential plaintiffs

3   and so, therefore, you can't certify the class?  Because if

4   you're going to be saying that to me, then it's hard to argue

5   that it is robust because frequently in these cases defense

6   counsel will come back and say, "Well, this was one person, but

7   there are other people out there who might fall into these other

8   categories and you don't know, Court, about these other

9   categories."  And so while I appreciate that, that is a common

10  argument that's presented to me.

11          I doubt that you're going to give up the right to make

12  that argument.  So in that instance what is the prejudice to

13  that?  In fact, because it seems to me, if your arguments are

14  true, that will in fact be borne out by the data and the experts

15  can explain that.  They can say, "Look, as you can see with this

16  data, even though it is a small sample, this demonstrates the

17  issues here that we've raised about the class."

18          So I don't know that I see any sort of prejudice to

19  your client.  It does seem to me that in fact if your argument

20  is what you say it is that it would actually be borne out by the

21  data, would it not?

22          MS. LEADER:  It would be borne out by the data.  I

23  think that the difference of opinion between or the different

24  arguments you're hearing -- Your Honor's hearing from both sides

25  is, you know, we have the data.  I don't think -- Meta was

———2:22-cv-00412-RFB-BNW———

1    pretty clear this is the type of data that's produced.  Our

2    position is you can't just speculate as to what Meta does with

3    that data and that it's irrelevant under *Eichenberger* because

4    reverse-engineering is not the test.  It has to be personally

5    identifiable information.  They've obviously taken a very

6    different position.

7          But to Your Honor's question about prejudice, I think

8    the concern is and what plaintiffs were suggesting is to get all

9    of the data for all of the potential class members --

10          THE COURT:  I thought he just said a few days.  I

11    actually didn't hear him say all of the data for all class

12    members.

13          MS. LEADER:  That --

14          THE COURT:  I thought they were saying an amended

15    subpoena that was actually a smaller data set.

16          MS. LEADER:  And that was not what was discussed in the

17    break room.  They said they were going to seek all of the data.

18    What we suggested in response to that was, perhaps, adding to

19    the data pool the data for I think his name is Lozano, but the

20    other plaintiff that they proposed adding to the class whose

21    name was not pulled, his data was not pulled from -- with the

22    Meta production.

23          THE COURT:  Well, I don't know that just adding one

24    person is going to do it.  I mean, this class is, what,

25    thousands of potential people, right?  Let's say 100 people.

2:22-cv-00412-RFB-BNW

1          MR. PATEK:  I agree with Your Honor.

2          THE COURT:  Let's say 100.  Okay?  We're not going to

3    do thousands.  Let's just say 100 people's information, however

4    -- particular class members.  I'm not sure how you would

5    identify them, but --

6          MR. PATEK:  Well, so I think the issue in terms of

7    retrieving the data is, without having the specific Facebook

8    IDs --

9          THE COURT:  Right, you can't know then --

10          MR. PATEK:  Well, we wouldn't -- we wouldn't be asking

11    for the data -- I mean, I suppose in theory we could ask for a

12    random sample of a certain number of people, but I was just

13    going to suggest, as I said, like, pick like one, two, three

14    dates, specific dates, and look at all of the data that was

15    transferred through the Zuffa pixel to Meta on those dates.  And

16    that should be, you know, a fairly limited subset of data, but

17    would cover multiple plaintiffs.  I mean, honestly, we don't

18    really know how many people that will cover on a given day.

19          THE COURT:  Right.

20          MR. PATEK:  It could be 10.  It could be 100.  You

21    know, could be --

22          THE COURT:  I suspect it will be more than 10, right.

23    So why don't we say this.  Pick three days.  That seems to me

24    that will be more than enough to subpoena the information.

25          And you also need to subpoena in a time where if

35

—2:22-cv-00412-RFB-BNW—

1  there's going to be an issue about the response, if you need

2  further Court action, you have to be able to come to me in time

3  to be able to do something and also to give them time, right?

4          MR. PATEK:  Right.

5          THE COURT:  So try to subpoena this as soon as

6  possible --

7          MR. PATEK:  We will get this out probably tomorrow.

8          THE COURT:  -- so that we can address this because I

9  really would like to have the hearing in February.  I wouldn't

10  want to push this back, and then that would allow me to be able

11  to try to get my decision out some time thereafter.  Because it

12  will take me a little bit to digest, but to try to get it out,

13  you know, the next couple of months after that.  So the sooner

14  we can get in and get this information produced and the

15  witnesses testifying, the sooner then I can issue my decision on

16  the motion to certify the class.

17          So is there anything else that we need to do today?

18          MR. PATEK:  I don't think so, Your Honor.

19          MS. LEADER:  I don't believe so, Your Honor.

20          THE COURT:  All right.  Well, thank you all for your

21  time.  Thank you also for adjusting your schedules.  I

22  appreciate that.  I'm glad that you made it here.  Safe a

23  travels back to where you are.

24          MR. PATEK:  Thank you.

25          THE COURT:  So have a good afternoon.

—2:22-cv-00412-RFB-BNW—

1          MR. PATEK:  You, too, Your Honor.

2          MS. LEADER:  Thank you, Your Honor.

3          (Whereupon the proceedings concluded at 2:33 p.m.)

4                         --oOo--

5               COURT REPORTER'S CERTIFICATE

6

7       I, PATRICIA L. GANCI, Official Court Reporter, United

8  States District Court, District of Nevada, Las Vegas, Nevada,

9  certify that the foregoing is a correct transcript from the

10  record of proceedings in the above-entitled matter.

11

12  Date:  November 26, 2024.

13                              /s/ **Patricia L. Ganci**

14                              Patricia L. Ganci, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25