UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| EVERETT BLOOM, JACK GRAHAM, and DAVE LINDHOLM, on behalf of themselves, and those similarly situated, | ) | Case No. 2:22-cv-00412-RFB-BNW |
| Plaintiffs, | ) | Las Vegas, Nevada<br>Tuesday, May 13, 2025<br>1:39 p.m. |
| vs. | ) | EVIDENTIARY HEARING, DAY ONE |
| ZUFFA, LLC; ENDEAVOR STREAMING, LLC; and ENDEAVOR GROUP HOLDINGS, INC., | ) | ***C E R T I F I E D  C O P Y*** |
| Defendants. | | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

THE HONORABLE RICHARD F. BOULWARE, II,
UNITED STATES DISTRICT JUDGE

APPEARANCES: See next page

COURT REPORTER: Patricia L. Ganci, RMR, CRR
United States District Court
333 Las Vegas Boulevard South, Room 1334
Las Vegas, Nevada 89101

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

APPEARANCES:

For the Plaintiffs:

**ANTHONY J. PATEK, ESQ.**
**SETH A. SAFIER, ESQ.**
GUTRIDE SAFIER, LLP
100 Pine Street, Suite 1250
San Francisco, California 94111
(415) 505-6226

For the Defendants:

**J. COLBY WILLIAMS, ESQ.**
CAMPBELL & WILLIAMS
710 South 7th Street, Suite A
Las Vegas, Nevada 89101
(702) 382-5222

**SUSAN K. LEADER, ESQ.**
**ALI REZA RABBANI, ESQ.**
PAUL HASTINGS, LLP
1999 Avenue of the Stars, 27th Floor
Los Angeles, California 90067
(310) 620-5700

INDEX OF EXAMINATIONS

TESTIMONY OF REBECCA HEROLD
Direct Examination by Mr. Patek......................22

LAS VEGAS, NEVADA; TUESDAY, MAY 13, 2025; 1:39 P.M.

--oOo--

P R O C E E D I N G S

THE COURT: Please be seated.

COURTROOM ADMINISTRATOR: The matter now before the Court is *Everett Bloom, et al., versus Zuffa, LLC*, Case Number 2:22-cv-412-RFB-BNW.

Counsel, please make your appearances, beginning with the plaintiff.

MR. PATEK: Appearing on behalf of the plaintiffs, this is Anthony Patek of Gutride Safier, and with me is Seth Safier as well. And we have our testifying expert, Rebecca Herold, and an advising expert, who we don't expect to be giving testimony unless you want him to. That would be Serge Egelman.

THE COURT: Okay. Good afternoon.

MS. LEADER: Good afternoon, Your Honor. Susan Leader on behalf of Defendant Zuffa, LLC. I'm here with my colleagues, Ali Rabbani and Taylor Farias. I keep trying to roll the R, but I'm entirely unsuccessful at it. And we're also with our testifying expert, Ron Schnell, and our local counsel, Colby Williams.

MR. WILLIAMS: Good afternoon, Your Honor.

THE COURT: Good afternoon.

So is there anything that we need to address before we get started here, just sort of from a procedural standpoint?

I know, Mr. Patek, there had been some discussion about Mr. Egelman testifying or not or -- I want to get a sense of who the plaintiffs anticipate presenting. I thought it was Ms. -- am I saying it right? -- Herold?

MR. PATEK: Yes. That was our expectation, and that is --

THE COURT: Just Ms. Herold.

MR. PATEK: Yes.

THE COURT: Okay.

MR. PATEK: We have no specific expectation that Mr. Egelman will be able to testify.

THE COURT: Okay.

And, then, for the defendants, it would be Mr. Schnell. Is that right, Ms. Leader?

MS. LEADER: That's correct, Your Honor.

THE COURT: Okay. So I want to hear just preliminarily from the parties as it relates to what their arguments are. And, specifically, I'm still trying to understand -- and the expert can help me with this -- how it is we don't know what was exactly transmitted to Meta. There seemed to be very different versions of what they did and did not receive or what would be discovered through discovery as it relates to the, sort of, Facebook ID and personal information and these other cookies in terms of what they're transmitting.

So, Mr. Patek, I want to start with you because, again,

I had ordered certain information to be disclosed or certain dates of -- of certain data to be disclosed. And I'm just, sort of, curious about what it is that you think the information that's been disclosed by Meta establishes and what more could be established through discovery because, again, I'm not clear from the plaintiffs, or the defendants, on what that is as it relates to the Facebook IDs and any other identifying information or unique identifiers.

MR. PATEK: Okay. So I think the information that's disclosed falls into two categories. So one is directly disclosed things, so things that are --

THE COURT: I'm sorry. One is -- say that again.

MR. PATEK: Directly -- directly exposed information. So, for example, fields of data that are identified in the pixel records, so, for example, the "fr" cookie or the hashed e-mail. Like, we know because those values are listed there in the provided match keys those were things that were provided, which there -- we would argue are personally identifying. We can also see, for example, the video URLs that contain the video titles. Those are directly listed in pixel data.

THE COURT: Okay.

MR. PATEK: Okay. Now --

THE COURT: Identifiable by user.

MR. PATEK: Again, we would argue yes.

THE COURT: Okay.

MR. PATEK: So -- and, again, in some cases, that is very -- again, each pixel event, the exact data that was transmitted may vary slightly. So there will be some pixel events where, for example, the "fr" cookie was actually in the exact same pixel event.

(Court reporter interruption and clarification.)

MR. PATEK: The "fr" cookie happens to be an encrypted form of the Facebook ID. Now, there is obviously a dispute between the parties as to whether or not that would constitute PII. But it is definitely directly there.

And then there are other arguments that could be made, for example, we can see that there are, you know, dozens, some cases maybe even hundreds, of pixel events that are transmitted for a given user. And it may be the case that there are pixel events at one point in time that showed that the "fr" cookie was received, but then there might be a different pixel event that is, perhaps, on the same day or a day or two before which would have the video URL.

So, there, there's going to be a dispute between the parties as to whether or not that particular video URL was disclosed in a personally-identifiable way. And there are certainly arguments that we would make that you can look at the data as a whole to see whether or not the disclosure occurred in a personally-identifiable way. And there are several different types of arguments that could be made on that front.

So one, for example, would be that those data are linkable and, in fact, were linked by Zuffa because Zuffa assigned unique identifiers and it sent unique identifiers with those different pixel events, indicating to Meta that all of those events pertained to the same person.

But then there are other arguments as well, for example, there's been much dispute -- or much debate in the papers about whether or not the Facebook ID was sent. And so, there, you know, I think you've probably seen Zuffa is arguing that because the Facebook ID is not explicitly listed in the pixel data, there is no evidence to be gleaned from the pixel data as to whether or not that Facebook ID was ever received via the c_user cookie.

We would argue in opposition to that that we can make inferences about the fact that third-party cookies were not blocked and that, in fact, because things like the "fr" cookie are there which require you to have a Facebook ID and which expire within 90 days of you logging into Facebook that you can infer from the fact that the "fr" cookie is there that that user has both been logging into Facebook and very likely never logged out because the default is that you don't log out, and because the "fr" cookie is being transmitted, we can know that third-party cookies were not blocked --

THE COURT: Okay. Well, why is it we can't simply get the information from Facebook and Meta that tells us whether or

not they received this ID and this information?

MR. PATEK: Well, all I can tell you at this point, Your Honor, is that in response to the subpoena that we sent, they sent data that did not include a direct record of the Facebook ID being received.

I -- and they explained that what happens is when the information is received, it gets converted into a separable ID and then it's stored using the separable ID.

THE COURT: But the fact that it may be converted doesn't mean they couldn't access it in the first place.

MR. PATEK: Okay. So that --

THE COURT: I don't understand that particular argument. You know, and this is an issue we're going to have to deal with in this case anyway, which is it is -- seems to me to be a little bit disconcerting that Meta is not responding to direct court orders. And this argument about them having no -- me having no jurisdiction to things -- I have no jurisdiction I think is wrong. They cannot be everywhere and nowhere at the same time, right, which is essentially their argument oftentimes on jurisdiction, right.

The fact of the matter is they clearly are -- are availing themselves of this jurisdiction, it seems to me, and we have a separate issue which deals with -- my concern is we set this for a hearing and I don't want to be micromanaging this all the time, but we should have gotten more clear data from Meta in

the first place. And I'm going to have to deal with that because you all are in some sense a little bit hamstrung by the fact that they're not providing complete information.

That being said, I think the experts have gleaned a certain amount of expertise from the reports that I can see about how these things operate anyway because of their experience, and despite what could potentially be described as obfuscation, it does appear that there is some ability to glean what's happening. But it is concerning to me because, when it comes to some of the central issues in this case, there may be some data that may need to be ordered to be more explicitly produced.

And I'm a little concerned about how and why it wasn't produced in this case, but we'll set that aside for the moment. Because, again, the parties are going back and forth on this issue of what was actually received and transmitted. That speaks to the definition of who would be in the class, whether the nationwide class or the California class, and it seems that Meta has a lot of this information which it may not be disclosing. So we'll have to come back to that. But that's to me a significant part of the problem. Having gone through all of what you all have submitted, right, through no fault of your own, you may be dealing with limited information.

That being said, the Court's going to proceed. I'm not going to not have your experts testify. But I think that at

some point, we may just have to have a Meta expert come in here, like I had wanted to do from the beginning -- have them come in here and testify because I don't want to be guessing about what they don't have and they do have or how they separate the IDs, right, when this is their pixel and they're the ones who designed it and they're the ones who keep converting it, quote/unquote, to do other things.

And so I just say that because it's a little frustrating to me in the course of this litigation to have that happening.

That being said, Mr. Patek, I didn't want to interrupt you, but, again, part of the -- again, my review of this information, and it's quite technical, but it turns on this idea of what they can do with what they have, more or less --

MR. PATEK: So --

THE COURT: -- right. And the parties dispute that basically, right. And that dispute is at the heart of this class, right, because if they can't do what you all -- what the plaintiffs claim they can do, then you have individualized class members who have information being blocked or information being provided on an incomplete basis. I don't know that necessarily there would be a basis for a class here if there is definitive evidence, right, of that level of differentiation based upon individual users. I'm not saying there is that, but I'm just saying that's a factor for the Court to consider.

So one of the things I would really like the experts to focus on today is to the extent that their expertise permits, explain to me the ability to access or not the ID, these cookies, and we can talk about differing definitions of personal -- personally-identifying information because that's at the heart also of your dispute, which is what is PII for the plaintiffs is not exactly what it is for the defendants. So when the experts testify, it's going to be important that you all are explicit about what you're saying that is.

But it would be helpful for me for the experts in terms of their expertise to talk about what they understand in terms of what is being communicated and exchanged between Zuffa and Meta when I know that that process even changed at a certain point around 2021. But just explaining that because that's helpful. I mean, we're going to go through the whole basics, too, but as I read your motions, it seems to me those are the central questions that are at issue in this case.

Would you agree with that, Mr. Patek?

MR. PATEK: I agree with you that those are the central questions. And you'll forgive me; you just threw a lot of questions at me that I feel like I need to respond to.

THE COURT: That's all right. I mean, I'm going to let you both respond, but it helps to set this up in terms of the expert testimony. But I'll give you a few minutes.

And, Ms. Leader, I'll come to you as well.

MR. PATEK: Yeah, and I would say, so first of all, I want to be very clear, there is no doubt in our minds that from the pixel data that was produced Meta has the ability to identify the Facebook IDs for each and every one of those people and identify and -- contact information for those people. They've made it clear that they have -- I think it's called a key-value store or -- which acts like a lookup table or an index that allows them to take the separable ID and, you know, use that to find the Facebook ID of the person and then know who that is.

So if --

THE COURT: And they indirectly advertise that.

MR. PATEK: Right. And if -- if --

THE COURT: Right, that's what they say.

MR. PATEK: -- the Court's concern is whether or not the pixel data will predominate on the ability to identify, you know, let's call them potential class members, right, it absolutely does. Like, it is a one-stop shop pretty much that's going to allow us to get that information once we also have the values in an unhashed format and we have the key-value store from Facebook ID, or alternately we could get them to produce the data again with the Facebook IDs in place of the separable IDs, which they do have the capability to do.

THE COURT: Okay.

MR. PATEK: So I'm sorry. So that's just one thing

that I wanted to get out there really quickly.

I think the other question that you had was just, like, why can't we get the -- the records of the c_user cookie being received. And, there, I think the short answer is, you know, we're just, you know -- we're having trouble getting information from Facebook about how some of these cookies are used.

That said, you know, Mr. Wooldridge, I think, was pretty helpful when he gave testimony about the data that was actually in the Meta Pixel records, but, you know, he really didn't speak to or couldn't speak to what it was that Meta did with the c_user cookie and if there is, in fact, a record of whether or not it's received.

You know, it's possible that it's just being recorded somewhere else, but that's something that we'll have to work on, and it's going to require a little bit more discovery from Meta, I think. But that said, it is clear from his testimony that there is a lot of circumstantial evidence that the c_user cookie would have been received. I mean, we've provided evidence from the perspective of a user transmitting data that shows pretty clearly that the c_user cookie -- you know, assuming the person's been logged into the device and has a Facebook account, that you can see that it is being -- that it's there and that it's being collected in the header and it's being transmitted, unless there's something to block it.

And, again, there is ample data in the Meta Pixel

records that helps us determine whether or not third-party cookies are being blocked, and that's just for the theory that the c_user cookie is transmitting the Facebook ID. If the Court opens up its analysis to look at other forms of PII, the analysis actually get much, much easier because the other things are recorded in the pixel records.

THE COURT: Such as?

MR. PATEK: Such as the "fr" cookie, which is, in fact, the Facebook ID, but it's just encoded, and --

THE COURT: Which includes -- again, you're using these -- so what's important for me is when you say "the Facebook ID," again, I want to make sure we're all understanding what information is actually transmitted through the ID or the respective cookie. So it's -- and, again, we can get into the definition with the experts. But it wasn't clear to me that you all even agreed as to what data's being transmitted by these respective cookies or the ID, and I want to make sure I'm understanding that, too.

Again, Mr. Patek, you don't have to testify to all of that. You have an expert here, obviously. But I'm saying that because these things are important as part of me understanding what I'm about to hear from these experts.

MR. PATEK: Sure. And we'll go over this in more detail with the expert. I mean, another piece of personally-identifying information that we see listed repeatedly

in the records is e-mails and, again, those -- technically those are hashed e-mails. So the string that you would see -- like, if you were just a person on the street, you would not be able to read it.

But that information, there are commercial services that you can submit the hashed e-mails to and it will spit back to you the actual e-mail of the person. So, I mean, that's a piece of information which, I mean, Meta touts that it anonymizes it, but basically we think that's a completely bogus claim. And we think that an ordinary person, like even just an ordinary person on the street who had just a tiny bit of savvy about being able to look up things on the internet, would be able to go and use a commercial service to get the person identified from the hashed e-mail.

You know, and then another one, of course, is the _fbp cookie, which I think was discussed in the -- in the reports and the papers. And, again, like, that is a unique identifier that Zuffa and Meta attach to each specific person, right. And granted, again, if you show it to a person on the street, we're not saying that a person on the street is going to know what that's referring to. But we don't think that's the correct test. The correct test is what does an ordinary person who's operating the website and transmitting the data to Meta know. And that party, to wit Zuffa, knows that that specific string of integers is being used as a code to identify that specific

individual and that it is being used to keep track of that person, you know, even if that person has third-party cookie blockers in place.

So, again, I understand there will probably be motion practice as to who's using the proper --

THE COURT: Darci.

MR. PATEK: -- definition of, you know, what's PII --

THE COURT: Just a moment, Mr. Patek.

I will let you all know, we have a jury that's out. And so, periodically, I may have to check to see if we get a question from them, which it looks like we do. Give me a moment.

(Court conferring with courtroom administrator.)

THE COURT: We'll go back on the record here.

Ms. Leader, before they get here, I want to give you an opportunity to be able to respond as well to some of the issues that the Court has raised. And, again, this is just a preview of the things that are going to be important for you all to highly in your presentation of the expert testimony. But -- and I know you take a different view about what can be demonstrated that has actually been transmitted and can be confirmed to have been transmitted or received by the -- Meta from the pixel, correct?

MS. LEADER: And that's -- that's correct, Your Honor. I mean, this case was filed almost three years ago now in 2022,

and what plaintiffs sought to do was to certify a class based on two things that they said constitute PII. They said what you're going to see in this class is the transmission of Facebook IDs -- I think they defined it as a Meta ID -- and video titles in the form of an URL.

And what Ms. Herold opined in her report is it would be very easy for this Court to discern that these Facebook IDs had been transmitted because they'd be contained in two third-party cookies. And when I say "third-party cookies," they're Meta's cookies; they're not Zuffa's cookies.

THE COURT: Right.

MS. LEADER: And the two that Ms. Herold focussed on that you'll, I'm sure, hear about were the c_user cookie --

THE COURT: Right.

MS. LEADER: -- and the m_page_voice cookie. And the reason why that was the focus of plaintiffs' case, is you could look at the cookie if it was in the data and you could see the 10-digit Facebook ID. And I think the argument was, even though an ordinary person under *Eichenberger* couldn't look at that 10-digit ID and know who it necessarily correlated with, all you would need to do is open up Facebook, copy and paste that 10-digit number in there, and you could figure out whose account was associated with that number. So that was the argument.

The Meta Pixel data was subpoenaed by the plaintiffs, and there was not a single c_user cookie or m_page_voice cookie

contained in that data. And what also happened after that production of data was that Mr. Wooldridge, who was Meta's corporate representative, was deposed. And what he testified is they don't work with c_user cookies; the only third-party cookie that you're going to see with an advertiser, which is what Zuffa was here, right -- Zuffa was paying Meta and saying, "Run these Fight Pass ads on your Facebook site so if someone who's not currently a subscriber, you know, clicks on this, it might help us build our subscriber base" --

THE COURT: Right.

MS. LEADER: -- right. And the type of cookie they used there is called an "fr" cookie. And I certainly agree with Mr. Patek that you can't look at an "fr" cookie and make -- and see any kind of Facebook ID or anything in there.

So when Mr. Wooldridge was deposed, he was asked the question point-blank: Is the Facebook ID contained in the "fr" cookie? And he said, "Sometimes the "fr" cookie is sent with a Facebook ID; other times it was not."

THE COURT: Ms. Leader, the question is whether or not they could readily access the information and whether or not we should accept their representation with respect to that. I mean, there are two issues here. One is if that's accurate. The other is whether or not their information can be gleaned by some other means as easily as if the ID were there. And can you offer your views on that in particular? Because, you know, if

it takes an additional step, but it can be easily done, Ms. Leader, that to me isn't a particular argument that they haven't received particular information.

So help me understand how this isn't just about the steps that it may easily -- may easily be taken to obtain the information versus the information simply isn't there, which is what your argument is, which is there's no evidence that it's transmitted and there's no evidence that what's transmitted contains the PII that they say that it does.

MS. LEADER: Right. And not only is -- can you not look at the -- there is no PII in any of the Meta Pixel data productions, period. And what I think is most important --

THE COURT: Okay. I'm sorry. When you say that, what is your definition? Because I also think there's a slight difference between the parties as to how you're defining PII. So can you tell me what your definition is when you make that argument?

MS. LEADER: I'm saying if you look at the test under *Eichenberger*, which is something that -- from the transmitting party where an ordinary person could identify or associate it with a person's identity. If you look at the Meta Pixel production, there is not included in there -- you don't see, you know, physical addresses, you don't have Social Security numbers, and you don't have Facebook IDs. You have a number of fields which Mr. Wooldridge was examined about, but the cookie

that I think plaintiffs have now focussed in on, because there wasn't a c_user cookie or an m_page_voice cookie in there where you could see a Facebook ID, is the "fr" cookie.

And what I think is really important to impress upon this Court is that for the three named plaintiffs: Mr. Bloom, Mr. Lindholm, and Mr. Graham, you don't even have a single instance of an "fr" cookie being sent at the same time as a video URL. So you don't even have a single instance of any third-party cookie. Forget about if I agree with Mr. Patek's characterization that an "fr" cookie is a form of PII because it's an encrypted Facebook ID. That was not Meta's testimony. Our expert will testify to something different.

But I don't even think the Court needs to go there because in the plaintiffs' Meta Pixel event data from the Fight Pass website, you just don't have a single instance of a third-party cookie being sent with a video page URL. And under the test, and under what plaintiffs have asked this -- asked this Court to certify, you simply don't have PII unless you can point to some, you know, instance of information that could be used by an ordinary person to associate it with an individual's identity being sent along with a video page link.

And, really, this case is just so far afield if you look at where the policies stem from where you have the Bork case -- it wasn't a case, but the situation that happened with that Supreme Court justice nominee where his family's

video-watching history was released by a Blockbuster clerk to a reporter, right. There you have, back in the days, right, lists of names, lists --

THE COURT: Okay. Ms. Leader, you're getting a little far afield of, like, our purpose today, and you're starting to move into your arguments about why the class shouldn't be certified. I'm really focussed on the expert testimony today, right, and the arguments that are being made.

And what I understand from your argument is that if you -- if the experts opined about the "fr" cookie and what is being transmitted, then it's clear that PII is not being transmitted and retained or received by Meta from the pixel. Is that right?

MS. LEADER: Well, there's no way of discerning from the data whether or not a c_user cookie or a Facebook ID was ever transmitted as part of the event data.

THE COURT: Okay.

MS. LEADER: There's absolutely no way of discerning that. Plaintiffs can point to things like the "fr" cookie, but as Mr. Wooldridge, who was Meta's corporate representative, testified, you can't just look at an "fr" cookie and assume that a Facebook ID had been sent. Sometimes it was, sometimes it wasn't. And there's no way of determining whether or not that happened, and there's certainly no way of linking that with a video link.

THE COURT: Okay. That's a helpful intro. So what I'm going to do is I'm going to take this other case and handle the note. And then we're going to start the testimony.

(Court conferring with courtroom administrator.)

THE COURT: We're off the record for this case.

(Recess taken at 2:08 p.m.)

(Resumed at 2:19 p.m.)

THE COURT: Okay. So now we're going to begin with the testimony. And your expert witness is whom, Mr. Patek?

MR. PATEK: This is Ms. Rebecca Herold.

THE COURT: Okay.

REBECCA HEROLD, having duly been sworn, was examined and testified as follows:

COURTROOM ADMINISTRATOR: Thank you. Please be seated.

I'm going to ask for you to state and spell your name for the record.

THE WITNESS: Rebecca Herold, R-E-B-E-C-C-A, H-E-R-O-L-D.

THE COURT: Okay. Go ahead, Mr. Patek.

DIRECT EXAMINATION OF REBECCA HEROLD

BY MR. PATEK:

*Q.* Okay. Thank you for being here today, Ms. Herold.

So as the Court --

THE COURT: Let me just say this in terms of efficiency for both sides. You can lead your --

MR. PATEK: Okay.

THE COURT: -- experts. This is -- you know, the Court has some --

MR. PATEK: Thank you --

(Court reporter interruption and admonition.)

THE COURT: So you all can -- both sides, you can lead your experts. Obviously, if you can -- you can object if you think something's objectionable. But, again, the purpose of this is to provide the Court with information, right. We're not at trial yet, even if we get to trial. So the point of this is just to provide information.

MR. PATEK: Okay.

THE COURT: So I'm not saying you can't object, but I am saying that I'm going to allow you all to lead and to do things that are efficient as relates to presentation of information.

MR. PATEK: You read my mind because I was going to ask you the extent to which that was okay. So thank you.

BY MR. PATEK:

*Q.* So, Ms. Herold, so you've already heard Judge Boulware's framing of the issues that he wants to have us address today, so I'm going to try to get us to that quickly.

THE COURT: And one thing I just want to ask, there's no dispute, I don't believe by either side, about the expertise of these witnesses. Is that correct?

Here's what I mean by that. You may dispute how they opine. That's not what I'm talking about. I'm talking about even their ability to actually engage in this analysis. There's a difference between saying, "I think this person didn't rely upon information and form this opinion" -- that's not what I'm talking about -- than saying, "This particular expert is not even qualified to offer an opinion." Those are two separate things.

MR. PATEK: Right.

I don't think that we would contest Mr. Schnell's expertise with respect to computers generally. I think we do have some concerns about his expertise specifically with relation to privacy issues, but we haven't presented those to the Court at this point.

THE COURT: Okay.

MR. PATEK: So there's no need to rule on that today.

THE COURT: So I don't need to -- I'm not going to address it today, then.

MR. PATEK: Fair enough.

THE COURT: If you want to address it later, that's fine.

MR. PATEK: I think we can deal with that later.

THE COURT: All right. Ms. Leader, is it the same for you?

MS. LEADER: Likewise, if we can just agree to address,

if necessary, via briefing. I think it would be helpful for both parties because we then will have the benefit of hearing what the expert actually testifies to.

THE COURT: Okay. Well, I am just saying that because I will tell you I think *Daubert* hearings are overused. Honestly, I think what happens is parties disagree with findings and they think that's a basis for a *Daubert* hearing. That is not the basis for a *Daubert* hearing, right. It's unreliable methodology, right, that's the basis for it. And, I mean, we've reached epidemic proportions of *Daubert* hearings being filed every single case for every single expert, the first sentence out of their report.

And so I'm just telling you if you file a report -- a *Daubert* motion, it should be clear that it's a *Daubert* motion because I will tell you if I think it's not -- I just want to be open with you about this -- you will get sanctioned for simply filing a *Daubert* motion just because you disagree with the findings. I'm not saying you can't raise those disagreements in other motion practice, but where an expert is clearly qualified and you're simply saying, "They should have taken this factor into consideration in reaching their opinion versus that factor," that is not a *Daubert* motion unless it rises to a level of fundamentally undermining the reliability of the methodology. So I just say that to you all for future reference.

Go ahead, Mr. Patek.

MR. PATEK: On that point, you are preaching to the choir, Your Honor.

Okay. So at the beginning here, actually, if I may approach, I'm just going to hand Ms. Herold copies of her report and her reply report.

THE COURT: That's fine.

MR. PATEK: And we're going to have electronic versions of this displayed, but I just wanted to give her a paper copy so that that is easy for her to read.

BY MR. PATEK:

*Q.* Okay. And so one of the big points that we're going to be focussing on today is whether or not there is evidence in the pixel data as to whether there was a personally-identifiable disclosure relating to consumers' video rental and viewing habits. So do you understand that, Ms. Herold?

***A.*** Yes.

*Q.* Okay. And at certain points during the questioning, as you've noted, there is disagreement between the parties as to the appropriate definition of what is PII, or personally-identifiable information. And so I may ask you certain questions during this process as to whether or not something meets the definition of PII under one of the proposed definitions. Okay. And so do you understand what I mean by that?

***A.*** Yes.

*Q.* Okay. And are you prepared to provide that kind of testimony today?
***A.*** I am.
*Q.* All right.
And, of course, the ultimate decision as to which of those definitions will control is going to be up to the Court, but we will deal with that at a later date.
And you submitted a report in this matter, correct?
***A.*** Yes.
*Q.* Okay. And is that the document that I handed to you that is titled the "Declaration and Preliminary Expert Report of Rebecca Herold in Support of Plaintiffs' Motion for Class Certification"?
***A.*** It is.
*Q.* Okay. And did you also submit a reply report in this case?
***A.*** Yes.
*Q.* Okay. And is that what is handed to you as Exhibit 31 filed under seal, which is then titled, I believe, as the "Reply Expert Report of Rebecca Herold" dated January 29th, 2024?
***A.*** Yes, it is.
*Q.* Okay.
So -- and in terms of materials that you've reviewed when you were preparing your report, I will represent to you, I think you know, that there were subpoenas that were sent to Meta --

THE COURT: You don't have to, Mr. Patek. It's listed in the reports, so you don't have to even go through that.

MR. PATEK: Okay. Fair enough.

BY MR. PATEK:

*Q.* But I just wanted to -- so when you supplied the reply report, you had -- had you received and reviewed the exhibit that is titled Meta Bloom 1, which is to say the spreadsheet that is the pixel data for the named plaintiffs in this case?

***A.*** Yes.

*Q.* Okay. And then the other spreadsheets, Meta 3 through 6, those you received after the date of your reply report, correct?

***A.*** Yes.

*Q.* Okay. And so to the extent that we're looking at that, those exhibits today, that will be new evidence with respect to your reply report.

***A.*** Correct.

*Q.* Okay.

So -- so let's begin by going into your expert report. And so I think you did some preliminary research where you looked at data in browsers that you thought was being transmitted to Meta. Do you remember that?

***A.*** Yes.

*Q.* Okay. And so if I direct you, for example, to Paragraph 67 of your opening report, there is a screenshot where you show a bunch of cookies, third-party cookies --

THE COURT: Okay. You know what's helpful, Mr. Patek? If you show on the screen or someplace else --

MR. PATEK: Oh. I'm sorry.

THE COURT: -- what we're all looking at together.

MR. PATEK: Yes. That would be helpful.

THE COURT: I'm sorry. How long do you expect the testimony to be?

MR. PATEK: My hope is that we will be through our testimony in an hour to an hour and a half.

THE COURT: Okay. That's good because one of the things -- even though I may sound like I fully understand all of how this works, I still would like the experts to explain it to me yet again. Because I think, you know -- I am not a computer expert, and this is very technical information that turns on some very technical determinations. And while my brother is a computer software engineer, I have no knowledge as relates to that expertise.

(Court conferring with courtroom administrator.)

MR. PATEK: Okay.

THE COURT: Hold on just a moment.

So, first, I want to go back. This whole case is about -- and you gave a little explanation about this -- about this Meta Pixel, right. Can you just explain to me, just take a few minutes and explain to me how it works. And what I'm particularly concerned, Ms. Herold, of how it works in the

context of, sort of, where it, sort of, resides and how it's transmitting information. Because it seems to me that at certain points the pixel, if you will, it's almost sort of like a tracker on the user's computer and/or web -- it's not a computer, but its -- its web-browsing activities. And then there are other times where it appears like there's communication between, in this case for example, Zuffa and Meta's servers directly without going through the user's web browser or used.

So can you just start from the beginning and just explain this to me, if you wouldn't mind, in like five to 10 minutes, please.

THE WITNESS: Sure. So when the user goes to the Zuffa server, the website, and they want to watch a fight. So when they get there to a webpage that has a video --

THE COURT: Right.

THE WITNESS: -- the Zuffa server is going to load code into their browser, and within that code is going to be commands to collect data from that user while they're at that website. And, also, that's where the pixel tool -- the pixel is, like, a set of code that is going to do various things to collect data from the user. And what happens, then, is --

THE COURT: So is it downloaded onto -- where does it reside exactly? So I wasn't sure -- again, this may be very technical -- on the computer itself or is it just connected to

the, for example, my -- if I have a Google account, my Google ID and obviously, that's not necessarily living on my computer, but that web ID and browser history lives in, for example, my Google ID. So if I switched it, it would be a different Google ID. I'm trying to understand how that works in terms of where this code, this pixel, resides, if you will, if that's the appropriate term.

THE WITNESS: Sure. So the code gets -- it starts out on the Zuffa server and they load it onto the user's, the viewer's, computer into the header of that page, basically. That's where the browser is. So it's on that user's computer, and they collect it at that point in time.

And then when the code is activated -- and I'm trying to make this just as, you know, ordinary terms as possible -- that code, then, sends the data that that Meta Pixel that Zuffa configured because the pixel is an advertising tool used by millions of organizations. So each organization has to configure that tool and tell it what do we want to collect from our customers who are on a webpage that we want to use then to be able to target them with specific ads about that page that they watched.

THE COURT: Well, that's what -- I think that's the part of your report where you talked about the choices made which would reflect not a passive, but an active determination of what information is going to be collected.

THE WITNESS: Yes, and I think that is a -- such an important point, is the fact that the Meta Pixel, yeah, it's software, it's a type of application that is made available to millions of organizations that want to use it for advertising, but it's up to each organization to then configure that tool to do what they want it to to meet their advertising goals. Because, of course, they're the ones making their advertising plan, not anybody else.

THE COURT: Right.

THE WITNESS: So that data that they've decided that it would be useful to collect this data from this end user, they send that to Meta, and then that's where Meta collects the data. And --

THE COURT: And let me then have you, again, go through it because I think you have a high level -- I think it's a five- or six-step analysis of how this actually works in your report, your initial report.

THE WITNESS: Uh-hmm.

THE COURT: I go to the UFC, sort of, fight page website.

THE WITNESS: Yes.

THE COURT: And then by activating the video or just by going to the website is the pixel downloaded onto my -- my computer?

THE WITNESS: When you go to the website, that's when

the cookies like my c_user cookie, and I -- I put a screenshot of that, gets the c_user cookie. But then it also loads the pixel along with those other cookies. So --

THE COURT: And is it just collecting information from my web-browsing activities when I'm using the UFC website, or even when I'm not using the Zuffa or UFC, sort of, fight page and I -- and I move to a different website or webpage, is it collecting that information as well?

THE WITNESS: Well, it depends on if they implemented a pixel in that page because that's something about this pixel. This pixel can be embedded into every page, and not only that, each pixel can actually cause multiple events to occur. It's not just one event.

THE COURT: So if I'm understanding you -- because that is the other part of the report that I thought I understood, but I want to clarify. Obviously it's an advertising benefit for Meta to say, "We have so many organizations that use our pixel, so if you go to another organization's website that has the Meta Pixel, the pixel will register that information, but not for websites that don't have the pixel." Is that correct?

THE WITNESS: Well, when you talk about it being registered --

THE COURT: Well, you say "interacting with." I'm trying to figure out --

THE WITNESS: Yeah.

THE COURT: -- how it's and when it's recording because this, again, goes to the PII portion of it.

THE WITNESS: Oh, yeah.

THE COURT: There's some discussion here about, sort of -- sort of, both, sort of, web browser history and sites that are visited, but also videos that are being watched on the site and elsewhere. And I'm trying to figure out -- you had used a term earlier "triggered," but is it just triggered if it's just watching whatever I watch on the UFC fight page website, or is it triggered when I go to some other website that has a pixel on it as well?

THE WITNESS: The pixels will be triggered and they could be collecting the same types of data, and it could be the same pixel with the same Pixel ID, but there's actually other pixels that can be used as well that collect different types of information. So -- and that information, once it's collected, could be shared with, then, other organizations who may want to use it for their own marketing.

THE COURT: Okay. And so if we go through -- if you want to go to -- Mr. Patek, put up just the -- Ms. Herold's report, there is that five-step -- I just want to go through that again, the --

MR. PATEK: Which --

THE COURT: -- five- or six-step --

THE WITNESS: Oh, good.

THE COURT: -- high-level analysis. Where -- I don't know where it is.

MR. PATEK: So -- yeah. So, I mean, I have up currently -- it's the figure at Paragraph 42.

THE COURT: Yeah, but I don't want that one. I want the one that -- there's one earlier where she -- where is it? I have it in my --

MR. PATEK: Do you think it might be the one from the demonstratives?

THE COURT: It might be the ones -- it's the -- I'm trying to look at my notes, where you have that -- I think is it a six-step or five-step high-level --

MR. PATEK: Okay. Let me see if I can cue that up for you.

THE COURT: Do you know what I'm talking about?

THE WITNESS: Yeah, yeah, yeah. And -- oh, good. I can see it here.

MR. PATEK: Yeah, if I can find it.

(Pause.)

THE COURT: Where did it go?

MR. PATEK: What is going on?

So is this what you were looking for?

THE COURT: No. You know what? It may be her -- I'm sorry. It may be the declaration that I was looking at. Hold on. Let me see.

This looks like it's actually -- I'm sorry. This looks like it's the declaration. That's what I was looking at, I think, which has this six -- it's on Page --

MS. LEADER: Your Honor, I think the Court may be referring to Paragraph 12 of Ms. Herold's report where she writes: "The following is a high-level summary of how Zuffa shared" --

THE COURT: Yes.

MS. LEADER: I think that's on Page 4 of the exhibit.

THE COURT: I thought there was a separate called the declaration, but it's still the report.

THE WITNESS: Oh, there it is.

THE COURT: Yes. That's what I'm talking about. Thank you, Ms. Leader.

MS. LEADER: You're welcome.

THE COURT: So, again, just walk me through that again, Ms. Herold.

THE WITNESS: Yes. I'll walk you through that, and I will also indicate where, you know -- how it may have been impacted by what Mr. Wooldridge then ultimately provided to us. So --

THE COURT: Okay. And by the way -- I'm sorry -- Mr. Schnell, I'm going to ask you the same question. We'll use something similar, but I'm going to first ask you to comment on these same steps, just so you can prepare yourself for that.

Go ahead, Ms. Herold.

THE WITNESS: Okay. So, first of all, you go to the UFC Fight Pass website. So you're there on their browser now -- or, excuse me, not their browser. You have your own browser. You're on their web server.

THE COURT: Right.

THE WITNESS: You then go to watch a video or whatever. And that's when the user's browser that went to the server, it -- the Zuffa server communicated with the end user's browser, and it requested code so it could enable viewing --

THE COURT: Right.

THE WITNESS: -- that -- the actual video.

So then Zuffa's server redirects the user's request. At that point in time, we were looking into the Google Tag Manager, but, really, it's just asking to be able to re- -- redirect it, which will ultimately be sent to Meta, then.

The Google Tag Manager loads -- that's what loads the actual pixel code into the user's browser. So hopefully I'm getting that, you know -- making that clear, not confusing it.

THE COURT: Uh-hmm.

THE WITNESS: But before, there's two ways that the Zuffa server can send data to Meta. So prior to -- one of the ways which is the Conversions API, the Meta Pixel on the user's computer communicated directly with the Facebook server. Afterwards, then, it basically was sending it to the Meta

server.

MR. PATEK: And if I -- may I interject one follow-up question?

THE WITNESS: Oh, I'm sorry.

BY MR. PATEK:

*Q.* So -- so I know that it says that prior to the Meta Conversions API, the web browser method was used. But after the Conversions API came into existence, did it -- was it the case that web browsers were never used or were both means available then?

***A.*** Oh, and that's great. They were both used. So then you were able to use both the browser to use the Meta Pixel, and you can also use Conversion APIs to send data directly between those servers as well.

THE COURT: Okay. All right.

THE WITNESS: So let's see. So we got to Step 4.

THE COURT: Okay. And Step 5.

THE WITNESS: And Step 5 -- whoops -- the -- then the Meta Pixel, that's when the cookies are being loaded into the user's browser. And that's where a lot of personal information is starting to be collected.

Now, when I was doing my testing, the two that I actually saw -- and I have screenshots for them -- were for the c_user cookie and also for the m_page_voice cookie. Both of those are third-party cookies that were established by Facebook.

So that means that --

THE COURT: So help me understand that. That's what I also don't understand. Are these cookies part of the pixel or are they separate from it? So, again, because I -- I'm trying to understand when you all reference these cookies how they are or are not part of what you also refer to as the Meta Pixel.

THE WITNESS: Yes. So the -- the pixel is like a library of coded functions that it's performing. So it's not necessarily like it's -- it contains those. This code is saying, "We want you to collect this data from here and this data from there." So it's -- it's just, like, a package of directions that is causing data to be collected or sent, you know, as it is being executed when it --

THE COURT: But is the c cookie one of these packages of data that it's collecting?

THE WITNESS: The c cookie is a third-party cookie that contains the Facebook ID. And so it's not a -- it's not software that's executed. It's a value that represents the 10-digit ID of that particular user at that website at that point in time. And --

THE COURT: But how does the pixel interact with the cookie? That's what I'm trying to understand.

MR. PATEK: And -- and --

THE COURT: How do they work together?

THE WITNESS: Well, with regard to how they work, they

cause that cookie value to then -- they take that and say with their software, "Hey, we want to send this to Meta so they can know what Facebook user ID is associated with the person who's here watching the video."

THE COURT: Does a c_user cookie ID come from the user's computer or is it already on -- I'm trying to understand --

THE WITNESS: Yeah.

THE COURT: -- where they get the information from, where the pixel gets -- pulls this PII from, where does it come from.

THE WITNESS: Okay. So what happens is when the user is logged into Facebook, that c_user cookie gets loaded into their browser at that point in time.

THE COURT: Okay.

THE WITNESS: So when they go to this website, this website is saying, "Hey, if you've got a c_user cookie, we know that you're from Facebook because you're loaded into it" --

THE COURT: Right.

THE WITNESS: -- "right now" -- "logged into it." So we want to get that cookie which contains the value that points directly to --

THE COURT: The Facebook ID.

THE WITNESS: -- the Facebook ID which reveals the particular Facebook user directly.

THE COURT: Okay.

THE WITNESS: And I guess -- I'm sorry. Did you want me to --

MR. PATEK: That's okay.

THE WITNESS: I'm sorry.

BY MR. PATEK:

*Q.* And I just wanted to point you -- I think you addressed the definition of the cookie. I actually scrolled to Paragraph 31, so I don't know if that will help you --

***A.*** Yeah. I mean, yeah, so the --

*Q.* -- resolve this question for the judge.

THE COURT: Well, part of it was just understanding the interaction between the pixel and the cookies and these particular cookies that you all are describing to figure out where they come from. Because it seems to me what you're saying, if I'm understanding this correctly, is that when they're using the Facebook or Meta website, this c_user cookie information is generated or created. And then when you're on the pixel and you go to the UFC fight page website, it says -- the pixel says, "Oh, we know that you have this c_user cookie, and we want to -- we want to access this information."

THE WITNESS: Yeah, and in my screenshots, it kind of actually displays that fact because on my --

THE COURT: Can we go to the screenshot? Do you have the screenshot to show me for that?

MR. PATEK: Yeah, I'll get back to it.

THE WITNESS: Let's see.

MR. PATEK: It was on Page 17. So let's focus on that one, why don't we.

THE WITNESS: Yeah, there. And I have it -- several of them because I did this research and experiments a lot of times.

So while I was on the webpage where the video is being shown, you can do what's called an inspect function to see the cookies that are on my computer at that time within my browser. And I could see that at this point in time that -- well, and there's one in here that actually shows what you're showing here is from Facebook -- whoops -- but there's also one that shows where I'm at the UFC Fight Pass, so that makes it really -- there it is.

So when I'm at the Fight Pass, because that's where the video's at, I'm there and you can see on that left-side column right next to the fighter's face, why -- you could see I'm on Fight Pass there, too.

THE COURT: Right.

MR. PATEK: And just --

THE WITNESS: But look at the cookies that are on my computer on my -- within my browser. Fight Pass has access to get the information that you see here from Facebook. Now, I just filtered this down to just the Facebook.com cookies that they're able to get to for readability.

But at that point in time, I saw they had a lot of Facebook cookies that are here, but the -- the one that's the c_user, that's my number. That's my 10-digit number. If you would enter "www.facebook.com/" and put that 10-digit number, you're going to see me and my Facebook page because that is directly pointing to me on Facebook at that point in time. So that's a direct link there.

Now, also another one that does that -- and this is an interesting one, because per Mr. Wooldridge's testimony, he had -- he wasn't sure what m_page_voice was, but that was another cookie that contained my Facebook ID as well. And I did some more research, and I found that a lot of other websites also used m_page_voice, but I've never been able to find out how that particular cookie value was being used. So, you know, that's -- that's in question right now.

BY MR. PATEK:

*Q.* Okay. So -- and just --

THE COURT: Thank you.

Go ahead, Mr. Patek.

BY MR. PATEK:

*Q.* So one thing, just to clarify for the record --

(Court reporter interruption and clarification.)

MR. PATEK: Sorry.

BY MR. PATEK:

*Q.* To clarify for the record since they can't see what I'm

scrolling to, you were just discussing the screenshot at Paragraph 66 of your report, correct?
***A.*** Yes.
*Q.* Okay. Just so the record is clear.
THE COURT: No, I appreciate that because we have to go back and look at it.
BY MR. PATEK:
*Q.* And then -- so with respect to you had just mentioned that you had done a little bit of additional research about the m_page_voice cookie, so did you see anything indicating -- I mean, not necessarily the exact use to which it is put, but, for example, what type of cookie it is categorized as by websites that use it?
***A.*** They didn't really answer that question. All they put -- and where I found this was a lot of these websites, they have their cookie policy, and within the cookie policy, they list all the cookies on their website that they have access to. And they listed that as one of the cookies that they had access to.
*Q.* Okay. And --
***A.*** But they didn't explain anything other than "This is a third-party cookie that" --
*Q.* So you don't -- you don't remember ever seeing anything that said this was, for example, just a marketing cookie or an advertising cookie?
***A.*** Well, they did say they were marketing cookies --

*Q.* Okay.

***A.*** -- as part of the Facebook policy because it's a marketing, you know -- that's what they were using it for. The pixel's a marketing tool.

*Q.* Okay.

THE COURT: All right. Go ahead, Mr. Patek.

BY MR. PATEK:

*Q.* So let's pick up again, then. If we can, let's go back to the top of Page 12, and you just had a little diagram there that showed the servers and the user's computer and Meta. So can you just walk through this very quickly and explain how this relates to the whole process that you just explained to the Court?

***A.*** Sure. So I just wanted a really easy way to show that when you go to a webpage on Zuffa, but -- and any other advertising -- advertiser's website that you're going to have two ways in which data can be taken from your computer and sent to that advertiser, or Zuffa in this case. So they can use the Conversions API to do a server-only transmission of data, and that's where the Zuffa server or whoever is using the Conversions API software -- it's a type of software -- it just takes the data and sends it directly to Meta.

Or it can also be sent through the browser from the pixel based upon what the -- they want to be taken, you know, that's established there as well.

THE COURT: From the user's browser.

(Court reporter interruption and clarification.)

THE COURT: From the user's browser.

THE WITNESS: Yes. So they're taking it either from the user's browser and sending it to Meta, or they're taking it after they went to Zuffa and Zuffa's sending it from their server to the Meta server.

THE COURT: Okay. Thank you.

BY MR. PATEK:

*Q.* Okay. And just to jump for a moment to the data that was actually produced by Meta. So in that diagram, you had the Conversions AP- --

THE COURT: Let's back up just a moment. Can you describe for me the data that was actually produced.

THE WITNESS: Oh. In this image?

THE COURT: Yes.

MS. LEADER: And, Your Honor --

THE COURT: Just generally, like, I want to make sure that I'm understanding what was and was not produced by Meta. So can you just describe for me what was produced that you saw in this case?

MS. LEADER: And, Your Honor, I'm so sorry. Before she does, can I just -- I don't know if it's an objection or just I want to clarify on the record. This -- what's been pulled up on the screen has additions to it that were not present in what was produced by Meta. For instance, it has the parent- -- I can see

parentheticals with the plaintiff's name --

MR. PATEK: If you want, I can explain what -- how Meta 1a was created. I'm the one who created it, so...

THE COURT: So all -- what would be helpful for me, Mr. Patek, is if you just tell me which portions are added for whatever commentary --

MR. PATEK: Okay.

THE COURT: -- or notation purposes --

MR. PATEK: Okay. So --

THE COURT: -- and what -- hold on.

(Court reporter interruption and admonition.)

MR. PATEK: Sorry.

THE COURT: Which columns are added and which columns are just, sort of, an input of the Meta data.

MR. PATEK: Okay. So I don't believe that I added any columns. What I did add is in Column B, because the data was produced with hashed identifiers, I went through and used the identifications that were supplied by Meta to more clearly identify which plaintiff was being referred to by which hashed identifier. And so that is the parenthetical with, for example, the name Graham or Lindholm that you should see in Column B of Meta Bloom 1a.

THE COURT: I'm sorry. So that's your interpretation of the hash information? Is that what you said?

MR. PATEK: Well, again, so when the data was produced,

Meta said that they were hashing the identifiers because -- just as a matter of policy. But they did identify which hash related to which plaintiff. So I -- I did not unhash the data. I simply assigned the values that Meta disclosed.

THE COURT: So, in other words, they gave you the hash value and they gave you the plaintiff associated with that, and then you took that hash value associated with the particular plaintiff and just, whenever you saw the hash value, put in the plaintiff's name.

MR. PATEK: Correct.

THE COURT: All right.

MR. PATEK: Yes. And then I also --

THE COURT: And hold on.

And, Ms. Leader, is there anything about this that would seem to be inaccurate from what Mr. Patek has represented?

MS. LEADER: No, Your Honor. I would just note for the record that obviously the Meta Pixel event data itself did not contain plaintiffs' names --

THE COURT: No.

MS. LEADER: -- I think --

THE COURT: No, I appreciate that. But I'm just saying in terms of the hash values that were given as associated with particular plaintiffs, that hasn't, as far as you know, been improperly or incorrectly transcribed here.

MS. LEADER: Correct.

THE COURT: Okay. All right.

MR. PATEK: Okay.

THE COURT: Okay. Go ahead, Mr. Patek.

MR. PATEK: And then, additionally, what I did do is I -- just to help make things more readable, I -- I don't actually remember if it came in the form in which it is sorted now. I may have done a sorting function on this so that, for example, all events that pertained to an individual browser and device were all contiguous to each other as opposed to being randomly strewn throughout the list. I think, to be honest, they probably were originally produced based in order on the date and event time. And then I reorganized it so that it was easier to analyze.

THE COURT: That's fine. I just want to make sure that I understand what was --

MR. PATEK: Sure. And --

THE COURT: -- what was modified about the data.

MR. PATEK: Yeah, and I'm just trying to make sure that I give a complete list of everything that I modified.

THE COURT: Okay.

MR. PATEK: And then I did do color coding, then, to help see where there was a transition from one thing to another. I applied yellow highlights where I saw video URLs.

And, you know, there -- there is a little index, I think, at the bottom of the table that gives some description of

what each color means, so -- but in terms of the raw data that is in there line by line, the only changes that were made to any of the text strings --

THE COURT: Right.

MR. PATEK: -- were the addition of the names next to the hashed identifiers.

THE COURT: Got it. Okay. Go ahead.

BY MR. PATEK:

*Q.* Okay. All right. And so -- sorry. Before we went off into the description of how I made this exhibit, we were talking about the fact that you had displayed the diagram that showed the Conversions API route and then separately showed the web browser route by which the pixel could transmit data to Meta. And so then you reviewed Mr. Wooldridge's testimony, which explained what all of the data in the spreadsheet means, right?

***A.*** Yes.

*Q.* Okay. And was -- and so looking at Column P, there is a column entitled "Event Source" --

THE COURT: I'm sorry. Why don't you just explain what's here for me --

THE WITNESS: Okay.

THE COURT: -- please.

THE WITNESS: So when we're looking at this, this shows the data that's collected from the pixel. It could be one or more rows, but for each of the events --

THE COURT: And I'm sorry. Just so we're clear, when you say "event" --

THE WITNESS: Yes. So --

THE COURT: -- we're obviously not talking about an event like a bout or a fight on UFC. What does it mean as an event on -- like, or a row on here, for example?

THE WITNESS: Yeah. So, like, when we're looking at the event source, why, that's talking about how it got there, and that's not directly answering your question yet. So -- but it's those two methods that I described to you. WEB_ONLY means it came from their browser via the pixel, and we're also going to see SERVER_ONLY and that's going to be Conversions API.

THE COURT: Okay. But before we get to that, an event is what, exactly?

THE WITNESS: So the event is basically what the Zuffa, or whomever the advertiser is, what they wanted to collect data from. So an event might be like a page view, and it might be, oh, somebody came here, so they're viewing the page.

So --

THE COURT: So the event is also defined by the coding in the pixel.

THE WITNESS: Yes.

THE COURT: So if I say, "Well, I only wanted to look at when they look at the video and I don't care what else they look at on our webpage," you could do that, or if you wanted to

say, "I want there to be an event for every separate page that they click on that's within our website, I want to see every single one," you could do either one of those things.

THE WITNESS: Yes, and you could have multiple events on one page --

THE COURT: Okay.

THE WITNESS: -- collecting different types of data. In fact, within what will go into the key values, you can even define your own key values to say, "These are the things that we want to collect, too, beyond what was predefined by Meta."

THE COURT: So each row here is an event.

THE WITNESS: Yes.

THE COURT: Okay.

THE WITNESS: Each row is an event.

THE COURT: Okay. Go ahead. You were going to explain a little bit more.

THE WITNESS: Okay. So we have the date stamp in Column A. We have the hashed identifier. So this isn't the identifier that we were talking about being hash. It's called a separable ID, and that is mapped by Meta so that it is linked to the Facebook ID. So it's not the Facebook ID directly. However, it's -- it basically is an index that says, "Oh, if you have this ID, it's actually this Facebook user's ID over here."

THE COURT: So how -- as you understand it, how do they do that?

THE WITNESS: So they do that, from what I understand from Mr. Wooldridge's testimony -- just a little background. As a Facebook user, why, there's an option that they have -- it's called off-Facebook tracking -- because they gave users an option to turn that off. So it's like, "Oh, people are going to turn off off-Facebook tracking for the c_user," but they wanted to still be able to understand the pages that were visited even if it's not going to be associated with that Facebook user's account.

So the separable ID is a different ID that is associated with one specific user. And a user can have different separable IDs as -- you know, and I'll explain that later when it makes more sense after I explain this.

BY MR. PATEK:

*Q.* And may I --

***A.*** But, in other words, they're making another ID that they can use specifically for their pixel so that they can use that to also still have that data, even though the user's account no longer is going to show that they're being tracked when they're on other Facebook -- or other --

MR. PATEK: May I --

THE COURT: But that separable ID is still going to be linked to the Facebook potential ID; that's how they can find it? How is the separable ID linked to the Facebook?

THE WITNESS: Oh. So there's what Mr. Wooldridge

called a key store. And the key store is where -- it's like a lookup table, if you will. It provides an index. So for the Facebook IDs, why, you know, you also have -- for the user IDs, you have this separable ID that's associated with it. So it's done through a type of index, I guess might be an easy way to describe it.

BY MR. PATEK:

*Q.* And I just wanted to follow up. I think part of what the judge was trying to get at was with the data that's transmitted, like, for example, is it that the separable ID is directly generated from the c_user cookie or is it the "fr" cookie or the _fbp cookie? Like, which of those values is used to link the separable ID to that data?

***A.*** So I believe it's my understanding that it's the "fr" cookie that is used to create the separable ID.

*Q.* Okay. And that was Mr. Wooldridge's testimony, yes?

***A.*** That's what I understand from his testimony.

*Q.* And is it possible that there are other instances where there are other types of data that are used to identify the separable ID?

***A.*** Yes. I mean, there are, and that's what I also understood from Mr. Wooldridge's -- the testimony he provided gave a lot of insight into what was going on that was not publicly available to consider at the point in time I wrote the original declaration. So it kind of helped to provide the back -- you

know, the -- the back office details, if you will.

THE COURT: All right. Thank you.

Go ahead, Mr. Patek.

BY MR. PATEK:

*Q.* Okay. And so just, again -- so -- so the data that was produced corroborates your description that was in that figure on Page 12 of your report where there were the two different avenues, right?

***A.*** Yes.

*Q.* Okay. And the pixel data can be used to conclusively determine for a given individual pixel event which of those two avenues was used to route the data.

***A.*** Yes.

*Q.* Okay.

THE COURT: How? How is that?

THE WITNESS: There's Column P, and that's "Event Source." So if you see that Column P has a value of "WEB_ONLY," ah, they got it through the user's browser from the pixel. And it's not shown on the screen, but there's also a value to that column that says "SERVER_ONLY." And if you see that, it's like, oh, they got it through the -- the Conversion API --

THE COURT: I hear you. So there's --

BY MR. PATEK:

*Q.* Sorry. I scrolled down. You can look at, for example, Line 1433.

***A.*** So 1433, yes. So that's SERVER_ONLY.

THE COURT: And that means what again?

THE WITNESS: So those particular transmissions actually occurred through the server-to-server transmission from the UFC Fight Pass server to the Meta server.

THE COURT: And what's it transmitting?

THE WITNESS: So -- well, it's transmitting a lot of different things. So it's transmitting -- as you see at the top here, we have Items F, G, and I. So this is telling you the type of browser they were using, the exact type of device that they were using, the operating system of the device that they were using. So you know the type of device that they're using.

THE COURT: I'm sorry. And so this information came from Zuffa's server and was sent to Meta, and that's why Meta produced it?

THE WITNESS: Well, it's coming from Zuffa's server either via server-to-server transmission or through the Meta Pixel.

THE COURT: So I guess -- so this will be a question for you, Ms. Leader, and Mr. Schnell, which is if they can identify this through the hash mark, how are they saying that they can't actually identify the people? I don't -- if you're saying to me that somehow these people aren't being identified, if they have a hashtag that can identify a particular person, how is it that you're saying that Meta can't confirm what

information is being received?

You don't have to answer that now. I'm just saying I want you all to be able to explain that to me because it seems to me that if they're using the hashtag and they can pull up the plaintiff's name, what is the argument that somehow they don't have the ability to easily access this when they could do this so quickly? And I'm sure you all have an answer to that, but I want to start flagging these things as we go so you all can give me these specific answers.

Because if there's a hash value associated with a particular individual user and they can provide it in a way that can be transcribed, I, sort of, want to know, then, why that wouldn't be able to be the case for all of the users or the people who actually go and use the UFC Fight Pass website where the pixel is loaded onto their browser, so just a question for the future.

MR. PATEK: Okay.

THE COURT: And, Ms. Herold, you understand my question?

THE WITNESS: Uh-hmm.

THE COURT: Because if the argument is that somehow we can't confirm that Meta's receiving this information or it's not receiving it in a way that it can identify users, but if they're receiving a hash value that they can quickly convert into a person's identity and other information about their browser, it

would seem that that would establish that they are clearly able to identify who is the source of these events and this data and that that's being communicated directly or received directly from the information they're getting from Zuffa's server, right?

THE WITNESS: Yes, and that's one of -- there's going to be more, too.

THE COURT: Okay. Well, show me more.

BY MR. PATEK:

*Q.* So if I may, so I just wanted to note for the record, so there are some columns that were produced that have been hidden here, again, just to make it easier to view. So, for example, if I go and I unhide, you can see that there's an exact event time. There's a pixel ID that identifies which are the pixels registered to Zuffa. I mean -- I'm sorry. You should actually be the one supplying this testimony.

THE COURT: Yeah. Why don't you explain the rest of it to me, Ms. Herold.

THE WITNESS: Yeah. So that pixel ID, that's the ID of the pixel that was put into the end user's browser when they got to the Zuffa website. That's where it contains that library of commands, software code, that says, "Hey, here's what we want to collect from this user while they're here at this page." So that -- each one has its own pixel ID. So you're talking about different pixel IDs, you know, on different pages where you're talking about that. That's where you could -- you could have

different pixel IDs.

So if you look here, you can see that there's different pixel IDs being used. And that's pretty common for advertisers to use different pixels that have different IDs because they might want to collect different types of data from one type of page, like one where you have a video showing, and another type of page where they might be -- the -- a user might be asking questions or they might be doing an order and things like that.

THE COURT: Okay. All right. Thank you.

Keep going, Mr. Patek.

MR. PATEK: All right. And is it okay? I'm going to -- actually, I'm going to hide this again, just to make other things a little bit easier to see.

BY MR. PATEK:

*Q.* So let's jump to Column L.

MR. PATEK: What did I just do?

THE COURT: What did you do? Did you erase your whole file, Mr. Patek?

MR. PATEK: No, I'm sure I did not do that.

THE COURT: All right. There we go. I can see Column L right here, so you don't have to -- Mr. Patek, we can look at it from here.

MR. PATEK: Okay. Well, anyway.

BY MR. CRAMER:

*Q.* So Column L, which is -- the header is "Resolved Document

Link." Can you explain what Mr. Wooldridge testified as to what the Resolved Document Link was?

***A.*** Yes. So Mr. Wooldridge talked about four different columns that have URLs, or the web address, in them. This one, L, he said this was the one that was most likely the one that had the actual pixel event occur when it executed, based upon what the other three are. The other three provide good information, too, though.

THE COURT: Okay.

BY MR. PATEK:

*Q.* Okay. And then in Column L, for example, in the yellow highlighted rows, those are video titles, correct?

***A.*** They are video titles, and they're shown -- I might add that they're coming directly from the ufcpass.com [sic] website.

THE COURT: So, in other words, the pixel's programmed to collect an event that's the video, right. What happens is this -- this event is created whatever -- based upon whatever the pixel ID is, and it creates a row that -- let's say, let's look at 1434, right, that has Conor McGregor versus Nate Diaz UFC 202. And this information was communicated directly from Meta's server to -- excuse me -- from Zuffa's server to Meta's server with this information.

THE WITNESS: Yes, using the Conversions API.

THE COURT: Okay. And what is the next column, R?

THE WITNESS: Oh. So that, that contains a lot of the

specific data items that Zuffa -- when they put -- when they configured their pixel to say, "Here's what we need for our advertising campaign," this shows at least some of them.

Now, the title says "all_provided_match_keys." However, if you look at Mr. Wooldridge's testimony, he actually says that this doesn't necessarily show all of the actual match keys; that there might be others that were collected at the same time.

So this shows you some of the primary ones. You'll also notice here the _fbp cookie, that's what was sent -- that was the Zuffa first-party cookie that was sent. And then there's other information that they could have -- that they did collect, like the IP address of the computer as it was connected together.

THE COURT: Is that in this column, too, or are you just saying that's what he said?

THE WITNESS: No, it's actually shown here as a --

THE COURT: IP address?

THE WITNESS: Yeah, the IP address. So that's one of the variables, I guess. I'll call those variables, right, because --

THE COURT: So I'm sorry. It's not listing any specific information in here. Is it just telling you the type of information that it's collecting for each event?

THE WITNESS: Yes, so those are like the variable

names --

THE COURT: Got it.

THE WITNESS: -- that's indicated in the pixel. So when the pixel goes to the user's computer, it says, "Hey" -- this is just showing these are the specific types of items we want to collect. And that's why it's just shown here. In this particular rendering of what was received from Meta, this is just showing that these were the variables that were identified to collect from -- via the pixel that Zuffa configured.

THE COURT: Perfect. Keep going. Thank you.

BY MR. PATEK:

*Q.* Okay. And, again, I'm just going to expand a little bit because there is some hidden data here.

So if we look at Column N, which it actually reads like it has user PII data, but I think Mr. Wooldridge testified that that referred to hashed user PII data. And so can you just explain what that column denotes?

***A.*** Yes, so that column is either blank or sometimes it has a 1. I don't know if it has any other values. Those are the two primary ways in which I saw them presented. If it has a 1 or something else there, per Mr. Wooldridge's testimony, I understood that to mean that that data was encrypted or encoded in some other way. I think I saw it referenced a couple of different ways within his testimony.

*Q.* Well, and more --

THE COURT: Hold on a second, Mr. Patek.

So is it collecting, right, user -- I don't know if it's hash user PII data, or is it not collecting it? I guess I'm not understanding.

THE WITNESS: Oh. So these that are blank --

THE COURT: Yes.

THE WITNESS: -- it's collecting it. And this is showing that it's not -- it's not encrypted, but it's still collecting it. That's just showing whether or not it's encoded.

MR. PATEK: So hold on.

MS. LEADER: Your Honor, I'm so sorry. I just -- I understand that the Court doesn't want objections to leading, and I don't intend to do that. But I do want to object to the extent that there is characterization or what we would argue is mischaracterization of Meta's corporate representative's testimony. So if he's going to ask her about something that Mr. Wooldridge testified to, we would ask that he show her the testimony itself versus stating in the record --

THE COURT: Ms. Leader, if you want to point out the differences later, I will give you an opportunity to do that, but for efficiency purposes, I'm going to allow that to happen. And if you want to point out -- and you, through Mr. Schnell, want to point that out, you can, if you think there's a disagreement as to how this is characterized. That's fine.

And I can look at that later, but I'll go ahead and

hear from Ms. Herold and Mr. Patek can ask questions that lead along those lines, but I'll give you an opportunity to be able to correct that later if you think it's incorrect.

Go ahead, Mr. Patek.

BY MR. PATEK:

*Q.* Okay. And so just to show some examples of where there is actually a value. So if we go up to Row 101, you can see that there's actually a "false" in there, correct?

***A.*** Correct, yes.

*Q.* And if you go across...

Well, so then let's go to up here -- whoop. Where is it? Come on. There we go.

So, here, in Row 54, there's a 1 in the "Hash User PII Data" column, right?

***A.*** Right.

*Q.* And so then when you go over to Column R, what does it show was transmitted in Column R?

***A.*** In Column R, it shows that -- the e-mail address; the _fbp cookie; the "fr" cookie, which contains the Facebook ID; the IP address; and the user agent, which typically, you know, it has some browser information. It's where you get information about the --

*Q.* And --

***A.*** -- the user's computer. Sorry.

*Q.* I'm sorry. I didn't mean to cut you off. But is there one

of those values in particular that you expect to be a hashed piece of PII?

***A.*** Yes, the e-mail in particular is hashed.

THE COURT: And explain to me again what you mean by the e-mail being hashed.

THE WITNESS: Yeah. So the e-mail is not -- when you look at it, you're going to see just some letters and numbers maybe with your -- you know, just looking at it with your eyes. But that's a hash value of the actual e-mail address for the Zuffa website user who is at that page. So that is the end user's e-mail address.

And as far as the e-mail address goes, that's -- from my experience as doing a lot of privacy work, that is a direct personally-identifying piece of information because most people don't share their e-mail addresses. It's them.

THE COURT: Thank you.

BY MR. PATEK:

*Q.* And just to follow up and anticipate questions that are going to be coming down the road. So if we adopted Zuffa's definition where the question for whether or not it's PII is whether just an ordinary person on the street would be able to read the hashed e-mail and know from -- just from reading the hashed e-mail what it was, would that be PII, the hashed e-mail?

***A.*** If I saw the -- the hashed e-mail information just on its own, no.

*Q.* Okay.
***A.*** I would not know what that was.
*Q.* But would it be possible for an ordinary person on the street who had received a hashed e-mail to identify that person --
***A.*** Oh.
*Q.* -- with a little bit of research?
***A.*** Yes.
THE COURT: How would you do that?
THE WITNESS: Oh, it's -- there are actually websites available -- I think hashes.com is one of them -- where you can actually take hashed e-mail addresses and other types of data that you have gotten through, like, all these different types of breaches that have been reported over the past 20 years -- anyway, those have been all collected. And what they do is they take and they hash using the most common types of hashing methods. And I don't know if you want me to tell you all of those, but there's -- there's four primary ones that are used a lot.
Anyway, they hash the clear tag. So now they have the hashed value of that e-mail address. And they do this for -- gosh, I think some of them have one billion, some have five billion e-mail addresses, and I think I mentioned that in one or more of the -- my papers.
But then -- so what you can do at these websites, you

can enter that hash value.

THE COURT: Right.

THE WITNESS: It will go in, and it will check through -- again, it's a type of table. And if it finds a matching hash value -- because that's the thing about hashing. It's a one-way cryptographic method. So when you hash a specific -- a specific value, you're going with, like, let's say --

(Court reporter interruption and clarification.)

THE WITNESS: -- SHA-256, if you hash it with that, why -- and you use, like, rebeccaherold@rebeccaherold.com, you'll get a value. Well, if that's been hashed by these sites that are selling these e-mail addresses or offering them, and they use the same hashing method, they're going to get the same value and they're going to make it available for other people because it's like, you know, "We hashed it, so" -- that's the thing with hashing. You can -- they almost always -- unless there's some other, you know, things going -- abnormalities, you will always have an equivalent hash, with a few exceptions.

But, again, these sites are pretty common. I think hashes.com is the name of one of several of them that's out there. And oftentimes they'll even offer, you know, "Hey, have 1,000 or 100,000 free ones," because then they want to sell you the whole database.

THE COURT: Got it. All right. Thank you.

THE WITNESS: Uh-hmm.

THE COURT: Go ahead, Mr. Patek.

MR. PATEK: Sorry. I didn't mean to cut you off.

THE COURT: Sorry. Hold on. Hold on.

Can we take about a -- we'll take about a five-minute recess and then we'll come back.

MR. PATEK: Sounds good.

THE COURT: You can step down, Ms. Herold.

THE WITNESS: Thank you, sir -- or Your Honor.

THE COURT: Sure. That's fine. Either way.

(Recess taken at 3:20 p.m.)

(Resumed at 3:48 p.m.)

THE COURT: So I was talking with my staff. We have, as you can imagine, had a fairly long trial day. And before we delve into further technical conversation, I think -- and given the fact that Ms. Herold had not been feeling well, I think the Court would simply prefer to just call it a day today and start tomorrow early, and we can go through the testimony full -- more efficiently that way. I think you all are aware of the issues that I want to be able to talk about. And so you can have your focussed testimony tomorrow.

I don't expect it will take more than a half a day, honestly, in terms of educating the Court and getting your points out, but I think that if we got started at 8:30 tomorrow, we could finish by lunchtime.

Do you all disagree with that? Mr. Patek?

MR. PATEK: Hope springs eternal.

THE COURT: Well, I will tell you this. I'm actually pretty good about keeping time limits when it comes to these sorts of things. And as this is to educate the Court, not the parties, since you all are very educated on these matters, I will certainly direct you all either way. But I think that half a day is more than enough time in this case.

Ms. Leader, do you think we need more time than that?

MS. LEADER: I would just ask that we have a roughly equal amount of time with our expert as Mr. Patek has with Ms. Herold, but I would certainly hope we could finish by then.

THE COURT: I think so. And, look, I think equal time is important, but I also think that there's some time that I spent with Ms. Herold that I'm not going to need to go over with Mr. Schnell because she's explained some basic terms to me that I think he's going to be using, too. I don't know if they're going to -- I don't think he's going to use a different term for cookie, I hope not, you know, unless it's an edible one.

So, you know, we'll play it by ear, but I'm just saying I'm not going to ask him to do exactly some of the same information. But I may ask more pointed questions depending upon what happens. If he wants to correct information, obviously he can do that about the process. I'm not preventing that. I'm just saying you don't need to have him going through

the same exact information about some of the basics. But you will certainly, Ms. Leader, have an equal opportunity.

So I would like to get started at 8:30 tomorrow, but if the parties can be here by at least 8:15 so that we can get started and go through our day tomorrow. Okay?

Anything else, then, we should address before we call it an afternoon? Mr. Patek?

MR. PATEK: Nothing from me, Your Honor.

THE COURT: Ms. Leader?

MS. LEADER: Nothing, Your Honor. Thank you.

THE COURT: All right. Thank you, Ms. Herold. You can step down. I hope you feel better.

THE WITNESS: Thank you.

THE COURT: All right. We'll be adjourned. Thank you.

MR. RABBANI: Thank you, Your Honor.

(Whereupon the proceedings concluded at 3:51 p.m.)

--oOo--

COURT REPORTER'S CERTIFICATE

I, PATRICIA L. GANCI, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date: August 11, 2025.

/s/ **Patricia L. Ganci**

Patricia L. Ganci, RMR, CRR