1    **CAMPBELL & WILLIAMS**
     J. COLBY WILLIAMS (Nev. Bar No. 5549)
2    jcw@cwlawlv.com
     710 South 7th Street
3    Las Vegas, Nevada 89101
     Telephone: (702) 382-5222
4    Facsimile: (702) 382-0540

5    **PAUL HASTINGS LLP**
     SUSAN K. LEADER (*admitted pro hac vice*)
6    susanleader@paulhastings.com
     ALI R. RABBANI (*admitted pro hac vice*)
7    alirabbani@paulhastings.com
     1999 Avenue of the Stars
8    Los Angeles, California 90067
     Telephone:  (310) 620-5700
9    Facsimile:  (310) 620-5899

10   *Attorneys for Defendant Zuffa, LLC*

11

12                    **UNITED STATES DISTRICT COURT**

13                         **DISTRICT OF NEVADA**

14

15   EVERETT BLOOM, JACK GRAHAM,            Case No. 2:22-cv-00412-RFB-BNW
     and DAVE LINDHOLM, on behalf of
16   themselves, and those similarly situated,    **DEFENDANT ZUFFA, LLC'S MOTION
                                                   FOR SUMMARY JUDGMENT**
17                    Plaintiffs,
                                                  **HEARING REQUESTED**
18          v.
                                                  **[REDACTED]**
19   ZUFFA, LLC,

20                    Defendant.

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2

**Page(s)**

3   INTRODUCTION ................................................................................................ 1

4   BACKGROUND AND CONCISE STATEMENT OF UNDISPUTED FACTS ......................... 3

    A.   The UFC Fight Pass Website and the Meta Pixel .................................... 3

5   B.   The Meta Pixel "PageView" Event ......................................................... 4

6   C.   Plaintiffs Filed "Gotcha" VPPA and California Privacy Claims ............................ 5

7   D.   Meta's Pixel Data ................................................................................... 6

    LEGAL STANDARD ........................................................................................... 6

8   ARGUMENT ..................................................................................................... 7

9   I.   ZUFFA IS ENTITLED TO SUMMARY JUDGMENT ON THE VPPA
         CLAIMS............................................................................................... 7

10       A.   Zuffa Did Not Disclose Plaintiffs' "PII" to Meta ...................................... 7

11            1.   The Ordinary Person Standard ....................................................... 7

12            2.   The C_User Cookie Is Not PII ...................................................... 9

              3.   The FR Cookie, FBP Cookie, and Hashed Emails/Names
13                 Are Not PII ................................................................................. 14

14                 a.   FR Cookie ...................................................................... 15

15                 b.   FBP Cookie ..................................................................... 16

                   c.   Hashed Email Addresses and Last Names ........................ 16

16       B.   There Is No Evidence That Zuffa "Disclosed" Plaintiffs' PII to
              Meta........................................................................................... 17

17       C.   There Is No Evidence That Zuffa "Knowingly" Disclosed PII to
18            Meta........................................................................................... 20

19  II.   ZUFFA IS ALSO ENTITLED TO SUMMARY JUDGMENT ON THE
          CALIFORNIA CLAIMS ............................................................................. 23

20       A.   California Civil Code § 1799.3 ............................................................. 23

         B.   California Constitution Invasion of Privacy .......................................... 26

21       C.   California's Unfair Competition Law ("UCL")..................................... 27

22  III.   PLAINTIFFS LACK STANDING ................................................................. 29

    CONCLUSION ................................................................................................. 30

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................. 6, 7, 30

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................... 6, 20

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994) ........................................................... *passim*

*Custis v. United States,*
511 U.S. 485 (1994) ........................................................................ 20

*Eichenberger v. ESPN, Inc.,*
876 F.3d 979 (9th Cir. 2017) ........................................... *passim*

*Fairbank v. Wunderman Cato Johnson,*
212 F.3d 528 (9th Cir. 2000) ............................................................ 6

*FTC v. Publ'g Clearing House, Inc.,*
104 F.3d 1168 (9th Cir.1997) ........................................................ 30

*Golden v. NBCUniversal Media, LLC,*
No. 22-CV-09858, 2025 WL 2530689 (S.D.N.Y. Sept. 3, 2025) ................ 13

*In re Google Location Hist. Litig.,*
428 F. Supp. 3d 185 (N.D. Cal. 2019) ........................................ 26

*In re Google, Inc. Privacy Pol'y Litig.,*
58 F. Supp. 3d 968 (N.D. Cal. 2014) .......................................... 27

*Hall v. SeaWorld Entertainment, Inc.,*
747 F. App'x 449 (9th Cir. 2018) (unpublished) ......................... 28

*Hammerling v. Google LLC,*
615 F. Supp. 3d 1069 (N.D. Cal. 2022) .................................. 28, 29

*Hammerling v. Google,*
No. 21-cv-09004-CRB, 2022 WL 2812188 (N.D. Cal. July 18, 2022) ................ 27

*Hill v. Nat'l Collegiate Athletic Ass'n,*
7 Cal. 4th 1 (1994) ........................................................................ 27

*Hodgson v. Mars, Inc.,*
891 F.3d 857 (9th Cir. 2018) ........................................................ 28

*Hughes v. Nat'l Football League*,
No. 24-2656, 2025 WL 1720295 (2d Cir. June 20, 2025) (Summary Order)..................... 1, 12

*In re Hulu Privacy Litigation*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) ............................................................. *passim*

*Jefferson v. Healthline Media, Inc.*,
674 F. Supp. 3d 760 (N.D. Cal. 2023) ................................................................. 28

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) ............................................................... 26

*Lipeles v. Ciccone*,
2025 WL 1843222 (C.D. Cal. May 20, 2025) ....................................................... 28

*Lloyd v. Facebook, Inc.*,
No. 21-cv-10075-EMC, 2022 WL 4913347 (N.D. Cal. Oct. 3, 2022) ............................ 23, 26

*Low v. LinkedIn Corp.*,
900 F. Supp. 2d 1010 (N.D. Cal. 2012) ............................................................... 27

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..................................................................................... 29

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) .......................................................................... 8

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) ......................................................................... *passim*

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
210 F.3d 1099 (9th Cir. 2000) .......................................................................... 6

*Nixon v. Pond5, Inc.*,
No. 24-CV-05823, 2025 WL 2030303 (S.D.N.Y. July 21, 2025) ................................... 13

*In re Oracle Corp. Secs. Litig.*,
627 F.3d 376 (9th Cir. 2010) ........................................................................... 7

*Popa v. Microsoft Corp.*,
No. 24-14, 2025 WL 2448824 (9th Cir. Aug. 26, 2025)............................................. 29

*Romag Fasteners, Inc. v. Fossil, Inc.*,
590 U.S. 212 (2020) ..................................................................................... 19

*Salazar v. Nat'l Basketball Assoc.*,
No. 22-CV-07935, 2025 WL 2830939 (S.D.N.Y. Oct. 6, 2025) .................................... 12

*Shin v. Campbell Soup Co.*,
No. CV 17-1082-DMG, 2017 WL 3534991 (C.D. Cal. Aug. 9, 2017) ............................... 27

*Sidhu v. Bayer Healthcare Pharms. Inc.*,
No. 22-cv-01603BFL, 2022 WL 17170159 (N.D. Cal. Nov. 22, 2022) .................................. 29

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) ........................................................................................... *passim*

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ......................................................................................................... 29

*Stardust, 3007 LLC v. City of Brookhaven*,
899 F.3d 1164 (11th Cir. 2018) ....................................................................................... 30

*Stark v. Patreon, Inc.*,
635 F. Supp. 3d 841 (N.D. Cal. 2022) ............................................................................. 28

*Svenson v. Google Inc.*,
No. 13-CV-04080-BLF, 2016 WL 8943301 (N.D. Cal. Dec. 21, 2016) .............................. 30

*Taino v. Bow Tie Cinemas, LLC*,
No. 23-CV-05371, 2025 WL 2652730 (S.D.N.Y. Sept. 16, 2025) ...................................... 12

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ......................................................................................................... 29

*U.S. v. Currency, U.S. $42,500.00*,
283 F.3d 977 (9th Cir. 2002) ........................................................................................... 30

*United States v. Sylvester*,
605 F.2d 474 (9th Cir. 1979) ........................................................................................... 20

*Washington v. Flixbus, Inc.*,
No. 25-CV-00212, 2025 WL 1592961 (S.D. Cal. June 5, 2025) ........................................ 26

*Worix v. MedAssets, Inc.*,
857 F. Supp. 2d 699 (N.D. Ill. 2012) ............................................................................... 21

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) ............................................................................... 26

**Statutes**

18 U.S.C.
§ 35 .................................................................................................................................. 20
§ 1030 .............................................................................................................................. 20
§ 1343 .............................................................................................................................. 20
§ 2710 (2) ........................................................................................................................... 5
§ 2710(a) ........................................................................................................................ 1, 7
§§ 2710(b)(1) ...................................................................................................................... 7

Cal. Civ. Code
    § 1799.3...................................................................................................*passim*
    § 1799.3(a) ...................................................................................................... 24
    § 1799.3(c) ...................................................................................................... 24
    § 1799.3 (3) ...................................................................................................... 5

California's Unfair Competition Law .......................................................... 3, 5, 6, 27

Electronic Communications Privacy Act ............................................................ 21

UCL .............................................................................................. 27, 28, 29, 30

Video Privacy Protection Act.............................................................*passim*

**Other Authorities**

134 Cong. Rec. 10259 (1988) ............................................................................ 21

134 Cong. Rec. 31839 (1988) ............................................................................ 21

California Constitution........................................................................... 3, 26, 28

Fed. R. Civ. P. 56(a)............................................................................................ 6

H.R. Rep. No. 647 (1986) ................................................................................. 21

1

## **INTRODUCTION**

2          After over three years of litigation and exhaustive discovery, Plaintiffs do not have a shred

3    of evidence to support their theory that Zuffa, LLC ("Zuffa") knowingly disclosed their personally

4    identifiable information ("PII") to Meta Platforms, Inc. ("Meta") in violation of the Video Privacy

5    Protection Act ("VPPA") and/or California law.  The core allegation underlying all of Plaintiffs'

6    claims—that Zuffa installed the Meta Pixel on the UFC Fight Pass website to surreptitiously send

7    to Meta (i) Plaintiffs' Facebook IDs (as embedded in the Facebook "c_user" cookie) and (ii) the

8    titles of videos they watched (as embedded in Fight Pass URLs)—is ***not just unsupported, it is***

9    ***demonstrably false***.  Not only is there zero evidence that Zuffa disclosed (let alone *knowingly*

10   disclosed) Plaintiffs' Facebook IDs or any other PII to Meta, the record shows that Zuffa did not

11   even use the Meta Pixel to track the videos its subscribers watched on the Fight Pass website.  Thus,

12   for the reasons discussed below and in light of undisputed Court of Appeals precedent, Zuffa is

13   entitled to summary judgment on all of Plaintiffs' claims.

14          ***First***, Plaintiffs cannot show that Zuffa disclosed "PII" to Meta.  Under the VPPA, PII

15   "includes information which identifies a person as having requested or obtained specific video

16   materials or services from a video tape service provider."  18 U.S.C. § 2710(a).  To determine the

17   kinds of information that are capable of identifying a person, the Ninth Circuit has adopted the

18   "ordinary person" standard.  *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017).  Under

19   this standard, Zuffa cannot be held liable unless Plaintiffs can show that Zuffa disclosed

20   information that would "readily permit an *ordinary person* to identify a specific individual's video-

21   watching behavior."  *Id.* (emphasis added).  Plaintiffs cannot do so.  The only information Plaintiffs

22   allege an ordinary person could use to identify a specific individual is Facebook's c_user cookie.

23   But as numerous courts have held as a matter of law, the c_user cookie is not PII under the ordinary

24   person standard.  *See, e.g.*, *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 54-55 (2d Cir. 2025);

25   *Hughes v. Nat'l Football League*, No. 24-2656, 2025 WL 1720295, at *2-3 (2d Cir. June 20, 2025)

26   (Summary Order).  Moreover, to the extent Plaintiffs allege that Zuffa disclosed PII to Meta through

27   other cookies and parameters, Plaintiffs and their expert have already ***admitted*** that an ordinary

28   person could not use that information to identify an individual, and thus any such claim must fail.

***Second***, even if Plaintiffs could establish that such information is PII under the VPPA (it is not), there is no evidence that Zuffa even "disclosed" such information to Meta.  To the contrary, the records Meta produced in this action, which include all available Pixel data from the Fight Pass website for the three Plaintiffs, do not reference ***a single*** ████████████████████.  Nor do Meta's records for the three Plaintiffs reflect ***a single*** instance where ████████████████████ In fact, for Plaintiff Bloom, Meta's records do not even include ***a single*** ████████████████ ████████  But even if hypothetically the records Meta produced in this action had included such information (which they unequivocally did not), Plaintiffs still could not establish that *Zuffa* disclosed their Facebook IDs.  Because the cookies that allegedly contained Plaintiffs' Facebook IDs are created *by Meta*, Zuffa cannot view them, access them, or control whether or not they are sent to Meta.  As such, Plaintiffs cannot demonstrate that Zuffa disclosed those cookies to Meta.

***Third***, Plaintiffs also cannot show that Zuffa "knowingly" disclosed their PII to Meta.  Under the VPPA, Plaintiffs must demonstrate that Zuffa *actually knew* that its use of the Meta Pixel would cause the disclosure of Plaintiffs' PII to Meta.  *See, e.g.*, *In re Hulu Privacy Litigation*, 86 F. Supp. 3d 1090, 1095-97 (N.D. Cal. 2015).  But even after over three years of litigation, there is not a sliver of evidence that so much as suggests Zuffa had such knowledge.  Rather, as discovery has confirmed, Zuffa did not know that the Meta Pixel could potentially cause Plaintiffs' web browsers to send Meta cookies that contained Facebook IDs or Fight Pass URLs with video titles, let alone that Meta might connect those two pieces of information.  To the contrary, Zuffa used the Meta Pixel to measure the effectiveness of the advertisements it placed on Facebook for potential new subscribers, ***not*** to track its subscribers' video-watching behavior on the Fight Pass website.

***Fourth***, Zuffa is also entitled to summary judgment on Plaintiff Bloom's California state law claims.[1]  As an initial matter, there is no evidence that Zuffa disclosed any "personal information" or "the contents of any record" that it "prepared or maintained" in violation of California Civil Code § 1799.3.  As noted above, the records Meta produced for Plaintiff Bloom do not include a single ████████████████████

---

[1] The California claims are brought on behalf of Plaintiff Bloom only, not the other two Plaintiffs.

1    ██████████████.   And even if they hypothetically did include such information,

2    Bloom's claim would still fail because he provided his consent for the alleged use and disclosure

3    of such information when he agreed to Zuffa's Cookie Policy and Privacy Policy, not to mention

4    Meta's own policies.  Moreover, Bloom cannot demonstrate that he had a reasonable expectation

5    of privacy in the information that was allegedly disclosed to Meta (which again did not include any

6    ███████████████████████████████), or that the alleged intrusion was an

7    egregious breach of social norms as required under the California Constitution.  Finally, for all of

8    the same reasons, Bloom cannot show that Zuffa violated California's Unfair Competition Law.

9      ***Lastly***, as a separate and independent basis for summary judgment, each of the Plaintiffs

10    lacks Article III standing because there is no evidence that Zuffa disclosed their PII in violation of

11    the VPPA or California law, and thus Plaintiffs have suffered no injury in fact.

12      For these reasons, as discussed in greater detail below, the Court should grant summary

13    judgment in Zuffa's favor on all of Plaintiffs' claim.

14        **BACKGROUND AND CONCISE STATEMENT OF UNDISPUTED FACTS**[2]

15      **A.  The UFC Fight Pass Website and the Meta Pixel**

16      Zuffa owns and operates UFC Fight Pass, a subscription-based video streaming platform

17    that gives UFC fans access to UFC-related video content.  Declaration of Travis Santypal

18    ("Santypal Decl.") ¶ 3.  Fight Pass subscribers can stream video content from the Fight Pass website

19    (ufcfightpass.com) or through any of the Fight Pass apps for mobile devices, smart TVs, and

20    streaming devices.  *Id.*

21      Zuffa advertises Fight Pass on Facebook.  *Id.* ¶ 7.  To understand the performance of those

22    advertisements, Zuffa installed a commonly used[3] digital marketing tool called the "Meta Pixel"

23    on the Fight Pass website.  *Id.*  This allows Zuffa to measure the number of times Fight Pass

24    subscriptions are purchased through its advertisements on Facebook, which helps Zuffa determine

25    whether an advertisement was effective and whether its marketing budget was well spent, and focus

26

27    [2] All citations to exhibits are attached to the concurrently-filed Declaration of Ali Rabbani ("Rabbani Decl."), unless otherwise noted.

28    [3] Plaintiffs' counsel themselves use the Meta Pixel on their law firm website (www.gutridesafier.com).  Ex. 1 ("Schnell Rep.") ¶ 58.

its advertisements on potential new subscribers.  *Id.* ¶ 8; *see also* Ex. 2 (Banks Tr.) at 73:16-74:6 (Zuffa used the Meta Pixel "to track purchases or subscriptions").

Contrary to Plaintiffs' allegations, Zuffa does ***not*** use the Meta Pixel to track what videos its subscribers watch on the Fight Pass website.  Santypal Decl. ¶ 9; *see also* Ex. 3 (Santypal Tr.) at 41:12-15 ("Q. So Zuffa had no knowledge whether or not video titles were sent to Facebook as a result of a user using the Fight Pass website?  A. Yes, that's what I'm saying."); Ex. 2 (Banks Tr.) at 138:20-139:19 ("Q. So it's your testimony that back in 2020, Fight Pass was not tracking page views for Fight Pass[?]  A. It's my testimony that we were tracking page views of people visiting the sign-up page only.  Q. But not tracking page views of, like, for example, page – like actual viewing of videos?  A. No.").  In fact, it would be illogical for Zuffa to use Meta to track the video viewing activity of Fight Pass subscribers because Zuffa, as the owner and operator of Fight Pass, already has that information internally and considers it commercially sensitive.  Santypal Decl. ¶ 9.

**B.    The Meta Pixel "PageView" Event**

The Meta Pixel is a snippet of JavaScript code that can be added to a website.  Santypal Decl. ¶ 11.  Here, Zuffa installed the Meta Pixel on the Fight Pass website by copying this code into a system called Google Tag Manager ("GTM"), which allows Zuffa to install and manage code on the Fight Pass website through a user-friendly interface.  Santypal Decl. ¶ 11; *see also* Ex. 3 (Santypal Tr.) at 35:4-7.  When installing the Meta Pixel through GTM, Meta instructs that the Pixel's "base code"—which is required to install the Pixel—should be configured to fire on *all* pages of a website.  *See* Santypal Decl. ¶ 12.  Zuffa followed Meta's instruction and set up the Pixel to fire on all pages of the Fight Pass website during the putative class period.  Santypal Decl. ¶ 12.

Once installed, the Meta Pixel can be used to log certain website visitor actions, which Meta calls "events."  *See* Santypal Decl. ¶ 12.  As noted above, Zuffa used the Meta Pixel to understand the number of times Fight Pass subscriptions were purchased through its Facebook advertisements. Santypal Decl. ¶ 8.  However, separate and apart from Zuffa's intended use of the Meta Pixel, the Pixel base code—which must be used to install the Pixel on a website—also includes a default "PageView" event.  Santypal Decl. ¶ 12.  This is the Pixel event at issue in this case.

According to Meta, the "PageView" event logs when a webpage is viewed.  Ex. 4

1    (Wooldridge Tr.) at 21:9-18.  As discovery has confirmed, Zuffa did **not** know that the PageView

2    event might also cause the transmission of Facebook cookies containing Facebook IDs or URLs

3    with video titles from the Fight Pass website.  Ex. 3 (Santypal Tr.) at 41:12-15; *see also* Ex. 2

4    (Banks Tr.) at 138:20-139:19.  In fact, the only reason the Fight Pass website included video titles

5    in URLs at times during the proposed class period was to make it more likely that Google searches

6    for UFC-related content would lead to the Fight Pass website.  Santypal Decl. ¶ 6.

7         **C.    Plaintiffs Filed "Gotcha" VPPA and California Privacy Claims**

8              Plaintiffs' lawsuit piggybacks onto a recent wave of class actions alleging that virtually any

9    website that uses the Meta Pixel and hosts video content must violate the VPPA and other privacy

10   laws (other defendants in these lawsuits include WeightWatchers, La-Z-Boy, Chick-fil-A, and

11   Mattress Firm).  From the outset of the case, Plaintiffs' theory of liability has been that Zuffa's use

12   of the Meta Pixel on the Fight Pass website caused the disclosure of two pieces of information to

13   Meta, which Plaintiffs claim constitute PII: (1) Facebook IDs embedded in the Facebook "c_user"

14   cookie, and (2) video titles embedded in Fight Pass URLs.  ECF No. 47 ("FAC") ¶¶ 35-41; *see also*

15   ECF No. 53 at 2 (defining the proposed classes as limited to Fight Pass subscribers "with respect

16   to whom Meta received their [Facebook] ID and the URL of the webpage hosting video content.").

17   On class certification, Plaintiffs raised several new disclosure theories that are not alleged in their

18   complaint, including that the Meta Pixel also transmits (1) Facebook IDs embedded in the third-

19   party "fr" cookie, (2) the first-party "fbp" cookie, which Plaintiffs allege can be used by Meta as a

20   personal identifier, and (3) "hashed" email addresses and last names.  ECF No. 184 (Evid. Hrg. Tr.)

21   at 8:8-13:16.[4]  As Plaintiffs and their expert have *admitted*, these other types of data cannot be used

22   by an ordinary person to identify a specific individual.  *See infra* Section I.A.3.

23             Based on these allegations, Plaintiffs assert four causes of action under (1) the Video

24   Privacy Protection Act, 18 U.S.C. § 2710, (2) California Civil Code § 1799.3, (3) California's

25   Constitution, and (4) California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

26

27

28   _____
     [4] Pursuant to Local Rule IA 10-3(b), Zuffa has not attached excerpts of the transcripts from the
     May 13-14, 2025 Evidentiary Hearing.

### D.    Meta's Pixel Data

In response to a subpoena served by Plaintiffs, Meta produced all available ███████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ through the Pixel on the Fight Pass website.  Exs. 5, 6.  Notably, the Pixel data does not include a single ███████████████ ████ Ex. 1 (Schnell Rep.) ¶¶ 22, 65-67.  Nor does the Pixel data for Plaintiffs include any events with both ████████████████████████████████████████████ *Id.*  In fact, for Plaintiff Bloom, the Pixel data does not include any ███████████████ at all.  *Id.*[5]

## **LEGAL STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those necessary to prove or defend a claim.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Id.* at 248-49.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  To meet its burden, "the moving party must *either* produce evidence negating an essential element of the nonmoving party's claim or defense *or* show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (emphasis added).  Thus, "a moving defendant may shift the burden of producing evidence to the nonmoving plaintiff merely by 'showing'—that is, pointing out through argument—the absence of evidence to support plaintiff's claim."  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000); *Celotex*, 477 U.S. at 325 (the moving party need only "show[]—that is, point[] out to the district court—that there is an absence of evidence to support the nonmoving party's case").

Once this initial burden is met, "the burden then shifts to the non-moving party to designate

---

[5] Meta also produced all available Pixel event data from the Fight Pass website for three sample dates: September 17, 2021, April 9, 2022, and May 2, 2022.  These records also do not include a single ████████████████████.  Ex. 1 (Schnell Rep.) ¶¶ 22, 67.

1    specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Secs.*

2    *Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  "This burden is not a light one." *Id.*  "If the evidence is

3    merely colorable, or is not significantly probative," there is no genuine dispute and "summary

4    judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).

5    <u>**ARGUMENT**</u>

6    **I.    ZUFFA IS ENTITLED TO SUMMARY JUDGMENT ON THE VPPA CLAIMS**

7        To establish a VPPA claim, Plaintiffs must prove, among other things, that Zuffa

8    "knowingly disclose[d]" their "personally identifiable information" to Meta.    18 U.S.C.

9    §§ 2710(b)(1).  But, as discussed below, Plaintiffs do not have sufficient evidence to prove that

10    Zuffa disclosed—let alone *knowingly* disclosed—their PII to Meta.  Thus, Zuffa is entitled to

11    summary judgment on Plaintiffs' VPPA claims.

12        **A.    Zuffa Did Not Disclose Plaintiffs' "PII" to Meta**

13            **1.    The Ordinary Person Standard**

14        The VPPA defines "personally identifiable information" to "include[] information which

15    identifies a person as having requested or obtained specific video materials or services from a video

16    tape service provider."  18 U.S.C. § 2710(a).  This includes both information that, "by itself,

17    identifies an individual as having watched certain videos," such as a person's name and address

18    along with a list of videos that person had watched, as well as "some information that is 'capable

19    of' identifying a person." *Eichenberger*, 876 F.3d at 984-85.  To determine the kinds of information

20    that are "capable of" identifying a person for purposes of the VPPA, the Ninth Circuit (like the

21    Second and Third Circuits) has adopted the "ordinary person" standard. *Id.* at 985.

22        Under the ordinary person standard, PII "means only that information that would 'readily

23    permit an ordinary person to identify a specific individual's video-watching behavior.'" *Id.*

24    (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016)).  This standard

25    "better informs video service providers of their obligations under the VPPA" because "[i]t looks to

26    what information a video service provider discloses, not to what the recipient of that information

27    decides to do with it." *Id.*  This ensures that PII has "the same meaning without regard to its

28    recipient's capabilities." *Id.*  "Holding otherwise would make '[t]he lawfulness of [a] disclosure . . .

1   depend on circumstances outside of [a video service provider's] control." *Id.* (quoting *Mollett v.*

2   *Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015)); *accord Solomon*, 136 F.4th at 52 ("It does not

3   make sense that a video tape service provider's liability would turn on circumstances outside of its

4   control and the level of sophistication of the third party.  The ordinary person standard is a more

5   suitable framework to determine what constitutes personally identifiable information" without

6   "impermissibly broadening [the VPPA's] scope to include the disclosure of technological data to

7   sophisticated third parties.") (citing *Eichenberger*, 876 F.3d at 985).

8        The ordinary person standard is also consistent with Congress's intent in passing the VPPA.

9   *See, e.g.*, *Eichenberger*, 876 F.3d at 985.  The legislative history of the VPPA demonstrates that

10  Congress's purpose was "quite narrow: to prevent disclosures of information that would, *with little*

11  *or no extra effort*, permit an ordinary recipient to identify a particular person's video-watching

12  habits." *In re Nickelodeon*, 827 F.3d at 284 (emphasis added).  Indeed, when the VPPA was enacted

13  in 1988, "the Internet had not yet transformed the way that individuals and companies use consumer

14  data—at least not to the extent that it has today." *Eichenberger*, 876 F.3d at 985.  Rather, at that

15  time, the VPPA's instructions were clear: "The manager of a video rental store in Los Angeles

16  understood that if he or she disclosed the name and address of a customer—along with a list of the

17  videos that the customer had viewed—the recipient of that information could identify the

18  customer." *Id.*  "By contrast, it was clear that, if the disclosure were that 'a local high school

19  teacher' had rented a particular movie, the manager would not have violated the statute . . . even if

20  one recipient of the information happened to be a resourceful private investigator who could, with

21  great effort, figure out which of the hundreds of teachers had rented the video." *Id.*  As the Ninth

22  Circuit has explained, "the advent of the Internet did not change the disclosing-party focus of the

23  statute." *Id.* ("[W]e are not persuaded that the 1988 Congress intended for the VPPA to cover

24  circumstances so different from the ones that motivated its passage."); *accord In re Nickelodeon*,

25  827 F.3d at 284 ("We do not think that, when Congress passed the [VPPA], it intended for the law

26  to cover factual circumstances far removed from those that motivated its passage."); *Solomon*, 136

27  F.4th at 54 ("[T]he VPPA was not intended to create liability where a third party is able to 'assemble

28  otherwise anonymous pieces of data to unmask the identity of individual [users].'").

Likewise, the 2013 amendments to the VPPA confirm that Congress did not intend for the statute to broadly regulate the various types of data transmitted on the Internet. The legislative history of the 2013 amendments shows that Congress was "keenly aware" of how technological advancements—such as "Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones"—affected the original statute. *In re Nickelodeon*, 827 F.3d at 287-88. But, despite this recognition and the passage of nearly thirty years since the VPPA was enacted, Congress did not update the definition of PII. *Id.* In fact, it chose *not* to do so despite a request at the time to add "[IP] addresses and account identifiers" to the definition of PII, due to concerns that such information could be used "to identify users and link consumers to digital video rentals." *Id.* at 288. "Congress's decision to retain the 1988 definition of personally identifiable information indicates that the [VPPA] serves different purposes, and protects different constituencies, than other, broader privacy laws." *Id.* ("If anything, the expansion of privacy laws since the Video Privacy Protection Act's passage demonstrates that, whatever else 'personally identifiable information' meant in 1988, it did not encompass [digital identifiers such as IP addresses, browser fingerprints, and unique device identifiers]."); *accord Solomon*, 136 F.4th at 53 ("When Congress amended the VPPA in 2013, it could have expanded its definition of 'personally identifiable information,' but it did not—even though it was urged to do so.").

Thus, Zuffa cannot be held liable under the VPPA unless Plaintiffs can prove that Zuffa disclosed information to Meta that would readily permit an "ordinary person" to identify their video-watching behavior. *See Eichenberger*, 876 F.3d at 985. Plaintiffs cannot do so.

## 2. The C_User Cookie Is Not PII

Plaintiffs allege that Zuffa's use of the Meta Pixel on the Fight Pass website caused their web browsers to send Meta (1) their Facebook IDs, embedded within Facebook's c_user cookie, and (2) URLs from the Fight Pass website that contained video titles. FAC ¶¶ 40-41. But even setting aside the fact that there is **zero evidence** that Zuffa disclosed even a single c_user cookie to Meta for any of the Plaintiffs (*see infra* Section I.B), Zuffa is entitled to summary judgment on Plaintiffs' VPPA claims because this information is not PII under the ordinary person standard.

Plaintiffs' theory of liability turns on whether the information transmitted through the Meta Pixel would "readily permit an ordinary person to identify a specific individual's video-watching behavior." *See Eichenberger*, 876 F.3d at 985. According to Plaintiffs, an ordinary person could use the Facebook ID in the value of a c_user cookie to access Plaintiffs' Facebook profiles by typing "www.facebook.com/[Facebook ID]" into a web browser. *See* FAC ¶ 74. In addition, if the c_user cookie was sent with a URL that contained a video title, Plaintiffs allege that an ordinary person could identify the videos they watched. *See id.* ¶¶ 35-36. But the reality is not so simple.

Rather, as Plaintiffs themselves allege, the information purportedly transmitted through the Meta Pixel would have been sent "through a 'GET Request,' which is a message sent from the user's web browser to Facebook's server," along with "various querystring parameters and cookie values." FAC ¶¶ 40-41.[6] Therefore, in the event that a c_user cookie and URL are transmitted through the Meta Pixel, they would be contained within lines of computer code that would be indecipherable to an ordinary person. The following is an example of a Meta Pixel GET request,[7] which shows a portion of the code that could be (but is not always[8]) included in such a transmission:

---

[6] *See also* Ex. 4 (Wooldridge Tr.) at 72:12-74:19, 75:12-19, 76:1-6 ████████████████ ).

[7] The Meta Pixel is no longer active on video pages on the Fight Pass website, so this example is taken from the Fight Pass welcome page (https://welcome.ufcfightpass.com/region/united-states) for illustrative purposes. The highlighting and annotations have been added for ease of reference.

[8] As Plaintiffs and their expert acknowledge, there are a variety of common Facebook and web browser settings and practices that would block third-party cookies (like Facebook's c_user cookie) from being transmitted through the Meta Pixel in the first place. *See* ECF No. 106 at 11-17. For

In this example, the Fight Pass URL is part of the "Request URL" in Box A. But since URLs are encoded when transmitted over the Internet, it has been converted into a different format such that the words are interspersed with other characters, numbers, and letters that make it unrecognizable.[9] Moreover, the c_user cookie is sent separately in the "Cookie" header in Box B. It appears as one of many lines of code and contains no context to indicate that its value (*i.e.*, the string of numbers after the equal symbol) corresponds to a Facebook ID. There can be no genuine dispute that an *ordinary person* would be unable to decipher the long strings of computer code contained in this transmission—particularly without the annotations and highlighting—to determine that a specific person visited a specific webpage or watched a specific video. Ex. 1 (Schnell Rep.) ¶¶ 18, 37-40.

Indeed, the Second Circuit recently held in two separate decisions that this exact information is not PII under the VPPA as a matter of law.[10] In *Solomon v. Flipps Media, Inc.*, the Second Circuit considered whether FITE, a video streaming service for combat-sports related programming, violated the VPPA through its use of the Meta Pixel by allegedly disclosing to Meta (1) the plaintiff's Facebook ID, as embedded in the c_user cookie, and (2) URLs from the FITE website that contained video titles. 136 F.4th at 43, 45-46. Adopting the Third and Ninth Circuits' ordinary person standard, the court held that such information did not constitute PII under the VPPA. *Id.* at 51-55. Specifically, the court found it was implausible that an ordinary person would understand, "with little or no extra effort," that the information transmitted through the Meta Pixel includes either a Facebook ID or video title. *Id.* at 54-55 (quoting *In re Nickelodeon*, 827 F.3d at 284). Rather, just like in the example above, a Facebook ID, which is nothing more than a string of numbers, would appear to be "just one phrase embedded in many other lines of code." *Id.* at 54. Thus, the court determined that "it is not plausible that an ordinary person . . . would see the "c_user" phrase . . . and conclude that [it] was a person's [Facebook ID]." *Id.* Likewise, the court concluded

---

Plaintiffs in particular, there is no evidence that ███████████████████████████████ *See infra* Section I.B.

[9] URLs are encoded using "ASCII" (or American Standard Code for Information Interchange), which replaces certain characters with symbols, numbers, and letters. Ex. 1 (Schnell Rep.) ¶ 18.

[10] While these decisions are not binding on this Court, they are instructive because they apply the Ninth Circuit's ordinary person standard to nearly identical Pixel-based VPPA claims.

that a video URL would be "interspersed with many characters, numbers, and letters," making it "implausible that an ordinary person would understand . . . [it was] a video title as opposed to any of the other combinations of words within the code." *Id.*  This is clear from the GET request in *Solomon*, where the video title "The Roast of Ric Flair" was transmitted as "title% 22% 3A% 22-% E2% 96% B7% 20The% 20Roast% 20of% - 20Ric% 20Flair." *Id.* at 54.[11]  Finally, the court was not persuaded that, even assuming an ordinary person "could somehow gain access" to the code transmitted through the Meta Pixel, he or she would even know how to use a Facebook ID to identify the plaintiff.  *Id.* ("[W]e are not persuaded that [a Facebook ID] is 'vastly different' from the unique device identifiers in *Nickelodeon*, or the Roku device serial numbers in *Eichenberger*.") (internal citations omitted).  Thus, the court affirmed dismissal of the VPPA claim with prejudice.

Likewise, in *Hughes v. National Football League*, the Second Circuit considered whether the NFL violated the VPPA through its use of the Meta Pixel on its website and app.  Declaring that "*Solomon* effectively shut the door for Pixel-based VPPA claims," the court found it is not plausible that an ordinary person would be able to understand the actual underlying code transmitted through the Meta Pixel GET request, including "the string of numerals following the 'c_user' field." 2025 WL 1720295, at *2-3.  In so ruling, the court rejected the plaintiff's request to amend his complaint to allege that "Facebook receives communications from the Pixel in a way that is automatically translated into a readable format," and that "an ordinary person could plug the code into ubiquitous internet-based tools like ChatGPT . . . to reveal the Facebook ID and video title in plain English." *Id.* (internal quotations omitted).  The court explained that "[n]one of these arguments supports a VPPA claim post-*Solomon*" because the focus is on whether an *ordinary person* would be able to understand the code underlying the Meta Pixel transmission, "regardless of how the code is later manipulated or used by Facebook." *Id.*  Thus, the court affirmed the dismissal of the VPPA claim with prejudice.[12]

---

[11] This would also be the case for any video titles allegedly transmitted through the Meta Pixel from the Fight Pass website.  *See* Ex. 1 (Schnell Rep.) ¶ 39.

[12] Following the Second Circuit's decisions in *Solomon* and *Hughes*, district courts have routinely dismissed VPPA claims based on the Meta Pixel on similar grounds.  *See, e.g.*, *Salazar v. Nat'l Basketball Assoc.*, No. 22-CV-07935, 2025 WL 2830939, at *5 (S.D.N.Y. Oct. 6, 2025) (dismissing with prejudice VPPA claim based on alleged disclosure of c_user cookies and video URLs through the Meta Pixel); *Taino v. Bow Tie Cinemas, LLC*, No. 23-CV-05371, 2025 WL 2652730, at *8

The Ninth Circuit's decision in *Eichenberger* is in accord.  In *Eichenberger*, the Ninth Circuit considered whether ESPN violated the VPPA by allegedly disclosing to a third party (1) the plaintiff's Roku device serial number, and (2) the identity of the videos he watched through ESPN's video streaming app on Roku devices.  876 F.3d at 981-82.  The third party, Adobe Analytics, allegedly used the information obtained from ESPN "to identify specific consumers by connecting that information with existing data already in Adobe's profile of th[ose] individual[s]," such as "email addresses, account information, or Facebook profile information." *Id.* (internal quotations omitted).  Adobe then gave the resulting data back to ESPN in an aggregated form, so ESPN could "provide[] advertisers with aggregated information about its users' demographics." *Id.*  ESPN allegedly "knew that Adobe could and would use that information to identify" the plaintiff. *Id.*

Based on these allegations, the Ninth Circuit affirmed dismissal of the VPPA claim.  Applying the ordinary person standard, the court held that the information ESPN allegedly disclosed to Adobe Analytics "does not constitute 'personally identifiable information' under the VPPA" because it "*cannot* identify an individual unless it is combined with other data in Adobe's possession—data that ESPN never disclosed and apparently never even possessed." *Id.* at 985-86 (emphasis in original).  Therefore, the court concluded that "an ordinary person could not use the information that [ESPN] allegedly disclosed to identify an individual." *Id.*

The Third Circuit's decision in *In re Nickelodeon Consumer Privacy Litigation* is also instructive.  In that case, the plaintiffs (children under thirteen) alleged that Viacom violated the VPPA by permitting Google to "unlawfully us[e] cookies to track children's . . . video watching habits on Viacom's [Nickelodeon] websites," which offered streaming videos geared towards children.  827 F.3d at 268-69.  In particular, Viacom allegedly disclosed to Google: (1) "URL information that effectively revealed what videos [the plaintiffs] watched on Nickelodeon's websites, and (2) "static digital identifiers," such as a user's IP address, a "browser fingerprint" comprised of user's browser and operating system settings, a computer device's "unique device

---

(S.D.N.Y. Sept. 16, 2025) (same); *Golden v. NBCUniversal Media, LLC*, No. 22-CV-09858, 2025 WL 2530689, at *7 (S.D.N.Y. Sept. 3, 2025) (same); *Nixon v. Pond5, Inc.*, No. 24-CV-05823, 2025 WL 2030303, at *5 (S.D.N.Y. July 21, 2025) (dismissing with prejudice VPPA claim based on alleged disclosure of c_user and fr cookies through the Meta Pixel).

identifier," and third-party cookies. *Id.* at 268-69, 279, 281 n.105, 281-82. That information allegedly enabled Google "to link the watching of those videos to [the plaintiffs'] real-world identities," so Google could "sell targeted adverting" to them. *Id.* at 269-70, 279.

Based on these allegations, the Third Circuit affirmed dismissal of the VPPA claim. *Id.* at 281-90. Applying the ordinary person standard, the court held that the information Viacom allegedly disclosed did not constitute PII under the VPPA because an ordinary person, as opposed to a sophisticated technology company like Google, could not use the information to identify an actual person's video-watching habits. *Id.* at 282 ("To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person."). It did not matter that the information was disclosed to Google, "a company whose entire business model is purportedly driven by the aggregation of information about Internet users." *Id.* at 289 (noting the allegation that Google "aggregates so much information that it has, in effect, turned the Internet into its own private data collection machine"). Rather, the court concluded that "whether or not this is true," the kinds of information allegedly disclosed by Viacom "are simply too far afield from the circumstances that motivated the [VPPA's] passage to trigger liability." *Id.* at 290 ("Indeed, the import of the plaintiffs' position seems to be that the use of third-party cookies on any website that streams video content is presumptively illegal. We do not think the Video Privacy Protection Act sweeps quite so broadly.").

Based on this precedent, there can be no genuine dispute that the information allegedly transmitted through the Meta Pixel—the c_user cookie and URLs from the Fight Pass website—is not PII because it would not "readily permit an ordinary person to identify a specific individual's video-watching behavior." *See Eichenberger*, 876 F.3d at 985.

### 3. The FR Cookie, FBP Cookie, and Hashed Emails/Names Are Not PII

Although not raised in their complaint, Plaintiffs argued on class certification that Zuffa disclosed several other types of PII through the Meta Pixel, including (1) the fr cookie, (2) the fbp cookie, and (3) hashed email addresses and last names. ECF No. 184 (Evid. Hrg. Tr.) at 8:8-13:16. As discussed below, however, Plaintiffs have ***admitted*** that an ordinary person could not use any

of this information to identify that a specific individual watched certain videos. Thus, by Plaintiffs' own admission, these additional types of information are not PII under the ordinary person standard.

### a.    FR Cookie

Plaintiffs contend that the fr cookie is PII because it can sometimes contain a Facebook ID. Plaintiffs are wrong. Unlike the c_user cookie, the fr cookie does not contain a visible Facebook ID. Ex. 1 (Schnell Rep.) ¶¶ 19, 62; ECF No. 184 (Evid. Hrg. Tr.) at 46:4-6 (Herold: "Correct, I do not see it here in my screenshot."). This is obvious when comparing the values of the two cookies. Whereas the c_user cookie contains a Facebook ID (*e.g.*, 1682280067), the fr cookie contains a much longer string of over 100 numbers, letters, and characters that does *not* include a visible Facebook ID (*e.g.*, 0LfdsjUNHFaNurYXS.AWf3nVIukwp3hEmL8vEb2bHYm0YNcTvDtCuG0f 8gfhzzyWVfNyk.BoeCT1..AAA.0.0.BolLhO.AWcgzOv_vPbqC1KHAHHjvf9wuX0).

The reason for this is simple: Meta encodes the value of the fr cookie, meaning it is converted into code that only Meta can read. Ex. 1 (Schnell Rep.) ¶ 19, 42, 62; *see also* ECF No. 184 (Evid. Hrg. Tr.) at 56:6-18 (Herold: "Yes, it's encoded."); ECF No. 183 (Evid. Hrg. Tr.) at 6:7-8, 14:8-9 (Plaintiffs' Counsel: "[T]he 'fr' cookie, which is, in fact, the Facebook ID, but it's just encoded . . . ."). Decoding the fr cookie would be no simple task. In fact, it would likely be impossible for a sophisticated software engineer to reveal the contents of the fr cookie without access to Meta's decoding algorithm. *See* Ex. 1 (Schnell Rep.) ¶ 62. Therefore, there can be no question that an *ordinary person* could not use the fr cookie to identify a specific individual's video watch history.[13] ECF No. 184 (Evid. Hrg. Tr.) at 46:4-11 (Herold: "I wouldn't expect" that an ordinary person could use the fr cookie to identify an individual "in the form of the hash that it's in."); *see also id.* at 109:23-111:18, 112:14-20 (Schnell: An ordinary person would not be able to use an fr cookie standing alone to identify a person.). Rather, like the information at issue in

---

[13] Moreover, even if an ordinary person could decode the fr cookie, ▮▮▮▮▮▮▮▮▮▮▮▮. As Meta's corporate representative testified at deposition: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 4 (Wooldridge Tr.) at 51:7-18, 184:9-22. Indeed, there are many reasons an fr cookie could exist on a user's browser but ▮▮▮▮▮▮▮▮▮▮▮▮ ▮ Ex. 1 (Schnell Rep.) ¶¶ 43, 62; *see also* ECF No. 184 (Evid. Hrg. Tr.) at 113:23-115:9.

*Eichenberger*, the fr cookie is not PII because it "*cannot* identify an individual unless it is combined with other data in [a third-party's] possession." *Eichenberger*, 876 F.3d at 985-86.

### b.    FBP Cookie

The fbp cookie does not contain a Facebook ID at all. Ex. 1 (Schnell Rep.) ¶¶ 20, 64; ECF No. 184 (Evid. Hrg. Tr.) at 69:16-18 (Herold: The fbp cookie does not contain a Facebook ID). Rather, it contains a time stamp and a random number. Ex. 1 (Schnell Rep.) ¶¶ 20, 64; ECF No. 184 (Evid. Hrg. Tr.) at 69:19-71:7.[14] For this reason, it is undisputed that an ordinary person could *not* use the fbp cookie to identify an individual's video watch history. *See* ECF No. 183 (Evid. Hrg. Tr.) at 15:15-21 (Plaintiffs' Counsel: "And granted, again, if you show [the fbp cookie] to a person on the street, we're not saying that a person on the street is going to know what that's referring to."); ECF No. 184 (Evid. Hrg. Tr.) at 71:17-23 (Herold: "[N]o, that would not be something that an ordinary person would be able to do."); *id.* at 112:21-23 (Schnell: An ordinary person could not use an fbp cookie to identify an individual.). Plaintiffs' suggestion that the fbp cookie can sometimes be "associated with a specific individual" does not change the analysis. Once again, just like the information at issue in *Eichenberger*, the fbp cookie is not PII because it "*cannot* identify an individual unless it is combined with other data in [a third-party's] possession." *Eichenberger*, 876 F.3d at 985-86.

### c.    Hashed Email Addresses and Last Names

Lastly, Plaintiffs assert that Zuffa disclosed PII in the form of "hashed" email addresses and last names through the Meta Pixel. But even setting aside that Plaintiffs have no evidence that their email addresses or last names were actually sent to Meta (*see infra* Section I.B), if such information was sent through the Meta Pixel, there is no dispute that it was hashed. Ex. 1 (Schnell Rep.) ¶ 21; ECF No. 183 (Evid. Hrg. Tr.) at 64:25-65:8 (Herold: "Yes, the e-mail in particular is hashed."); *see also* Ex. 4 (Wooldridge Tr.) at 110:3-16, 119:12-21.[15] That means any email addresses and last names would have been converted to long strings of numbers and letters in a process that cannot

---

[14] Meta's corporate representative called the value of the fbp cookie ▮▮▮▮▮▮▮▮ Ex. 4 (Wooldridge Tr.) at 186:7-11.

[15] Meta's systems "are designed to not accept customer information that is unhashed Contact Information . . . ." Ex. 7; *see also* ECF No. 184 (Evid. Hrg. Tr.) at 79:5-22 (Herold: Meta's Developer's Website states that hashing is required).

easily be reversed.  Ex. 1 (Schnell Rep.) ¶ 21; ECF No. 183 (Evid. Hrg. Tr.) at 64:25-65:8 (Herold: "So the e-mail is not—when you look at it, you're going to see just some letters and numbers maybe with your—you know, just looking at it with your eyes").  For example, through the hashing process, the email address "john_smith@gmail.com" would be converted to "62a14e44f765419d10fea9936 7361a727c12365e2520f32218d505ed9aa0f62f."  Ex. 7.  And the name "Mary" would be converted to "6915771be1c5aa0c886870b6951b03d7eafc121fea0e80a5ea83beb7c449f4ec." *Id.*

There is no dispute that an ordinary person could not use such information, on its own, to identify a specific individual's video-watching behavior.  ECF No. 183 (Evid. Hrg. Tr.) at 14:24-15:4 (Plaintiffs' Counsel: "[T]echnically those are hashed e-mails.  So the string that you would see – like if you were just a person on the street, you would not be able to read it."); *id.* at 65:18-66:2 (Herold: "If I saw the—hashed e-mail information just on its own, no. . . . I would not know what that was."); ECF No. 184 (Evid. Hrg. Tr.) at 112:24-113:6 (Schnell: An ordinary person could not identify someone using a hashed e-mail or hashed last name.).  Nor does it matter that a third-party service could potentially match a hashed email address or last name to information collected from data breaches, as Plaintiffs have suggested.  Rather, just like the fr and fbp cookies, hashed email addresses and last names are not PII because they "*cannot* identify an individual unless [they are] combined with other data in [a third-party's] possession."  *Eichenberger*, 876 F.3d at 985-86.[16]

**B.**     **There Is No Evidence That Zuffa "Disclosed" Plaintiffs' PII to Meta**

As discussed above, the fundamental premise underlying Plaintiffs' VPPA claims is that Zuffa disclosed Plaintiffs' PII to Meta in the form of (1) their Facebook IDs, as embedded within Facebook's c_user cookie, and (2) URLs from the Fight Pass website that contained video titles.  FAC ¶¶ 40-41.  But, even setting aside that this information is not PII under the ordinary person standard (*see supra* Section I.A), Plaintiffs' theory suffers from another fundamental flaw: Plaintiffs have no evidence that Zuffa disclosed their Facebook IDs or any other alleged PII to Meta.

As an initial matter, the records produced by Meta, which purport to include all available Pixel data from the Fight Pass website for Plaintiffs, do not reference ***a single*** ██████████

---

[16] Indeed, Meta's corporate representative testified that ███████ ████████████████████████████████████ Ex. 4 (Wooldridge Tr.) at 189:16-190:2.

1   ████████████████ Ex. 1 (Schnell Rep.) ¶¶ 22, 65-67; ECF No. 184 (Evid. Hrg. Tr.) at 44:23-45:23

2   (Herold: █████████████████████████████████████████████████████, *id.* at

3   60:7-13 (same); *id.* at 113:9-22 (Schnell: Same).[17]  Nor do Meta's records for the three Plaintiffs

4   include *a single* instance where █████████████████████████████████████████████

5   ██████████████ Ex. 1 (Schnell Rep.) ¶¶ 23, 65; ECF No. 184 (Evid. Hrg. Tr.) at 62:1-64:17

6   (Herold: ██████████████████ In fact, for Plaintiff Bloom, Meta's records do not include ████

7   ██████████████████████████████ Ex. 1 (Schnell Rep.) ¶ 23; ECF No. 184

8   (Evid. Hrg. Tr.) at 61:13-25, 66:11-67:13 (Herold: ████████████████████████████████

9   ████████████████████, 67:14-68:15 (Herold: ██████████████████████████████

10  Thus, Plaintiffs cannot meet their burden of proving that Zuffa disclosed their Facebook IDs with

11  video URLs to Meta.[18]

12      Likewise, Meta's records for the three Plaintiffs do not include *a single* instance where

13  █████████████████████████████████████████ Ex. 1 (Schnell Rep.) ¶¶ 24, 65, 69.

14  In fact, for Plaintiff Bloom, Meta's records do not include ███████████████████████████

15  ██████████ Moreover, in the few instances where Meta's records include ███████████████

16  ████████████████████████████████████████ there is no indication of what data was

---

17  [17] To the extent Plaintiffs are still relying on the m_page_voice cookie, ██████████████████████

18  ██████████████. ECF No. 184 (Evid. Hrg. Tr.) at 44:23-45:23 (Herold did not see a single ████████████████ in any of the data produced by Meta); *id.* at 113:9-22 (Schnell: Same).

19  Moreover, Meta's corporate representative, Mr. Woodridge, testified that ██████████████████████ ████████████ Ex. 4 (Woolridge Tr.) at 30:23-31:3

20  [18] To the extent Plaintiffs suggest that circumstantial evidence can be used to determine whether Meta received a Facebook ID through the Meta Pixel, they are wrong.  For example, there are a

21  variety of reasons why the existence of ██████████ (which is ██████████████

22  ) does not mean ██████████████ was also transmitted to Meta.  *See, e.g.*, ECF No. 184 (Evid. Hrg. Tr.) at 115:10-16 (Schnell: █████████████████████████

23  (Schnell: ████████████     Nor would it matter here because, as discussed above, there is not a single entry in

24  Meta's records for the Plaintiffs that includes ███████████████████ Nor does the existence of ██████████████ suggest that Meta received a Facebook ID through the

25  Meta Pixel.  To the contrary, as Meta's corporate representative testified, ███████████████

26  ██████████████████████████████████ Ex. 4 (Woolridge Tr.) at 113:25-114:19, 151:12-25, 153:7-17, 187:21-188:4, 188:18-24; *see also* ECF No. 184 (Evid. Hrg.

27  Tr.) at 38:1-9 (Herold: ██████████████████████████ 78:15-19, 90:24-91:13 (Schnell: ██████████████████████████████████ For example,

28  Meta's records for the Fight Pass website from September 17, 2021 include ██████████████████ ██████████████ *Id.* at 76:5-78:13.

actually sent.  Ex. 1 (Schnell Rep.) ¶¶ 25, 71.  Rather, Meta's records simply refer to ███ and nothing more.  There is no dispute that there is no way to determine whether this actually refers to a user's email.  ECF No. 184 (Evid. Hrg. Tr.) at 80:6-81:2 (Herold: ██████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████); *id.* at 115:20-116:17 (Schnell: ████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████████████.  Indeed, as Meta's corporate representative testified at deposition, ███████████████████████████████████████████████████████ Ex. 4 (Wooldridge Tr.) at 119:12-21.  Thus, Plaintiffs also cannot meet their burden of proving that Zuffa disclosed their hashed email addresses or hashed last names with video URLs to Meta.

In addition, even if Plaintiffs had evidence that Meta received their Facebook IDs (they do not), Plaintiffs still could not establish that *Zuffa* disclosed their Facebook IDs to Meta.  As noted above, Plaintiffs allege that their Facebook IDs were stored in two third-party cookies, called the c_user and fr cookies.  These are Meta cookies—*not* Zuffa cookies.  Ex. 1 (Schnell Rep.) ¶ 26; ECF No. 184 (Evid. Hrg. Tr.) at 47:24-48:1 (Herold: The c_user, m_page_voice, and fr cookies are Facebook's cookies.).  That means Zuffa has no access to those cookies and cannot control whether they are sent to Meta from a user's browser. Ex. 1 (Schnell Rep.) ¶¶ 26-33, 36, 46-58; ECF No. 184 (Evid. Hrg. Tr.) at 86:12-87:9, 97:15-98:19; *see also Hulu*, 86 F. Supp. 3d at 1094 n.3 ("The only servers that can access a particular cookie are those associated with the domain that wrote the cookie.  In other words, Hulu can read only *hulu.com* cookies, while Facebook can read only *facebook.com* cookies; the companies cannot read or write to cookies associated with the other service.").  Because Zuffa does not have access to and cannot control the transmission of Meta's cookies, Plaintiffs cannot show that Zuffa "disclosed" those cookies (or any embedded Facebook IDs) to Meta.  *See, e.g.*, *Eichenberger*, 876 F.3d at 986 (affirming dismissal of VPPA claim premised on information that the defendant "never disclosed and apparently never even possessed").

The plain language of the VPPA does not hold video tape service providers liable for the transmission of data that is outside of their possession and control.  Plaintiffs should not be permitted to "read into [the] statute[] words that aren't there."  *Romag Fasteners, Inc. v. Fossil,*

*Inc.*, 590 U.S. 212, 215 (2020).  Rather, "[i]f . . . Congress intended to impose [such] liability, [courts] presume it would have used the words . . . in the statutory text," *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994), particularly where other statutes show that when "Congress intended to authorize [something,] . . . it knew how to do so," *Custis v. United States*, 511 U.S. 485, 492 (1994).  Indeed, Congress has made clear in other sections of Title 18 when it intended to impose liability for both disclosing information (like the VPPA) and causing the disclosure of information (unlike the VPPA).  *See, e.g.*, 18 U.S.C. § 35 (creating civil and criminal liability for anyone who "imparts or conveys *or causes to be imparted or conveyed* false information" in specified circumstances); 18 U.S.C. § 1030 (creating criminal liability for anyone who "communicates, delivers, transmits, *or causes to be communicated, delivered, or transmitted*" specified information obtained by unauthorized computer access); 18 U.S.C. § 1343 (making it a crime to "transmit[] *or cause[] to be transmitted*" wire communications as part of a fraud scheme) (all emphasis added); *Cf. United States v. Sylvester*, 605 F.2d 474, 475 (9th Cir. 1979) (holding that a statute reaching "one who 'causes to be sold in interstate or foreign commerce'" is "far more broadly worded" than one that only reaches the act of selling).

### C.    There Is No Evidence That Zuffa "Knowingly" Disclosed PII to Meta

Lastly, Plaintiffs also have no evidence that Zuffa "knowingly" disclosed PII to Meta.  This is sufficient at the summary judgment stage to shift the evidentiary burden to Plaintiffs to come forward with admissible evidence demonstrating Zuffa's knowledge.  *See Celotex*, 477 U.S. at 322-33.  Plaintiffs cannot do so.  Zuffa has given Plaintiffs all potentially relevant communications and multiple deponents, none of which so much as suggests Zuffa "knowingly" disclosed PII to Meta.

Under the VPPA, the term "knowingly" connotes *actual* knowledge.  *In re Hulu Privacy Litigation*, 86 F. Supp. 3d 1090, 1095-97 (N.D. Cal. 2015) (granting summary judgment where there was "no evidence that Hulu knew that Facebook might combine a Facebook user's identity (contained in the c_user cookie) with the watch-page address to yield 'personally identifiable information' under the VPPA.").  "It is not enough . . . that a disclosure be merely 'voluntary' in the minimal sense of the defendant's being 'aware of what he or she is doing and . . . not act[ing] because of some mistake or accident.'"  *Id.*  Rather, the term "knowingly" requires "consciousness

of transmitting the private information." *Id.* "It does not merely mean transmitting the code." *Id.*

This is consistent with the meaning of the term "knowingly" under the Electronic Communications Privacy Act ("ECPA"), on which the VPPA was modeled. *Id.*; *see also* 134 Cong. Rec. 31839 at 31840 (1988) (noting that the VPPA "follows in the footsteps" and "is a logical and important extension" of the ECPA); 134 Cong. Rec. 10259 at 10260 (1988) (the VPPA provides "a similar opportunity to establish privacy safeguards" as the ECPA). As Congress explained in enacting the ECPA: "The term knowingly means that the defendant was aware of the nature of the conduct, aware of or possessing a firm belief in the existence of the requisite circumstances and an awareness of or a firm belief about the substantial certainty of the result." *Worix v. MedAssets, Inc*., 857 F. Supp. 2d 699, 702 (N.D. Ill. 2012) (quoting H.R. Rep. No. 647 at 64 (1986)). Because Congress modeled the VPPA on the ECPA, it follows that Congress intended "knowingly" to have the same meaning under both statutes.

Thus, for Plaintiffs to establish a VPPA violation, they must prove that Zuffa *actually knew* its use of the Meta Pixel would cause the disclosure of PII to Meta. *See Hulu*, 86 F. Supp. 3d at 1095 ("For there to be an actionable VPPA violation, the video provider must have knowingly disclosed: 1) a consumer's identity; 2) the identity of 'specific video materials'; and 3) the fact that the person identified 'requested or obtained' that material. There are, in other words, three distinct elements here: the consumer's identity; the video material's identity; and the connection between them."). Plaintiffs cannot meet this burden.

***First***, there is no evidence that Zuffa *actually knew* that using the Meta Pixel on the Fight Pass website might cause a subscriber's web browser to disclose his or her identity to Meta in the form of a Facebook ID, c_user cookie, or otherwise. As Zuffa's 30(b)(6) witness testified, Zuffa had no visibility into the data sent from a subscriber's web browser to Meta in connection with Zuffa's use of the Pixel, and therefore Zuffa had no knowledge that the Pixel could potentially cause a subscriber's web browser to send cookies containing Facebook IDs to Meta. Ex. 3 (Santypal Tr.) at 53:2-11 ("Zuffa cannot tell what the browser or what Facebook is sending to Facebook. What I can tell you is that Zuffa does not have Facebook IDs."). Nor do Zuffa's documents so much as mention Facebook IDs, much less Facebook cookies such as the c_user

cookie that contain Facebook IDs.  That is because, as discussed above, the c_user cookie (and any other cookie alleged to contain a Facebook ID) is a Meta cookie—*not* a Zuffa cookie.  That means Zuffa had no access to those cookies and could not control whether or not they were sent to Meta.

**Second**, there is also no evidence that Zuffa *actually knew* that using the Meta Pixel on the Fight Pass website would cause a subscriber's web browser to disclose the identity of specific video materials to Meta.  As Zuffa's 30(b)(6) witness testified, Zuffa did not know that Fight Pass URLs with video titles were being sent to Meta in connection with Zuffa's use of the Pixel.  Ex. 3 (Santypal Tr.) at 41:1-15, 46:6-47:12, 77:16-22, 113:21-114:9, 124:8-19.  Nor did Zuffa have any reason to send video titles to Meta in the first place.  *Id.* at 44:18-45:5.  That is because Zuffa uses the Meta Pixel to measure the effectiveness of its advertisements on Facebook and to focus advertisements on potential new subscribers, **not** to track information that was already in its possession regarding what videos its subscribers were watching on Zuffa's own Fight Pass website.  Ex. 2 (Banks Tr.) at 138:20-139:19 (Zuffa was not tracking page views of people viewing videos).

**Third**, there is no evidence that Zuffa *actually knew* Meta would connect Facebook IDs (embedded in third-party cookies) with Fight Pass video URLs.  Despite the thousands of pages of documents produced to Plaintiffs, including Zuffa's communications with Meta and internal communications about Zuffa's use of the Meta Pixel, there is no evidence that Zuffa knew Meta might combine these two pieces of information.  To the contrary, deposition testimony from Meta's corporate representative makes clear that ███████████████████████████████████████ ██████, negating the entire premise of Plaintiffs' claims.  *See, e.g.*, Ex. 4 (Wooldridge Tr.) at 113:18-24 █████████████████████████████████████████████████████ █████), 93:17-25, 102:16-103:5.[19]  Likewise, Meta's representative testified that ████████ ███████████████████████████████████████████████████████████████ ██████████ *Id.* at 190:9-22 ████████████████████████████[20]  Even Plaintiffs' expert, Ms. Herold, was not aware of the fr cookie when she issued her initial expert report in this case.  Thus, as in *Hulu*, "the dispositive point lies in the *lack* of a known connection between those things."

---

[19] Rather, the fr cookie is ████████████████████████████ *Id.* at 50:25-51:4.

[20] As noted above, the fr cookie may or may not contain a Facebook ID.  However, since the fr cookie is encoded, Zuffa could not be expected to know its contents.

1   *Hulu*, 86 F. Supp. 3d at 1097.  As the *Hulu* court explained, "[t]he point of the VPPA . . . is not so

2   much to ban the disclosure of user or video data; it is to ban the disclosure of information connecting

3   a certain user to certain videos." *Id.* at 1096.  Since Zuffa "did not actually know that Facebook

4   might 'read' the c_user [or any other Facebook cookie] and video title together (yielding something

5   akin to the list of Judge Bork's videos), then there cannot be a VPPA violation." *Id.* at 1097.

6   **II.    ZUFFA IS ALSO ENTITLED TO SUMMARY JUDGMENT ON THE**

7   **CALIFORNIA CLAIMS[21]**

8       **A.    California Civil Code § 1799.3**

9       Zuffa is entitled to summary judgment on Plaintiff Bloom's California Civil Code § 1799.3

10  claim for several reasons.  ***First***, Zuffa did not disclose any "personal information" or "the contents

11  of any record" that it "prepared or maintained" to Meta.  Cal. Civ. Code § 1799.3 ("No person

12  providing video recording sales or rental services shall disclose ***any personal information or the***

13  ***contents of any record***, including sales or rental information, ***which is prepared or maintained by***

14  ***that person***, to any person . . . .") (emphasis added).  Similar to his VPPA claim, Bloom alleges

15  that Zuffa's use of the Meta Pixel on the Fight Pass website caused his web browser to send Meta

16  (1) his Facebook ID, embedded within Facebook's c_user cookie, and (2) URLs from the Fight

17  Pass website that contained video titles.  FAC ¶¶ 40-41, 102.  But, as discussed above, there is no

18  evidence that Zuffa disclosed any such information for Plaintiff Bloom.  Meta's records for Bloom

19  do not reference ***a single*** ████████████████████████████████████████████████

20  ████████████████████████████████████.  *See supra* Section I.B.  This alone is dispositive.

21      Even if Bloom had evidence that this information was disclosed to Meta (he does not), the

22  c_user cookie (and any other cookie alleged to contain his Facebook ID) is not "personal

23  information."  *See supra* Section I.A.  Nor is it "prepared or maintained" by Zuffa.  Rather, it is

24  undisputed that the c_user cookie is a *Facebook* cookie—not a Zuffa cookie.  Ex. 1 (Schnell Rep.)

25  ¶ 26; ECF No. 184 (Evid. Hrg. Tr.) at 47:24-48:1 (Herold: The c_user, m_page_voice, and fr

26  cookies are Facebook's cookies.).  The same is true for the other cookies alleged to contain a

27  Facebook ID, including the m_page_voice and fr cookies.  *Id.*; *see also* Ex. 4 (Wooldridge Tr.) at

28  _____

[21] The California claims are brought on behalf of Plaintiff Bloom only.  FAC ¶¶ 98-128.

1    190:9-22 ██████████████████████████████  Meta—*not* Zuffa—creates and

2    places these cookies on a user's web browser when he or she visits and/or logs into the Facebook

3    website.  Ex. 1 (Schnell Rep.) ¶ 26.  Zuffa has no role in this interaction and, indeed, cannot even

4    access these cookies.  Ex. 1 (Schnell Rep.) ¶¶ 26, 33, 36, 46-58.  Likewise, URLs from the Fight

5    Pass website are not "the contents of any record . . . prepared or maintained" by Zuffa.  Rather, as

6    discussed above, URLs are automatically sent to Meta as part of a standard Internet communication

7    called a GET request.  *See supra* Section I.A.  Thus, Bloom cannot establish that Zuffa disclosed

8    "personal information" or "the contents of any record" that it "prepared or maintained" to Meta.

9        **Second**, California Civil Code § 1799.3 requires a "willful" violation.  Cal. Civ. Code §

10    1799.3(c) ("Any ***willful*** violation of this section shall be subject to a civil penalty . . . .") (emphasis

11    added).  But, as discussed above, Bloom has no evidence that Zuffa disclosed his Facebook ID or

12    video URLs to Meta, much less that Zuffa did so *willfully*.  *See supra* Sections I.B, I.C.

13        **Lastly**, the plain text of Section 1799.3 makes clear that it does not apply where a user

14    provides "consent."  Cal. Civ. Code § 1799.3(a).  Here, Bloom expressly consented to any alleged

15    use and disclosure of his information when he agreed to Zuffa's "Cookie Policy," which was a

16    requirement to signing up for his Fight Pass subscription.  Santypal Decl. ¶ 4, Ex. A (screen shot

17    of Fight Pass sign up page).  The Cookie Policy in effect when Bloom subscribed to Fight Pass

18    plainly states that Zuffa may use "cookies and other similar technologies" for advertising purposes:

19
20    > By consenting to this cookie policy ("Cookie Policy"), you acknowledge and
    > consent to our website using ***cookies and other similar technologies*** (as described
    > below) to distinguish you from other users of our website and for analytics.  This
21    > helps us to provide you with a good experience during your visit to our website.
    > This also allows us to improve our website and provide you with ***tailored content
22    > and advertising***.
    > . . .
23
    > **Third party cookies**
24    > Some third parties can also provide cookies on our website(s).  These cookies or
    > similar technologies are managed by the third parties set out in the table below, and
25    > are divided into the following categories:
    > . . .
26
    > **Marketing/Advertising**: Cookies used to provide advertising services on a given
27    > Website fall within this category.
28

Santypal Decl., Ex. C (emphasis added). This notice clearly informed Bloom that by subscribing to Fight Pass, he was consenting to the use of third-party cookies by Zuffa's advertising partners, including Facebook. *Id.*

Zuffa's "Privacy Policy," which Bloom also accepted when signing up for his Fight Pass subscription, compels the same result. Santypal Decl. ¶ 4. Like the Cookie Policy, the Privacy Policy in effect at the time of Bloom's subscription was clear about how Zuffa may use personal information. Under the bolded heading: "**Cookies**," the Privacy Policy states:

> As with many Websites, the Site and Third Party Platforms uses standard technology called "cookies," which are small data files that are transferred to your computer when you allow your browser to accept cookies. . . . Cookies may also allow the Site to present to you ***advertising*** which may be of interest to you. ***We may also use technologies, such as our own cookies, to provide you with personalized online display advertising tailored to your interests***. ***We may use the services of third parties to collect and use information about your visits to and interactions with our website through the use of technologies such as cookies to personalize advertisements for goods and services***.

Santypal Decl., Ex. B (emphasis added).

In addition to Zuffa's ample disclosures, Bloom also consented to Meta's alleged use and disclosure of his information as a Facebook user. *See* FAC ¶ 53 ("Plaintiff Bloom had a Facebook account before he subscribed to the UFC Fight Pass."). Specifically, Meta provides disclosures in its data policies that Facebook collects various information about its users, including from other third-party websites that use Facebook's services. For example:

- "We collect information when you visit or use third-party websites and apps that use our Services . . . . This includes information about the websites and apps you visit, your use of our Services on those websites and apps, as well as information the developer or publisher of the app or website provides to you or us." Ex. 8 (September 9, 2016 Facebook Privacy Policy).
- "We receive information about you and your activities on and off Facebook from third-party partners, such as information from a partner when we jointly offer services or from an advertiser about your experiences or interactions with them." *Id.*
- "Advertisers, app developers, and publishers can send us information through Facebook Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, *or the Facebook pixel*. These partners provide information about your activities off Facebook—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services—whether or not you have a Facebook account or are logged into Facebook." Ex. 9 (April 19, 2018 Facebook Privacy Policy).

1  In short, Bloom's express agreement to these policies and continued use of the Facebook

2  and the Fight Pass websites constitutes consent of any alleged use and disclosure of his information.

3  The Court should therefore award summary judgment to Zuffa on Bloom's Section 1799.3 claim.

**B.    California Constitution Invasion of Privacy**

5  Zuffa is also entitled to summary judgment on Bloom's California Constitution invasion of

6  privacy claim.  To establish this claim, Bloom must show "(1) a legally protected privacy interest;

7  (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by [a defendant]

8  constituting a serious invasion of privacy."  *In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185,

9  196 (N.D. Cal. 2019) (citation omitted).  Bloom cannot meet his burden on any of these elements.

10  *First*, Bloom cannot establish that Zuffa intruded upon "a legally protected privacy interest."

11  Rather, since Plaintiff's invasion of privacy claim is premised entirely on the privacy interests

12  protected by the VPPA and Section 1799.3, it fails for the same reasons discussed above.

13  *Second*, Bloom cannot establish "a reasonable expectation of privacy" because, as

14  discussed above, he repeatedly and expressly consented to the alleged use and disclosure of his

15  information on both the Fight Pass and Facebook websites.  This alone is sufficient to demonstrate

16  that he had no reasonable expectation of privacy under the circumstances.  *See, e.g.*, *Lakes v.*

17  *Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1058 (N.D. Cal. 2025) (dismissing invasion of privacy claim

18  where "Defendant has established consent as a defense"); *see also Washington v. Flixbus, Inc.*, No.

19  25-CV-00212, 2025 WL 1592961, at *2-5 (S.D. Cal. June 5, 2025) (dismissing invasion of privacy

20  claim where, as here, "Plaintiff was presented with conspicuous hyperlinks to Defendant's policies

21  during the checkout process, and in order to complete his purchase, Plaintiff was required to affirm

22  that he agreed to be bound by the stated terms."); *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1037-

23  38 (N.D. Cal. 2014) ("The plaintiff in an invasion of privacy action must have conducted himself

24  or herself in a manner consistent with an actual expectation of privacy, i.e., he or she must not have

25  manifested by his or her conduct a voluntary consent to the invasive actions of defendant."); *Lloyd*

26  *v. Facebook, Inc.*, No. 21-cv-10075-EMC, 2022 WL 4913347, at *10 (N.D. Cal. Oct. 3, 2022)

27  (finding no reasonable expectation of privacy from Facebook tracking on third party websites).

28

***Third***, Plaintiff Bloom cannot establish that any alleged intrusion was "so serious as to amount to an egregious breach of the social norms." *See, e.g.*, *Hammerling v. Google*, No. 21-cv-09004-CRB, 2022 WL 2812188, at *10-12 (N.D. Cal. July 18, 2022) ("routine commercial behavior" is generally not sufficient to establish a "highly offensive" intrusion of privacy). Actionable invasions of privacy must be "sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 5 (1994). Here, however, there is no evidence of conduct that meets this high standard. As discussed above, Meta's records for Bloom do not reference ***a single*** ████████████████████████████████████████████████████ ████████████████████████████████████████. *See supra* Section I.B. Moreover, even if Meta's records did ████████████████████████████████ Plaintiff Bloom merely alleges that he "watched multiple videos of fights and other content," without any indication of how or why the URLs for those video web pages (even if they included video titles) were sensitive and confidential. FAC ¶ 53. Courts have consistently held that alleged disclosures of a user's browser history to third parties does not amount to a serious invasion of privacy. *See, e.g.*, *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012) (dismissing invasion of privacy claim with prejudice where disclosure of "LinkedIn ID and the URL of the LinkedIn profile page that the user viewed (which in the aggregate discloses a user's browsing history among LinkedIn profiles)" did not amount to a serious invasion); *In re Google, Inc. Privacy Pol'y Litig.*, 58 F. Supp. 3d 968, 988 (N.D. Cal. 2014) (collection and disclosure of users' browsing histories was not highly offensive).[22]

## C.    California's Unfair Competition Law ("UCL")

Finally, Bloom cannot establish a UCL claim under any of the three prongs.

***Unlawful Prong.*** Bloom can only establish a UCL claim based on the "unlawful" prong by establishing a violation of some other underlying law. *See Shin v. Campbell Soup Co.*, No. CV 17-1082-DMG (JCx), 2017 WL 3534991, at *4 (C.D. Cal. Aug. 9, 2017). Here, Bloom's "unlawful" theory relies on the success of his VPPA, Section 1799.3, and California Constitution claims. *E.g.*,

---

[22] To the contrary, Bloom testified that ████████████████████████████████ ████████████████████████████████████████████████████ ████ loom Tr.) at 130:7-18.

FAC ¶ 122.  Because each of these claims fails as a matter of law, as shown above, the Court should summarily dispose of this claim as well.  *See, e.g.*, *Jefferson v. Healthline Media, Inc.*, 674 F. Supp. 3d 760, 764 (N.D. Cal. 2023) ("Dismissal is also warranted for the UCL [claim], which [the plaintiff] effectively tethers to her VPPA claim."); *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 855 (N.D. Cal. 2022) ("Because the VPPA claim is dismissed as discussed above, Plaintiffs' claim under the "unlawful" prong of the UCL is also DISMISSED").

**Fraudulent Prong.**  To establish a fraudulent omission claim, Bloom must point to an omission that is "contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obligated to disclose."  *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1084 (N.D. Cal. 2022).  Here, Bloom claims that Zuffa "actively concealed" its use and disclosure of his Facebook ID.  But as shown above, this is flatly refuted by (1) the lack of evidence that Bloom's Facebook ID was ever disclosed—let alone *knowingly* disclosed—to Meta, and (2) Bloom's consent to Zuffa's Cookie Policy and Privacy Policy.

But even if Bloom could show that Zuffa "actively concealed" such information (he cannot), his claim would still fail because Zuffa did not have a duty to disclose in the first place.  Under binding Ninth Circuit authority, a duty to disclose only exists when a product or service contains a defect that "relate[s] to the central functionality of the product."  *Hodgson v. Mars, Inc.*, 891 F.3d 857, 863 (9th Cir. 2018).  Here, Plaintiff does not complain about any "defect" with the Fight Pass website.  *See, e.g.*, *Hall v. SeaWorld Entertainment, Inc.*, 747 F. App'x 449, 451 (9th Cir. 2018) (unpublished) (affirming dismissal of UCL fraudulent concealment claim where the consumer plaintiffs did "not allege any omitted flaw in the [SeaWorld animal] performances"); *Lipeles v. Ciccone*, 2025 WL 1843222, at *4-5 (C.D. Cal. May 20, 2025) (dismissing UCL fraudulent concealment claim where "[t]he alleged omission [hot and uncomfortable temperatures at music concerts] concerns a subjective preference, 'which does not relate to the central functionality of' the service at issue") (internal citation omitted).  Put simply, Zuffa had no duty to disclose because Plaintiff does not assert a "defect" in the functionality of the Fight Pass website.

**Unfair Prong.**  A claim under the UCL's "unfair" prong cannot survive where it overlaps entirely with the same conduct that purportedly violates the UCL's fraudulent and unlawful prongs.

1   *See Hammerling*, 615 F. Supp. 3d at 1094 ("Because the Court dismisses Plaintiffs' claims under

2   the fraud and unlawful prongs, the unfair prong [which was also premised on Google's collection

3   of personal data without disclosure] cannot survive either."); *Sidhu v. Bayer Healthcare Pharms.*

4   *Inc.*, No. 22-cv-01603BFL, 2022 WL 17170159, at *9 (N.D. Cal. Nov. 22, 2022) ("Despite [the

5   plaintiff's arguments to the contrary in the Opposition, the unfair UCL claim . . . is based on the

6   same conduct underlying the other two UCL claims, and it must therefore be dismissed.").  That is

7   precisely what Bloom aims to do by invoking the UCL's unfair prong in this case.  But there is

8   nothing in the record that would support an independent claim based on the UCL's unfair prong.

9   The Court should grant summary judgment as to this theory as well.

10   **III.   PLAINTIFFS LACK STANDING**

11       Finally, as a separate and independent basis for summary judgment, each of the Plaintiffs

12   lacks Article III standing because there is no evidence that Zuffa disclosed their Facebook IDs with

13   Fight Pass video URLs (or any other alleged PII) in violation of the VPPA or California law.

14       To have Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that

15   is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the

16   defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC*

17   *v. Ramirez*, 594 U.S. 413, 423 (2021).  A harm is "concrete" if it is "'*de facto*'; that is, it must

18   actually exist" rather than being only "abstract."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).

19   To determine whether a plaintiff's injury is concrete, a court must "assess whether an individual

20   plaintiff has suffered a harm that has traditionally been actionable."  *Popa v. Microsoft Corp.*, No.

21   24-14, 2025 WL 2448824, at *4 (9th Cir. Aug. 26, 2025) (citing *TransUnion*, 594 U.S. at 424-25).

22   While Congress's views may be "instructive," "it may not simply enact an injury into existence,

23   using its lawmaking power to transform something that is not remotely harmful into something that

24   is."  *Id.* (citation omitted).[23]   "[U]nder Article III, an injury in law is not an injury in fact."

25   *TransUnion*, 594 U.S. at 427.  The plaintiff, as the party invoking federal jurisdiction, bears the

26   burden of demonstrating they have standing.  *Id.* at 430-31.  Speculation about the mere possibility

27

28   [23] The Ninth Circuit noted: "[p]erhaps we might analyze [the VPPA] differently today, especially
    after the Supreme Court's decision in *Transunion*."  *Popa*, 2025 WL 2448824, at *8.

1    that Plaintiffs' privacy was invaded is not enough. "Speculation does not create a genuine issue of

2    fact; instead, it creates a false issue, the demolition of which is a primary goal of summary

3    judgment." *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1170 (11th Cir. 2018).

4          Here, the only injury that Plaintiffs allege is Zuffa's purported disclosure of their Facebook

5    IDs with video URLs from the Fight Pass website. *See, e.g.*, FAC ¶¶ 93, 102, 108, 115.[24]  But the

6    records produced by Meta in this action, which include all available Pixel Data from the Fight Pass

7    website for the three Plaintiffs, does not show that Zuffa disclosed even *a single* ███████████

8    ████████████████████████████████  for any of the Plaintiffs. *See supra* Section I.B.  In fact,

9    for Plaintiff Bloom, Meta's Pixel Data does not even show that Zuffa disclosed *a single* ████████

10   ████████████████████  *Id.*  In other words, none of the Plaintiffs can demonstrate that they

11   suffered an injury in fact because there is no evidence that Zuffa disclosed their alleged PII to Meta.

12         Moreover, there is no other evidence in the record that shows what information, if any,

13   Zuffa purportedly disclosed to Meta.  Plaintiffs cannot cure this defect by submitting conclusory

14   and self-serving declarations that assert Zuffa (take their word for it) must have disclosed their PII.

15   *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.1997) ("A conclusory, self-

16   serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a

17   genuine issue of material fact.").  At the summary judgment stage, the district court must ask itself

18   whether "a fair-minded jury" could find that the claimant had standing on the evidence presented.

19   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252; *cf. U.S. v. Currency, U.S. $42,500.00*, 283

20   F.3d 977, 983 (9th Cir. 2002).  "The mere existence of a scintilla of evidence in support of the

21   plaintiff's position [is] insufficient . . . ." *Anderson*, 477 U.S. at 252.

22                                    **CONCLUSION**

23         For the foregoing reasons, Zuffa respectfully requests that the Court grant summary

24   judgment in its favor on all of Plaintiffs' claims.

25

26   _____

[24] To the extent Plaintiff Bloom argues that he also suffered monetary damages in connection with
27   his claims for Invasion of Privacy and violation of the UCL, that is not sufficient to establish Article
III standing.  Rather, "a plaintiff still must show the *fact* of injury in order to have Article III
28   standing." *Svenson v. Google Inc.*, No. 13-CV-04080-BLF, 2016 WL 8943301, at *10 (N.D. Cal.
Dec. 21, 2016) (emphasis in original).  As explained herein, Plaintiff Bloom cannot do so.

DATED:  October 10, 2025

Respectfully submitted,

PAUL HASTINGS LLP

By:  _/s/ Susan K. Leader_
　　　SUSAN K. LEADER

Attorneys for Defendant Zuffa, LLC

1

2

**CERTIFICATE OF SERVICE**

3

I hereby certify under penalty of perjury that on October 10, 2025, I authorized the

4

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which

5

will send notification of such filing to the email addresses on the attached Electronic Mail Notice

6

List.

7

*/S/ SUSAN K. LEADER*

8

SUSAN K. LEADER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

***Bloom, et al. v. Zuffa, LLC, et al.***
USDC of Nevada | Case No. 2:22-cv-00412-RFB-BNW

Index

| Document | Exhibit | Page | Sealed |
|---|---|---|---|
| Declaration of Ali Rabbani in Support of Defendant Zuffa, LLC's Motion for Summary Judgment | **Exhibit 1** – Supplemental Expert Report of Ron Schnell, designated Highly Confidential | | Filed Under Seal 2-47 |
| | **Exhibit 2** – Kristen Banks Deposition Transcript Excerpts, dated May 31, 2023 | | 48-63 |
| | **Exhibit 3** – Zuffa, LLC 30(b)(6) and Travis Santypal Deposition Transcript Excerpts, dated May 15, 2023 | | 64-86 |
| | **Exhibit 4** – Tobias Wooldridge Deposition Transcript Excerpts, dated January 25, 2025, designated Highly Confidential | | Filed Under Seal 87-131 |
| | **Exhibit 5** – Production Letter from Meta's counsel re Meta's Production of Documents in Response to Plaintiffs' Amended Subpoena, dated August 21, 2023, designated Highly Confidential | | Filed Under Seal 132-134 |
| | **Exhibit 6** – Excel sheet produced by Meta on August 21, 2023 with Bates No. META _BLOOM_0001, designated Highly Confidential | | Filed Under Seal and Manually Filed 135 |
| | **Exhibit 7** – Meta's Webpage "Customer Information Parameters", as it appeared on May 1, 2025 | | 136-141 |
| | **Exhibit 8** – Facebook's Data Policy, dated September 9, 2016 | | 142-152 |
| | **Exhibit 9** – Facebook's Data Policy, dated April 19, 2018 | | 153-165 |
| | **Exhibit 10** – Everett Bloom Deposition Transcript Excerpts, dated November 1, 2023, designated Highly Confidential | | Filed Under Seal 166-170 |
| Declaration of Travis Santypal in Support of Defendant Zuffa, LLC's Motion for Summary Judgment | **Exhibit A** – Fight Pass Sign Up Process | | 171-172 |
| | **Exhibit B** – Zuffa's Privacy Policy, effective August 30, 2019 | | 173-181 |
| | **Exhibit C** – Zuffa's Cookie Policy, effective August 30, 2019 | | 182-186 |