**CAMPBELL & WILLIAMS**
J. COLBY WILLIAMS (Nev. Bar No. 5549)
jcw@cwlawlv.com
710 South 7th Street
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540

**PAUL HASTINGS LLP**
SUSAN K. LEADER (*admitted pro hac vice*)
susanleader@paulhastings.com
ALI R. RABBANI (*admitted pro hac vice*)
alirabbani@paulhastings.com
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (310) 620-5700
Facsimile: (310) 620-5899

*Attorneys for Defendant Zuffa, LLC*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

EVERETT BLOOM, JACK GRAHAM, and DAVE LINDHOLM, on behalf of themselves, and those similarly situated,

Plaintiffs,

v.

ZUFFA, LLC,

Defendant.

Case No. 2:22-cv-00412-RFB-BNW

**DEFENDANT ZUFFA, LLC'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Hon. Richard F. Boulware II

**HEARING REQUESTED**

**[REDACTED]**

## TABLE OF CONTENTS

**Page(s)**


I. ZUFFA IS ENTITLED TO SUMMARY JUDGMENT ON THE VPPA CLAIMS .............. 3

A. ZUFFA DID NOT DISCLOSE PLAINTIFFS' "PII" TO META .............. 3

1. The C_User Cookie Is Not PII .............. 3

2. Plaintiffs Do Not Dispute That the FR Cookie Is Not PII .............. 5

3. The FBP Cookie Is Not PII .............. 5

4. Hashed Emails Are Not PII .............. 8

B. ZUFFA DID NOT "DISCLOSE" PLAINTIFFS' PII TO META .............. 9

C. THERE IS NO EVIDENCE THAT ZUFFA "KNOWINGLY" DISCLOSED PII TO META .............. 12

1. Zuffa's Use of the Meta Pixel .............. 12

2. Zuffa's Emails About the Meta Pixel .............. 14

3. Meta's Online Documents .............. 15

II. ZUFFA IS ALSO ENTITLED TO SUMMARY JUDGMENT ON THE CALIFORNIA CLAIMS .............. 16

A. CALIFORNIA CIVIL CODE § 1799.3 .............. 16

B. CALIFORNIA CONSTITUTION INVASION OF PRIVACY .............. 17

C. CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL") .............. 18

III. PLAINTIFFS LACK STANDING .............. 18

IV. PLAINTIFFS CANNOT STALL THIS CASE BY INVOKING RULE 56(D) .............. 19

CONCLUSION .............. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amaya v. Garland*,
15 F.4th 976 (9th Cir. 2021) .......... 13

*Aramark Facility Servs. v. Serv. Emps. Int'l Union, Loc. 1877, AFL CIO*,
530 F.3d 817 (9th Cir. 2008) .......... 13

*Arroyo v. Int'l Paper Co.*,
611 F. Supp. 3d 824 (N.D. Cal. 2020) .......... 20

*Cabral v. State Farm Fire & Cas. Co.*,
582 F. Supp. 3d 701 (D. Ariz. 2022) .......... 15

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... *passim*

*Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*,
525 F.3d 822 (9th Cir. 2008) .......... 20

*Far Out Productions, Inc. v. Oskar*,
247 F.3d 986, 977 (9th Cir. 2001) .......... 14

*In re Fu*,
739 F. App'x 432 (9th Cir. 2018) .......... 20

*Hammerling v. Google*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) .......... 18

*Hardwick v. Complete Skycap Servs., Inc.*,
247 F. App'x 42 (9th Cir. 2007) .......... 16

*Hodgson v. Mars, Inc.*,
891 F.3d 857, 863 (9th Cir. 2018) .......... 18

*Hughes v. Nat'l Football League*,
No. 24-2656, 2025 WL 1720295 (2d Cir. June 20, 2025) .......... 2, 3, 4, 5

*In re Hulu Privacy Litigation*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......... *passim*

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) .......... 7, 8

*Nat'l Union Fire Ins. Co of Pittsburgh, Pa. v. Argonaut Ins. Co.*,
701 F.2d 95, 97 (9th Cir. 1983) .......... 14

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) .......... 19

*Roybal v. Equifax*,
2008 U.S. Dist. LEXIS 79789 (E.D. Cal. Oct. 9, 2008) .......... 17

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007) .......... 17

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) .......... 2, 3, 4, 5

*Stardust, 3007 LLC v. City of Brookhaven*,
899 F.3d 1164 (11th Cir. 2018) .......... 11

*Taylor v. List*,
880 F.2d 1040 (9th Cir. 1989) .......... 16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 19, 20

*Warren v. Shaw Grp., Inc.*,
825 F. Supp. 2d 1052 (D. Nev. 2011) .......... 16

**Statutes**

18 U.S.C. § 2710(a)(3) .......... 12

California Civil Code § 1799.3 .......... *passim*

California Penal Code § 7(b)(1) .......... 17

**Other Authorities**

Federal Rule of Civil Procedure 56(d) .......... 3, 20, 22

Plaintiffs' Opposition confirms there is no evidence that Zuffa, LLC ("Zuffa") knowingly disclosed personally identifiable information ("PII") to Meta. Even if Plaintiffs were correct that a c_user cookie or hashed email meets the definition of PII under the VPPA (it does not), there is simply no evidence that this information was sent to Meta along with a Plaintiff's video-watch history. It is for this reason, presumably, that Plaintiffs' Opposition hinges on the opinions of their new expert that, take his word for it, Meta was able to discern a Plaintiff's video-watch history by matching up Pixel data with information from *other* sources that it already had in its database relating to the Plaintiffs. But even if Plaintiffs' expert is correct regarding how Meta operates and what dots it can connect, that does not equate to liability under the VPPA, which governs ***knowing*** disclosures of a person's video-watch history to a third party. While Plaintiffs may argue what Zuffa could have or should have known about Meta's capabilities, this is a far cry from actual knowledge and irrelevant to the ordinary person standard followed in the Ninth Circuit. Thus, for the reasons discussed below, Zuffa is entitled to summary judgment on all of Plaintiffs' claims.

***First***, Plaintiffs have failed to raise a genuine dispute of material fact that Zuffa disclosed "PII" to Meta. The only information Plaintiffs allege constitutes PII is the c_user cookie and hashed emails. Opp. at 11. But as recent Court of Appeals authority has held, the c_user cookie is not PII under the ordinary person standard. *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 54-55 (2d Cir. 2025); *Hughes v. Nat'l Football League*, 2025 WL 1720295, at *2-3 (2d Cir. June 20, 2025) (Summary Order). Likewise, hashed emails are not PII because, by Plaintiffs' own admission, they cannot be used to identify individuals without the use of a "complex" technique that links them "with other identifying information derived from 'an enormous amount of information' collected 'from a variety of sources.'" *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985-86 (9th Cir. 2017).

***Second***, even if the c_user cookie and hashed emails were PII (they are not), Plaintiffs have failed to raise a genuine dispute that Zuffa actually "disclosed" such information to Meta. As Plaintiffs concede, the records Meta produced in this action, which include all available Pixel data from the Fight Pass website for the Plaintiffs, do not reference ***a single*** [redacted] Nor do Meta's records for Plaintiffs reflect ***a single*** instance where [redacted]. In fact, for Plaintiff Everett

Bloom, Meta's records do not even include ***a single*** [redacted]. Likewise, Plaintiffs cannot show that the few references to the word [redacted] (and nothing more) in Meta's production actually refer to [redacted]. As Plaintiffs' expert admits, hashed emails come from website form fields, but Fight Pass video pages have never had such form fields.

***Third***, Plaintiffs have not (and cannot) produce any evidence that Zuffa "knowingly" disclosed their PII to Meta. The undisputed evidence confirms that Zuffa does not (and logically would not) use the Meta Pixel to track the videos its subscribers watch on the Fight Pass website. As the owner and operator of Fight Pass, Zuffa already knows its subscribers watch history and would have zero incentive to share this commercially sensitive information with Meta. Rather, Zuffa paid Meta (and not the other way around) to run Fight Pass ads on Facebook and share with Zuffa information measuring how successful these ads were in attracting and converting *new* subscribers to join Fight Pass. Thus, the goal was for Meta to give Zuffa information about the effectiveness of its ads, not the other way around.

***Fourth***, Zuffa is also entitled to summary judgment on Plaintiff Bloom's California state law claims. Bloom has no evidence that Zuffa disclosed any "personal information" or "the contents of any record," much less that Zuffa disclosed any information that Zuffa itself "prepared or maintained." Even if he had such evidence, Bloom's California Civil Code § 1799.3 claim would still fail because the record shows he provided his consent for the alleged use and disclosure of such information when he agreed to Zuffa's Cookie Policy and Privacy Policy, as well as Meta's own policies. Bloom's California Constitution Invasion of Privacy and Unfair Competition Law claims are almost entirely derivative of his other claims and fail for all of the same reasons.

***Fifth***, Plaintiffs have failed to establish that they have Article III standing. Given the lack of evidence that Zuffa disclosed Plaintiffs' PII and Plaintiffs' admission that Meta does not use the c_user cookie to identify individuals with the Meta Pixel, Plaintiffs have suffered no injury in fact.

***Lastly***, Plaintiffs' Rule 56(d) request should be rejected. Plaintiffs have already taken extensive discovery since this case was filed four years ago, and they have not requested any additional discovery from Zuffa since December 2023. Plaintiffs cannot abandon discovery, then avoid summary judgment by suggesting there "could" be evidence that might support their claims.

# I. ZUFFA IS ENTITLED TO SUMMARY JUDGMENT ON THE VPPA CLAIMS

## A. Zuffa Did Not Disclose Plaintiffs' "PII" to Meta

### 1. The C_User Cookie Is Not PII

Plaintiffs argue that the Court should disregard the only relevant Circuit court authority on the issue of whether a c_user cookie constitutes PII under the VPPA as being "poorly reasoned." Opp. at 2, 13-14 (citing *Solomon*, 136 F.4th 41 & *Hughes*, 2025 WL 1720295). Plaintiffs' self-serving assessment should be rejected for several reasons.

***First***, Plaintiffs claim that the Second Circuit decisions in *Solomon* and *Hughes* conflict with Ninth Circuit precedent. Opp. at 13-14. Plaintiffs are wrong. The Second Circuit expressly adopted and followed the Ninth Circuit's ordinary person standard for PII under the VPPA. *Solomon*, 136 F.4th at 51 ("[W]e adopt the Third and Ninth Circuits' ordinary person standard."); *Hughes*, 2025 WL 1720295, at *2 (same). In fact, *Solomon* relied on the Ninth Circuit's decision in *Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017) in reaching its conclusion that a c_user cookie is not "vastly different" from "the Roku device serial numbers [the Ninth Circuit held were not PII] in *Eichenberger*." *Solomon*, 136 F.4th at 54-55.[1]

***Second***, Plaintiffs contend that *Solomon* is "inapposite" because it purportedly "applied Rule 12(b)(6) to a different set of allegations than those pled by Plaintiffs." Opp. at 14. But Plaintiffs make nearly identical allegations to those alleged in *Solomon*. *Compare* ECF No. 47 (FAC) ¶¶ 40-41 (alleging that Zuffa disclosed Facebook IDs, as embedded in the c_user cookie, and Fight Pass URLs with video titles "through a 'GET Request'"), *with Solomon*, 136 F.4th at 43, 45-46 (alleging that FITE disclosed Facebook IDs, as embedded in the c_user cookie, and FITE URLs with video titles through a GET request). Even in their Opposition, Plaintiffs allege that "Zuffa's website transmitted these Facebook IDs to Meta as part of a GET request." Opp. at 5.

***Third***, Plaintiffs suggest that *Solomon* and *Hughes* are based on "flawed reasoning" because, take their word for it, an ordinary person would "use common computer programs (e.g., Microsoft Word, Adobe Acrobat, Safari, Chrome, etc.) to read [GET request] transmissions after

[1] Plaintiffs also argue that *Solomon* and *Hughes* conflict with district court decisions in the Ninth Circuit on motions to dismiss. Opp. at 14. But those decisions are not binding on this Court.

translation into readable text." Opp. at 14-15. But Plaintiffs offer no explanation, let alone evidence, to demonstrate how an ordinary person would gain access to a Meta Pixel transmission "after translation to plain text" in a Word document or Adobe PDF. *Id.* Thus, even if Plaintiffs were correct, it would not change the outcome here as the GET request will still consist of a trove of numbers, symbols, and letters because that is the actual information being sent. *See, e.g.*, ECF No. 220-1 (Egelman Report) ¶ 159, Fig. 11 (showing a "translated" GET request). Thus, a c_user cookie would still appear as one of many lines of code without any context to indicate that its value (a string of numbers) corresponds to a Facebook ID.

*Hughes* addresses this very issue. In *Hughes*, the Second Circuit rejected the plaintiff's request to amend his complaint to allege that "Facebook receives communications from the Pixel in a way that is automatically translated into a readable format," and that "an ordinary person could plug the code into ubiquitous internet-based tools like ChatGPT . . . to reveal the Facebook ID and video title in plain English." 2025 WL 1720295, at *2-3 (internal quotations omitted). The court explained that "[n]one of these arguments supports a VPPA claim post-*Solomon*" because the focus is on whether an *ordinary person* would be able to understand the code underlying the Meta Pixel transmission, "regardless of how the code is later manipulated or used by Facebook." *Id.*; *see also Eichenberger*, 876 F.3d at 985 (The VPPA "looks to what information a video service provider discloses, not to what the recipient of that information decides to do with it.").

***Fourth***, Plaintiffs' attempt to distinguish *Solomon* and *Hughes* on the ground that they were not decided on summary judgment is a distinction without a difference. Opp. at 14. In *In re Hulu*, the Northern District of California applied the same reasoning as *Solomon* and *Hughes* in granting summary judgment in Hulu's favor. 86 F. Supp. 3d at 1091. In *Hulu*, the plaintiffs argued that "session captures," which "record[ed] the actual data sent between a browser and the Web pages on Hulu," showed "the Hulu developer's own Facebook ID being sent to Facebook in a c_user cookie when he was logged in to Facebook." *Id.* However, the court found it dispositive that the session captures—like the GET requests here—only included "the value 'c_user=55431124,'" without any indication "that the c_user cookie contained a user's Facebook ID." *Id.* As the court explained: "As it happens, '55431124' is a Facebook user ID. There is no proof that anyone at

Hulu saw this, knew generally what a c_user signified, or recognized '55431124' as a Facebook ID—*the latter two things being far from obvious from the face of the data*." *Id.* (emphasis added). The court further noted that "[t]he plaintiffs' expert himself had to conduct additional investigation, th[r]ough a third website, to determine what '55431124' signified." *Id.* As in *Hulu*, an ordinary person would be unable to associate a c_user cookie to a Plaintiff without additional investigation.

Because Plaintiffs cannot distinguish the relevant authority, they instead urge the Court to disregard it on the ground that it would purportedly "immunize all electronic communications from the VPPA." Opp. at 14. But Plaintiffs conveniently ignore that electronic communications could easily include other types of information that would readily enable an ordinary person to identify an individual, such as a list of names and addresses with corresponding video titles. The Meta Pixel transmissions at issue here include no such PII under the VPPA.

**2. <u>Plaintiffs Do Not Dispute That the FR Cookie Is Not PII</u>**

Plaintiffs acknowledge that the fr cookie is *not* PII as it contains a string of over 100 seemingly random, numbers, letters and characters. *See* Opp. at 11-19 (arguing only "the c_user cookie and its user's email addresses" are PII); Mot. at 15-16. In fact, neither Plaintiffs nor their experts have identified any way to reveal the contents of the fr cookie without (hypothetically) getting access to Meta's decoding algorithm. *See, e.g.*, Ex. B (Egelman Tr.) at 76:3-21. If Plaintiffs' own experts cannot read the fr cookie, there is no question an ordinary person could not do so.

Even if an ordinary person could somehow decode the fr cookie, there is no guarantee the cookie would contain a Facebook ID. Mot. at 15-16. As Meta's corporate representative testified: [redacted] ECF No. 186-5 (Wooldridge Tr.) at 51:7-18, 184:9-22. In fact, there are a number of reasons an fr cookie could exist on a user's browser without a Facebook ID. Mot. at 15-16; Ex. A (Schnell Rep.) ¶¶ 7, 10, 49-53, 105-107. Plaintiffs have submitted no evidence to the contrary, and Plaintiffs' expert admitted he did not test whether an fr cookie could exist without being logged into a Facebook account. Ex. B (Egelman Tr.) at 63:23-65:3.

**3. <u>The FBP Cookie Is Not PII</u>**

It is undisputed that the fbp cookie, standing alone, is *not* PII under the VPPA. Mot. at 16.

Unlike the c_user cookie, the fbp cookie does not contain a Facebook ID. Ex. B (Egelman Tr.) at 142:9-12. Rather, it contains a time stamp and a random number. *Id.* at 143:13-145:9. As such, Plaintiffs do not argue that an ordinary person could use an fbp cookie to identify an individual. ECF No. 183 (Evid. Hrg. Tr.) at 15:15-21 ("[I]f you show [the fbp cookie] to a person on the street, we're not saying that a person on the street is going to know what that's referring to.").

Instead, Plaintiffs argue for the first time that the fbp cookie is PII because it purportedly allowed Meta to "link all transmissions [from the Meta Pixel] in a personally identifiable manner." Opp. at 6-7, 18-19. But not only is Plaintiffs' new theory speculative and unsupported, it fails to meet the Ninth Circuit standard for PII under the VPPA. Ex. A (Schnell Rep.) ¶¶ 20-21, 49, 55-57, 76, 80-85, 97-98. As discussed above, the fbp cookie, *on its own*, cannot be used to identify an individual. Plaintiffs' theory is therefore based on the false assumption that Zuffa must have disclosed some *other* PII that the fbp cookie could then be used to "link" to video titles. But, as discussed herein, the other types of information at issue (c_user cookies, fr cookies, and hashed emails) are also not PII under the VPPA.[2] Linking one type of non-PII with another type of non-PII does not equate to a VPPA violation.

Based on the flawed premise above, Plaintiffs and their experts contend that "Zuffa adopted a system where each transmission identified the Zuffa subscriber with a codename (e.g., 'user 12345'), and then periodically linked that codename to a specific identity (e.g., the user's Facebook ID or email address)." Opp. at 7. This is patently false. Using the actual values and parameters at issue, Plaintiffs' hypothetical would more accurately read: Under certain circumstances, the Meta Pixel may have caused a user's web browser to send an fbp cookie (e.g., fb.1.1596403881668.1116446470) to Meta, and under other, more limited circumstances, the Meta Pixel may have caused a user's web browser to send an fr cookie (e.g., 0LfdsjUNHFaNurYXS.AWf3nVIukwp3hEmL8vEb2bHYm0YNcTvDtCuG0f8gfhzzyWVfNyk.BoeCT1..AAA.0.0.BolLhO.AWcgzOv_vPbqC1KHAHHjvf9wuX0) or hashed email address (e.g., 62a14e44f765419d10fea99367361a727c12365e2520f32218d505ed9aa0f62f) to Meta.

[2] Moreover, Plaintiffs' suggestion that Meta uses the fbp cookie to link video titles to c_user cookies at all is proven false by Plaintiffs' admission that [redacted])." Opp. at 12.

Even if this added up to PII (it does not), it would not change the fact that an ordinary person could not tie all this information together to identify an individual's video-watching behavior. In fact, the Third Circuit rejected a similar argument in *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262 (3d Cir. 2016). In that case, the plaintiffs alleged that Viacom violated the VPPA by permitting Google to "us[e] cookies to track children's . . . video-watching habits on [Nickelodeon] websites." *Id.* at 268-69. Specifically, they alleged "Viacom disclosed to Google URL information that effectively revealed what videos they watched on Nickelodeon's websites, and static digital identifiers (such as IP addresses, browser fingerprints, and unique device identifiers) that enabled Google to link the watching of those videos to their real-world identities." *Id.* at 279. Just as Plaintiffs allege the fbp cookie allowed Meta to "link[] all [] events together," Opp. at 19, the *Nickelodeon* plaintiffs alleged: "What these pieces of information have in common is that they allegedly permit Google to track the same computer across time. So, for example, if someone with a Google account were to run a Google search from his or her computer, and then that person's child were to visit Nick.com and watch a video on that same computer, the plaintiffs claim that Google could 'match' the data (based on IP address, browser fingerprint, or unique device identifier) to determine that the same computer was involved in both activities." *Id.* at 282.

The Third Circuit affirmed dismissal of the VPPA claim. *Id.* at 281-90. Applying the ordinary person standard, the court held that the information Viacom allegedly disclosed did not constitute PII. *Id.* at 282 ("To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person."). It did not matter that the information was disclosed to a sophisticated technology company like Google, "whose entire business model is purportedly driven by the aggregation of information about Internet users." *Id.* at 289. Rather, the court concluded that "[w]hether or not this is true," "[t]he allegation that Google will assemble otherwise anonymous pieces of data to unmask the identity of individual[s] is, at least with respect to the kind of identifiers at issue here, simply too hypothetical to support liability under the Video Privacy Protection Act." *Id.* at 290.

The outcome here should be no different. Like the static digital identifiers in *Nickelodeon*, an fbp cookie would "be of little help in trying to identify an actual person." *Id.* at 283.

**4. <u>Hashed Emails Are Not PII</u>**

It is undisputed that an ordinary person could not use a hashed email address, on its own, to identify a specific individual. Mot. at 16-17; ECF No. 183 (Evid. Hrg. Tr.) at 65:18-66:2 (Herold: "If I saw the—hashed e-mail information just on its own, no. . . . I would not know what that was."). That is because the hashing process converts an email address to a long string of numbers and letters that cannot be reversed. ECF No. 220-1 (Egelman Report) ¶ 73 ("[A] hash *by itself* cannot be 'reversed' to reveal the input data."). For example, through Meta's hashing process, the email address "john_smith@gmail.com" would be converted to "62a14e44f765419d10fea99367361a727 c12365e2520f32218d505ed9aa0f62f." ECF No. 186-8 (Customer Information Parameters) at 2.

Even if a commercial third-party service (or Meta) could potentially "match" a hashed email to information collected from data breaches and data brokers, as Plaintiffs suggest, Opp. at 16, this does not change the end result. These third-party services (and Meta) are only *sometimes* able to so by "maintaining dictionaries of billions of email addresses" that are "likely harvested from data breaches or obtained from data brokers." ECF No. 220-1 (Egelman Decl.) ¶ 79; Ex. A (Schnell Rep.) ¶¶ 5, 33-40, 100-101; Ex. B (Egelman Tr.) at 187:8-190:14. Thus, even if a third-party service could determine a Plaintiff's identity by engaging in this type of sophisticated matching process, hashed emails still do not qualify as PII under binding Ninth Circuit precedent.

In *Eichenberger*, the Ninth Circuit considered whether ESPN violated the VPPA by allegedly disclosing to a third party the plaintiff's Roku device serial number, and the identity of the videos he watched through ESPN's video streaming app. 876 F.3d at 981-82. The third party, Adobe Analytics, allegedly used the information obtained from ESPN "to identify specific consumers by connecting that information 'with existing data already in Adobe's profile of th[ose] individual[s],'" such as "email addresses, account information, or Facebook profile information." *Id.* Adobe then gave the resulting data back to ESPN in an aggregated form, so ESPN could "provide[] advertisers with aggregated information about its users' demographics." *Id.* ESPN allegedly "knew that Adobe could and would use that information to identify" the plaintiff. *Id.*

The Ninth Circuit affirmed dismissal of the VPPA claim. Applying the ordinary person standard, the court held the information ESPN allegedly disclosed to Adobe "does not constitute

'personally identifiable information' under the VPPA" because it "*cannot* identify an individual unless it is combined with other data in Adobe's possession—data that ESPN never disclosed and apparently never even possessed." *Id.* at 985-86. Thus, the court concluded that "an ordinary person could not use the information [ESPN] allegedly disclosed to identify an individual." *Id.*

Accordingly, even under Plaintiffs' third-party data broker theory, a hashed email cannot be PII because it cannot be used to identify an individual without the use of a "complex" technique that links them "with other identifying information derived from 'an enormous amount of information' collected 'from a variety of sources'" that Zuffa never disclosed or possessed. *Id.*[3]

**B. Zuffa Did Not "Disclose" Plaintiffs' PII to Meta**

Summary judgment should also be granted in Zuffa's favor because there is no evidence that Zuffa "disclosed" Plaintiffs' c_user cookies and hashed emails to Meta.

**Facebook IDs.** It is undisputed that the records produced by Meta do not reference ***a single*** [redacted] Ex. B (Egelman Tr.) at 60:18-24, 61:17-24; *see also* Mot. at 17-18. With no direct evidence to support their claim, Plaintiffs contend that circumstantial evidence is sufficient to meet their burden. They are wrong.

***First***, Plaintiffs argue that because the Meta Pixel has been shown to transmit the c_user cookie in *other* irrelevant circumstances, the Court should *assume* the Meta Pixel transmitted the c_user cookie with video titles from the Fight Pass website for each of the Plaintiffs. Opp. at 11-13 (citing to testing on "non-video" pages on the Fight Pass website and Zuffa's screenshot of a GET request from the Fight Pass "welcome" page[4]). But as Zuffa has previously demonstrated, the c_user cookie can be blocked by a variety of common settings and practices—including using web browsers that block Facebook's third-party cookies, changing default web browser settings to block third-party cookies, installing cookie blocker extensions like AdBlock, using Incognito mode,

---

[3] As Meta's corporate representative testified, [redacted]. ECF No. 186-5 (Wooldridge Tr.) at 189:16-190:2.

[4] Zuffa did not "admit" that Fight Pass video pages transmitted the c_user cookie during the proposed class period. As Zuffa's Motion made clear, "there are a variety of common Facebook and web browser settings and practices that would block third-party cookies (like Facebook's c_user cookie) from being transmitted through the Meta Pixel in the first place." Mot. at 10 n.8.

manually clearing cookies, using multiple web browsers and/or devices, sharing web browsers and/or devices, and logging out of Facebook. ECF No. 106 at 11-17. Thus, there is no way to determine whether the Meta Pixel sent a c_user cookie without additional facts.

Because there is no direct evidence that Zuffa "disclosed" Plaintiffs' c_user cookies to Meta—including, as discussed below, in Meta's productions of Pixel data—Plaintiffs' silence on these issues is fatal to their claims. Despite having the burden on summary judgment, Plaintiffs fail to submit even a single declaration to substantiate their claims. Absent such evidence, the Court cannot simply assume Zuffa violated the VPPA. *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1170 (11th Cir. 2018) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.").[5]

***Second***, Plaintiffs argue that [redacted]. Opp. at 11, 17-18. This assumption is flawed for one simple reason: the fr cookie can exist independent of the c_user cookie. Ex. A (Schnell Rep.) ¶¶ 7, 10, 49-53, 105-107. There are many common scenarios where an fr cookie would be stored on a user's web browser *without* a c_user cookie. *Id.*; Mot. at 15 n.13. For instance, the fr cookie can be created by visiting Facebook's website and other related websites on the same domain, whether or not the user has a Facebook account or logs in. In contrast, a c_user cookie can only exist if a user visits the Facebook website and logs in to a Facebook account. Likewise, an fr cookie is saved when a user logs out of their Facebook account, whereas logging out of Facebook deletes the c_user cookie.[7] Plaintiffs have no way around these evidentiary hurdles.

Because they have no answer, Plaintiffs resort to misstating the facts instead. Contrary to

---

[5] At a minimum, Plaintiffs' failure to present such evidence is fatal to any claim pre-dating June 19, 2021, which is the earliest date of Meta's records. *See* Opp. at 18.

[6] Plaintiffs' reliance on data relating to putative class members is misplaced. No class has been certified. Rather, Plaintiffs must show there is sufficient evidence for their individual claims.

[7] [redacted] Opp. at 17-18. This is nothing more than speculation. Ex. A (Schnell Rep.) ¶ 99.

what Plaintiffs assert, Opp. at 11, [redacted]

Ultimately, it is a distinction without a difference because Meta's records confirm that Zuffa did not disclose Plaintiffs' PII to Meta. For Everett Bloom, it is undisputed that Meta's records do not include a single [redacted]. This alone is dispositive because PII includes only "information which identifies a person as having requested or obtained *specific video materials or services* from a video tape service provider." 18 U.S.C. § 2710(a)(3) (emphasis added). Without any evidence that Zuffa disclosed [redacted], Bloom cannot establish this essential element of his claim. Even setting this fundamental defect aside, it is also undisputed that Meta's records for Bloom do not include a single [redacted]. Thus, Bloom cannot argue that there is even circumstantial evidence that Zuffa disclosed his c_user cookie to Meta.[8] For Jack Graham and Dave Lindholm, Meta's records do not include a single instance where [redacted]. Thus, even under Plaintiffs' flawed theory, Graham and Lindholm also cannot argue there is circumstantial evidence that Zuffa disclosed their c_user cookies with a video title to Meta.[9]

**Hashed Emails.**[10] Plaintiffs have also failed to meet their burden on hashed emails because [redacted] Opp. at 16-17; Mot. at 18-19. Plaintiffs' expert admits that the Meta Pixel—not Zuffa—collects and transmits hashed emails. Ex. B (Egelman Tr.) at 147:21-150:21. Plaintiffs' expert also admits that the Meta Pixel does so by collecting information that a user types into a form field on a website

---

[8] It makes no difference that [redacted] an essential element of PII under the VPPA. 18 U.S.C. § 2710(a)(3).

[9] Other than a passing reference, Opp. at 1, Plaintiffs fail to respond to Zuffa's argument that, even if Plaintiffs had evidence that [redacted]. Mot. at 19-20.

[10] Plaintiffs also make passing reference to [redacted] ECF No. 186-7.

(such as an email address), then hashing that information on the user's web browser and transmitting it to Meta. *Id.*. But since Zuffa has never included form fields on video pages on the Fight Pass website, ECF No. 186-12 (Santypal Decl.) ¶ 5, whatever information was transmitted was likely not an email. Ex. A (Schnell Rep.) ¶¶ 3, 5, 15-19, 100. Thus, Plaintiffs have failed to meet their burden of establishing that Zuffa actually disclosed Plaintiffs' hashed emails based on [redacted].[11]

### C. There Is No Evidence That Zuffa "Knowingly" Disclosed PII to Meta

The Opposition confirms Plaintiffs have no evidence that Zuffa "knowingly" disclosed PII to Meta. For there to be an actionable VPPA violation, Zuffa must have knowingly disclosed information that would "readily permit an ordinary person to identify a specific individual's video-watching behavior." *Eichenberger*, 876 F.3d at 985. "There are, in other words, three distinct elements here: the consumer's identity; the video material's identity; and the connection between them." *Hulu*, 86 F. Supp. 3d at 1095. Yet, even though Zuffa has given Plaintiffs all potentially relevant communications and multiple deponents, Plaintiffs have no evidence that Zuffa knowingly disclosed either c_user cookies (or any other alleged PII) *or* video titles, let alone a connection between the two. Instead, Plaintiffs attempt to manufacture disputed issues by arguing Zuffa *should have known* the Meta Pixel allegedly disclosed PII based on nothing more than Zuffa's use of the Meta Pixel, Zuffa emails generally discussing the Meta Pixel, and Meta's online documentation.[12] None of Plaintiffs' purported evidence is sufficient to create a genuine dispute of material fact.

#### 1. <u>Zuffa's Use of the Meta Pixel</u>

first argue that Zuffa knowingly disclosed PII to Meta "by installing the Pixel on all the Fight Pass Website video pages." Opp. at 20. But Zuffa's use of the Meta Pixel does not equate

---

[11] There is also no evidence that hashed emails were disclosed during the time period pre-dating Meta's production of Pixel data. Ex. A (Schnell Rep.) ¶ 15.

[12] As a threshold matter, Plaintiffs misstate the standard. Opp. at 21. Constructive knowledge is not sufficient to establish that Zuffa knowingly disclosed PII to Meta. Under the VPPA, the term "knowingly" connotes *actual* knowledge. Mot. at 20-21 (citing *In re Hulu*, 86 F. Supp. 3d 1095-97); *see also id.* at 1101-02 (finding that evidence of "what Hulu should have known . . . does not yield a genuine issue for trial" under the VPPA). The cases Plaintiffs rely on are inapposite because they do not address the meaning of the term "knowing" under the VPPA; they address different and irrelevant statutory schemes—i.e., federal immigration law and Washington criminal law, respectively. Opp. at 21 (citing *Aramark Facility Servs. v. Serv. Emps. Int'l Union, Loc. 1877, AFL CIO*, 530 F.3d 817 (9th Cir. 2008) & *Amaya v. Garland*, 15 F.4th 976 (9th Cir. 2021)).

to knowledge of what was sent to Meta. *See In re Hulu*, 86 F. Supp. 3d at 1102 (granting summary judgment where there was "no proof that anyone at Hulu saw [the c_user cookie], knew generally what c_user signified, or recognized '55431124' as a Facebook ID—the latter two things being far from obvious from the face of the data"). To the contrary, the record supports the opposite conclusion—Zuffa had no visibility into the data sent from a subscriber's browser to Meta in connection with Zuffa's use of the Pixel, and no knowledge the Pixel could potentially cause a subscriber's browser to send the c_user cookie to Meta. ECF No. 186-4 (Santypal Tr.) at 53:2-11.

Likewise, Plaintiffs have not (and cannot) identify a single piece of evidence that demonstrates Zuffa knew the "Page View" event would potentially disclose to Meta the titles of the videos its subscribers watched on the Fight Pass website. Plaintiffs do not (and cannot) cite to any internal Zuffa documents discussing efforts to use the Meta Pixel to track Fight Pass subscribers' video watch history, any advertising campaigns targeting Fight Pass subscribers based on the videos they watched on the Fight Pass website, or any reports from Meta to Zuffa about the videos Zuffa's subscribers watched on the Fight Pass website.[13]

This makes sense because Zuffa does ***not***, and never has, used the Meta Pixel to track its subscribers' watch history on Fight Pass. Mot. at 3-4, 22; ECF No. 186-12 (Santypal Decl.) ¶ 9; ECF No. 186-3 (Banks Tr.) at 138:20-139:19. Zuffa, as the owner and operator of Fight Pass, already has that information and considers it commercially sensitive. ECF No. 186-12 (Santypal Decl.) ¶ 9. Zuffa did not install Meta's pixel for this purpose, and it did not know that video titles were being sent to Meta in connection with Zuffa's use of the Pixel. ECF No. 186-4 (Santypal Tr.) at 41:1-15, 46:6-47:12, 77:16-22, 113:21-114:9, 124:8-19. Zuffa had no reason to believe the Meta Pixel was sending video titles to Meta in the first place. *Id.* at 44:18-45:5. The only reason the

---

[13] There is also no evidence that Zuffa knew (or could have known) of any "connection" between the c_user cookie and video titles. *Hulu*, 86 F. Supp. 3d at 1095. As Plaintiffs admit, [redacted]

Fight Pass website even included video titles in URLs at times during the proposed class period was to help link Google searches for UFC-related content to the Fight Pass website. *Id.* ¶ 6. These uncontested facts are dispositive.[14]

**2. Zuffa's Emails About the Meta Pixel**

Despite years of exhaustive discovery (Section IV), Plaintiffs can point to *only six* documents from Zuffa's production that they allege establish knowledge under the VPPA. ECF Nos. 205-4, 205-16, 205-18, 205-19, 205-20 (duplicate of 205-16), 205-21, 205-22. Plaintiffs grossly mischaracterize these documents.

Contrary to Plaintiffs' false claim that emails from Meta to Zuffa explained that the fbp cookie was used [redacted] Opp. at 23, the cited documents say nothing of the sort. [redacted] ECF No. 205-16 at ZUFFA0002392, ZUFFA0002394. [redacted]" ECF No. 205-19 at ZUFFA0001073-74. Moreover, Plaintiffs' description of the same email chain above as Zuffa [redacted] ECF No. 205-16 at ZUFFA0002392, ZUFFA0002394. The email chain says nothing about

[14] Plaintiffs cannot avoid summary judgment by claiming Zuffa's knowledge is "a credibility issue." Opp. at 2, 22. Indeed, "neither a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment." *Nat'l Union Fire Ins. Co of Pittsburgh, Pa. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) (affirming summary judgment); *see also Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 977 (9th Cir. 2001) ("A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment"). This is particularly true here given that Plaintiffs have already deposed Zuffa's witnesses and cannot point to a single document contradicting their testimony.

[redacted].

Notably, none of cited documents mention Facebook IDs, any cookie that allegedly contains a Facebook ID (like the c_user cookie), the "Page View" event sending video titles to Meta, or using the Meta Pixel to track what videos Fight Pass subscribers watch on the website. And aside from the single email chain discussed above, none mentions the fbp cookie or hashed emails. Instead, they corroborate testimony from Zuffa's witnesses that Zuffa used the Meta Pixel to measure the number of times Fight Pass subscriptions were purchased through its advertisements on Facebook (i.e., "conversions"). ECF No. 186-12 (Santypal Decl.) ¶¶ 7-8; ECF No. 205-19 at ZUFFA0001987 (describing a Pixel event as "any tracked conversion; a buy, a ticket sale, a subscription); ECF No. 205-19 (using "Add to Cart" as an example of a Pixel Event).[15]

### 3. <u>Meta's Online Documents</u>

Lacking any direct evidence of Zuffa's knowledge, Plaintiffs grasp at a handful of "instructions" from Meta's website to try to impute knowledge on Zuffa. Opp. at 21. But there is no mention in any of these documents of the Meta Pixel transmitting the Facebook ID or the c_user cookie. Nor is there any mention that the Page View event might transmit video titles. It is a gross overreach for Plaintiffs to argue, without any support, that general statements about "potentially sensitive information" and "responsible data handling" indicate Zuffa actually knew the Meta Pixel might cause the disclosure of PII under the VPPA.[16]

Moreover, Plaintiffs cannot impute Zuffa with knowledge of every document on Meta's website simply because Zuffa used "Meta's instructions" to set up the Meta Pixel. *See* Opp. at 21. Plaintiffs have no evidence that anyone at Zuffa read these documents, were aware of their

---

[15] Plaintiffs also have no evidence that Zuffa and Meta "conspired" to track Fight Pass subscribers, Opp. at 12-13, and Plaintiffs' reliance on inapposite cases in the criminal context (i.e., money laundering, arson, and murder) is misplaced.

[16] *See In re Hulu*, 86 F. Supp. 3d at 1101-02 ("[A] jury cannot be allowed to pass on liability based on broad hand waves toward what we all know, what we all expect about how our personal information moves around, and how things generally work in the age of the Internet. Triable claims must still be rooted in reasonably specific proof about what in fact was done here, what information was sent and connected here, and what [the defendant] actually knew about these things.").

existence, or even that they existed at the relevant times, such as when Zuffa began using the Meta Pixel on the Fight Pass website. *See, e.g.*, *Taylor v. List*, 880 F.2d 1040, 1045-46 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.").

For example, Plaintiffs claim, without support, that "Zuffa agreed to [Facebook's Business Tools Terms] when it adopted Meta's Pixel." Opp. at 20 (citing ECF No. 205-5). But the document Plaintiffs rely on is dated August 31, 2020, whereas the Meta Pixel has been on the Fight Pass website since at least 2018. 186-12 (Santypal Decl.) ¶ 7. Moreover, while Plaintiffs contend that this document "expressly noted that Zuffa was instructing Meta to match user's identities with their 'events,'" Opp. at 20, the statement Plaintiffs rely on is limited to "Contact Information," such as email addresses, that Facebook "will hash . . . prior to transmission." ECF No. 205-5 at 5; *see also* Ex. A (Schnell Rep.) ¶ 66. As demonstrated above, hashed emails are not PII. But even if hashed emails were considered PII (they are not), Plaintiffs have no evidence that Zuffa actually knew hashed emails (or any other alleged PII) might be connected to video titles from the Fight Pass website. As discussed above, PII under the VPPA is not only information that identifies an individual, it must also identify a specific individual's video-watching behavior. Without evidence that Zuffa knowingly disclosed video titles, and that Zuffa actually knew such video titles would be connected to a Fight Pass subscriber's identity, there can be no genuine dispute of material fact that Zuffa knowingly disclosed PII. *See Hulu*, 86 F. Supp. 3d at 1097.

## II. ZUFFA IS ALSO ENTITLED TO SUMMARY JUDGMENT ON THE CALIFORNIA CLAIMS

### A. California Civil Code § 1799.3

Plaintiff Bloom's arguments concerning his Section 1799.3 claim all fail. ***First***, Zuffa did not disclose any "personal information" or "the contents of any record" that Zuffa "prepared or maintained" to Meta. Cal. Civ. Code § 1799.3. As discussed above, there is no evidence that Zuffa disclosed a single [redacted] *See supra* Section I.B. That alone is dispositive. And even if Bloom had such evidence, the c_user cookie and hashed emails are not "personal information." *See supra* Section I.A. Nor

are the c_user cookie or hashed emails "prepared or maintained" by Zuffa. Rather, the c_user cookie is a *Facebook* cookie. Mot. at 23-24. And any hashed email would have come directly from Bloom's web browser, not from Zuffa's records. *See supra* Section I.B.

***Second***, Bloom fails to point to any evidence that Zuffa *willfully* disclosed his personal information or the contents of records to Meta. *See supra* Section I.C. Even if Bloom had evidence that Zuffa could have or should have known that such information could possibly be sent to Meta, that is not enough to survive summary judgment. Willfulness requires a showing of purpose or intent to commit an act. *See, e.g.*, Cal. Pen. Code § 7(b)(1). There is no evidence of that here.[17]

***Third***, there is no dispute that Bloom consented to Zuffa's Cookie Policy and Privacy Policy when he signed up for UFC Fight Pass. *See* Mot. at 24-25.[18] Bloom's arguments—that Section "1799.3 should be interpreted similarly" to the VPPA and that Zuffa's policies should be deemed meaningless because they do not specifically mention the Meta Pixel—are meritless. Section 1799.3 does not apply when a user provides "consent," and the statute does not impose additional consent requirements like the VPPA. Nor is there any requirement that a website provide detailed descriptions of the technological means by which information may be collected or disclosed. Likewise, Bloom's argument that Meta's data policies do not apply is misplaced. Section 1799.3(a) immunizes any disclosure of personal information based on written consent, and there is no requirement that such consent be obtained by the person or entity making the disclosure.

**B. California Constitution Invasion of Privacy**

Bloom's invasion of privacy claim also cannot survive summary judgment. ***First***, Bloom cannot establish that Zuffa intruded upon "a legally protected privacy interest" because he concedes that this claim relies entirely on his meritless VPPA and Section 1799.3 claims. It therefore fails for the same reasons. ***Second***, Bloom cannot establish a reasonable expectation of privacy. Indeed,

---

[17] Bloom's citation to *Safeco Ins. Co. of Am. v. Burr* does not change this result. 551 U.S. 47 (2007). Even if Section 1799.3 applied to reckless behavior (it does not), Bloom has failed to provide any evidence that Zuffa behaved recklessly. Likewise, unlike *Roybal v. Equifax*, 2008 WL 4532447 (E.D. Cal. Oct. 9, 2008), the question here is not whether Zuffa's conduct was "reasonable"; it is whether Bloom has shown that Zuffa *willfully* violated Section 1799.3. He has not.

[18] Bloom urges that his consent to these terms is a question of fact. But there is no dispute that Bloom checked a box expressly "confirm[ing] that [he had] read and agree[d]" to Zuffa's Cookie Policy and Privacy Policy. Nor is there any dispute about the content of those policies, which are clear about how Zuffa may use personal information.

Bloom does not address, much less refute, the authorities in Zuffa's Motion showing that invasion of privacy claims fail where the plaintiff, as here, repeatedly and expressly consented to the use and disclosure of his information. ***Third***, Bloom once again ignores that courts have consistently held that "routine commercial behavior," including disclosures of a user's browser history to third parties, does not amount to a serious invasion of privacy. Mot. at 27. Bloom's conclusory assertion that the alleged conduct here was "highly offensive" is plainly insufficient.

### C. California's Unfair Competition Law ("UCL")

***Unlawful and Unfair Prongs.*** Bloom acknowledges that his claims under the "unlawful" and "unfair" prongs are completely derivative of his VPPA and Section 1799.3 claims. Opp. at 27. Because those claims cannot survive summary judgment, Bloom's UCL claim fails as well.

***Fraud Prong.*** First, Bloom has failed to adduce any evidence that Zuffa shared his PII, much less that Zuffa "actively concealed" such conduct. *See supra* Section I.B. Second, Bloom does not deny that a duty to disclose only exists when a product or service contains a defect that relates to its central functionality. Mot. at 28. Instead, Bloom argues that the disclosure of his video viewing activity is "arguably" a central function of a streaming service. Opp. at 28. Not so: the central function of UFC Fight Pass is to provide UFC fans access to video content. Any disclosure of data is, at best, ancillary. Bloom next argues that the alleged "defect" here "was in the exclusive knowledge of Zuffa." Opp. at 28. But, again, a duty to disclose only exists when a service contains a defect that "relate[s] to the central functionality of the product." *Hodgson v. Mars, Inc.*, 891 F.3d 857, 863 (9th Cir. 2018). Bloom's final argument—that a duty to disclose should be implied by the VPPA's and Section 1799.3's consent provisions—is wholly unsupported.

## III. PLAINTIFFS LACK STANDING

Summary judgment should also be granted because Plaintiffs have failed to establish that they "suffered an injury in fact that is concrete, particularized, and actual or imminent[.]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Under binding Ninth Circuit law—which Plaintiffs ignore—Article III "requires a court to assess whether an individual plaintiff has suffered a harm that has traditionally been actionable in our nation's legal system." *Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025). Plaintiffs do not explain how their alleged injuries bear any

resemblance, much less a "close relationship," to a harm that is traditionally recognized under American law, as required. *Id.* at 789. Nor could they. To the extent Plaintiffs rely on their purported statutory violations, the Supreme Court has held that, under Article III, plaintiffs must demonstrate a "concrete harm" beyond a mere statutory violation. *TransUnion*, 594 U.S. at 427-28. Thus, Plaintiffs' conclusory reference to their statutory claims is insufficient.

In addition, Plaintiffs point to no evidence from which a rational trier of fact could reasonably infer that they suffered a traditionally actionable harm. Instead, Plaintiffs just contend that such "evidence does exist." Opp. at 28. But as shown above, none of the Plaintiffs have presented evidence sufficient to establish that Zuffa disclosed their PII.

## IV. PLAINTIFFS CANNOT STALL THIS CASE BY INVOKING RULE 56(D)

Rule 56(d) can only provide relief if a party opposing summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition . . . ." Fed. R. Civ. P. 56(d). "The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." *Arroyo v. Int'l Paper Co.*, 611 F. Supp. 3d 824, 830-31 (N.D. Cal. 2020). "The party seeking additional discovery also must demonstrate that he or she acted diligently to pursue discovery in the past." *Id.* at 830-31; *In re Fu*, 739 F. App'x 432, 434 (9th Cir. 2018) (affirming summary judgment where the opposing party had not taken any discovery in 15 months).

Plaintiffs ignore these standards and instead insist that additional discovery is necessary because Zuffa filed its Motion before the latest possible deadline. Plaintiffs' request is meritless in light of the discovery that has taken place over the past four years. Since filing this action on March 4, 2022, Plaintiffs have served, and Zuffa responded and objected to, 44 document requests and 8 interrogatories. Zuffa has produced nearly 1,000 documents, totaling 2,709 pages, from four custodians. Plaintiffs also obtained discovery from Endeavor Streaming, and six productions of Pixel data from Meta. Meta's production purports to include all available Pixel data for Plaintiffs, as well as Pixel data from three sample dates from the proposed class period that Plaintiffs chose. Rabbani Decl. ¶¶ 2-6.[19]

[19] Plaintiffs also argue they are "still waiting for complete responses to interrogatories directed to

Plaintiffs have also taken substantial deposition testimony in this case, including Zuffa's 30(b)(6) deposition and individual depositions of two Zuffa employees. Plaintiffs also deposed corporate representatives from Meta and Endeavor Streaming. All of these depositions were held years ago, in either 2023 or 2024. *Id.* ¶¶ 10.[20] Likewise, this case has also involved substantial expert discovery, with the parties exchanging, in total, *eight* expert reports. *Id.* ¶ 12. Plaintiffs argue they "have not had an opportunity to depose" Zuffa's expert about what they call a "new position he has set forth[.]" But Plaintiffs fail to identify any "new issue" that they wish to question Mr. Schnell about, much less that any new issue actually exists or would be essential to their opposition to this Motion. Plaintiffs also omit that they have already taken a full day deposition of Mr. Schnell and cross examined him during the May 14, 2025 evidentiary hearing—both times questioning him about the exact issues here. *Id.* ¶ 13.

Two final points. First, Plaintiffs did not ask—and to date have still not asked—for any additional discovery since Zuffa filed its Motion four months ago. Second, Plaintiffs have not requested any additional documents, noticed any depositions, or conducted essentially any discovery (aside from limited expert discovery) in this case since December 2023. *Id.* ¶¶ 14-15. Plaintiffs cannot abandon this case for years and then avoid summary judgment by vaguely suggesting that there "could" be evidence that might aid their defense. The Court should therefore deny Plaintiffs' Rule 56(d) application and grant summary judgment.

## **CONCLUSION**

For the foregoing reasons, Zuffa respectfully requests that the Court grant summary judgment in its favor on all of Plaintiffs' claims.

---

Zuffa's internal compliance efforts" and suggest they are seeking documents concerning VPPA compliance. But in October 2023, the Court ruled on Plaintiffs' motion to compel such discovery from Zuffa, and in December 2023, Zuffa advised Plaintiffs that, following a reasonably diligent search, Zuffa believes no non-privileged documents responsive to this request exist. *Id.* ¶ 7, 9. Zuffa also supplemented its interrogatory responses, and Plaintiffs have not asked for further supplement. *Id.* ¶ 8. If Plaintiffs had further questions, they should have raised them years ago.

[20] Plaintiffs complain that they "have only been allowed to depose two Zuffa employees" and suggest they may want to depose another Zuffa employee, Jordan Brown. But Plaintiffs omit that, in September 2023, Zuffa offered *multiple* dates for Mr. Brown's deposition. It was Plaintiffs who failed to notice it. *Id.* ¶ 11. And in any event, Plaintiffs have not met the threshold burden of showing that Mr. Brown's testimony would provide anything "essential" to their Opposition.

DATED: February 9, 2026

Respectfully submitted,

PAUL HASTINGS LLP

By: *s/ Susan K. Leader*
SUSAN K. LEADER

Attorneys for Defendant Zuffa, LLC

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on February 9, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List.

*/S/ SUSAN K. LEADER*
SUSAN K. LEADER

***Bloom, et al. v. Zuffa, LLC, et al.***
USDC of Nevada | Case No. 2:22-cv-00412-RFB-BNW

Index

| **Document** | **Exhibit** | **Page** | **Sealed** |
|---|---|---|---|
| Declaration of Ali R. Rabbani in Further Support of Defendant Zuffa, LLC's Motion for Summary Judgment | **Exhibit A** – Reply Expert Report of Ron Schnell, dated February 9, 2026, designated Highly Confidential | 1-55 | Filed Under Seal |
| | **Exhibit B** – Serge Egelman Deposition Transcript Excerpts, dated February 2, 2026, designated Highly Confidential | 56-103 | Filed Under Seal |