# Plaintiffs' Opposition to Defendant Zuffa's Motion for Summary Judgment

Redacted per Minute Order ECF No. 255

**MARKMAN LAW**
DAVID MARKMAN (Nevada Bar No. 12440)
David@Markmanlawfirm.com
4484 S. Pecos Rd., Suite #130
Las Vegas, NV 89121
Telephone: (702) 843-5899
Facsimile: (702) 843-6010

**GUTRIDE SAFIER LLP**
SETH A. SAFIER (admitted *pro hac vice*)
seth@gutridesafier.com
MARIE A. MCCRARY (admitted *pro hac vice*)
marie@gutridesafier.com
HAYLEY REYNOLDS (admitted *pro hac vice*)
hayley@gutridesafier.com
ANTHONY J. PATEK (admitted *pro hac vice*)
anthony@gutridesafier.com
KALI R. BACKER (admitted *pro hac vice*)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| EVERETT BLOOM, JACK GRAHAM, and DAVID LINDHOLM, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ZUFFA, LLC; ENDEAVOR STREAMING, LLC; and ENDEAVOR GROUP HOLDINGS, INC.<br><br>Defendants. | Case No. 2:22-cv-00412-RFB-BNW<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT ZUFFA, LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>District Judge Richard F. Boulware, II<br><br>No hearing set |

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

  A. Plaintiffs Subscribed to Zuffa's Fight Pass, a Video Subscription Service. ........ 3

  B. Zuffa Shared Plaintiffs' Video Rentals with Meta Platforms in a Personally-Identifiable Manner, Without Lawful Consent. ........ 4

III. ARGUMENT ........ 7

  A. Legal Standard. ........ 7

  B. There is a Triable Issue of Fact as to Whether Zuffa Violated the VPPA. ........ 8

    1. Reasonable jurors could find that Zuffa disclosed personally-identifiable information. ........ 8

      a) There is evidence Zuffa sent user's Facebook IDs. ........ 11

      b) There is evidence Zuffa sent user's emails. ........ 16

      c) Zuffa correlated all videos to specific individuals. ........ 17

    2. Reasonable jurors could find that Zuffa did so knowingly. ........ 19

  C. There Are Triable Issues of Fact Whether Zuffa Violated California Law. ........ 23

    1. California Civil Code § 1799.3. ........ 23

    2. California constitutional invasion of privacy. ........ 26

    3. California UCL Claim. ........ 27

  D. The Plaintiffs Have Standing. ........ 28

  E. In the Alternative, This Court Should Deny the Motion Pursuant to Rule 56(d) or Defer Its Ruling Until After Discovery Is Complete. ........ 29

IV. CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505 (1986) .......... 22

*Archer v. NBC Universal Media, LLC*,
794 F. Supp. 3d 716 (C.D. Cal. 2025) .......... 10

*Arroyo v. TP-Link USA Corp.*,
No. 5:14-cv-04999-EJD, 2015 U.S. Dist. LEXIS 133473 (N.D. Cal. Sep. 29, 2015) .......... 28

*ASUS Comput. Int'l v. Round Rock Research, LLC*,
No. 12-cv-02099-JST, 2013 U.S. Dist. LEXIS 145824 (N.D. Cal. Oct. 8, 2013) .......... 30

*Balestrieri v. SportsEdTV, Inc.*,
No. 25-cv-04046-SK, 2025 U.S. Dist. LEXIS 194373 (N.D. Cal. Sep. 16, 2025) .......... 14

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024) .......... 28

*Burlington N. Santa Fe R.R. Co. v. Assiniboine and Sioux Tribes of Fort Peck Reservation*,
323 F.3d 767 (9th Cir. 2003) .......... 29

*Cappello v. Walmart Inc.*,
394 F. Supp. 3d 1015 (N.D. Cal. 2019) .......... 27

*Cappello v. Walmart Inc.*,
No. 18-cv-06678-RS, 2019 U.S. Dist. LEXIS 237326 (N.D. Cal. Apr. 5, 2019) .......... 10

*Chabolla v. Classpass, Inc.*,
129 F.4th 1147 (9th Cir. 2025) .......... 25

*Davis v. Facebook, Inc. (In re Facebook Inc. Tracking Litig.)*,
956 F.3d 589 (9th Cir. 2020) .......... 26, 27

*Edwards v. Mubi, Inc.*,
773 F. Supp. 3d 868 (N.D. Cal. 2025) .......... 25

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... passim

*Garcia v. Bandai Namco Ent. Am. Inc.*,
No. 8:25-CV-00967-DOC-PVC, 2025 U.S. Dist. LEXIS 152616, 2025 WL 2451033 (C.D. Cal. Aug. 7, 2025) .......... 14

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023) .......... 10

*Graham v. Noom, Inc.*,
533 F. Supp. 3d 823 (N.D. Cal. 2021) .......... 26

*Hughes v. National Football League*,
No. 24-2656, 2025 WL 1720295 (2d Cir. June 20, 2025) .......... 13

*In re Google Location Hist. Litig.*,
428 F. Supp. 3d 185 (N.D. Cal. 2019) .......... 26

*In re Hulu Privacy Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......... 18, 19

*In re Hulu Privacy Litig.*,
No. C 11-03764 LB, 2014 U.S. Dist. LEXIS 59479 (N.D. Cal. Apr. 28, 2014) .......... 20

*In re Nickelodeon Consumer Privacy Litig.*,
827 F.3d 262 (3d Cir. 2016) ........ 9, 16

*Lee v. Plex, Inc.*,
773 F. Supp. 3d 755 (N.D. Cal. 2025) ........ 10, 14

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) ........ 28

*Long v. Johnson*,
736 F.3d 891 (9th Cir. 2013) ........ 12

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 28

*Mullins v. Premier Nutrition Corp.*,
178 F. Supp. 3d 867 (N.D. Cal. 2016) ........ 8

*Munoz v. Cal. Dep't of Corr. & Rehab.*,
No. 1:16-cv-01103-LJO-JLT (PC), 2018 U.S. Dist. LEXIS 213877
(E.D. Cal. Dec. 19, 2018) ........ 29

*Roybal v. Equifax*,
No. 2:05-cv-01207-MCE-KJM, 2008 U.S. Dist. LEXIS 79789 (E.D. Cal. Oct. 9, 2008) ........ 24

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007) ........ 24

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) ........ 13, 14, 15

*Stark v. Patreon, Inc.*,
No. 22-cv-03131-JCS, 2022 U.S. Dist. LEXIS 187602 (N.D. Cal. Oct. 13, 2022) ........ 10

*Stegall v. Citadel Broad. Co.*,
350 F.3d 1061 (9th Cir. 2003) ........ 8

*United States v. Candoli*,
870 F.2d 496 (9th Cir. 1989) ........ 12, 13

*United States v. Doe*,
842 F.3d 1117 (9th Cir. 2016) ........ 12

*United States v. Jaimez*,
45 F.4th 1118 (9th Cir. 2022) ........ 12, 13

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ........ 10

**Statutes**

18 U.S.C. § 2710(a)(3) ........ 8, 9

18 U.S.C. § 2710(b)(1) ........ 8, 19, 20

Cal. Bus. & Prof. Code § 17200 ........ 27

Cal. Civ. Code § 1799 ........ 3

Cal. Civ. Code § 1799.3 ........ passim

Cal. Civ. Code § 1799.3(a) ........ 23, 24

**Other Authorities**

Senate Report 100-599 at 12 ........ 8

**Rules**

Fed. R. Civ. P. 12(b)(6)........ 13, 14
Fed. R. Civ. P. 56(a) ........ 7, 14
Fed. R. Civ. P. 56(d) ........ 29

# I. INTRODUCTION

The Court should deny Defendants' motion for partial summary judgment. The motion is not only premature—coming well before both the close of fact discovery and the start of expert discovery—but based entirely on a self-serving, mistaken selection of facts. To date, Plaintiffs have adduced ample evidence that Zuffa's Fight Pass website transmitted the titles of the videos its users watched to third party Meta Platforms, Inc. ("Meta") in a personally identifiable manner. Indeed, Meta produced tens of thousands of lines of data confirming that Zuffa not only transmitted users' video "rentals," but did so in a way that identified the individuals. In short, Plaintiffs have collected evidence more than sufficient to withstand summary judgment.

Zuffa's motion for summary judgment essentially repackages the same arguments that it presented in opposition to Plaintiffs' motion for class certification. It should be denied for many of the same reasons. Zuffa's arguments are specious.

First, Zuffa rehashes the tired argument that it played no role in causing or knowledge of its disclosure of its subscriber video views to Meta. This argument is easily disposed of. Zuffa's inclusion of the Meta pixel in the Fight Pass website was a clear "but for" cause of the unlawful data sharing, and there is evidence that it did so specifically so that it and Meta could track what Zuffa's subscribers were doing, including what videos they watched that led to purchases. Zuffa's role is even more obvious for data transmissions that occurred after Zuffa's adoption of Meta's Conversions API, which required Zuffa to create a first-party cookie based on code provided by Meta for the express purpose of undermining its subscribers' attempts to protect their privacy, and which resulted in Zuffa's servers transmitting the information directly to Meta.

Similarly, Zuffa's arguments that any data shared was not personally identifiable regurgitate the same positions argued in the motion for class certification. Zuffa argues that there is no evidence the c_user cookie was transmitted, but this argument fatally relies on the absence of the c_user cookie in the data Meta produced. But Meta acknowledged that it simply did not record whether it received the c_user cookie, so its absence from Meta's records of the pixel data does not prove Zuffa did not transmit it. And there is other evidence that Zuffa transmitted the c_user cookie to Meta. This includes not only testimony from Plaintiffs' experts Rebecca Herold

and Serge Egelman, but Zuffa's admission in an "illustrative" example of a GET request from the ufcfightpass.com "welcome" page in its motion that the c_user cookie is transmitted. From this evidence, a reasonable jury could conclude that Zuffa did transmit the c_user cookie. There is also clear evidence that Zuffa transmitted PII in the form of its subscribers' email addresses, which Zuffa routinely transmitted with the fbp cookie in order to link all of its data transmissions together in a personally identifiable manner. As the testimony of Plaintiffs' experts makes clear, both Zuffa and Meta are banking on the fact that Zuffa's data transmissions are personally-identifiable, and any person who wished to identify Zuffa's subscribers via their hashed names and emails could easily do so using publicly available services.

The only new argument that Zuffa presents is that the data it transmits is not personally identifiable because it is transmitted in computer-readable "encoded" form, which it contends ordinary people cannot read. This argument, which is based on a recent, poorly reasoned decision by the Second Circuit, is neither binding nor convincing. Moreover, it facially exempts all disclosure via electronic means from the VPPA, since all electronic communications—including the PDF of this brief—are "encoded" in computer-readable forms. All such communications, including the GET requests at issue here, are easily read by ordinary people in plain text format using common, off-the-shelf software such as Google Chrome.

Similarly, Zuffa's assertion that there is no evidence it intended to transmit its users' video rentals to Meta misstates both the facts and the law. Again, Zuffa's intentional inclusion of the Meta pixel and later update to Meta's Conversions API shows that Zuffa not only knew it was allowing tracking of users' video views in a personally-identifiable manner, but intended to facilitate that tracking. A jury could reasonably conclude that Zuffa intended to perform the acts that violated the law, despite Zuffa's self-serving assertion of ignorance and subsequent innocence. Ultimately, this boils down to a credibility issue, which is a fact-intensive question specifically reserved for jurors. Granting summary judgment on Zuffa's intent based solely on its self-serving claim of innocence is inappropriate under controlling law.

Zuffa's motion for summary judgment of Plaintiff Bloom's California law claims is similarly unpersuasive. Most of its arguments are identical to those it presented for the VPPA

and are wrong for the same reasons. Zuffa also misreads the plain language of California Civil Code § 1799.3, and repeatedly ignores the fact that both federal and California law codify a right to privacy in video rental and viewing, which clearly supports Plaintiffs' invasion of privacy claims.

For all these reasons and more, the Court should deny Zuffa's motion.

## II. BACKGROUND

### A. Plaintiffs Subscribed to Zuffa's Fight Pass, a Video Subscription Service.

Zuffa's Fight Pass Website is a streaming service for mixed martial arts video content. ECF 186-12 (Santypal Decl.), ¶ 3 & 5–6. Subscribers can access on-demand video content on Fight Pass via a computer or mobile device. *Id.* Subscribers watch the video content by logging into the Fight Pass Website on a computer or mobile device.[1] *See e.g.,* Santypal Decl. (ECF 186-12), ¶¶ 3, 5; Patek Decl. in Support of Class Certification "("PDCC") (ECF 53-1), Ex. 1; Ex. 2 at 1439. The Fight Pass Website displays each on-demand video via a "video page." PDCC (ECF 53-1), Exs. 4–9; Ex. 10 (Sanytpal Tr.) at 35:23–36:19; Herold Decl. in Support of Class Certification ("HDCC") (ECF 53-31), ¶¶ 46–61. From March 3, 2018 to December 5, 2019 and October 1, 2020 to June 3, 2022, each video page had a website address (i.e., "URL") in the form of "ufcfightpass.com/video/[title]," where "[title]" is the title of the on-demand video the user is requesting to view. Santypal Decl. (ECF 186-12), ¶ 6; HDCC (ECF 53-31), ¶ 75; PDCC (ECF 53-1), Ex. 3 at 8; Ex. 10 at 37:8–39:6. [redacted] in the United States and California watched Fight Pass videos during the proposed class period. PDCC (ECF 53-1), Ex. 3 at 8.

Plaintiffs are former Fight Pass subscribers: Plaintiff Bloom from August 2019 to August 2022 (with small gaps); Plaintiff Graham from mid-2020 to October 2022 (also with small gaps); and Plaintiff Lindholm from January 2022 to April 2023. ECF 106 (Zuffa Opp. to Class Cert.), Ex. C (Bloom Tr.) at 51:11–13, 65:2–4; Ex. E (Lindholm Tr.) at 61:17–24, 64:24–65:11, Ex. G (Graham Tr.) at 54:15–55:16; Patek Decl., Ex. 1 (Lindholm Tr.) at 58:7–23. Each of the Plaintiffs

---

[1] Subscribers can also access content through SmartTVs and a Fight Pass application, but Plaintiffs limit the Class to users who accessed video content using the Fight Pass Website.

also had a Facebook account (and in some cases, Instagram account as well), and had not changed the default setting from "keep me logged in." *See, e.g.*, Patek Decl., Ex. 2 (Bloom Tr.) at 107:7–20; Ex. 3 (Graham Tr.) at 92:19–93:22; Ex. 1 (Lindholm Tr.) at 99:20–100:5, 106:1–24, 109:25–110:18. Plaintiffs Graham and Lindholm generally viewed videos on the Fight Pass Website using Google Chrome browser, either on their computer (Graham) or phone (both). Patek Reply DCC, Ex. 25 (META_BLOOM_0001; ECF 122-2) (also submitted by Zuffa as Rabbani Decl. iso MSJ, Ex. 6). Plaintiff Bloom used Chrome, Firefox, and Brave browsers. *Id.*; Patek Decl., Ex. 2 at 79:10–17. Only Plaintiff Graham had installed any cookie blocking extensions to his Chrome browser, and he testified that he turned it off. Zuffa Opp. to CC (ECF 106), Ex. K at 8. None of the Plaintiffs had turned off Facebook's "Off-Facebook Tracking" feature. *See* ECF 122-2 (META_BLOOM_0001); ECF 122-3 (Wooldridge Tr.) at 87:21–90:6, 158:20–160:8.

### B. Zuffa Shared Plaintiffs' Video Rentals with Meta Platforms in a Personally-Identifiable Manner, Without Lawful Consent.

Zuffa transmitted its users' video views to third party Meta Platforms Inc. (a.k.a., Facebook). More specifically, Zuffa configured the ufcfightpass.com website so that, when subscribers viewed Fight Pass videos, the website caused the users' browsers to transmit to Meta the subscriber's Facebook ID and/or email address, and the video title they were viewing. Herold Decl. in Support of Class Certification ("Herold DCC") (ECF 53-31), ¶¶ 12, 96–106; Herold Reply Decl. in Support of Class Certification ("Herold Reply DCC") (ECF 122-8), ¶¶ 2–87; Egelman Decl. in Opposition to Mot. Summary Judgment ("Egelman Decl."), ¶¶ 9–12; Herold Decl. in Opposition to Mot. Summary Judgment ("Herold Decl."), ¶¶ 1–75.

Zuffa did this by installing several Meta pixels (the "Meta Pixels") into its website. Santypal Decl. (ECF 186-12), ¶¶ 7–12; Egelman Decl., ¶¶ 27, 49, 65, 87–112, 140–178; Herold Decl., ¶¶ 4, 16–17; Herold DCC (ECF 53-31), ¶¶ 12, 62–95; Patek DCC (ECF 53-1), Exs. 4–9; Ex. 10 (Santypal Tr.) at 35:23–36:19. Each Meta Pixel is software code developed by Meta for the express purpose of tracking website users' activity. Patek Decl., Ex. 5 (Meta Business Tools Terms: "You instruct us to process the Contact Information solely to match the Contact

Information ***against user IDs*** (“***Matched User IDs***”), as well as ***to combine those user IDs with corresponding Event Data***.”) (emphasis added). The Meta Pixels associated with the fightpass.com website are specific to that website, and Zuffa registered each pixel with Meta, pursuant to Meta’s general Terms of Service, Business Tools Terms of Service, and Commercial Terms of Service. Herold Decl., ¶¶ 27–44; Egelman Decl., ¶¶ 25, 49, 84–112; Patek Decl., Exs. 4–9; Zuffa’s Opp. to Motion for Class Certification (ECF 106), Exs. HH & KK. Zuffa included the Page View event that triggered the Meta Pixel to “fire” when Zuffa installed the code. Santypal Decl. (ECF 186-12), ¶¶ 11–12. From at least March 2018 to June 3, 2022, Zuffa configured the Meta Pixel “to fire (i.e., operate) on all pages of the Fight Pass website,” *id.*, including whenever a Fight Pass subscriber viewed a UFC video via their computer or mobile device. Egelman Decl., ¶¶ 97 & 147–150; Herold Decl., ¶¶ 4–17; Herold DCC (ECF 53-31), ¶¶ 12, 62–106; Patek DCC, Ex. 10 (Santypal Tr.) (ECF 53-23) at 37:8–39:6.

When it fired, the Meta Pixel transmitted the URL being visited (i.e., the video title) and one or more unique identifiers for the subscriber to Meta Platforms, allowing Meta to track each user’s video viewing and browsing behavior. Egelman Decl., ¶¶ 147–154; Herold Decl., ¶¶ 16–17, 45–75; Herold DCC (ECF 53-31), ¶¶ 62–63, 76, 83–86, 91; Patek Decl., Exs. 10–15 (Meta Pixel Data partial production for proposed class)[2]. At all relevant times, for any Fight Pass subscribers who also had a Facebook or Instagram account, Meta set the c_user and fr cookies on users’ computers, both of which contained the user’s Facebook ID, either in a plain text (c_user) or encrypted (fr cookie) form.[3] Egelman Decl., ¶¶ 101–108, 147–151; Herold Decl., ¶¶ 4–17, 45–63. Facebook IDs are personally-identifiable data, because one can use a Facebook ID to identify a person. Egelman Decl., ¶¶ 103–104; Herold Decl., ¶ 14; Herold DCC (ECF 53-31), ¶ 75. Zuffa’s website transmitted these Facebook IDs to Meta as part of a GET request,

---

[2] This is the data Meta produced for the three dates Plaintiffs selected, as ordered by the Court for the evidentiary hearing. The data was produced as three spreadsheets: META_BLOOM_0004, -0005, and -0006. Plaintiffs also provide three filtered spreadsheets, limited to video data (META_BLOOM_0004a, -0005a, and -0006a), with counts of events of interest included (e.g., number of events with video titles and email, etc).

[3] Cookies are “first party” or “third party.” First party cookies are those identified as belonging to the website being visited (i.e., ufcfightpass.com). Third party cookies are identified as belonging to other website domains (e.g., facebook.com).

along with the URL of the page being viewed, which included the video title. Egelman Decl., ¶¶ 144, 157 & 165; Herold Decl., ¶¶ 45–63; Herold DCC (ECF 53-31), ¶ 68. Zuffa also enabled "advanced matching" for the Pixel, which routinely caused it to transmit the user's email, zip code, and last name under certain circumstances, such as when users joined or logged in to Fight Pass. Egelman Decl., ¶¶ 129–133, 141–143; Herold Decl., ¶¶ 64–69; Patek Decl., Ex. 14 at ZUFFA0002392 (Meta email to Zuffa, suggesting Zuffa increase its transmission of emails, last names, and zip codes (i.e., advanced matching)); Ex. 15 (Meta instructions on use of "advanced matching" to match actions to individual Meta users (i.e., to identify specific users)).

At all relevant times during this lawsuit, unless blocked by third party cookie blocking technology (which there is no evidence of), the Pixel transmitted to Meta the unique identifiers as described above. Egelman Decl., ¶¶ 102–112; Herold Decl., ¶¶ 22–26, 72. If the user had an active Facebook or Instagram account, this included the c_user cookie (unless the user had logged out) and fr_cookie (if the user had logged into Facebook within the past 3 months), both of which contain the visitor's Facebook ID. Egelman Decl., ¶¶ 105–107, 148–151, 170–171; Herold Decl., ¶¶ 22–26, 72.

Starting in late 2021, Zuffa additionally integrated Meta's Conversions API into its websites, which allowed Zuffa to bypass many of its subscribers privacy measures. Herold DCC, ¶¶ 41–45, 65, 70; Patek Decl., Exs. 16–20 (Zuffa emails discussing integration of Conversions API). The Conversions API converted Meta's third party fbp cookie into a Zuffa cookie. *Id.* Even though Meta created the fbp cookie code and supplied it to Zuffa, Zuffa placed the fbp cookie on the subscriber's computing device and associated with the ufcfightpass.com website, making it a "first party" cookie. Egelman Decl., ¶¶ 21–30, 109–129; Herold Decl., ¶¶ 46–48; Patek Decl., Ex. 20. Conversions API then sent data to Meta indirectly through Zuffa's servers. *Id.* This bypassed any privacy or anti-tracking measures its subscribers may have implemented based on third party cookies. *Id.* The fbp cookie allowed Zuffa to link all the data it was transmitting to Meta to a single persistent identity. Egelman Decl., ¶¶ 20, 31–40, 110–129; Herold Decl., ¶¶ 46–62.

This additionally allowed Zuffa to link *all* transmissions in a personally-identifiable manner, so long as the third party c_user or fr cookie or the user's email had been previously transmitted. Egelman Decl., ¶¶ 125 & 144–154; Herold Decl., ¶¶ 45–63, 70–75; Patek Decl., Exs. 20. In essence, Zuffa adopted a system where each transmission identified the Zuffa subscriber with a codename (e.g., "user 12345"), and then periodically linked that codename to a specific identity (e.g., the user's Facebook ID or email address). Egelman Decl., ¶¶ 175–178. In many cases, a single packet contained both the video title and the user's Facebook ID. Patek Decl., Exs. 8–13. In others, the video title would be transmitted in one data "packet" with the user's fbp cookie, then their Facebook ID would be transmitted in a separate, contemporaneous data "packet." Egelman Decl., ¶¶ 125, 144–154, and 172–175; Herold Decl., ¶¶ 45–63.

Because Zuffa registered and used at least four Meta pixels, and set up multiple "Events" that caused those cookies to trigger, Zuffa transmitted numerous "packets" of data to Meta each time a Fight Pass subscriber viewed a Fight Pass video. Egelman Decl., ¶¶ 140, 170, and 175–8; Herold Decl., ¶¶ 45–63. This routinely included alternate unique identifiers and items of data. *Id*. Thus, for example, a single viewing event often resulted in two or more associated data transmissions. For most users, Zuffa transmitted hundreds or even thousands of data points to Meta. Patek Decl., Exs. 8–13; Egelman Decl., ¶¶ 112, 175–178; Herold Decl., ¶¶ 24–25, 63. These distinct data "events" were all linked to the same user by the fbp value, thereby identifying the specific individual to Meta. Egelman Decl., ¶¶ 141, 171, and 175–8; Herold Decl., ¶¶ 46–51. Furthermore, an ordinary person presented with the complete set of information transmitted would be able to recognize that the video title was associated with a specific Facebook ID whether it was presented in the same "line" or "packet" of data or not, because all related "events" would be linked by the same fbp, Facebook ID, and email values. Egelman Decl., ¶¶ 35, 39, 53, 56, 77–83, 140–147, 175–178; Herold Decl., ¶¶ 45–63.

## III. ARGUMENT

### A. Legal Standard.

A party is entitled to summary judgment only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"The party who seeks summary judgment bears the initial responsibility of identifying an absence of a genuine issue of material fact." *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 887 (N.D. Cal. 2016). In response, "the non-moving party must present specific facts showing that there is a genuine issue for trial." *Id.* "A genuine issue exists if the non-moving party presents evidence from which a reasonable fact-finder, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor." *Id.* Finally, "the evidence of the [nonmoving party] is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in the light most favorable to [them]." *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003) (internal quotations omitted).

**B. There is a Triable Issue of Fact as to Whether Zuffa Violated the VPPA.**

The VPPA makes it unlawful for a "video tape service provider" to "knowingly disclose[], to any person, personally identifiable information concerning any consumer." 18 U.S.C. § 2710(b)(1). It defines "personally identifiable information" to "include[] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The legislative history for the VPPA notes that "paragraph (a)(3) uses the word 'includes' to establish a minimum, but not exclusive, definition of personally identifiable information." Senate Report 100-599 at 12.

Zuffa's motion for summary judgment focuses on Plaintiffs' ability to prove two elements of the VPPA: disclosure of "personally identifiable information," and whether any such disclosure was done "knowingly." The evidence adduced to date establishes Plaintiffs can prove both elements.

**1. Reasonable jurors could find that Zuffa disclosed personally-identifiable information.**

The VPPA defines "personally identifiable information" to "include[] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). This includes both information that, "by itself, identifies an individual as having watched certain videos," and "information that is 'capable of' identifying a person." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984–85 (9th Cir.

2017). As the Ninth Circuit noted in *Eichenberger*, Congress' use of "includes" in § 2710(a)(3) was open ended, as was its use of "identifiable" rather than "identifying." *Eichenberger*, 876 F.3d at 984. Thus, "personally identifiable information" is not limited just to an explicit name.

The Ninth Circuit applies an "ordinary person" standard to "personally identifiable information." *Id*. at 985. Under this standard, information that "readily permits an ordinary person to identify a particular individual as having watched certain videos" is "PII." *Id.* The focus of the ordinary person is on what the party sharing the information disclosed, not what the receiving party actually did with it. If the disclosing party referred only to "a local high school teacher," that is not PII because the disclosing party did not specify an individual. In contrast, if the disclosing party sent information indicating that "CODENAME X" watched specific videos, and a separate "lookup table" disclosing that the "CODENAME X" is "Everett Bloom," that is PII, because the sender is clearly specifying that Everett Bloom watched the videos in question. At the same time, what the recipient actually does with the information is not controlling. Thus, the fact that the recipient never actually used the lookup table in the example above would not prevent the disclosure from being PII.

*In re Nickelodeon*—which set forth the "ordinary person" standard later adopted by the Ninth Circuit—described "personally identifiable information" as a "spectrum":

> At one end of the spectrum, of course, is a person's actual name. Then there are pieces of information, such as a telephone number or a physical address, which may not by themselves identify a particular person but from which it would likely be possible to identify a person by consulting publicly available sources, such as a phone book or property records. Further down the spectrum are pieces of information, like social security numbers, which are associated with individual persons but might not be easily matched to such persons without consulting another entity, such as a credit reporting agency or government bureau.

*Id.*, 827 F.3d 262, 282–283 (3d Cir. 2016). *Nickelodeon* then held that "static digital identifiers"—such as IP addresses—fell "even further down the spectrum" because "[t]o an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person." In adopting *Nickelodeon*, the Ninth Circuit expressly noted that "modern technology may indeed alter—or may already have altered—what qualifies [as PII]

under the [VPPA]. A Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual." *Eichenberger*, 876 F.3d at 986.

Thus, whether disclosed information is PII or not under the VPPA hinges on its specificity, accessibility to the public, and whether the disclosing party does so in combination with other PII. The combination of GPS location and unique device identifier is considered PII under the "ordinary person" standard, since "most people" could correlate a GPS location with a user's physical address. *See Eichenberger*, 876 F.3d at 986 (applying "ordinary person" standard to facts previously deemed PII under "reasonable foreseeability" standard), quoting *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). In contrast, neither IP addresses nor Roku device identifiers, standing alone, are PII under the VPPA, since neither can be directly correlated to a specific person using information available to the public. *See Eichenberger*, 876 F.3d at 986 (Roku serial number not PII under VPPA) and 985 (citing *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 284 (3d Cir. 2016) (same, for IP address).

The Facebook ID is personally identifiable data. *See Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 772 (N.D. Cal. 2025) ("Consistent with the great weight of authority, this Court agrees that a Facebook ID is personally identifiable information for purposes of the VPPA. . . ."); *Archer v. NBC Universal Media, LLC*, 794 F. Supp. 3d 716 (C.D. Cal. 2025) ("Defendants disclosed Plaintiffs' identity by transmitting their [Facebook IDs] to Meta along with information on the video materials."); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 717 (N.D. Cal. 2023) ("This Court agrees that a FID can constitute PII where it leads to a Facebook page that discloses personal and identifying information about the consumer."); *Cappello v. Walmart Inc.*, No. 18-cv-06678-RS, 2019 U.S. Dist. LEXIS 237326, at *6 (N.D. Cal. Apr. 5, 2019) (VPPA applies to Facebook ID); *Stark v. Patreon, Inc.*, No. 22-cv-03131-JCS, 2022 U.S. Dist. LEXIS 187602, at *25 (N.D. Cal. Oct. 13, 2022) (Facebook ID is PII under VPPA). Anyone can identify someone with a Facebook ID by going to the URL www.facebook.com/[*FacebookID*] which reveals the person's Facebook profile. *Ghanaat*, 689 F. Supp. 3d at 717 ( "If appended to the URL 'facebook.com/' [a Facebook ID] will lead to the associated user's Facebook page."); Egelman Decl., ¶ 101; Herold Decl., ¶ 14.

Here, there is a genuine dispute whether Zuffa transmitted PII, which a jury must decide. Zuffa does not contest that it disclosed video titles watched by Plaintiffs Graham and Lindholm, as well as other class members. *Cf.* MSJ at 2 & 23 (arguing only that no video titles were present in Meta's produced data for Bloom). Zuffa disputes only that it did so in a personally identifiable manner. But Plaintiffs have presented evidence that Zuffa transmitted both the c_user cookie and its user's email addresses, both of which personally identify the users to ordinary people.

***a) There is evidence Zuffa sent user's Facebook IDs.***

A reasonable jury could conclude that Zuffa's website transmitted users' Facebook IDs. In its motion, Zuffa admits that the Fight Pass "welcome" page transmits users' Facebook IDs in the c_user cookie, and submits that this is "illustrative" of how its video pages worked prior to Zuffa turning off the Meta Pixel for its video pages. *See* MSJ at 10 n.7 ("The Meta Pixel is no longer active on video pages on the Fight Pass website, so this example [showing the format in which fightpass.com transmitted the c_user cookie if present] is taken from the Fight Pass welcome page (https://welcome.ufcfightpass.com/region/united-states) for illustrative purposes."). Additionally, Plaintiffs' experts Rebecca Herold and Serge Egelman independently confirmed that the Fight Pass website continues to transmit the c_user cookie for non-video pages. Egelman Decl., ¶¶ 148–154; Herold Decl., ¶¶ 4–17. Since the video pages operated identically to non-video pages during the class period (i.e., prior to Zuffa excluding video pages from the Pixel's data collection), jurors could reasonably conclude that the video pages transmitted the c_user cookie and the Facebook ID contained therein. Furthermore, Meta's pixel data productions confirm that Zuffa's website transmitted third party cookies to Meta, and Meta's representative Tobias Wooldridge confirmed that, if any third party cookies were transmitted by Zuffa (i.e., were not blocked), the c_user cookie would presumably have been transmitted as well. Herold Reply Decl. in Support of Class Certification ("Herold Reply DCC") (ECF 122-8), ¶ 54, citing Wooldridge Tr. (ECF 122-3) at 130:16–131:22 and 138:6–139:8.

From these facts alone, jurors could reasonably infer that the Fight Pass website transmitted the c_user cookie during the class period. Since the current website runs the same pixel code used for video pages during the class period (as Zuffa admits), this confirms that

viewing a video page during the class period would have done the same. This is particularly true once the Court makes reasonable inferences in Plaintiffs' favor, such as assuming that any cookie blockers used would have blocked all third party cookies, and that Plaintiffs fall within the large majority (over 90%) of Facebook users who routinely remain logged into Facebook even after they have closed the browser window, as the Plaintiffs' themselves have testified.

Zuffa's defense relies on the false assumption that, because Meta did not record any c_user cookies as "match keys" (i.e., as the data Facebook actually used to identify individuals), that means Zuffa never sent the c_user cookie. But Meta's failure to record the c_user cookies does not prove that Zuffa never sent them. Moreover, under *Eichenberger*, 876 F.3d at 985, the controlling inquiry is whether an ordinary person *could* have identified whose video rentals Zuffa was disclosing using the transmitted Facebook IDs in the c_user cookies, not whether Meta actually did so. *Id.* (The "ordinary person" standard applied by the VPPA "looks to what information a video service provider discloses, not to what the recipient of that information decides to do with it"). And as the expert testimony of Rebecca Herold and Serge Egelman, as well as the weight of authority in this Circuit, make clear, ordinary people could look up the user's identity on the Facebook website and easily connect the disclosed videos to the Plaintiffs and other class members.

Ultimately, Zuffa's motion boils down to the specious—and repeatedly rejected—argument that a defendant cannot be found guilty or liable based on circumstantial evidence. *See United States v. Jaimez*, 45 F.4th 1118, 1127 (9th Cir. 2022) ("Indeed, we have long held that conspiracies can be proven based on the reasonable inferences drawn from circumstantial evidence"); *United States v. Candoli*, 870 F.2d 496, 511 (9th Cir. 1989) (same); *United States v. Doe*, 842 F.3d 1117, 1121 (9th Cir. 2016) (holding that repeated submission of information can be circumstantial evidence of knowledge such information is being submitted for an unlawful purpose); *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (even a conviction for murder may rest on circumstantial evidence).

For example, in *Candoli*, the Ninth Circuit held that both the existence of a conspiracy and a defendant's connection to that conspiracy can be proven by circumstantial evidence. In

*Candoli*, 870 F.2d at 511, the defendant argued that there was no direct evidence that the defendant had participated in a conspiracy to commit arson. But the Court noted that there was copious circumstantial evidence supporting the defendant's participation in the conspiracy, including motive, a history of meetings that included tools that were consistent with arson, and a series of actions that were consistent with an intent to commit arson and then collect insurance. *Id.*; *see also Jaimez*, 45 F.4th at 1127 (applying similar analysis to circumstantial evidence of participation in conspiracy to distribute drugs).

There are relevant parallels to the conspiracy between the arsonist in *Candoli*, 870 F.2d 511 (or the money-laundering scheme in *Jaimez*) and the interactions between Zuffa and Meta. It is undisputed that Zuffa had frequent contacts with Meta for the purpose of improving Zuffa's tracking of its customers. There is also evidence that Zuffa adopted tools created by Meta for the purpose of tracking, and that Meta informed Zuffa those tools would be used for tracking Zuffa's customers. *See, e.g.*, Patek Decl., Exs. 4 & 18–20 (citing use of "tracking" technology as part of Zuffa's strategy and increased adoption of Meta tracking technology). And there is evidence that Zuffa's website operated in a way that typically would have transmitted the c_user cookie, and still does today for non-video pages on the ufcfightpass.com website. *See* section III.B.1. From all of this, a jury could reason that Zuffa intended to enable Meta's tracking of Zuffa's subscribers in a personally-identifiable manner. The fact that all such evidence is circumstantial—rather than direct admissions of Zuffa's express intent to do so or Meta's direct records of receiving the c_user cookie—does not support summary judgment. Moreover, this evidence is likely the tip of the iceberg, all of which Meta has agreed to provide if/when a class is certified. Zuffa will be compelled to do the same.

Zuffa suggests that this Court should ignore Ninth Circuit precedent in favor of conflicting law created by the Second Circuit in *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 43–46 (2d Cir. 2025), and *Hughes v. National Football League*, No. 24-2656, 2025 WL 1720295 (2d Cir. June 20, 2025). In *Solomon*, the Second Circuit held, in the context of a 12(b)(6) motion, that it was "implausible" that "an ordinary person" would be able to interpret the c_user cookie

and video link in a "GET" request, because GET requests are "encoded" in a manner that makes them incomprehensible to ordinary people. This Court should decline Zuffa's invitation.

As an initial matter, "*Solomon* conflicts with the weight of authority in this Circuit" holding that a Facebook ID transmitted via Meta's pixel is plausibly "personally identifiable information" under the ordinary person standard. *Balestrieri v. SportsEdTV, Inc.*, No. 25-cv-04046-SK, 2025 U.S. Dist. LEXIS 194373, at *26 (N.D. Cal. Sep. 16, 2025), citing *Garcia v. Bandai Namco Ent. Am. Inc.*, No. 8:25-CV-00967-DOC-PVC, 2025 U.S. Dist. LEXIS 152616, 2025 WL 2451033, at *8 (C.D. Cal. Aug. 7, 2025) ("Considering how code is the primary communication medium for data sharing technologies and a growing proportion of the public has the technological fluency to discern information from lines of code, particularly with the advent of artificial intelligence tools, the Court finds it plausible that an ordinary person could identify Plaintiff based on the information shared by Defendant's Facebook Pixel technology."); *see also Lee*, 773 F. Supp. 3d at 772 ("great weight of authority" holds Facebook ID is "personally identifiable information"), and other cases cited at p. 9, *supra*. In all of these cases, the plaintiffs alleged disclosure of the Facebook ID via a GET request. Thus, as a practical matter, *Solomon* overrules all prior caselaw within this Circuit holding that such disclosures plausibly violate the VPPA.

In any event, *Solomon* is inapposite because it applied Rule 12(b)(6) to a different set of allegations than those pled by Plaintiffs. This, in contrast, is a motion under Rule 56, and Plaintiffs present evidence rebutting *Solomon*'s flawed reasoning, which *Solomon* did not receive or consider. Specifically, *Solomon* is based on the specious assumption that cookies and video titles sent in GET request are incomprehensible to ordinary people because ordinary people cannot read software code. But people do not read electronic files in binary, html, or other machine-coded form; they use common computer programs (e.g., Microsoft Word, Adobe Acrobat, Safari, Chrome, etc.) to read those transmissions after translation into readable text. As Plaintiffs' expert Serge Egelman points out, *Solomon*, taken to its logical conclusion, would immunize all electronic communications from the VPPA, which is absurd:

> To be clear, if the automatic encoding and decoding of data using standard means renders that data somehow not personally-identifiable under the VPPA, then no digital communications could ever be considered within the scope of the VPPA: all digital communications definitionally require the encoding and decoding of data. However, all of this occurs automatically in purpose-built software, which when used allows an ordinary person to make sense of it.

Egelman Decl., ¶ 160.

In other words, arguing that a GET request is not PII because ordinary people cannot read GET requests in their machine-readable form is like arguing that ordinary people can't read emails because emails are transmitted as binary code (i.e., zeros and ones). Egelman Decl., ¶¶ 155–158. The recipients of Zuffa's GET requests would not view the data in the form presented in Zuffa's motion; they would view it in the same plain text format this Court is reading this brief, after translation to plain text by common and widely available software. *Id.*; *see also* Patek Decl., Exs. 8–13 (Meta's production of the Pixel data in plain text form). Even this brief, which is submitted in PDF form, would be difficult to read if viewed as "raw" data, but is easy to read with a PDF viewer. Any email or Word document is easily readable by ordinary people despite the fact that the "raw" data would look similar to the GET requests that *Solomon* deems unreadable. *Solomon's* reasoning is fundamentally flawed.

Another way to think of this is by analogy to a foreign language. If a video store clerk tells someone a Mandarin speaker that "Shǒuxí dà fǎguān luó bó zī zài guòqù yīgè yuè lǐ zūjièle liǎng cì "yīgè guójiā de dànshēng" zhè bù diànyǐng." (i.e., "Chief Justice Roberts has rented 'Birth of a Nation' twice in the past month," in Mandarin)[4], that clerk has violated the VPPA, even though most "ordinary" Americans don't speak Mandarin. Mere use of a different language should not immunize a disclosure from violating the VPPA. Yet that is what *Solomon* has effectively done.[5] This Court should not follow *Solomon*'s ill-considered example.

---

[4] This translation was generated using Google Translate. *See* Patek Decl., ¶ 3.

[5] Additionally, Plaintiffs do not concede that a GET request would be incomprehensible just because it is ASCII encoded. Most people who grew up with computers have encountered ASCII encoded text at some point, and the mere replacement of spaces with "%" characters does not make the video titles incomprehensible to ordinary people.

***b) There is evidence Zuffa sent user's emails.***

With respect to emails, there is already ample evidence for reasonable jurors to conclude that Zuffa disclosed the emails in a personally-identifiable manner. Although Zuffa argued that hashed emails are not PII in opposition to Plaintiffs' motion for class certification, it did not expressly do so in this motion. *Eichenberger* stated that advances in technology could change what constitutes PII under the VPPA, 876 F.3d at 986, and Plaintiffs have presented evidence that data brokers have "broken" whatever anonymity hashed email provided. *See* Egelman Decl., ¶¶ 164–166 (describing use of publicly available services to identify unhashed emails from hashed emails). At class certification and again here, Plaintiffs have presented evidence that hashing emails does not anonymizing data, due to the rise of numerous commercial services that match hashed emails to unhashed emails.[6] *Id.*; Herold Decl., ¶¶ 64–69; Patek Decl., Ex. 21 (Transcript of Herold testimony at class certification evidentiary hearing describing use of data brokers to identify hashed emails) at 66–68. These services allow the public to do a "reverse lookup," inputting the hashed email to identify the associated plain text (i.e., unhashed) email address. *Id.* Plaintiffs' expert Serge Egelman looked up all three named Plaintiffs using one such service, thereby confirming that Plaintiffs' hashed emails could be used by an ordinary person to lookup the named Plaintiffs' identities. Egelman Decl., ¶¶ 164–166. Hashed emails thus now fall within the same category as social security numbers on *Nickelodeon*'s "spectrum" of PII; they are information capable of identifying a person using a publicly available service.

Zuffa argues that the Court must nonetheless grant summary judgment, because Meta's mere indication that it received *an* "email" does not prove that it received *Plaintiffs'* emails. This argument is absurd; Zuffa configured its website to transmit the emails of the person logged into the Fight Pass account to view videos in line with Meta's instructions for "advanced matching." Egelman Decl., ¶¶ 139–144; Herold Decl., ¶¶ 64–69; Patek Decl., Exs. 4 & 14 (Zuffa emails discussing increased sending of its users email addresses to improve identification and matching

---

[6] In short, even though one cannot calculate an unhashed email by running the hashing function in reverse, data services can generate huge databases of hashed emails by hashing hundreds of millions of known email addresses, thereby creating a searchable database of "hashed" emails. Egelman Decl., ¶¶ 164–166.

of actions with individual subscribers). Furthermore, Zuffa provides no evidence or argument identifying who else's email would have been transmitted. Zuffa configured what emails are sent, so it has evidence in its possession identifying whose emails its sends. If it configured its system to send the email of someone other than the subscriber logged into its website, it could have submitted evidence to that effect. It did not. On this record, reasonable jurors could readily conclude that the email Zuffa transmitted was the subscriber's email, and, on a motion for summary judgment, the Court is required to make the reasonable inference that the emails transmitted were those of the Plaintiffs and other subscribers, since those are the only possible emails that could have been transmitted based on the record before the Court.

***c) Zuffa correlated all videos to specific individuals.***

Meta's Pixel limited data production confirms that Zuffa sent Meta tens, if not hundreds, of thousands of "events" that included both its subscribers' fr cookie (which necessarily implies a c_user cookie and plain text Facebook ID) and a video title. Patek Decl., Exs. 10–15; Patek Reply DCC, Ex. 25 (ECF 122-2). [redacted] Patek Reply Decl. in Support of Class Certification, Ex. 25 (ECF 122-2), at rows 167 and 171–173 ([redacted]). The data for Lindholm shows dozens of such events. *See, e.g., id.* at rows 1558, 1563, 1569, and 1573 ([redacted]). The Pixel data shows at least six events for each of Graham and Lindholm that included both the video and an "email" field. Both of these Plaintiffs even have at least one pixel event that involved all three ([redacted]

[redacted]). *Id.; see also id.* at rows 4 and 1903 (showing receipt of fr cookie for Graham and Lindholm, respectively).

Nonetheless, Zuffa contends that summary judgment is warranted because the only "events" that include *both* the fr cookie *and* a video title involve absent class members, not the named Plaintiffs. Zuffa is wrong. Even Meta's representative testified that it did not track its receipt of the c_user cookie, which expires after 1 year as opposed to 3 months for the fr cookie, the absence of the fr cookie in a given Pixel "event" is not proof that c_user cookie was not transmitted. Egelman Decl., ¶¶ 103–105; 159–163; Herold Decl., ¶¶ 45–63. Further, [redacted], the produced data does not preclude a finding that Zuffa transmitted such data for the named Plaintiffs during the deleted date range. Thus, making the reasonable inference that, over a large enough number of transmissions, Zuffa would have disclosed the same information for the named Plaintiffs that it did for tens of thousands of absent class members, jurors could conclude that Zuffa did transmit the fr cookie (and thus necessarily the c_user cookie as well) with the video titles in the same event as a video title.

More importantly, Zuffa's argument that there is no "personally-identifiable information" unless the user's identity and video title are in the exact same "event" mischaracterizes the law. As *In re Hulu Privacy Litig.* noted, "[o]ne could not skirt liability under the VPPA, for example, by disclosing a unique identifier and a correlated look-up table." *Id.*, 86 F. Supp. 3d 1090, 1096 (N.D. Cal. 2015). Indeed, while *In re Hulu* found no PII had been disclosed where the identifiers and video titles were not correlated, it expressly noted that such correlation would constitute "personally-identifiable information," and could have been proven by establishing a shared link between separate communications:

> Let us say that a video-store clerk gives a local reporter a slip of paper showing only someone's name. Weeks later, someone else hands the reporter a list of video titles. There is no obvious connection between the two. In the VPPA's terms, no one has tied a person to specific videos. There is consequently no actionable disclosure of PII. Unless, that is, additional evidence reestablishes the link between name and titles. If extrinsic proof shows that the reporter and video provider had agreed to separate the disclosures in place and time, so that the clerk would hand over only the renter's name, while the video titles would arrive later by a third-party courier — but that both parties understood how the name and titles were related — that would supply the connection.

*In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1096 (N.D. Cal. 2015).

That is exactly what Zuffa has done here. Each time one of its subscribers viewed a Fight Pass video, Zuffa transmitted multiple video viewing "events" to Meta. This amounted to hundreds, even thousands, of such "events" for most users. Moreover, *Zuffa* then linked all such events together for Meta using the fbp cookie. For each user, all such transmissions must be viewed as a single, related set of communications, not as isolated events. And unlike *Eichenberger*, where only the recipient had the information linking the data, Zuffa set the fbp cookie and created the attached value as the unique, persistent identifier that connected all transmissions. *Compare id.*, 876 F.3d at 986 ("an ordinary person could not use the information that Defendant allegedly disclosed to identify him" without combining other data in Adobe's possession *that ESPN never disclosed nor possessed*); with Egelman Decl., ¶¶ 11–12, 35, 39, 138, and 172–175 (testifying that any ordinary person could link the transmissions Zuffa's transmissions together).

Thus, even where the produced Pixel data contains no single event with both the video title and a direct identifier (i.e., c_user, fr cookie, or email), the pixel data still shows that Zuffa disclosed PII by correlating (i.e., "linking") all the information within the collected communications to the same person. Specifically, because fbp is a unique identifier, its presence in two related events (one containing the video and the other containing the user's email or Facebook ID) would allow any ordinary person to identify both of those events as relating to the same individual. Zuffa *intentionally* adopted the fbp cookie *specifically* to enable Meta to identify specific individuals using the correlated direct identifiers, and the Pixel data confirms that Meta actually did so. Patek Reply DCC, Ex. 25 (ECF 122-2) (META_BLOOM 0001); Patek Decl., Exs. 10–15 (META_BLOOM_0004-0006). Thus, such communications are "personally identifi*able*" under the "correlating" theory described by *In re Hulu*.

**2. Reasonable jurors could find that Zuffa did so knowingly.**

The VPPA applies to "knowing" disclosures of personally identifiable information. 18 U.S.C. § 2710(b)(1). The Ninth Circuit applies an "ordinary person" standard for determining whether a disclosure is "knowing":

> To that end, 18 U.S.C. § 2710(b)(1) focuses on what information a video service provider "knowingly discloses." In other words, the statute views disclosure from the perspective of the disclosing party. **It looks to what information a video service provider discloses, not to what the recipient of that information decides to do with it**. As a result, "personally identifiable information" must have the same meaning without regard to its recipient's capabilities. Holding otherwise would make "[t]he lawfulness of [a] disclosure . . . depend on circumstances outside of [a video service provider's] control."

*Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (emphasis added); *see also In re Hulu Privacy Litig.*, No. C 11-03764 LB, 2014 U.S. Dist. LEXIS 59479, at *49–50 (N.D. Cal. Apr. 28, 2014) (a "knowing disclosure" occurs if a defendant "know[s] what it was transmitting.").

At a minimum, the evidence establishes that Zuffa knowingly disclosed PII to Meta by installing the Pixel on all the Fight Pass Website video pages, as described above. Indeed, Zuffa admits that it installed the Meta Pixel. MSJ at 4 ("Zuffa installed the Meta Pixel on the Fight Pass website by copying this code into a system called Google Tag Manager ("GTM"), which allows Zuffa to install and manage code on the Fight Pass website through a user-friendly interface."), citing Santypal Decl. (ECF 186-12) ¶ 11; *see also* Patek DCC, Ex. 10 (Santypal Tr.) (ECF 52-11) at 35:4–7 (Zuffa designee Travis Sanytpal, admitting Zuffa installed Pixel using GTM) and 48:4–9 (Sanytpal, admitting he had "seen the pixel" and "placed it"). Zuffa also knew the Pixel sent "Page View" events to Meta, including when subscribers accessed on-demand video content. Santypal Decl. (ECF 186-12), ¶ 12 (Santypal, testifying he configured the Pixel to send "PageView" events because Meta instructed him to include all web pages); Patek DCC (ECF 52-1), Exs. 4–9 (Fight Pass' Pixel event settings); Ex. 10 (Santypal Tr.) at 91:1–21; *id.*, Ex. 20; Ex. 24 at 2:32–36. And, the Meta Business Tools Terms that Zuffa agreed to when it adopted Meta's Pixel expressly noted that Zuffa was instructing Meta to match user's identities with their "events" (i.e., Page Views). Patek Decl., Ex. 5 (Meta Business Tools Terms: "You instruct us to process the Contact Information solely to match the Contact Information ***against user IDs*** ("***Matched User IDs***"), as well as ***to combine those user IDs with corresponding Event Data***.") (emphasis added).

Zuffa also admits that it read Meta's instructions for the Meta Pixel, which informed users that the Pixel would identify tracked individuals using the information Zuffa sent via the Pixel. *See* MSJ at 4 (blaming Meta's instructions for Zuffa's inclusion of video pages among those that triggered the Meta Pixel). Thus, jurors can impute to Zuffa knowledge of the information contained in those instructions. As other courts have noted, Meta "warns companies installing the Pixel on their websites that the Pixel is a personal identifier because it enables Meta 'to match your website visitors to their respective Facebook User accounts.'" *Ghanaat*, 689 F. Supp. 3d at 717. Meta also warned Zuffa to "[b]e aware of any potentially sensitive information that could be shared with your analytics and advertising service providers. You should review the information you share with Meta using Meta Business Tools, such as the Conversions API . . . or the Meta Pixel, including information stored in URL parameters . . . ." Meta's instructions accordingly directed Zuffa to "[e]nsure responsible data handling" and "[t]ake inventory of the data that comes in and out of your systems." Patel Decl., Ex. 6 (Meta "Best Practices"). Moreover, irrespective of whether Zuffa understood every technical detail of how it was tracking subscribers for Meta, it did know that it was using "tracked" advertising via Meta's pixel and the Conversion API, so it had actual knowledge that it was transmitting some identifier to Meta.

Thus, Zuffa had actual knowledge that it was personally-identifying its subscribers to Meta information via the Pixel, potentially in violation of the law. This establishes "knowledge," whether interpreted as actual or constructive knowledge. *See Aramark Facility Servs. v. SEIU, Local 1877*, 530 F.3d 817, 827 (9th Cir. 2008) ("The term knowing includes having actual or constructive knowledge. Constructive knowledge is knowledge that may fairly be inferred through notice of certain facts and circumstances that would lead a person, through the exercise of reasonable care, to know about a certain condition."); *see also Amaya v. Garland*, 15 F.4th 976, 983 n.5 (9th Cir. 2021) (same, under Washington law). On this motion for summary judgment, Plaintiffs are entitled to the reasonable inference that Zuffa was aware of all the information in the instructions it admits it read, and that Zuffa thus knew it was transmitting personally-identifiable information.

Zuffa's "lack of knowledge" defense also fails to justify summary judgment because it is based entirely on Zuffa's self-serving assertion that it did not know it was transmitting the c_user cookie. Unsurprisingly, defendants rarely admit that they knew they were behaving unlawfully, and whether Zuffa's claim of innocence is true presents a question of credibility. For example, Zuffa's Vice President of Content Marketing testified that she had no idea whether Zuffa had even implemented Conversions API, even though she was on numerous emails discussing that project's progress, and had included the update to Conversions API as a key task in a strategy document she circulated to Zuffa personnel as part of year-end planning. *Compare* Patek Decl., Exs. 19–22 *with id.*, Ex. 23 at 63:15–64:8; 85:8–23; 101:11–102:20; 103:16–104:9: 105:9–181; 107:18–108:1; 118:22–119:17. Such equivocations and claims of ignorance from a key executive suggest a lack of honesty, and credibility is an issue for the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). Accordingly, that issue should not be decided on summary judgment here.

Zuffa does not argue that it did not know it was transmitting user's emails or linking its various transmissions using the fbp cookie. As such, its c_user cookie arguments do not apply to the other information it transmitted. Furthermore, even if Zuffa stuck its head in the sand with respect to *how* Meta was matching the video Page Views Zuffa was sending to individuals, it certainly knew that Meta was doing so, because the Terms Zuffa agreed to expressly stated that Zuffa was instructing Meta to "match" IDs to those events. *See* Patek Decl., Ex. 5, discussed above. Thus, even if Zuffa tried to claim complete ignorance it was sending personally-identifiable information, it could not do so. And even if it was unaware of it was sending the c_user cookie, it cannot deny its knowledge of other directly identifying information it sent.

First, there is strong evidence that Zuffa knowingly disclosed "hashed" emails to Meta, and knew that it was personally identifying its users to Meta in the process. The transmission of hashed emails, names, and other "form" data using the Meta Pixel is part of what Meta call "advanced matching"—a process whose very name evinces an intent to match that user with an

identity (here, the user's Facebook ID). Egelman Decl., ¶¶ 139–144; Patek Decl., Exs.16 & 17. Use of "advanced matching" is not automatic; Zuffa would have had to turn that setting on. Patek Decl., Ex. 17. The Meta Pixel data produced by Meta contains such hashed data, which confirms that Zuffa did turn "advanced matching" on. Egelman Decl., ¶¶ 131–133, 142–143. Meta's instructions make clear that any hashed emails and other form data it receives will be used by it to identify that individual. Patek Decl., Ex. 16. Thus, there is evidence from which a jury could conclude that Zuffa knowingly disclosed this PII.

Similarly, there is ample evidence that Zuffa knew it was linking its various communications together via the fbp cookie. Patek Decl., Ex. 16 at 2392 (Facebook to Zuffa: "you can add eventID for dedupe *instead of relying on FBP/cookie ID*") (emphasis added) and 2395 (Santypal, confirming event data indicated "server" as source (i.e., Conversion API). Emails from Meta to Zuffa's marketing team explained how Conversions API used the fbp identifier to track users and associate them with their Facebook account (i.e., Facebook ID) even if those users had third party cookie blockers in place. *Id.*; Patek Decl., Ex. 21. In response, Zuffa intentionally adopted the fbp cookie as a first party cookie. *See* Egelman Decl., ¶¶ 110–112; Patek Reply DCC, Ex. 25 (META_BLOOM_0001, showing transmission of fbp cookie via "[redacted]" (i.e., Conversions API)). Making reasonable, logical inferences in Plaintiffs' behavior, it would be entirely logical to conclude that Zuffa knew it was disclosing its subscribers' identities and video views to Meta or anyone else who received the transmitted data by linking the fbp to all the other identifying information Zuffa was transmitting, including the c_user cookie and its subscriber's email addresses.

**C. There Are Triable Issues of Fact Whether Zuffa Violated California Law.**

**1. California Civil Code § 1799.3.**

Material issues of fact exist for Plaintiff Bloom's California Civil Code § 1799.3 claims for the same reasons discussed above for the VPPA. Section 1799.3(a) provides that "[n]o person providing video recording sales or rental services shall disclose any personal information or the contents of any record, including sales or rental information . . . to any person, other than the

individual who is the subject of the record, without the written consent of that individual." Cal. Civ. Code § 1799.3(a).

As with the VPPA claims, Plaintiff Bloom has adduced evidence that Zuffa disclosed his video viewing history to a third party. *See supra* at § III.B. Zuffa's primary defense is that there is no evidence it transmitted Bloom's c_user cookie, which is incorrect for the reasons already discussed above in relation to Plaintiffs' VPPA claims. Zuffa then tries to argue that it disclosed no "personal information" or "records" of the Plaintiffs' video "rentals," because the c_user cookie is Meta's record, not Zuffa's. This is pure sophistry; Zuffa transmitted the record of which of its files the Plaintiffs were accessing, along with the c_user and other info as identifying information. This is a disclosure of both the Plaintiffs' "personal information" and Zuffa's records of what was being accessed. That Zuffa included a cookie that happened to be set by Facebook does not immunize Zuffa from liability; Zuffa still disclosed "personal" information. Moreover, Zuffa's argument fails to address its transmissions of the users' emails (which they provided to Zuffa) and linkage of all transmissions via the fbp cookie (which is a first party cookie set by Zuffa, and thus *its* cookie). Zuffa's self-serving protestation that it had no idea it was transmitting this information is not credible, and creates at most a dispute of fact, for the reasons described above. *See* supra, section III.B.2; Egelman Decl., ¶ 173–174; Herold Decl., ¶¶ 12–13, 27–44.

Zuffa's argument that any violation of § 1799.3 was not willful simply repeats its argument that it did not "knowingly" violate the VPPA. *See* MSJ at 24 (directing the reader to sections I.B-I.C of the motion). Zuffa is wrong for all the same reasons. Additionally, "[w]here willfulness is a statutory condition of civil liability, [courts] have generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). Thus, where, as here, a defendant is provided with notice of a statutory violation and that defendant fails to respond or correct the violation, a trier of fact could find that such actions constitute a willful violation of a statute. *See Roybal v. Equifax*, No. 2:05-cv-01207-MCE-KJM, 2008 U.S. Dist. LEXIS 79789, at *20–21 (E.D. Cal. Oct. 9, 2008) ("A reasonable trier of fact could find that Defendants' alleged failure to respond to Plaintiffs' phone calls over

almost one and one-half years constituted action taken in 'reckless disregard of that statutory duty.'"). Here, reasonable jurors could find that Zuffa's disclosure was "willful" based on its affirmative decision to use the Meta Pixel in the face of Meta's numerous warnings that doing so would likely disclose PII, as well as Zuffa's apparent decision to ignore Meta's instructions to audit the data Zuffa was transmitting.

Lastly, Zuffa argues that various privacy and data policies from it and from Meta establish Bloom's consent to the disclosure of his personal information. But all Zuffa's argument does is raise yet another disputed *fact* question regarding consent. *Edwards v. Mubi, Inc.*, 773 F. Supp. 3d 868, 884 (N.D. Cal. 2025). Disclosing the use of "cookies" to "tailor" ads and content does not inform users Zuffa will disclose the videos they view, nor that users are waiving their constitutional and statutory rights *not* to have such information disclosed. *Id.* And, Zuffa must prove *unambiguous* assent to its Cookie Policy and Privacy Policy. *See Chabolla v. Classpass, Inc.*, 129 F.4th 1147, 1153 (9th Cir. 2025) ("We must discern intent; this requires notice of contract terms as well as 'unambiguous manifestation of assent to those terms[.]'" (citation omitted)). After all, the VPPA has very strict requirements for such consent that are not satisfied by generic privacy policies, and § 1799.3 should be interpreted similarly. Even if Plaintiff Bloom agreed to Zuffa's Policies, neither policy mentions the Meta Pixel, nor does it mention that subscribers' use of Zuffa's "video recording sales and rentals" services specifically will be sent to a third party. Simply put, if Zuffa tried to use its vague, generically worded privacy policies to argue that it had the right to disclose Plaintiffs video rentals to a newspaper, no reasonable juror would find that Zuffa's user agreements fairly disclosed that possibility.

Finally, Zuffa posits that Plaintiff Bloom consented to its sharing of information with Meta by accepting *Meta's* data policy. Other than a screenshot of its sign up page, Zuffa supplies no evidence that Plaintiff Bloom assented to the terms quoted in Zuffa's Motion. But even if Bloom had, § 1799.3 states that "[n]o person providing video recording sales or rental services" shall disclose the covered information "without the written consent of that individual." That plain language requires Zuffa to obtain the necessary consent, since Meta is not the "person providing

video recording sales or rental services." Zuffa cites no authority holding that "written consent" may be obtained by a third party such as Meta, because there is none.

**2. California constitutional invasion of privacy.**

Material fact issues also exist as to Plaintiff Bloom's California Constitution invasion of privacy claim. This claim requires "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by [a defendant] constituting a serious invasion of privacy." *In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 196 (N.D. Cal. 2019) (citation omitted). Evidence exists for each of these elements.

First, Zuffa intruded upon "a legally protected privacy interest" and violated Plaintiffs' "reasonable expectation of privacy." As discussed above, Plaintiffs have established Zuffa's violations of the VPPA and Section 1799.3. The decisions of both Congress and the California Legislature to codify a right to privacy in video rental and viewing information conclusively establishes that Zuffa intruded on a legally protected interest for which Plaintiffs had a reasonable expectation of privacy.

Second, whether Plaintiff Bloom had a reasonable expectation of privacy in his personal information is a "mixed question[] of law and fact." *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 836 (N.D. Cal. 2021) (citation omitted). Zuffa's arguments regarding consent fail for the same reasons as those discussed above—namely that whether such consent occurred and whether the disclosures included in the various policies cited by Zuffa were sufficient to notify Plaintiff Bloom of Zuffa's conduct here is an issue of fact. Here, the VPPA and California Civil Code § 1799.3 create a legally protected privacy interest and a reasonable expectation of privacy. *See e.g., Eichenberger*, 876 F.3d at 983 ("By contrast, 18 U.S.C. § 2710(b)(1), the VPPA provision at issue here, codifies a context-specific extension of the substantive right to privacy."). Zuffa's conduct violates that privacy interest.

Third, Plaintiff Bloom can establish that Zuffa's intrusion was "highly offensive to a reasonable person," with a "focus[] on the degree to which the intrusion is unacceptable as a matter of public policy." *Davis v. Facebook, Inc.* (*In re Facebook Inc. Tracking Litig.)*, 956 F.3d 589, 606 (9th Cir. 2020). As in *In re Facebook Tracking Litig.*, where the Ninth Circuit held that

plaintiffs alleged highly offensive conduct based on their "allegations of surreptitious data collection," *id.*, Zuffa buried its disclosure of subscribers' video histories in its policies, to the extent it truly disclosed it at all. Again, the fact that both Congress and the California legislature codified Plaintiffs' privacy rights (particularly, in reaction to a very public example of such a disclosure, for Supreme Court candidate Robert Bork), conclusively establishes that such a disclosure is "highly offensive."

**3. California UCL Claim.**

Finally, Plaintiff Bloom can establish a UCL claim under all three prongs. The UCL proscribes "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice." *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1018 (N.D. Cal. 2019) (citing Cal. Bus. & Prof. Code § 17200). Here, Plaintiff Bloom advances claims under each of the prongs.

Plaintiffs' claims under the unlawful prong alleges that Zuffa violated the VPPA and Civil Code § 1799.3. As discussed above, Plaintiffs have established Zuffa's violations of the VPPA and Section 1799.3. Accordingly, Plaintiff Bloom has established the requisite elements of his UCL unlawful claims.

A business practice violates the unfair prong if the business practice is contrary to established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits. *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033 (N.D. Cal. 2014). The VPPA and California Civil Code § 1799.3 establish a policy against disclosing customers' video rentals and viewing history. Even if Zuffa managed to sidestep unlawful conduct, its decision to share video rental information with Zuffa violates the policies in the VPPA and § 1799.3, and thus supports an unlawful prong claim under the UCL.

Plaintiffs' UCL fraud prong claim similarly alleges that Zuffa concealed from Plaintiff Bloom that Zuffa would share their personally identifiable information as defined under the VPPA with Meta through the Meta Pixel and that Plaintiffs and Class members had a statutory right to opt out from ongoing disclosures or on a case-by-case basis. *See* Amended Complaint (Dkt. No. 47), ¶ 115. Zuffa argues that Plaintiff Bloom has not established that Zuffa knowingly disclosed information. But as discussed above, substantial evidence in the record refutes Zuffa's

position. Furthermore, this defect was in the exclusive knowledge of Zuffa, which omitted facts that Plaintiff could not have reasonably discovered. *See Arroyo v. TP-Link USA Corp.*, No. 5:14-cv-04999-EJD, 2015 U.S. Dist. LEXIS 133473, at *23 (N.D. Cal. Sep. 29, 2015).

Zuffa's assertions that it had no duty to disclose ignores the fact that both the VPPA and California Civil Code § 1799.3 codify a duty to obtain consent, which inherently requires explicit disclosure of Zuffa's intent to share user's video views. While Zuffa's failure to obtain consent and decision to disclose such information interferes with the reasonable expectation that the Website would not broadcast Plaintiff Bloom's video viewing activity in a personally-identifiable manner, which arguably is part of the "central function" of a streaming service, since streaming services have a statutory duty to construct their sites in a manner that protects their user's privacy. At minimum, this is a question of fact that should be submitted to jurors so that they can decide if privacy is such a central function, rather than simply adopting Zuffa's self-serving assertion that it is not.

**D. The Plaintiffs Have Standing.**

In accordance with Article III, a plaintiff must establish (1) a "concrete and particularized" injury-in-fact that is "actual or imminent, not conjectural or hypothetical," (2) that the injury is fairly traceable to the defendant's conduct; and (3) that the likelihood that the injury will be redressed by the requested relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal citations and quotations omitted).

On a motion for summary judgement "the court 'must leave the resolution of material factual disputes to the trier of fact when the issue of [standing] is intertwined with an element of the merits of the plaintiff's claim.'" *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1144 (9th Cir. 2024) (quoting *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014)). Here, Zuffa has attacked Plaintiffs' standing by claiming there is no evidence that Zuffa disclosed their personal information to Meta. As discussed above, such evidence does exist. Accordingly, the question of Plaintiffs' standing is one of fact that must be resolved by the trier of fact.

**E. In the Alternative, This Court Should Deny the Motion Pursuant to Rule 56(d) or Defer Its Ruling Until After Discovery Is Complete.**

Alternatively, the Court should deny the motion and exercise its powers under Rule 56(d). Under that rule, where facts are not available to the moving party, a court may deny a motion for summary judgment without prejudice and defer to allow time to complete discovery, or alternatively, issue other supplemental orders to ensure efficient and fair management of the claims. Fed. R. Civ. P. 56(d). Interpreting this rule, the Supreme Court has stated that "summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson*, 477 U.S. at 250, n. 5. District courts "should grant a Rule 56(d) motion fairly freely when the moving party seeks summary judgment before the non-moving party has had a realistic opportunity to pursue discovery relating to its theory of the case." *See Munoz v. Cal. Dep't of Corr. & Rehab.*, No. 1:16-cv-01103-LJO-JLT (PC), 2018 U.S. Dist. LEXIS 213877, at *3–4 (E.D. Cal. Dec. 19, 2018) (citing *Burlington N. Santa Fe R.R. Co. v. Assiniboine and Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 773 (9th Cir. 2003)).

Here, Defendant prematurely filed this motion prior to any deadline for the filing of dispositive motions or disclosure of expert testimony. *See* ECF 26 (Parties' Joint Scheduling Proposal, presenting competing proposals for length of discovery post-order on class certification); ECF 32 (Order, adopting Plaintiffs' proposed deadlines of 120 days of fact discovery "following resolution of the motion for class certification," plus another 120 days of expert discovery). The Court has not yet resolved the pending motion for class certification, so the 240 days of further fact discovery and expert discovery have not even begun, much less been completed. Thus, Plaintiffs are unfairly prejudiced by Zuffa's sudden and unilateral decision to cut off any further discovery and force summary judgment on an incomplete record.

Nonetheless, as set forth herein, Plaintiffs' collected evidence and expert reports evince a triable issue of material fact despite short notice. Additional facts can be added after discovery is complete. Patek Decl., ¶ 4. For example, Plaintiffs have only been allowed to depose two Zuffa employees and have received only a few hundred documents from Zuffa. *Id.* Plaintiffs are also still waiting for complete responses to interrogatories directed to Zuffa's internal compliance

efforts, as well as its privilege logs and responses to contention interrogatories. *Id.* Zuffa has also produced very few documents regarding its integration of Meta's Conversions API with Zuffa's servers, nor logs or records of the data its servers transmitted to Meta. *Id.* Further, it is doubtful that Zuffa has produced all relevant emails regarding its adoption and use of the Meta Pixel and Conversions API, since it has produced documents primarily from just two custodians. *Id.* As such, Plaintiffs are still missing evidence that could be used to rebut Zuffa's positions here, particularly with regard to scienter. *Id.*

While Defendants have now "produced" putative expert testimony, many questions remain that Plaintiffs have not had an opportunity to explore. *Cf. Munoz*, 2018 U.S. Dist. LEXIS 213877, at *6 (granting request to stay ruling on summary judgment under Rule 56(d) where summary judgment motion filed in advance of expert discovery; collecting cases on same); *ASUS Comput. Int'l v. Round Rock Research, LLC*, No. 12-cv-02099-JST, 2013 U.S. Dist. LEXIS 145824, at *6 (N.D. Cal. Oct. 8, 2013) (plaintiff "entitled to avail itself of the remainder of the discovery period, and of expert discovery, prior to responding to such a motion"). Plaintiffs have not had an opportunity to depose Mr. Schnell regarding the new position he has set forth in his expert "report," and Zuffa's filing of its motion during a period where the Parties are awaiting a class certification decision has prejudiced Plaintiffs severely. As discussed above, Defendant's position that it had no idea it was sharing its users' video viewing with Meta in a personally-identifiable manner is incompatible with its adoption of Meta's Conversions API, which was designed for the sole purpose of allowing Meta to identify and track consumers' browsing habits. And, Zuffa has provided no documents or testimony explaining what efforts it took to audit what data it sent to Meta or otherwise ensure compliance with the VPPA and other privacy laws. Plaintiffs have not yet had an opportunity to depose Jordan Brown, one of the Zuffa employees who integrated Conversions API into Zuffa's servers. Finally, as the Court is aware, Meta has yet to produce complete class data, which could elucidate additional facts about how much personally-identifiable information Zuffa transmitted to Meta.

## IV. CONCLUSION

For all the reasons above, the Court should deny Zuffa's motion for summary judgment.

Dated: December 19, 2025

**GUTRIDE SAFIER LLP**

*s/ Anthony J. Patek*
SETH A. SAFIER (admitted *pro hac vice*)
seth@gutridesafier.com
MARIE A. MCCRARY (admitted *pro hac vice*)
marie@gutridesafier.com
HAYLEY REYNOLDS (admitted *pro hac vice*)
hayley@gutridesafier.com
ANTHONY J. PATEK (admitted *pro hac vice*)
anthony@gutridesafier.com
KALI R. BACKER (admitted *pro hac vice*)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469

**MARKMAN LAW**
DAVID MARKMAN (Nevada Bar No. 12440)
David@Markmanlawfirm.com
4484 S. Pecos Rd., Suite #130
Las Vegas, NV 89121
Telephone: (702) 843-5899
Facsimile: (702) 843-6010

*Attorneys for Plaintiffs*